Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, and PRAIRIE HILLS AUDUBON SOCIETY, <br><br> *Plaintiffs,* <br><br> v. <br><br> DAVID BERNHARDT, Secretary of Interior; JOSEPH R. BALASH,* Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE, <br><br> *Defendants*. | Case No. 1:16-cv-00083-BLW <br><br> **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Expedited Decision Requested** |

*\* Official Defendant automatically substituted per Fed. R. Civ. P. 25(d)*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF RELEVANT FACTS ............................................................................. 2

    I.     Background on Sage-Grouse Plans ..................................................................... 2

    II.    2015 Sage-Grouse Plans and FWS "Not Warranted" Finding. .................... 4

    III.   The 2019 BLM Plan Amendments ................................................................... 8

    IV.   Key Changes in the 2019 BLM Plan Amendments ..................................... 11

    V.    BLM Is Moving Rapidly to Implement The 2019 Plan Amendments ...................... 15

ARGUMENT ...................................................................................................................... 18

    I.     APPLICABLE LEGAL STANDARDS .................................................... 18

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR NEPA CLAIMS ........... 19

          A.   BLM Refused to Consider a Reasonable Range of Alternatives .................. 19

              1.   BLM Formulated an Impermissibly Narrow Purpose and Need ........... 20

              2.   BLM Refused to Consider Alternatives Other Than Its Proposed Action ................................................................................................. 21

              3.   BLM Unreasonably Rejected Viable Alternatives That Would Have Partially Fulfilled its Purpose and Need .................................. 22

          B.   BLM Misrepresented the 2019 Plan Amendments, and Failed to Take a "Hard Look" at the Adverse Impacts on Sage-Grouse. ............................. 23

              1.   BLM Misrepresented the 2019 Plan Amendments ............................. 24

              2.   BLM Failed to Evaluate Baseline Condition Changes Affecting Sage-Grouse ..................................................................................... 21

              3.   Insufficient Analysis of Cumulative Impacts ......................................... 27

          C.   BLM Violated NEPA by Failing to Circulate Supplemental Draft EISs Before Rescinding Compensatory Mitigation Requirements ...........................................

    III.   INJUNCTIVE RELIEF IS NEEDED TO AVOID IMMINENT IRREPARABLE HARM ............................................................................... 31

IV.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION ................................................................................. 35

V.    NO BOND SHOULD BE REQUIRED ................................................. 37

CONCLUSION ....................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127, 1131 (9th Cir. 2011)……………………………………………18, 36

*Amoco Prod. Co. v. Village of Gambell,*
   480 U.S. 531 (1987)……………………………………………………………….31

*Barahona-Gomez v. Reno,*
   167 F.3d 1228, 1237 (9th Cir. 1999)……………………………………………..30

*California v. Block,*
   690 F.2d 753, 767 (9th Cir. 1982)…………………………………………….19, 24

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,*
   766 F.2d 1319, 1325 (9th Cir. 1985). …………………………………… ….37

*Earth Island Inst. v. USFS,*
   442 F.3d 1147, 1162 (9th Cir. 2006)…………………………………………...23

*Friends of Yosemite Valley v. Kempthorne,*
   520 F.3d 1042, 1038 (9th Cir. 2008)…………………………………………… 22

*Kleppe v. Sierra Club,*
   427 U.S. 390, 413-14 (1976)..……………………………………………………28

*Lands Council v. McNair,*
   537 F.3d 981, 1005 (9th Cir. 2008)..……………………………………………36

*Lands Council v. Powell,*
   395 F.3d 1019, 1031 (9th Cir. 2005)..……………………………………………27

*Metcalf v. Daley,*
   214 F.3d 1135, 1142 (9th Cir. 2000)……………………………………………..23

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
   177 F.3d 800, 813 (9th Cir. 1999)……………………………………………21, 28

*N. Cheyenne Tribe v. Norton,*

503 F.3d 836, 843 (9th Cir. 2007)…….……………………………………………………31

*N. Plains Res. Council v. Surface Transp. Bd.*,
668 F.3d 1067, 1085-86 (9th Cir. 2011)…………………………………………………26-27

*Native Ecosystems Council v. United States Forest Service*,
418 F.3d 953, 961 (9th Cir. 2005)…………………………………………………………19, 24

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722, 737 (9th Cir. 2001)………………………………………………………..31

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
606 F.3d 1058, 1070 (9th Cir. 2010)……………………………………………………..31

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372, 1380 (9th Cir. 1998)…………………………………………………23, 27

*North Buckhead Civic Association v. Skinner*,
903 F.2d 1533, 1542 (11th Cir. 1990)…………………………………………………22

*NRDC v. Callaway*,
524 F.2d 79, 93 (2nd Cir. 1975)……….…………………………………………………22

*NRDC v. Evans*,
168 F. Supp. 2d 1149 (N.D. Cal. 2001)..…………………………………………………21

*NRDC v. Morton*,
458 F.2d 827, 834–35 (D.C. Cir. 1972)………………………………………………22

*NRDC v. U.S. Forest Serv.*,
421 F.3d 797, 813 (9th Cir. 2005)..………………………………………………………23

*ONDA v. Jewell*,
840 F.3d 562 (9th 2016)……………………………………………………………………27

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332, 350 (1989)………………………………………………………………23

*Russell County Sportsmen v. U.S. Forest Serv.*,
668 F.3d 1037, 1045 (9th Cir. 2011)……………………………………………………...30

*Southeast Alaska Conserv. Council v. Fed'l Hwy Admin.*,
649 F.3d 1050, 1056 (9th Cir. 2011)……………………………………………………22

*W. Watersheds Project et al. v. Zinke et al*,
No. 1:18-cv-187-REB (D. Idaho)………………….…………………………………...16

*W. Watersheds Project v. Jewell*,
   56 F. Supp. 3d 1182, 1189-90 (D. Idaho 2014)……………………………………………28

*W. Watersheds Project v. Kraayenbrink*,
   538 F.Supp.2d 1302, 1312 (D. Idaho 2008)……………………………………………19, 26

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011)……………………………………………………..2, 20

*W. Watersheds Project v. Rosenkrance*,
   No. 09-CV-298-EJL, 2011 WL 39651, at *14 (D. Idaho 2010)……………………………....36

*W. Watersheds Project v. Salazar*,
   No. 08-cv-516-BLW, 2011 WL 4526746 (D. Idaho 2011)……………………………..2, 20

*W. Watersheds Project v. Salazar*,
   No. 4:08-cv-516-BLW, 2012 WL 5880658, at *2 (D. Idaho Nov. 20, 2012)……………...….3

*W. Watersheds Project v. U.S. Fish and Wildlife Serv.*,
   535 F. Supp.2d 1173 (D. Idaho 2007)…………………………………………………..3

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305, 312-133 (1982)………………………………………………………35

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853, 872 (9th Cir. 2004)……………………………………………………..29

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7, 20 (2008)……………………………………………………………18, 34

## Statutes

5 U.S.C. § 706(2)(A) …………………………………………………………………………19

43 U.S.C. § 1702(c) ……………………………………………………………………………20

43 U.S.C. § 1712(c)(1) ………………………………………………………………………… 20

43 U.S.C. § 1732(b) …………………………………………………………………………12

42 U.S.C. § 4332(2)(C) ……………………………………………………………………23

## Regulations

40 C.F.R. §§ 1500.1(b)………………………………………………………………………23

40 C.F.R. § 1502.9(c)…………………………………………………………………………30

40 C.F.R. § 1502.12……………………………………………………………………………19

40 C.F.R. § 1502.13...………………………………………………………………20

40 C.F.R. § 1502.24...………………………………………………………………29

40 C.F.R. § 1508.25 (a)(1)…………………………………………………………29

40 C.F.R. § 1508.7………………………………………………………………….27

43 C.F.R. § 1610.5-3(a)…………………………………………………....12, 31

43 C.F.R. § 3101……..………………………………………………………….33

## INTRODUCTION

Plaintiffs respectfully move the Court for a preliminary injunction under Rule 65 to prohibit Federal Defendants from implementing the 2019 BLM Sage-Grouse Plan Amendments challenged in Plaintiffs' [Proposed] First Supplemental Complaint, ECF No. 118-2.

Since 2004, scientists have warned that preventing the greater sage-grouse from sliding toward extinction requires protecting all its remaining habitats and populations. The Bureau of Land Management (BLM) and U.S. Forest Service recognized this science in adopting their 2015 Sage-Grouse Plans, asserting the plans would "conserve, enhance, and restore GRSG [greater sage-grouse] habitat across the species' remaining range" and "safeguard the long-term sustainability, diversity, and productivity of these important and iconic landscapes."

Plaintiffs brought this case to challenge aspects of the 2015 Plans for not following the best available science in identifying and protecting sage-grouse habitats—but acknowledged the 2015 Plans "represent a substantial step forward in sage-grouse conservation," and thus prayed that the Court leave them in place while remanding for Federal Defendants "to adopt consistent, science-based conservation measures needed to ensure survival and recovery of the greater sage-grouse across its range into the future." *See* Complaint, ¶¶ 1–13, ECF No. 1.

The Trump Administration has gone in exactly the opposite direction. As explained below, Defendants falsely assert that the 2019 BLM Plan Amendments build upon the 2015 Plans, but in truth they rescind or weaken numerous 2015 Plan measures and open up priority sage-grouse habitats to energy development and other impacts, while eliminating compensatory mitigation to offset unavoidable impacts and provide a "net conservation gain" to sage-grouse.

By gutting key sage-grouse conservation measures while denying they are doing so, Defendants violated numerous requirements of the National Environmental Policy Act (NEPA),

including by refusing to consider any alternatives to their chosen amendments, disregarding recent fires and energy developments that have degraded over four million acres of priority habitats since 2015, and misrepresenting the adverse impacts that will result from weakening sage-grouse protections.  Plaintiffs are thus likely to prevail on their NEPA claims.

The 2019 BLM Plan Amendments were made effective upon their approval in mid-March, and BLM is moving rapidly to implement them by authorizing oil and gas leasing and development, mining, rights-of-way, livestock grazing, and other actions that will further destroy, degrade, and fragment sage-grouse habitats and populations. While the 2015 Plans have significant defects, they are far more protective of sage-grouse than the 2019 Plans. Injunctive relief prohibiting BLM from implementing the 2019 Plans is thus necessary to maintain the status quo, prevent irreparable harm to sage-grouse and Plaintiffs, and serve the public interest.

Indeed, this case is closely similar to the BLM grazing regulation revisions the Court initially enjoined, and then reversed on the merits, where BLM misrepresented or avoided addressing adverse environmental impacts.  *W. Watersheds Project v. Kraayenbrink,* No. 05-cv-297-E-BLW (D. Idaho), ECF Nos. 61, 74, 143, *aff'd* 632 F.3d 472 (9th Cir. 2011) (affirming NEPA rulings). *Kraayenbrink* strongly supports the requested injunctive relief sought here.

## STATEMENT OF RELEVANT FACTS

### I.      Background on Sage-Grouse Plans.

The decline of greater sage-grouse populations and habitats is well-known to this Court from prior cases, including the 2008 BLM Resource Management Plan (RMP) litigation, and Endangered Species Act (ESA) listing and grazing cases.  *See, e.g.*, *W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW, 2011 WL 4526746 (D. Idaho 2011) (Craters of the Moon and Pinedale "test case RMPs" violated NEPA and FLPMA for failing to address sage-grouse

conservation needs); *W. Watersheds Project v. U.S. Fish and Wildlife Serv.*, 535 F. Supp.2d 1173 (D. Idaho 2007) (reversing 2005 "not warranted" ESA listing determination).

After this Court reversed the "not warranted" determination, the U.S. Fish and Wildlife Service (FWS) published a new finding in 2010 that ESA listing was "warranted-but-precluded." *See* 75 Fed. Reg. 13910 (March 5, 2010). That finding stressed the inadequacy of federal land use plans to protect sage-grouse, particularly from energy development impacts. *Id.* at 13,942.

Citing the March 2010 finding, BLM and Forest Service launched their National Greater Sage-Grouse Planning Strategy in 2011 to amend federal land use plans with sage-grouse conservation measures to avoid ESA listing. *See* WO AR 252.[1] To guide that Strategy, a National Technical Team of sage-grouse experts was convened and released their "Report on National Greater Sage-grouse Conservation Measures" (NTT Report) in December 2011. WO AR 1491. This Court found—after an evidentiary hearing and testimony from leading sage-grouse expert Dr. Clait Braun—that the NTT Report "contains the best available science concerning the sage-grouse." *W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW, 2012 WL 5880658, at *2 (D. Idaho Nov. 20, 2012).

The NTT Report emphasized that the "overall objective is to protect priority sage-grouse habitats from anthropogenic disturbances that will reduce distribution or abundance of sage-grouse." NTT Report, at 7. It identified priority sage-grouse habitats as "breeding, late brood-rearing, winter concentration areas, and where known, migration or connectivity corridors." *Id.*

The NTT Report recommended closing these priority sage-grouse habitat areas to oil and gas or other mineral leasing, concluding that "[t]here is strong evidence . . . that surface-

---

[1] All materials for the National Planning Strategy and the 2015 Sage-Grouse Plans are on file with the Court as part of the Administrative Record (AR) in this case, *see* ECF Nos. 87–88. The AR materials cited here are found in the "Washington Office" AR Index, ECF No. 87-1, and are cited by the Index document number there as "WO AR ____".

disturbing energy or mineral development within priority sage-grouse habitats is not consistent with the goal to maintain or increase populations or distribution." *Id.* at 19.  It further found that BLM's existing 0.25 mile "No Surface Occupancy" (NSO) buffers around sage-grouse leks and 0.6 mile seasonal timing buffers are inadequate to protect sage-grouse, stating that "protecting even 75 to >80% of nesting hens would require a 4-mile radius buffer" and even that "would not be large enough to offset all the impacts" of energy development.  *Id.* at 21.

The NTT Report further recommended that priority habitats be managed "so that discrete anthropogenic disturbances cover less than 3% of the total sage-grouse habitat regardless of ownership," and that priority habitats be "exclusion areas" for new rights-of-way (ROWs). *Id.* at 7–8, 12.  Regarding livestock grazing, the NTT Report recommended numerous steps, including that BLM "modify grazing management to meet seasonal sage-grouse habitat requirements," and "maintain residual cover of herbaceous vegetation during nesting."  *Id.* at 14–15.

In March 2013, FWS released its own expert "Conservation Objectives Team Report" (COT Report) that identified "Priority Areas for Conservation" (PACs) as "key habitats necessary for sage-grouse conservation." *See* COT Report (WO AR 1492), at 13.  The COT Report emphasized that "[m]aintenance of the integrity of PACs . . . is the essential foundation for sage-grouse conservation," but recognized that "habitats outside of PACs may also be essential," including to provide connectivity between PACs. *Id.* at 13, 36.  In October 2014, FWS identified a sub-category of the PACs as sage-grouse "stronghold" areas, which were the basis for the "Sagebrush Focal Areas" (SFAs) designated in the 2015 Plans for highest protection from energy development and other surface disturbance. WO AR 1490.

## II.    2015 Sage-Grouse Plans and FWS "Not Warranted" Finding.

Culminating the National Planning Strategy, BLM and Forest Service approved Records

of Decision (RODs) in September 2015, based on Final Environmental Impact Statements (FEISs) released in May 2015, to amend or revise 98 federal land use plans across sage-grouse habitats in Idaho and nine other western states.  *See* Compl. ¶¶ 115-133; WO AR 3596-3611.

As quoted in the Introduction, BLM asserted that the 2015 Plans would ensure conservation of sage-grouse by protecting and restoring sage-grouse habitats, and explained that the 2015 Plans incorporated the NTT and COT Reports' recommendations and were based on the "best available science." *See, e.g.,* BLM Great Basin ROD, at S-1 to S-2 and 1-1 to 1-41.[2]

As called for in the NTT and COT Reports, the 2015 Plans established new sage-grouse priority habitat designations with heightened management protections across some 67 million acres of federal land, including "Priority Habitat Management Areas" (PHMAs)—of which SFAs are a subset—and "General Habitat Management Areas" (GHMAs), along with other priority habitats in certain states (including "Important Habitat Management Areas," or IHMAs, in Idaho).  *Id.* PHMAs are "lands identified as having the highest value to maintaining sustainable GRSG populations," and "largely coincide with areas identified as PACs in the COT Report." *See* Great Basin ROD at 1-15. GHMAs are "GRSG habitat that is occupied seasonally or year-round … where special management would apply to sustain GRSG populations." *Id.*

These priority habitat designations failed to include all areas identified as PACs in the COT Report, however, and also failed to include other critical sage-grouse habitats, such as

---

[2] The BLM Great Basin and Rocky Mountain RODs are very similar, except in addressing certain differences among the respective plans they approved—particularly the Wyoming Plans, which were significantly weaker than other plans regarding energy development.  *See* Compl. ¶¶ 126, 151, 203–42.  The Great Basin ROD is readily available on BLM's website at: https://eplanning.blm.gov/epl-front-office/projects/lup/103344/143604/176719/2015_Great_Basin_GRSG_ROD_ARMPA.pdf and BLM's Rocky Mountain ROD is available at: https://eplanning.blm.gov/epl-front-office/projects/lup/103347/143765/177177/2015_Rocky_Mountain_Region_Record_GRSG_ROD_ARMPA_508.pdf.

winter concentration areas and connectivity habitats. *See* Compl. ¶¶ 137–164.  Some of the

management restrictions and protections for the designated priority sage-grouse habitats varied

between different states—a significant point of challenge raised by Plaintiffs, *see* Compl. ¶¶ 136,

203–253.  But the 2015 Plans included conservation measures drawn from the NTT and COT

Reports, intended to prevent or minimize surface disturbances in priority habitats, and also

required compensatory mitigation for unavoidable adverse impacts to sage-grouse habitats. Key

features of the 2015 Plans relevant here included the following:

• SFA Protections: BLM's 2015 Plans designated nearly 11.3 million acres as SFAs in

Idaho and other states, with non-waivable "No Surface Occupancy" (NSO) stipulations to

prevent surface disturbance from oil and gas development, prohibition of other types of energy

development, recommended withdrawal from hard rock mining, and prioritization for grazing

permit reviews and post-fire treatments. *See* Great Basin ROD, 1-15 to 1-19 (8.385 million acres

of SFAs), Rocky Mtn. ROD, 1-15 to 1-21(2.91 million acres).

• Density and Disturbance Caps:  Following the NTT Report, the 2015 Plans limited

surface disturbance from energy or industrial activities in priority habitats to 3% per square mile

in all states—except Wyoming, which has a 5% disturbance cap (another variance challenged in

the Complaint, ¶¶ 240-42). *See* Great Basin ROD, 1-21 to 1-23; Rocky Mtn. ROD, 1-22 to 1-25.

• Lek Buffers:  The 2015 Plans adopted "lek buffers" to prevent or limit anthropogenic

impacts in sage-grouse breeding, nesting, and brood-rearing areas, generally ranging from 1 to 4

miles around leks, depending on the state and nature of activity—but again with much smaller

.25 and .6 mile buffers in Wyoming (also challenged in the Complaint, ¶¶ 224–233). *Id.*

• Prioritize Oil and Gas Leasing/Development Outside Sage-Grouse Habitats:  The 2015

Plans directed that BLM will: "Prioritize the leasing and development of fluid mineral resources

outside GRSG habitat," including PHMA and GHMA.  *See* Great Basin ROD, 1-17, 1-23; Rocky

Mtn. ROD, 1-19, 1-25.

• Other Limits on Energy Development:  The plans limited oil and gas and other energy

development in PHMA and GHMA, including NSO requirements for PHMA with some

allowance for modification, waivers, and exceptions (for which FWS approval is required),

"Conditions of Approval" (COAs) for oil and gas development under existing leases, and other

"Required Design Features" (RDFs) to limit adverse impacts of drilling, roads, pipelines, and

other activities.  *See* Great Basin ROD, 1-15 to 1-24; Rocky Mtn. ROD, 1-15 to 1-26.

• Hard and Soft Triggers:  The Plans set population and disturbance thresholds to trigger

increased protections if sage-grouse habitats or populations fall below specified levels.  *Id.*

• Compensatory Mitigation:  All plans required compensatory mitigation "to provide a

net conservation gain" from actions that result in unavoidable habitat loss or degradation.  *See*

Great Basin ROD at 1-17, 1-25 to 1-26; Rocky Mtn. ROD at 1-15, 1-27.

In approving the 2015 Plans, BLM asserted that this suite of protections was necessary to

ensure sage-grouse conservation, stating:

> In summary, all forms of new development in PHMAs and GHMAs would either be
> closed, excluded, avoided, or developed only if the resultant effect were a net
> conservation gain to the GRSG or its habitat, ensuring that existing habitat would be
> protected or restored through compensatory mitigation.

*See* BLM Great Basin ROD at 1-24; BLM Rocky Mtn. ROD at 1-26.

In October 2015, FWS relied on this suite of new conservation measures from the 2015

Plans to find that ESA listing was "not warranted."  *See* 80 Fed. Reg. 59,857 (Oct. 2, 2015). It

stated that the new plans "reduce and minimize threats to the species in the most important

habitat" and "we expect these conservation efforts will continue to be implemented for the next

20 to 30 years, ensuring the protection of the most important habitats. . . ." *Id.* at 59,936.

### III.    The 2019 BLM Plan Amendments.

After President Trump assumed office in January 2017, he announced a new "energy dominance" agenda and his Administration began working aggressively to dismantle protections for public lands resources—including the 2015 Sage-Grouse Plans—in order to promote fossil fuel development.  *See* [Proposed] First Supp. Compl. ¶¶ 2–4, 21–87.

The 2019 BLM Plan Amendments were launched on June 7, 2017, when then-Interior Secretary Zinke issued Secretarial Order 3353, "Greater Sage-Grouse Conservation and Cooperation with Western States," which directed that a DOI "Sage-Grouse Review Team" be assembled to review the 2015 Sage-Grouse Plans and recommend modifications to "enhance State involvement," among other directives.  *Id.* ¶¶ 39–40.

There was no public notice or comment period allowed for this review.  However, states and industry groups apparently provided substantial input to the Review Team, including a July 19, 2017 letter from Western Energy Alliance (WEA), which identified a "wish list" of measures to weaken in the 2015 Plans, including priority habitat designations, lek buffers, density and disturbance caps, NSO prohibitions, RDFs, and "[i]mposition of unlawful and overly broad compensatory mitigation and net conservation gain requirements." *See* Anderson Decl. Ex. C.

On August 4, 2017, the DOI Review Team issued its report which recommended numerous modifications of the 2015 Sage-Grouse Plans, including every one of WEA's "wish list."[3] In October 2017, BLM moved to implement the DOI Report recommendations by publishing notice of a new NEPA/land use planning process to "consider the possibility of amending some, all or none" of the 2015 Sage-Grouse Plans, and invited public scoping comments. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017).

---

[3] *See* Report in Response to S.O. 3353 (Aug. 4, 2017), https://eplanning.blm.gov/epl-front-office/projects/lup/90121/123510/150623/SO3353-report.pdf.

In response, Plaintiffs and others submitted extensive scoping comments and scientific literature to support improving instead of weakening the 2015 Sage-Grouse Plans. *See* Anderson Decl. ¶ 14 (providing links to public comments). Leading sage-grouse experts—including Drs. Clait Braun and Jack Connelly, the former lead sage-grouse biologist with Idaho Dept. of Fish and Game—also opposed weakening the 2015 Sage-Grouse Plans under the proposals raised by the DOI Report and industry special interests. *See* Connelly Decl. Ex. 2.[4]

On May 2, 2018, BLM released six Draft Environmental Impact Statements (Draft EISs) and draft proposed plan amendments to revise the 2015 Sage-Grouse Plans in Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, and allowed a 90-day public comment period. *See* 83 Fed. Reg. 19,800-11 (May 4, 2018).[5]

In response to the May 2018 Draft EISs, Plaintiffs and others submitted detailed, science-based comments to BLM opposing the proposed weakening of the 2015 Sage-Grouse Plans and recommending numerous ways to strengthen them, including by improving their priority habitat protections and management restrictions to protect sage-grouse from energy development, livestock grazing, and other threats. *See* Anderson, Saul Declarations.

---

[4] The accompanying Anderson, Carter, Donnelly, Hartl, Herman, Horning, Kerr, Marvel, Miller, Molvar, Ratner, Saul, and Silver Declarations are from Plaintiffs' staff and members, while the Declarations of Drs. Clait E. Braun, John ("Jack") Connelly, and Amy Haak are from experts who explain how the 2019 Plan Amendments are contrary to the best available science and threaten irreparable harm to sage-grouse. The Court may properly consider all these declarations to show Plaintiffs' Article III standing, harms warranting injunctive relief, and environmental impacts that BLM failed to consider in violation of NEPA. *See Northwest Envtl. Defense Ctr. v. BPA*, 117 F.3d 1520, 1527 (9th Cir. 1997); *Earth Island Inst. v. USFS*, 442 F.3d 1147, 1162 (9th Cir. 2006); *Nat'l Audubon Soc. v. USFS*, 46 F.3d 1437, 1147 (9th Cir. 1993).

[5] The documents comprising the 2019 BLM Plan Amendments are on BLM's "E-Planning" website: https://eplanning.blm.gov, and are addressed in more detail, with links to specific documents, in the accompanying Anderson Declaration at ¶ 14.

The U.S. Environmental Protection Agency (EPA) also submitted comments on the Draft EISs that identified numerous concerns and defects. *See* Anderson Decl. Ex. B (copies of EPA comments). EPA questioned BLM's purported tiering to the 2015 EISs without addressing recent impacts from fires and other threats to sage-grouse habitats, its failure to address discrete impacts on winter and brood-rearing habitats, and questioned how the proposed changes to weaken lek buffers and other surface disturbance protections were supported by science. *Id.* EPA expressed an overarching "concern[] that the [Draft EISs do] not provide sufficient information to fully assess the impacts of the proposed action," and graded the Draft EISs as "EC-2: Insufficient Information" on environmental concerns. *Id.*

These criticisms fell on deaf ears, however, as BLM pursued its pre-determined course. On December 7, 2018, BLM published notice of its Final Environmental Impact Statements (Final EISs) and proposed plan amendments to amend or revise BLM's 2015 Sage-Grouse Plans in Idaho, Colorado, Wyoming, Utah, Nevada/Northeastern California, and Oregon, and opened 30-day public protest and 60-day Governor consistency review periods. *See* 83 Fed. Reg. 63,161 (Dec. 7, 2018). Per BLM regulations, Plaintiffs submitted detailed protests of the proposed plan amendments.  Anderson Decl. ¶ 6.

On March 14–15, 2019, BLM issued six Records of Decision ("BLM 2019 RODs") to amend its 2015 Sage-Grouse Plans in Idaho and the six other states, based on the December 2018 Final EISs. Anderson Decl. ¶ 14 (providing links to RODs and FEISs).  On March 20, 2019, BLM published Notices of Availability of these 2019 BLM RODs, and stated that they were "effectively immediately." 84 Fed. Reg. 10,322–10,330 (Mar. 20, 2019).[6]

---

[6] The Forest Service is pursuing a separate process to weaken the 2015 Sage-Grouse Plans, and released Draft EISs in October 2018 for public comment. *See* 83 Fed. Reg. 50,331 (Oct. 5, 2018). It is unclear when the Forest Service may complete its amendment process.

IV.     **Key Changes in the 2019 BLM Plan Amendments.**

Plaintiffs' [Proposed] First Supplemental Complaint, ¶¶ 88-142, alleges in detail

numerous ways the 2019 BLM Plan Amendments rescinded or weakened sage-grouse

protections adopted in the 2015 Plans. While not identical across all states—and the 2015 Plans

for Montana and the Dakotas were not changed—the 2019 BLM Plan Amendments in Idaho and

the other six states made the following changes of particular importance for this injunction

motion, as detailed further in the accompanying "Overview of 2019 Sage-Grouse Plan

Amendments" (Anderson Decl. Exh. A; copy attached as Appendix A hereto).

*Elimination of Sagebrush Focal Areas:* The 2019 BLM Plan Amendments eliminated

SFAs in all states but Oregon, downgrading SFAs to the less protective PHMA designation. This

removed key protections including the non-waivable NSO prohibition of surface disturbance for

oil and gas development fluid mineral leasing (in Idaho, Utah, Nevada and California), and

prioritization of SFAs for habitat restoration, monitoring and evaluation, and grazing permit

reviews.  *See* App. A at 1.  The Final EISs claimed that removing the SFA designations "would

have no measurable effect on the conservation of Greater Sage-Grouse," without mentioning the

added protections SFA provided over the PHMA designation. *Id.*

*Removal of Compensatory Mitigation and Net Conservation Requirements:* Consistent

with the Trump Administration's broader reversal of compensatory mitigation requirements, *see*

[Proposed] First Supp. Compl. ¶¶ 25–37, the 2019 BLM Plan Amendments eliminated both the

"compensatory mitigation" requirement and related "net conservation gain" standard. *See* App.

A at 1. These plan features previously ensured that unavoidable adverse impacts from energy

development and other BLM-approved actions would be offset by off-site mitigation to provide a

net gain to the species. The FWS cited compensatory mitigation as one of the "regulatory

mechanisms and conservation efforts" that justified its 2015 "not warranted" finding. 80 Fed. Reg. at 59,882 ("Requiring mitigation for residual impacts provides additional certainty that, while impacts will continue at reduced levels on Federal lands, those impacts will be offset to a net conservation gain standard").

The 2019 Amendments now prohibit BLM from requiring compensatory mitigation, unless otherwise required by state policies or law, and remove the phrase "net conservation gain" in Idaho, Nevada, Utah, and Wyoming. App. A at 2. The Final EISs characterize these changes as "clarifications" and assert that the effects will be "nominal." *Id.*

*Reduction or Elimination of Mandatory Lek Buffers:* The 2019 Amendments included significant changes to mandatory buffers around sage-grouse leks in designated habitat areas. *See* App. A at 2. In Idaho and Nevada/California, BLM drastically reduced existing lek buffers by several miles. *Id.* Colorado removed the prohibition on oil and gas leasing within 1 mile of active sage-grouse leks, opening up approximately 224,000 acres of previously-protected habitat. *Id.* The application of buffers around lek sites was changed from mandatory to discretionary in Colorado, Utah, and Nevada/California, and the plans in Idaho and Wyoming now allow BLM officers to exempt projects from buffers in more circumstances. *Id.*

*Weakened Disturbance and Density Caps:* BLM's 2019 Plan Amendments in Idaho and Utah eliminated density caps of 1 energy/mining project per 640 acres, even though the 2015 Sage-Grouse Plans already allowed disturbance beyond the thresholds recommended by agency scientists in the NTT and COT Reports. *See* Compl. ¶¶ 234–46; App. A at 3. Idaho also eliminated the 3% project-scale surface disturbance cap, allowing projects to totally destroy habitat locally. *Id.* Utah and Nevada/California will now allow exceedances of the disturbance cap under more circumstances. *Id.*

***Weakening or Elimination of Required Design Features:*** The 2019 Amendments weakened the 2015 Plans' requirement that all projects in greater sage-grouse habitat apply a suite of Required Design Features (RDFs) to help avoid, minimize, or mitigate adverse impacts. *See* App. A at 4. In Idaho, RDFs were downgraded to voluntary Best Management Practices (BMPs) in GHMA. In Utah, elimination of GHMA means those habitats will no longer be protected by the RDFs. *Id.* The Wyoming amendments also give BLM staff greater discretion to waive RDF requirements if they decide the features are not "appropriate," "necessary," or "suitable." *Id.* The Final EISs failed to evaluate the effect of making buffers discretionary and suggested that the impacts of smaller buffers will be minimal. *Id.*

***Elimination or Weakening of GHMA:*** The 2019 Amendments eliminated GHMA in Utah, about 620,000 acres of sage-grouse habitat; and GHMA protections were weakened in other states, such as Wyoming which removed any obligation to prioritize oil and gas leasing and development outside of GHMA. App A. at 4. Idaho similarly eliminated the prioritization requirement, significantly reduced lek buffers, and downgraded mandatory RDFs to optional "Best Management Practices" (BMPs) in GHMA.  *See* App. A at 2, 3, 5. BLM asserted that accelerating declines of small sage-grouse populations in GHMA has "no significant effect" and that removing GHMA would have no impacts "in the long term." *Id.*

***Changes to Hard and Soft Trigger Adaptive Management***: The 2019 Amendments included a series of measures undermining the 2015 Plans' mechanisms of "hard and soft triggers" requiring BLM to take corrective action when monitoring data shows that sage-grouse populations or habitats fall below specified thresholds. *See* App. A at 4. In Nevada/NE California, for example, BLM replaced "hard" triggers requiring management changes with "warnings" and will now apply triggers only at the lek cluster scale, which could allow

individual leks to blink out without corrective management action. *Id*. The Utah ROD similarly undermined the certainty that concrete steps will be taken once adaptive management "triggers" are met, by lengthening time-frames for management response and introducing qualifications on when corrective strategies must be implemented.  *Id*. The Final EISs claimed that these changes will be "beneficial" for sage-grouse or failed to evaluate them at all. *Id*.

   *Relaxed Protections Against Energy Development (Prioritization and NSO Stipulation):*  The 2019 BLM Plan Amendments significantly weakened protections specific to oil and gas development. *See* App. A at 5. First, BLM eliminated or substantially weakened the 2015 Plans' requirement that BLM prioritize oil and gas leasing and development outside of designated sage-grouse habitat. *Id.* The prioritization requirement was eliminated completely in Utah; eliminated for GHMA in Idaho and Wyoming; and limited to other sage-grouse habitats in Wyoming to situations in which BLM has an administrative "backlog" of parcel nominations. *Id.* BLM also characterized its changes to the prioritization requirement as mere "clarifications," even though they depart from the plain language and intent of the 2015 Sage-Grouse Plans. *Id.*

   Second, the 2019 Plans reduced the certainty that the NSO stipulation will be applied in PHMA in multiple states, by (1) eliminating the SFA designation, the only priority habitat protected by a NSO stipulation without possibility of waivers, exceptions, and modifications; (2) allowing BLM to issue waivers, exceptions, modifications in a broader array of circumstances; (3) and eliminating the requirement that BLM obtain consent from FWS in doing so. In Colorado, BLM also delegated to counties authority to determine in the first instance that exceptions or modifications should apply.  *See* App. A at 5.

   *Relaxed Protections Against Livestock Grazing:* The 2019 BLM Plan Amendments weakened already inadequate protections of the 2015 Plans from livestock grazing in numerous

ways.  *See* App. A at 6. These include by: (a) eliminating or weakening the requirement that

BLM impose terms and conditions for achieving sage-grouse "habitat objectives" into allotment

management plans or grazing permits, as they are renewed; (b) allowing BLM to "adjust" habitat

objectives through plan "maintenance" without any public involvement; (c) removing

requirements that allotments in SFA and PHMA be "prioritized" for field checks to ensure

compliance with the terms and conditions of grazing permits; (d) walking back required

conformance with certain scientifically-recommended objectives, such as 7-inch grass height ;

(e) reducing or eliminating requirements for the impacts of grazing-related infrastructure to be

evaluated and modified; (f) removing prohibitions on livestock grazing within 13 Oregon

Research Natural Areas; and (g) weakening or eliminating the obligation to prioritize PHMA

habitat for land health evaluations, grazing permit reviews, and permit compliance checks. *Id.*

**V.      BLM Is Moving Rapidly to Implement the 2019 Plan Amendments.**

FLPMA's "consistency" requirement means that BLM must follow the 2019 Plan

Amendments in approving leases, permits, rights-of-way, and other discretionary actions within

sage-grouse habitats. *See* 43 U.S.C. § 1732(b); 43 C.F.R. § 1610.5-3(a)-(b). Because RMPs are

the planning-level decisions that determine the areas of public lands that are open for activities

such as oil and gas leasing and development, livestock grazing, rights-of-way, and other

activities, and impose limits or conditions on how such activities may be approved, the 2019

Plan Amendments have immediate and ongoing impacts.

BLM is implementing the 2019 Plan Amendments through imminent approval of new oil

and gas leasing and development, coal leasing, phosphate mining, rights-of-way, livestock

grazing permit renewals, and other actions that threaten irreparable harm to sage-grouse

populations and habitats.  *See* Saul, Anderson, Braun, Connelly Declarations.  These include the

following partial list of upcoming BLM actions that Plaintiffs have been able to identify as posing significant threats to sage-grouse:

**_Oil and Gas Leasing/Development_**:  BLM has already approved the "Normally Pressured Lance" (NPL) project involving 3,500 oil/gas wells in sage-grouse winter concentration areas and other priority habitats near Pinedale, Wyoming, which Dr. Braun cautioned against developing when he testified about the NPL project before this Court in 2012. *See* Braun Decl. ¶ 66. BLM is expected to approve permits to drill and rights-of-way in the imminent future.  *See* Ratner Decl. ¶¶ 47–54; Saul Decl. ¶ 26; Molvar Decl. ¶¶ 20–22.[7]

Other major oil/gas development approvals expected from BLM in the near future include: (a) "Moneta Divide," which proposes 4,250 new oil/gas wells and a pipeline affecting 265,000 acres within sage-grouse habitats in the BLM's Lander, Rawlins, and Casper Field Offices in Wyoming, and BLM is expected to move forward with a Final EIS approving it during 2019; (b) "Jonah Infill Project," located in BLM's Pinedale Field Office, in which BLM is expected to continue approving drilling permits under the terms of the 2019 Plan Amendments over the next year; (c) "Converse County," the largest proposed oil/gas field development in Wyoming, which BLM is expected to approve through a Final EIS in August 2019 under the terms of the 2019 Plan Amendments; and (d) "Continental Divide/Creston Infill Project," in which BLM is expected to approve up to 9,000 additional oil/gas wells in this large oil field development west of Rawlins, Wyoming.  *Id.*

---

[7] BLM's August 2018 ROD approving the NPL master development plan is challenged in related litigation before U.S. Magistrate Judge Bush of this Court.  *See* First Amended Complaint, *W. Watersheds Project et al. v. Zinke et al*, No. 1:18-cv-187-REB (D. Idaho), ECF No. 78 ¶¶ 225, 332–343. The injunction sought here would only prohibit BLM from applying the 2019 Plan Amendments to NPL site-specific approvals.

BLM is also continuing to aggressively offer oil and gas leases in sage-grouse habitats in Wyoming, Utah, Colorado, Nevada, and other states, including upcoming quarterly lease sales scheduled for September 2019. *See* Saul Decl. ¶¶ 23–25. Among these, BLM is offering 80,000 acres of oil/gas leases in sage-grouse habitats in northwestern Colorado under the 2019 Plans, allowing surface disturbance and other harmful impacts that would have been prevented or limited under the 2015 Plans. *Id.* BLM also recently offered at least 26 parcels for oil/gas leasing in sage-grouse habitats in the Vernal, Utah field office under the 2019 Plan Amendments, which removed all GHMA protections there. *Id.* Other upcoming Utah oil/gas leases are likely to impact the Uintah, Carbon, Emery, and Rich sage-grouse populations, according to BLM itself. *See* UT FEIS at App.-1–8.

*Coal, Gold, and Phosphate Mining:* BLM is expected to approve new coal leases and gold and phosphate mining projects in Idaho, Utah, Nevada, and other states affecting sage-grouse, under the 2019 Plan Amendments. *See* Saul Decl. ¶ 27–28; Anderson Decl. ¶ 53–59. In Idaho, the "Caldwell Canyon Mine" phosphate project would impact over 30,000 acres of priority sage-grouse habitats, including six leks, and threatens the East-Central Idaho sage-grouse population, which is described as "isolate/small" and at "high risk" with a "low probability of persistence." *See* Anderson Decl. ¶ 58; Carter Decl. ¶¶ 22–23.

*Off-Highway Vehicle (OHV) Use:* Some 14,000 acres of sage-grouse habitat in Utah were opened to cross-country off-road vehicle under the 2019 Amendments. This area includes habitat for the imperiled Sheeprocks population of sage-grouse, which recently tripped a hard trigger due to sharp population declines. *See* Anderson Decl. ¶¶ 45–49. Opening up this area to OHV use risks further habitat loss for the Sheeprocks population, as BLM itself admitted, threatening irreparable harm to its long-term resiliency and recovery. *See* UT FEIS at 4-22.

*Rights-of-Way (ROWs)*: Hundreds of ROW applications are pending in Idaho (123), Nevada and California (85), Utah (380), and Wyoming (590), according to BLM.  *See* ID FEIS at App-3-1 to App-3-15 (Table 1); Saul Decl. ¶¶ 29-31.  Prior requirements of the 2015 Plans to bury powerlines and pipelines are now discretionary, allowing further surface disturbance and infrastructure that fragments sage-grouse habitats.  *Id.* Not only will BLM now be able to approve such ROWs in sage-grouse habitats without certain lek buffers, COAs, RDFs, and other provisions of the 2015 Plans, but no compensatory mitigation will be required and the projects can be approved without meeting the "net conservation gain" standard.  *Id.*

*Livestock Grazing:*  BLM's website lists hundreds of livestock grazing permits that are to be renewed in 2019 within sage-grouse habitats in Idaho and other states, which will not adhere to the provisions of the 2015 Plans, such as ensuring that grazing permit renewals meet sage-grouse cover height and other habitat requirements. *See* Anderson Decl. ¶¶ 27–42; Braun Decl. ¶¶ 67–77.  New fences, corrals, and other range infrastructure may also be constructed without steps required to prevent adverse impacts to sage-grouse, and existing infrastructure in certain states will no longer be subject to monitoring to address risks to greater sage-grouse. *Id.*

## ARGUMENT

## I.   APPLICABLE LEGAL STANDARDS.

To obtain injunctive relief under Fed.R.Civ.P 65, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in their favor, and (4) an "injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), *quoting Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Court reviews the 2019 BLM Plan Amendments under the APA to determine

whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This requires a "thorough, probing, in-depth review" to determine whether BLM presented a "rational connection between the facts found and the conclusions made." *See W. Watersheds Project v. Kraayenbrink*, 538 F.Supp.2d 1302, 1312 (D. Idaho 2008) (*quoting Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th Cir. 2005)). The Court applies a "rule of reason" to determine whether BLM's Final EISs satisfy NEPA, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Id.*

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR NEPA CLAIMS.

Plaintiffs allege four different claims challenging the 2019 BLM Plan Amendments under NEPA, FLPMA, and the APA. *See* [Proposed] First Supp. Compl. ¶¶ 143–178.  But the Court need only address the NEPA claims to grant injunctive relief, which are obvious from the face of the December 2018 Final EISs and March 2019 BLM RODs.  Among BLM's many NEPA violations, the 2019 Plan Amendments are fatally flawed in the following ways:

### A.   BLM Refused to Consider A Reasonable Range of Alternatives.

NEPA requires BLM to "rigorously explore and objectively evaluate all reasonable alternatives" to its proposed course of action. 40 C.F.R. § 1502.12. The alternatives section is the "heart" of an EIS, and must be sufficient to "foster[] informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004); *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). Here, BLM's alternatives analysis was deficient in three ways, each of which renders the Final EISs invalid.

1.   BLM Formulated an Impermissibly Narrow Purpose and Need

To delimit the range of reasonable alternatives, an EIS must "specify the underlying

purpose and need . . . [for] the proposed action." 40 C.F.R. § 1502.13. Agencies may not subvert NEPA's directive to study a reasonable range of alternatives by adopting an unreasonably narrow purpose and need for a project. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010). In assessing the reasonableness of a purpose and need statement, courts must consider the statutory context of the federal action. *Id.*

The Final EISs identified the purpose and need of the 2019 BLM Plan Amendments as follows: (1) to enhance cooperation and coordination with the states, (2) to align with Dept. of Interior and BLM policy directives issued since 2015, and (3) to incorporate measures to better align with state conservation plans. *See, e.g.,* ID Final EIS at ES-2.

Notably absent from this stated purpose and need was any goal of ensuring the long-term viability of the greater sage-grouse—a striking omission, considering that the 2015 Plans BLM is amending were intended to ensure conservation of sage-grouse. By excluding any purpose of sage-grouse conservation, BLM failed to reflect FLPMA's statutory directives, which require land use plans to meet FLPMA's multiple use and sustained yield policies.  *See* 43 U.S.C. §§ 1702(c), 1712(c)(1); *Kraayenbrink*, 632 F.3d at 478.  BLM's Special Status Species Policy, adopted under FLPMA, also requires BLM to ensure that "land use plans and subsequent implementation-level plans identify appropriate . . . provisions for the conservation of Bureau sensitive species," which include sage-grouse.  *See* BLM Manual 6840, Special Status Species Management at .04D5 (2008); *Salazar*, 2011 WL 4526746 at *4, 17 (discussing Policy).

The statutory context here also includes the ESA, as the 2015 Sage-Grouse Plans were a direct response to the 2010 "warranted-but-precluded" ESA listing decision and provided the "foundation" for FWS's 2015 "not warranted" listing decision. *See* 80 Fed. Reg. at 59,887.

In light of this statutory and factual context, BLM could not reasonably define the 2019

Plan Amendments' purposes to advance only the Trump Administration's policy changes or state and industry interests, to the exclusion of greater sage-grouse conservation. *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1072.

    2.  <u>BLM Refused to Consider Alternatives Other Than Its Proposed Action.</u>

BLM also considered an unduly narrow range of alternatives to achieve its stated purpose and need. Each Draft EIS identified only two alternatives: (1) the "No Action" alternative (*i.e.*, keeping the 2015 Plans intact), and (2) BLM's preferred "Management Alignment Alternative," (*i.e.,* proposed modifications for each state). *See, e.g.,* Idaho DEIS at ES-5. The Final EISs modified the "Management Alignment Alternatives" slightly, to arrive at the Proposed Plan Amendments approved in the RODs. No other alternatives were considered, and BLM included the "No Action" alternative only as basis for comparison, since BLM determined it would <u>not</u> meet the stated purpose and need. *See, e.g.,* ID ROD at 1-9.

The Final EISs thus only considered BLM's preferred outcome, a blatant NEPA violation. Numerous courts have reversed similar NEPA analysis that reflect a pre-determined outcome without analysis of reasonable alternatives. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (NEPA violated where agency "considered only a no action alternative along with two virtually identical alternatives"); *Block*, 690 F.2d at 767–68 (rejecting as unreasonable a range of eight alternatives that all assumed the same level of roadless area development); *NRDC v. Evans*, 168 F. Supp. 2d 1149 (N.D. Cal. 2001) (only considering status quo and preferred alternative not a reasonable range of alternatives).

    3.  <u>BLM Unreasonably Rejected Viable Alternatives That Would Have Partially Fulfilled its Purpose and Need</u>

BLM also unreasonably refused to consider viable alternatives proposed by commenters. In order to be adequate, an EIS must consider every reasonable alternative to the proposed

Opening Brief on Motion for Preliminary Injunction --               21

action. *Southeast Alaska Conserv. Council v. Fed'l Hwy Admin.,* 649 F.3d 1050, 1056 (9th Cir. 2011). The "existence of a single viable but unexamined alternative renders an [EIS] inadequate[.]" *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1042, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness Recr. v. Morrison,* 67 F.3d 723, 729 (9th Cir. 1995)).

Here, public comments identified viable alternatives that fell between the "no action" and "management alignment" extremes. For example, The Wilderness Society submitted a proposed alternative that would enhance "cooperation with the states while conserving, enhancing and restoring sage-grouse habitat."  *See* Anderson Decl., Ex. C. Plaintiffs and others also suggested numerous alternatives that would vary certain plan elements to maintain greater protections for sage-grouse. See, e.g., ID FEIS at App. 4 (public comments).

BLM unreasonably rejected these and other proposals, asserting they "failed to meet the purpose and need." *Id.*; see also Idaho Protest Resolution Report at 50. However, agencies must analyze alternatives that "would only partly meet the goals of the project" so long as they "have a less severe environmental impact than the preferred alternative." *North Buckhead Civic Association v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990); *NRDC v. Callaway*, 524 F.2d 79, 93 (2nd Cir. 1975); *NRDC v. Morton*, 458 F.2d 827, 834–35 (D.C. Cir. 1972). As the Ninth Circuit held in *Block*, when an agency's decision demands a trade-off between environmental preservation versus development, the decision "cannot be intelligently made without examining an alternative that would soften resource extraction." 690 F.2d at 767; *see also Muckleshoot*, 177 F.3d at 813–14 (agency had duty to consider an alternative that furthered rather than impeded the agency's resource protection mandate under FLPMA). BLM similarly violated NEPA here by refusing to address potential alternatives that would have met its stated goals of enhancing cooperation but maintain better protections for sage-grouse, again requiring reversal.

**B. BLM Misrepresented the 2019 Plan Amendments, and Failed to Take a "Hard Look" at the Adverse Impacts on Sage-Grouse.**

NEPA requires that BLM take a "hard look" at the direct, indirect, and cumulative environmental impacts of its 2019 Plan Amendments, and disclose those to the public. 42 U.S.C. § 4332(2)(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Taking a "hard look" requires "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Block*, 690 F.2d at 761. The hard look doctrine bars "[g]eneral statements about 'possible effects' and 'some risk' . . . absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

NEPA regulations also require that information used "must be of a high quality," and be based on professional and scientific integrity. *See* 40 C.F.R. §§ 1500.1(b), 1502.24 4. "Accurate scientific analysis [is] essential to implementing NEPA." *Id.* § 1500.1(b).

As the Ninth Circuit held in *Kraayenbrink*, the NEPA hard look thus "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made," and must include a "discussion of adverse impacts that does not improperly minimize negative side effects." *See* 632 F.3d at 491 (*citing Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006)). Agencies violate NEPA when they rely on an EIS that lacks scientific integrity, fails to candidly address adverse effects or scientific criticism, or is so incomplete or misleading that the decision-maker and the public cannot make an informed decision. *Id.; see also NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964–66 (9th Cir. 2005) (reversing EISs that relied on inaccurate science or misleading information).

These authorities are squarely on point here, confirming an injunction is proper based on BLM's misrepresentations of its 2019 Plan Amendments and other "hard look" violations.

1. BLM Misrepresented the 2019 Plan Amendments.

BLM's "hard look" violations begin with its misrepresentations about the nature and effects of the 2019 Plan Amendments. BLM's attempt to disguise environmentally-damaging changes that jeopardize public land resources fails here, just as it did in *Kraayenbrink*.

The Idaho Final EIS and ROD, for example, assert that the 2019 Plan Amendments for Idaho are "equally environmentally preferable" as the 2015 Plan, and are based on the "best available science and data." *See* ID ROD at 1-9; ID FEIS at 4-2. But the 2019 Plan Amendments eliminated 3,961,824 acres of SFAs in Idaho, along with their heightened protections (non-waivable NSOs, prioritization for grazing changes, etc.); substantially reduced lek buffers and allow increased waivers in PHMA, IHMA and GHMA; removed density disturbance caps; replaced RDFs with voluntary BMPs in GHMA; and eliminated compensatory mitigation and net conservation gain requirements. *See* App. A; Anderson Decl. ¶¶ 28–31; Connelly Decl. ¶¶ 23, 26–32, 46–47 (all addressing Idaho changes).

BLM refused to acknowledge that these many changes are inconsistent with the best available science—including the NTT and COT Reports—and remove or weaken many conservation protections that BLM deemed necessary in adopting the 2015 Plans. *See* Braun Decl. ¶ 18; Connelly Decl. ¶¶ 42–49. Nowhere in the Idaho FEIS or ROD will the Court find discussion of the NTT Report and its management recommendations, much less explanation of how the science may supposedly have changed to now allow more relaxed management protections for sage-grouse—which it has not. As Drs. Braun and Connelly explain, the 2019 Amendments are contrary to the NTT and COT Reports, and inconsistent with the best available

science. *See* Braun Decl. ¶¶ 3–5, 45, 55, 57; Connelly Decl. ¶ 42–49. Neither did the Idaho FEIS or ROD address the FWS' 2015 "not warranted" ESA listing determination, which presumed that the full suite of conservation protections from the 2015 Plans would be implemented—much less did BLM acknowledge that removing those requirements now may lead to ESA listing.

Similar misrepresentations and omissions are found in the other 2019 Plan Amendments, as summarized in the Overview of 2019 Sage-Grouse Plan Amendments (Appendix A) and detailed further in the Anderson, Saul, Carter, Donnelly, Molvar, Hartl, Miller, Ratner, Silver Herman, Kerr, and Marvel Declarations.

Rather than being "equally environmentally preferable" as the 2015 Plans and based on the "best available science," as BLM falsely claims, the 2019 BLM Plan Amendments gut key sage-grouse protections previously deemed necessary to conserve sage-grouse and avoid ESA listing. For example, the 2019 Plan Amendments rescind SFAs and eliminate their protections against surface disturbances from oil and gas and other development in those sage-grouse "strongholds," while weakening or eliminating other habitat designations and protections. Leading sage-grouse experts Drs. Clait Braun and Jack Connelly strongly refute BLM's assertions that the 2019 Plan changes are consistent with sage-grouse science, and explain that the changes will allow substantial losses and fragmentation of sage-grouse habitats. *See* Braun Decl. ¶¶ 5, 17–22, 46–76; Connelly Decl. ¶¶ 5–7, 20–62. Dr. Amy Haak underscores that BLM's plan changes ignored well-established conservation biology principles for imperiled species by removing protections needed to maintain species' resilience and persistence, while allowing losses of isolated or small populations. *See* Haak Decl. ¶ 59. Her analysis is consistent with the NTT Report and FWS October 2015 "not warranted" finding, which the 2019 Plan Amendments now undermine. *Id.*

Even EPA's comment letters questioned the impacts of BLM's proposed plan changes, repeatedly asking BLM to explain its planned actions and how they may impact sage-grouse. *See* Anderson Decl. Exh. 2.  But BLM never admitted the scope and nature of its 2019 Plan Amendments in undermining sage-grouse protections.  By flatly misrepresenting its 2019 plan changes, and disregarding the critical comments of its sister agency EPA, BLM violated its core NEPA duty of candor and accuracy, demonstrating Plaintiffs are likely to prevail and warranting injunctive relief.  *See Kraayenbrink*, 538 F.Supp.2d at 1313–19.

2.  BLM Failed to Evaluate Baseline Condition Changes Affecting Sage-Grouse

In amending its 2015 Plans, BLM had a NEPA duty to take a "hard look" at current conditions and evaluate how the "baseline" may have changed since its last analysis in the 2015 Plans. *See, e.g., N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083-86 (9th Cir. 2011). Yet BLM ducked this duty too, claiming that conditions "have not appreciably changed" since 2015, and that the 2015 Plans' analysis of sage-grouse populations and habitats is unaltered. *See, e.g.,* ID FEIS at 4–6. The 2019 Plan Amendments thus failed to provide an updated assessments of current sage-grouse population and habitat trends in the affected states, or across the sage-grouse range.  *Id.*

BLM's claim that conditions "have not appreciably changed" is belied by the facts that millions of acres of sage-grouse habitat in the West have burned in wildfires since 2015, millions more acres have been newly leased for oil and gas development, and evidence indicates sage-grouse populations have declined in several states. *See* Braun Decl. ¶¶ 24–33; Connelly Decl. ¶¶ 56–61.  As Dr. Haak demonstrates, wildfires and oil/gas leasing have impacted over 4 million acres of the highest priority sage-grouse habitats in the last three years alone.  *See* Haak Decl., ¶¶ 47–56 & Maps 1-3.  Other habitats have also been lost or degraded, impacting connectivity

between sage-grouse populations and exposing isolated or peripheral populations to further declines or elimination. *Id.*

BLM's December 2018 Final EISs acknowledged that fires have recently occurred in sage-grouse habitats, but made no effort to analyze the scope and impacts of these fires on range-wide sage-grouse habitats—even though such analysis can be readily performed, as Dr. Haak demonstrates. And BLM never disclosed or analyzed in the RMP amendment process the scope of its recent oil and gas leasing and development in sage-grouse habitats, as Dr. Haak has done.

Without adequate baseline knowledge of sage-grouse populations and their habitat, BLM failed to satisfy its NEPA "hard look" duty. *See N. Plains Res. Council*, 668 F.3d at 1085–86 (reversing where agency used "stale" baseline wildlife data); *ONDA v. Jewell*, 840 F.3d 562 (9th 2016) (BLM violated NEPA by not gathering baseline data on sage-grouse potentially impacted by wind development); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (reversing for stale baseline fish population data. This NEPA defect again requires reversal. *Id.*

3. Insufficient Analysis of Cumulative Impacts

NEPA requires adequate disclosure of the cumulative impacts of the proposed action "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1379 ("quantified or detailed information is required" to take a hard look at cumulative impacts).

BLM violated this requirement in numerous ways, because its 2019 Plan Amendments failed adequately to address cumulative impacts of its management changes along with recent trends, such as sage-grouse habitat losses from fires and energy development, and present and foreseeable other developments in sage-grouse habitats.

First, by fragmenting the analysis of its 2019 Plan Amendments into six separate EISs, BLM failed to adequately assess the cumulative range-wide impacts of the Amendments and related threats to sage-grouse. This is a similar violation as Plaintiffs identified over the 2015 Plans, which utilized 15 EISs but had no cumulative range-wide analysis of sage-grouse and overarching threats, including from climate change. *See* Complaint ¶¶ 154–181.  While agencies have discretion in determining the scope of a geographical areas for NEPA analysis, an agency must articulate a rational explanation justifying its chosen cumulative impacts analysis areas. *See W. Watersheds Project v. Jewell*, 56 F. Supp. 3d 1182, 1189–90 (D. Idaho 2014), *citing Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976).  Here, BLM acted unreasonably in adopting state-by-state NEPA reviews for the 2019 Plan Amendments without evaluating their range-wide impacts to greater sage-grouse, when the whole purpose of the Plans was to provide species-wide protections and avoid ESA listing.

Second, the "cumulative effects analysis" in each Final EIS is woefully inadequate, failing to address major threats—including climate change—and omitting discussion of how ongoing or foreseeable BLM and other actions will contribute to cumulative impacts upon sage-grouse populations and habitats.  *See* Saul, Molvar, Carter, Haak Declarations.  In Utah, for example, BLM failed to mention the Greater Chapita Wells Natural Gas Infill Project, which could involve the drilling of 2,808 natural gas wells in prime sage-grouse habitat. In Wyoming, the list omitted the Normally Pressured Lance, Continental Divide/Creston, and Converse County oil and gas projects, all of which will involve drilling thousands of oil and gas wells in prime sage-grouse habitat. *Id.*  Where millions of acres of prime sage-grouse habitats have been lost, degraded, or threatened by wildfires and energy development just in the last three years since the 2015 Plans were adopted, *see* Haak and Connelly Declarations, BLM's refusal to

consider those losses along with upcoming projects that will further fragment and degrade sage-grouse habitats violated NEPA.

Third, BLM failed to analyze the cumulative effects of its 2019 Plan Amendments with its 2017 cancellation of the proposed mineral withdrawal of about 10 million acres of SFAs,[8] or the Forest Service's proposed plan amendments to weaken sage-grouse measures on its lands. These actions are closely related, and under applicable NEPA regulations, they should have been discussed in the same NEPA document. *See* 40 C.F.R. § 1508.25 (a)(1). For all these reasons, the 2019 Plan Amendments fail NEPA's "hard look" requirements, warranting injunctive relief.

## C.  BLM Violated NEPA by Failing to Circulate Supplemental Draft EISs Before Rescinding Compensatory Mitigation Requirements.

Finally, BLM violated NEPA by failing to circulate supplemental Draft EISs for public comment on its decision to eliminate compensatory mitigation (and the "net mitigation gain" requirement) from the 2015 Plans.

As explained above, the 2015 Plans required public land users to offset unavoidable habitat degradation through compensatory mitigation sufficient to provide a "net conservation gain" to sage-grouse.  FWS cited these requirements in its 2015 "not warranted" ESA finding, explaining that: "Requiring mitigation for residual impacts provides additional certainty that, while impacts will continue at reduced levels on Federal lands, those impacts will be offset to a net conservation gain standard."  80 Fed. Reg. at 59,881-82.

---

[8] In connection with the 2015 Plans, BLM proposed in September 2015 to withdraw 10 million acres of SFAs from mineral entry and location for 20 years because the 2015 Plans could not "adequately constrain nondiscretionary uses," *i.e.*, hard rock mining under the 1872 Mining Law. *See* [Proposed] First Suppl. Compl. ¶¶ 48–60. FWS relied on the proposed withdrawal, along with the 2015 Plans, in reaching its 2015 "not warranted" ESA listing determination.  *Id.* But the Trump Administration abruptly cancelled the proposed SFA mineral withdrawal, *see* 82 Fed. Reg. 47,248 (Oct. 11, 2017), another final action Plaintiffs challenge in addition to the 2019 BLM Plan Amendments.  *Id.* ¶¶ 179–187. The Final EISs do not address the ramifications of this cancellation at all, thus violating NEPA.

Yet the May 2018 Draft EISs did <u>not</u> notify the public that BLM would eliminate these compensatory mitigation requirements as part of its proposed plan changes, stating only that BLM was "evaluating whether the implementation of a compensatory mitigation standard on public lands is appropriate and consistent with applicable legal authorities." *See, e.g.*, ID Draft EIS at 2-4. The Draft EISs assumed, in their discussion of alternatives and environmental consequences, that compensatory mitigation elements of the 2015 Sage-Grouse Plans would remain in effect. *Id.* at 4-15.  The Final EISs were the first time BLM announced it was removing the compensatory mitigation and "net conservation gain" requirements, so the public was never given notice or opportunity to comment on those actions before they were adopted.

A supplement to a draft or final EIS is required if (i) the "agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or (ii) there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c); *Russell County Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011).

BLM's elimination of compensatory mitigation through the Final EISs constituted both "substantial changes" to its proposed action and "significant new circumstances" under 40 C.F.R. § 1502.9(c), requiring that BLM have issued a supplemental draft EIS for public review and comment before finalizing these changes. Failing to do so "insulate[d] [the agency's] decision-making process from public scrutiny. Such a result renders NEPA's procedures meaningless." *Block*, 690 F.2d at 771. [9]

---

[9] *See also Western Exploration v. US DOI*, 250 F.Supp.3d 718, 749–50 (D. Nev. 2017), which held that addition of SFAs in the 2015 Plans' Final EISs violated NEPA, because they were not proposed in the Draft EISs. The court explained that the "decision to designate certain lands as particular kinds of sage-grouse habitats affects subsequent management decisions on those lands," which the public should have been given an opportunity to comment upon. *Id.*

### III.   INJUNCTIVE RELIEF IS NEEDED TO AVOID IMMINENT IRREPARABLE HARM.

To determine whether preliminary injunctive relief is appropriate, courts apply a "traditional balance of the harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). Although the Supreme Court has rejected a presumption of irreparable injury from NEPA violations, it recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Accordingly, in the face of irreparable harm to the environment, courts will withhold or limit injunctive relief only in "unusual circumstances." *Nat'l Parks*, 241 F.3d at 738 n.18 (citation omitted); s*ee also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) ("[i]njunctive relief is typically appropriate in environmental cases").

Injunctive relief is necessary here to preserve the status quo and prevent irreparable injury, by maintaining the 2015 Sage-Grouse Plans in effect while Plaintiffs' challenges to the 2019 BLM Plan Amendments are adjudicated. As noted above, FLPMA's "consistency" requirement means that all BLM approvals of discretionary actions affecting sage-grouse habitats must now follow the 2019 Plan Amendments. *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). Those BLM approvals include issuance of oil and gas leases; drilling permits; rights-of-way for roads, pipelines, and powerlines; coal and phosphate mining approvals; livestock grazing permit renewals and inspections; vegetation treatments; and countless others. *See* Saul Decl. ¶¶ 22–31; Anderson Decl. ¶¶ 26–59.

Irreparable harms will occur if BLM proceeds to approve these new developments and actions under the 2019 Plan Amendments. *Id.*  The 2019 Plans will immediately impact BLM's management of sage-grouse habitat and the conditions placed on third parties operating in sage-

grouse habitat, including by: (a) opening up hundreds of thousands of acres previously closed to surface disturbance, through changes to lek buffers and habitat designations; (b) altering the lease stipulations and permit conditions BLM imposes on oil and gas, phosphate, coal, and other mineral developments; (c) weakening the conditions on ROW approval and construction, such as the obligation to bury powerlines; (d) weakening the noise limits and design features imposed on developments in sage-grouse habitat; (e) altering how BLM reviews livestock grazing permits and grazing thresholds designed to protect sage-grouse habitat needs; (f) altering how BLM monitors degradation from existing range infrastructure and livestock grazing; (g) expanding criteria for waivers, exceptions, or modifications to protective stipulations and eliminating requirements for FWS consultation. *See* App. A; Saul Decl. ¶¶ 14-21; Anderson Decl. ¶¶ 26-59.

Adverse impacts from these changes include irreversible destruction of sage-grouse habitat and impacts to greater sage-grouse survival, breeding, and behavior. *See* Braun, Connelly, Haak Declarations. As Dr. Haak explains, implications from the weakening of habitat protections in the 2019 Plan Amendments include: (a) "exacerbating wildfire risks in fire-prone areas through weakening of livestock regulatory measures and increasing potential for spread of cheatgrass,"(b) further "contraction of range to center core areas as small isolated priority areas around the range margins are irreparably changed resulting in the loss of unique habitats and reduced range-wide habitat diversity," and (c) loss of connectivity between priority areas and to seasonal habitats outside of priority areas, which "will increase isolation and vulnerability of resulting island habitats and populations.  This is particularly problematic in Wyoming where industrialization of sage-grouse habitat from energy development is occurring at an alarming rate." Haak Decl. ¶¶ 70–71.

Plaintiffs' staff and members eloquently describe how these impacts will affect them

personally, by degrading BLM public lands on which they recreate and their interests in viewing sage-grouse and other wildlife species. *See* Carter, Donnelly, Hartl, Herman, Horning, Kerr, Miller, Molvar, Ratner, and Silver Declarations.

These problems under the new plans will be seen immediately across the planning area in the coming weeks and months. Numerous site-specific applications of the 2019 Plan Amendments that are upcoming (or have already occurred) include oil and gas well drilling and associated road and pipeline construction in Wyoming; coal mining projects in Utah; gold and other surface mining projects in Nevada; and large phosphate mining projects in Idaho. *See* Saul Decl. ¶¶ 22–31; Anderson Decl. ¶¶ 53–58. Other upcoming actions include dozens if not hundreds of livestock grazing permit renewals and vegetation treatment projects in sage-grouse habitats in Idaho, Nevada, and other states in areas also cherished by Plaintiffs' staff and members. *See* Anderson, Marvel, Carter, Herman, Molvar Declarations.

Plaintiffs and the public also face immediate irreparable injury from BLM's planned issuance of oil, gas, and coal leases in sage-grouse habitats with weakened surface disturbance stipulations. *See* Saul Decl. ¶¶ 28–38. Once such leases are granted, the lessees have "valid existing rights" defined by BLM regulations (*see, e.g.*, 43 C.F.R. § 3101), and it is the RMP-level planning decision that determines which stipulations will be imposed on those leases. *Id.* This is illustrated by the recent Utah example, where BLM already offered at least 107 oil and gas leases with formerly-applicable protective stipulations removed or relaxed due to the plan amendments. *Id.* Because the stipulations are set (or removed) at the planning level, the only effective relief from legal violations in plans is for the Court to enjoin the unlawful plan provisions before BLM can issue enforceable leases and rights-of-way to private parties. *Id.*

Plaintiffs and the public also face immediate irreparable injury from BLM's issuance—

under a much broader array of circumstances, with minimal or no public notice, and without FWS concurrence—of waivers, exceptions, or modifications to protective stipulations. Saul Decl. ¶¶ 35–38. Because of the difficulty of discovering, participating in, or contesting these actions prior to habitat-disturbing activity, if the 2019 Plan Amendments are not enjoined, there is no feasible means of preventing harm to greater sage-grouse and their habitat from BLM officials' exercise of their discretion to approve waivers, exceptions, and modifications. As the Government Accountability Office documented in 2017, there is virtually no public documentation of BLM decisions to grant exemptions to protective stipulations, let alone public notice and opportunity for the public to comment on or challenge those decisions before the harm has occurred. Saul Decl. ¶ 36 (citing Report No. GAO-17-307). Absent an injunction, Plaintiffs and others will be irreparably deprived of their ability to participate in this process. Such exclusion of public involvement in BLM decision-making factored into the Court's preliminary injunction orders on the 2006 BLM grazing regulation revisions, *see Kraayenbrink,* No. 05-cv-297-BLW, ECF Nos. 61, 74, and similarly supports the requested injunction now.

In short, Plaintiffs have abundantly established that "irreparable injury is likely in the absence of an injunction," *Winter,* 555 U.S. at 22, thus warranting injunctive relief.

## IV.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION.

Finally, the balance of the hardships and public interest weigh strongly in favor of enjoining the 2019 BLM Plan Amendments.

BLM and Intervenors may argue they are harmed because the requested injunction would block BLM from rapidly approving pending or new projects in sage-grouse habitats.  That is unfounded.  Plaintiffs do not seek injunctive relief preventing BLM from approving any new oil and gas well or lease, grazing permit, or other discretionary authorization for use of public lands.

Plaintiffs only ask the Court to enjoin BLM from approving such uses <u>based on</u> the 2019 Plan Amendments.  Under the requested injunction, BLM may continue applying the 2015 Plans to upcoming permits, licenses and other approvals; and Plaintiffs reserve the right to challenge such actions as may be appropriate.  But this Court is not asked to enjoin them now.  BLM and Intervenors cannot legitimately claim harm if BLM approves new actions under the terms and requirements of the 2015 Plans, when BLM so obviously violated NEPA in approving the 2019 Plans and actions taken under the 2019 Plans are thus subject to reversal because the plan amendments are unlawful.

Moreover, the requested injunctive relief will benefit BLM, states and industries, and the public by preventing Federal Defendants for proceeding to dismantle sage-grouse protections that underpinned the FWS' October 2015 "not warranted" finding for ESA listing of sage-grouse.  The prospect that sage-grouse may require ESA listing, with much stronger mandatory protections that such ESA protection would entail, is precisely what drove the National Greater Sage-Grouse Planning Strategy and BLM/Forest Service adoption of the 2015 Plans.  The 2019 BLM Plan Amendments utterly ignore how their revisions undermine the "not warranted" determination and could put sage-grouse back on a path to ESA listing—but the Court has broad authority to consider this factor in its equitable calculus for the requested injunction. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–133 (1982) ("essence of equity jurisdiction" is power "to mould each decree to the necessities of the particular case"). Moreover, BLM's statutory and regulatory obligations require it to foster multiple values—including not just accommodation of extractive uses but also the protection of sensitive species such as sage-grouse—in its planning processes. Because BLM itself has a Congressionally-mandated interest in the conservation of

sage-grouse habitat, the public interest favors maintenance of those protections pending resolution of Plaintiffs' claims.

Finally, of course, the public has a strong interest in ensuring BLM correctly follows the law. Congress has recognized through passage of NEPA and FLPMA that there is a strong public interest in requiring BLM to fully involve the public in its land management decisions, and carefully consider its actions, duties BLM has breached here.  When an agency disregards the law, "it disregards the public interest and undermines its own credibility." *W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 WL 39651, at *14 (D. Idaho 2011). There is also an undeniable "public interest in preserving nature and avoiding irreparable environmental injury," *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc), and "in careful consideration of environmental impacts before major federal projects go forward," *All. for the Wild Rockies*, 632 F.3d at 1138.

BLM's misrepresentations and omissions about its 2019 Plan Amendments underscore the public importance of holding it accountable to its duties under law, including NEPA, and again warrant preliminary injunctive relief until Plaintiffs' claims can be adjudicated on the merits, just as the Court did in *Kraayenbrink*.

## V.   NO BOND SHOULD BE REQUIRED.

Plaintiffs are non-profit environmental groups seeking to advance the public interest in this litigation. Therefore, the Court should waive the injunction bond requirement, or impose a nominal bond of $100 under the public interest exception to Fed. R. Civ. P. 65(c). *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully pray that the Court grant their Motion for Preliminary Injunction and prohibit Federal Defendants from implementing the 2019 BLM Plan Amendments until Plaintiffs' challenges can be adjudicated on the merits.

Dated this 19th day of April, 2019.          Respectfully submitted,

*/s/ Laurence ("Laird") J. Lucas*
Laurence ("Laird") J. Lucas (ISB # 4733)
Todd C. Tucci (ISB # 6526)
Sarah Stellberg (ISB #10538)
*Advocates for the West*

Attorneys for Plaintiffs

# APPENDIX A

*Overview of 2019 Sage-Grouse Plan Amendments*

(copy of Exhibit A to Anderson Declaration)

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Sagebrush Focal Areas | • Included in all states but CO, ND, SD. | • **SFA designation eliminated in all states but OR.** As a result, 8.9 million acres lose the following protections: (1) recommendation for hardrock mineral withdrawal; (2) non-waivable NSO stipulation for oil and gas dev't; (3) prioritization for grazing permit reviews, compliance checks, post-fire treatments. ID FEIS at App-2-3; NV/CA FEIS at 2-13; UT ROD at 38; WY FEIS at A-12. | • "The removal of SFA designations would have no measurable effect on the conservation of Greater Sage-Grouse in Idaho because the Management Direction proposed for PHMA would remain in place and continue to protect Greater Sage-Grouse habitat." ID FEIS at 4-10; *see also* CO FEIS at 4-13; NV/CA FEIS at 4-12; UT FEIS at 4-12, 4-42 to 4-42; WY FEIS at 4-9 to 4-10. |
| Compensatory mitigation & Net Conservation Gain standard | • All plans required off-site compensation for unavoidable impacts to birds or habitat as part of the "mitigation hierarchy" (avoidance, minimization, and compensatory mitigation)<br><br>• BLM must require mitigation that achieves a net conservation gain to the species | • **All plans *prohibit* BLM from requiring compensatory mitigation**. Project proponents can volunteer compensatory mitigation or states can require.<br><br>• **CO, ID, NV, UT, WY also downgrade the mitigation standard** from a "net conservation gain" to a "no net loss" (or no clear standard at all). CO ROD at 2-4; ID ROD at 2-13; ID FEIS at App-2-13 to 2-14; NV/CA ROD at 2-14, 2-41 to 2-43; OR ROD at 1-4; UT ROD at 38–42; WY FEIS at A-7 to A-8.<br><br>• UT: avoidance, minimization mitigation only required in PHMA (formerly all habitat). UT ROD at 38, 51. | • "This clarification simply aligns the Proposed Plan Amendment with BLM policy. . . . Any analysis of compensatory mitigation relating to future projects is speculative at this level of land use planning. . . However, the effects of the changes to compensatory mitigation in the Proposed Plan will be nominal, in part, because the BLM will continue to ensure consistency of its actions and authorizations with the land use planning level goals and objectives of the Proposed Plans." ID FEIS at 4-4; *see also* CO FEIS at 4-8; NV/CA FEIS at 4-14; OR FEIS at 4-21 to 4-22; UT FEIS at 4-18; WY FEIS at 4-14.<br><br>• Changing the mitigation standard "would reduce the amount of habitat that would be restored, improved, or protected by the difference between a net gain and a no net loss. . . . It is not possible to state how much benefit would be [lost]. . . . The acres of habitat not restored because of the reduction in the mitigation standard from net gain to no net loss would be much less than one percent of the vegetation treatments completed each year." ID FEIS Appx. 1 at 4-15 to 4-16; *see also* NV/CA FEIS at 4-13 to 4-15; UT FEIS at 4-17 to 4-19; WY FEIS at 4-14 to 4-15.<br><br>• No environmental analysis of applying mitigation only in Utah PHMA. |

---

[1] Citations are provided to the FEIS only where the state ROD lacks a comparison (using underlining and strikethroughs) of the 2015 and 2019 language.

**Exhibit A to Declaration of Greta Anderson – Overview of 2019 Sage-Grouse Plan Amendments**                    **Page 1 of 8**

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Lek buffers | • Required in all states; distances based on USGS report | • **Buffer requirements shortened or eliminated in most states**<br><br>• <u>CO</u>: removes prohibition on new leasing 1 mile from active leks (now open subject to NSO subject to exception, modification, waiver). CO ROD at 2-15.<br><br>• <u>UT, CO, NV/CA</u>: replaced language that BLM "will apply" buffers with commitment only to "evaluate" or "assess" buffers. CO ROD at 2-3; NV/CA ROD at 2-9; UT ROD at 47.<br><br>• <u>ID</u>: (1) buffer distances reduced in IHMA, GHMA to USGS minimums; (2) new buffer exceptions; (3) eliminate buffers for vegetation treatment projects. ID FEIS at App-2-16 to 2-19.<br><br>• <u>NV/CA</u>: (1) switches to lower end of buffers from Manier (as opposed to USGS); (2) allows exceptions during NEPA process; (3) allows line officers to shorten, extend, or waive seasonal buffer restrictions. NV/CA ROD at 2-11.<br><br>• <u>UT</u>: 5-mile wind energy buffer now discretionary. UT ROD at 53, 90.<br><br>• <u>WY</u>: expands circumstances in which BLM officers may grant exceptions to lek buffers, including 2-mile buffer during breeding, nesting, brood-rearing. WY FEIS at A-10. | • <u>CO</u>: "Although the additional acres would be available to leasing, their impact on Greater Sage-Grouse would be similar to the No-Action Alternative. This is because surface disturbance, fragmentation, and indirect habitat loss would not be expected to increase due to restrictions on surface disturbance." CO FEIS at 4-5.<br><br>• No environmental analysis of change from "apply" buffers to "evaluate" buffers in any FEIS.<br><br>• <u>ID</u>: "The reduction of buffers in IHMA would not result in increased development around every or even most leks because disturbance in BLM HMAs is limited and not the major threat to Greater Sage-Grouse habitat, however where development occurs nearer than the buffers identified in the No Action those leks would be at an increased risk of being abandoned." Idaho FEIS Appx. 1 at 4-12. "Overall, the impacts of the changes to lek buffers . . . are not quite as protective as those in the No-Action Alternative." *Id.* at 4-3.<br><br>• <u>NV</u>: "The criteria established for modifying or removing seasonal timing restrictions has been revised . . . . Due to the fact that it would be speculative to anticipate at the land use planning level how often and when this exception would be pursued on a project-by-project basis, impacts would be more appropriate at the project scale." NV FEIS at 4-15. No environmental analysis of (1) or (2).<br><br>• <u>UT</u>: "Constructing transmission lines above-ground could increase predator perches, which may lead to increased take of Greater Sage-Grouse and their nests; however, impacts of predator perches would be minimized by conforming [to other plan provisions] . . . . Constructing transmission lines above the ground could also maintain more habitat than the burial of lines." UT FEIS at 4-23.<br><br>• <u>WY</u>: No environmental analysis of broader exception. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Disturbance and Density Caps | • Included in all states<br>• Most states: 3% project-level and total disturbance cap; density cap of 1 energy/mining project per 640 acres (oil and gas; coal; wind; solar; geothermal; other mining)<br>• Wyoming: 5%<br>• Montana: option to move to 5% | • **Eliminated or weakened in ID, UT, NV/CA**<br><br>• ID: removes 3% project-level disturbance cap and eliminate density cap of 1 energy, mining facility per 640 acres. ID FEIS at App-2-4 to 2-6.<br><br>• UT: Allows exceedances of 3% disturbance cap and 1/640 acre density cap in non-habitat or where project will improve habitat. UT ROD at 42–46.<br><br>• NV/CA: disturbance cap can be exceeded under more circumstances ("allocation exception" criteria); USFWS concurrence no longer required. NV ROD at 2-7 to 2-8 (allocation exception criteria at NV ROD at 2-12 to 2-13). | • ID: "Removal of the 3 percent project level disturbance cap would allow BLM to intentionally cluster developments within areas already degraded. . . . Some areas . . . may be further developed even though compensatory mitigation would offset those impacts. . . . Removal of the one energy or mining facility per 640 acres on average density cap would have little effect on Greater Sage-Grouse conservation . . . because Idaho has limited energy or mining development in Sage-grouse habitat . . . Additionally, there are restrictions on where and how energy facilities and salable mineral mining facilities are developed." ID FEIS Appx. 1 at 4-10 to 11.<br><br>• UT: "The ability to exceed the disturbance and density caps could result in loss and degradation of site-specific Greater Sage-Grouse habitat and impacts on local grouse populations. . . . [H]owever, exceedances to the caps would only be allowed if site-level analysis indicates the project . . . will improve the condition of Greater Sage-Grouse habitat. There is a risk that allowing this exceedance could result in the loss of a specific type of habitat that mitigation may not address[.]" UT FEIS at 4-17. |
| Required Design Features (RDFs) | • All states apply a suite of uniform Required Design Features (RDFs) to mitigate adverse impacts. Applicable RDFs are required for all projects in PHMA and GHMA. | • **Partially eliminated or weakened in ID, UT, WY**<br><br>• ID, UT: RDFs no longer mandatory in GHMA. ID FEIS at App-2-8; UT ROD at ii.<br><br>• WY: replaces RDFs "are required" with RDFs "can be applied." WY FEIS at B-1.<br><br>• UT: eliminates requirement of burying transmission, power lines in PHMA. UT ROD at 93. | • ID: "Removal of the requirement to apply RDFs and buffers in existing Greater Sage-Grouse habitat outside of designated habitat management areas would reduce protections to Greater Sage-Grouse and its habitat; however, PHMA and IHMA designations were designed to protect approximately 90 percent of occupied Greater Sage-Grouse leks. . . . This action is not expected to have any measurable population level effects to Greater Sage-Grouse in Idaho." ID FEIS Appx. 1 at 4-8 to 4-9; *see also* UT FEIS at 4-23.<br><br>• WY: No environmental analysis of change.<br><br>• UT: "This change in management could result in both positive and negative impacts on Greater Sage-Grouse, depending on threats in local populations." UT FEIS at 4-23. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| General Habitat Management Areas (GHMA) | • All plans include GHMA (or equivalent) | • **GHMA designation entirely eliminated in UT (502,500 acres),** along with corresponding buffers, RDFs, disturbance caps, seasonal restrictions, mitigation requirements. UT ROD at 36, 49-51, 82, 87, 88, 97 | • UT: "[T]he impacts from the two alternatives would be the same in the long term, though the Proposed Plan Amendment could likely accelerate the effect on resources in the former GHMA. This is because it incentivizes development in [GHMA] over PHMA. . . . [T]here would be no significant effect of accelerating the impacts on the small populations in former GHMA that contain 5 percent of Utah's Greater Sage-Grouse populations and just 0.25 percent of the populations range-wide. In addition, the Proposed Plan Amendment provides that the BLM would replace occupied habitat outside PHMA that is lost to development by creating or improving habitat inside PHMA." UT FEIS at 4-20 to 4-21, 4-48. |
| Adaptive management (soft and hard triggers) | • Plans all include "hard" and "soft" triggers requiring BLM to take corrective action when monitoring data shows that sage-grouse populations fall below specified thresholds. | • NV/CA: replaces hard-wired changes with warning system; easier to remove protections; trigger applied only at lek cluster scale, allowing declines in individual leks. NV/CA FEIS at Appx. D.<br><br>• UT: lengthens timeframe for management response to hard trigger; new qualifications on when corrective strategies must be implemented; easier to remove protections. UT ROD at 54–56.<br><br>• WY: "The Adaptive Management Working Group (AMWG) would define a process to review and reverse adaptive management actions once the identified causal factor is resolved." WY FEIS at 2-18. | • NV/CA: "Habitat triggers have been replaced with a system of adaptive management warnings related to fire risk, wildland fire, anthropogenic and natural disturbances. If these warnings justify a response, this would be considered an adaptive management habitat trigger. Impacts on Greater Sage-Grouse and its habitat from this change to the adaptive management strategy would be beneficial, providing the ability to detect declining populations and/or habitat and change management on the ground with other Federal, state, and local partners." NV/CA FEIS at 4-13.<br><br>• UT: "[N]o additional analysis is necessary." UT FEIS at 4-15.<br><br>• WY: "The only change for adaptive management would be at the implementation level, when the AMWG identifies a process for returning to previous management. The impacts associated with returning to previous management would be the same as those identified in the final EISs for the 2014 and 2015 proposed land use plan amendments and revisions." WY FEIS at 4-14. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Prioritizing oil and gas leasing, development outside habitat | • All states require BLM to prioritize oil and gas leasing and development outside of PHMA and GHMA. | • **Partially or totally eliminated in ID, UT, NV/CA, and WY**<br><br>• UT, NV/CA: eliminates prioritization requirement. UT ROD at 78; NV/CA at 2-32.<br><br>WY: removes prioritization requirement from GHMAs. WY FEIS at A-3. | • WY: Removal of prioritization has "the potential for locally adverse impacts on habitat in GHMA. This would be a result of potentially concentrating development in the GHMA or non-core areas; however, locally adverse impacts would not be likely to affect the conservation of Greater Sage-Grouse in Wyoming." WY FEIS at 4-16.<br><br>UT: "At most, the prioritization objective could potentially result in temporarily deferring a parcel in PHMA from leasing to a later sale, but only in instances of large lease sales where staff capacity would be incapable of analyzing all the nominated parcels. Because the mineral leasing prioritization objective provides no certain or durable protection to PHMA, its removal would not increase threats, since the no surface occupancy stipulation is still in effect." UT FEIS at 4-22. |
| No surface occupancy (NSO) stipulation | • Most plans impose NSO stipulation in PHMA without waivers, exceptions and modifications (WEMs); where WEMs allowed, requires unanimous consent of BLM, state wildlife agencies, and U.S. Fish & Wildlife Service (FWS) | • **Many more loopholes**<br><br>• ID, NV/CA, UT: allow waivers, exceptions, and modifications of NSO for more reasons and eliminate FWS consultation requirement. ID ROD at App-2-7 to App-2-8; NV/CA ROD at 2-32 to 2-33; UT ROD at 79-81;<br><br>• CO: now allow waivers, exceptions, modification to NSO stipulation. CO ROD at 2-16 and G-4 to G-7.<br><br>• UT: allows operators to place infrastructure (e.g., roads, pipelines, power lines) in PHMA without adhering to the NSO stipulation. UT ROD at 80. | • "While allowing the possibility for an exception introduces the potential for an impact . . . , the criteria that must be met prior to approving an exception would either result in the exception not being granted, or in subsequent development having a low potential for impacts. Further, if the exception to the NSO stipulation is granted, and subsequent development would be subject to other minimization measures." UT FEIS at 4-19; *see also* ID FEIS at 4-13; NV/CA FEIS at 4-11.<br><br>• CO: "[N]o impact on Greater Sage-Grouse or Greater Sage-Grouse habitat would occur" due to availability of waivers, exceptions, and modifications. CO FEIS at 4-5.<br><br>• UT: "[The] modification to the NSO stipulation [] could result in some site-specific impacts on Greater Sage-Grouse or their habitat. . . . The construction of such associated infrastructure would remove vegetation associated with habitat, increase predation opportunities on Greater Sage-Grouse and potentially displace birds." UT FEIS at 4-19 to 4-20. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Habitat objectives / Livestock grazing | • **Threshold and Response requirement**: NEPA analysis for grazing permits/lease renewals within SFA and PHMA must include specific management thresholds based on Greater Sage-Grouse Habitat Objectives, and "responses" for when thresholds are exceeded | • **ID, UT, WY eliminate requirement that BLM proactively impose thresholds/ responses** to protect sage-grouse during permit renewals, now requiring management changes only after habitat assessment identifies problem. ID FEIS at App-2-12 to 2-13; UT ROD at 72-73; WY FEIS at A-22.<br><br>• UT, WY: Weaken requirement that existing grazing-related infrastructure be evaluated and modified. UT ROD at 74, 75; WY FEIS at A-24<br><br>• ID, WY, UT: Remove requirements to prioritize permit renewals and/or field checks for PHMA. WY FEIS at A-22; ID FEIS at App-2-12; UT ROD at 71.<br><br>• UT: Eliminates other restrictions including: emergency measures during drought; consideration of permit retirements; restrictions on new livestock infrastructure. UT ROD at 70-76.<br><br>• ID, UT, WY: Weaken certain habitat objectives (e.g., 7" grass height). ID FEIS at App-2-11; UT ROD at 25-27; WY FEIS at 2-25.<br><br>OR: Removes prohibitions on livestock grazing within 13 Research Natural Areas. OR ROD at 1-6. | • "The Proposed RMP Amendment would not have an explicit requirement for analysis of thresholds and responses during permit renewal or modification; however, it would require analysis of one alternative that would allow for adaptive management to meet or make progress toward meeting the wildlife/Special Status Species standard. . . . The impacts . . . would be similar to those for the No-Action Alternative. Localized, adverse impacts on Greater Sage-Grouse in GHMA may occur, but conservation of Greater Sage-Grouse in Wyoming would not be affected." WY FEIS at 4-11 to 4-12; *see also* UT FEIS at 4-13; ID FEIS at 4-14 to 4-15.<br><br>• Removal of infrastructure evaluation "would be unlikely to affect Greater Sage-Grouse conservation." WY FEIS at 4-10 to 4-13. No analysis in UT FEIS.<br><br>• WY: "Allotments in PHMA would not be prioritized for field checks under the Proposed RMP Amendment; however, there would be more discretion to identify the allotments with the highest needs at the local level for monitoring actual use, utilization, use supervision, etc., which may already be those allotments in PHMA." WY FEIS at 4-11; ID FEIS at 4-15.<br><br>• UT: "Changes in the habitat objectives table . . . will have beneficial impacts on management and Greater Sage-Grouse habitat because the indicators and values more accurately reflect vegetation characteristics in Utah . . . ." UT FEIS at 4-19. No environmental analysis of remaining changes in UT.<br><br>• "Seven inches is not a threshold where Greater Sage-Grouse nesting success suddenly disappears. Multiple studies have found successful Greater Sage-Grouse nests in areas that averaged less than 7 inches of herbaceous cover (Connelly et al. 2000)." ID FEIS App. 1 at 4-14; *see also* WY FEIS at 4-10.<br><br>• UT: analysis at OR FEIS 4-3. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Habitat boundary adjustments | • Habitat boundary changes require Plan Amendment (public comment) | • <u>ID</u>: boundary adjustments allowed through Plan Maintenance (no public involvement). ID FEIS at App-2-3.<br><br>• <u>UT</u>: boundary adjustments allowed at the project level by BLM staff, based on site surveys. UT ROD at 31-34.<br><br>• <u>UT, ID</u>: eliminates requirement that BLM evaluate project area before authorization to determine if it contains sage-grouse habitat not already designated as PHMA. UT ROD at 52; ID FEIS at App-2-3.<br>• | • <u>ID</u>: "If HMA habitat boundary changes were more than minor mapping error fixes, then determining the environmental consequences would not be determined at this time. . . . The BLM anticipates that any impact resulting from a change in map boundaries would be consistent with those described in 2015." ID FEIS Appx. 1 at 4-8.<br><br>• <u>UT</u>: No environmental analysis of change. |
| Exceptions to plan requirements | • Exception process tailored to the specific resource; exceptions not allowed for many provisions; consent of USFWS often required. | • <u>NV</u>: Under new "allocation exception," BLM state director can grant an exception to any stipulation, buffer, timing restriction, etc. if <u>any</u> of the following applies: (1) location is not and lacks potential to be habitat; (2) adverse impacts will be offset; (3) public health, safety concerns; (4) reauthorization of existing infrastructure in previously disturbed sites <u>or</u> expansion that won't result in new impacts; (5) routine administrative function, prior existing use, authorized use, valid existing right, or existing infrastructure (i.e., roads) that serve a public purpose and adverse impacts will be mitigated; (6) non-disposal or exchange of certain lands. This broadens circumstances in which an exception can be granted and eliminates requirement of USFWS consent. NV ROD at 2-12 to 2-13. | • <u>NV</u>: "Because these criteria ensure that projects are either in unsuitable Greater Sage-Grouse habitat; do not result in direct, indirect, or cumulative impacts on Greater Sage-Grouse; or can be offset, with the exception of those needed for public health and safety, no new impacts on Greater Sage-Grouse and its habitat are anticipated above those analyzed in the 2015 Final EIS." NV FEIS at 4-11. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Noise restrictions | • <u>WY</u>: Noise thresholds and monitoring protect leks in all habitat designations. | • <u>WY</u>: Eliminated noise restrictions in GHMA (now applied in PHMA only). WY FEIS at A-11. | • <u>WY</u>: "The impacts associated with clarifying that the noise measurement and monitoring condition of approval (COA) would apply only to leks within Greater Sage-Grouse PHMA would have similar impacts as those described under the No-Action Alternative for the RMPAs and for the RMP revisions. . . . The removal of noise restrictions in GHMA would likely result in localized, adverse impacts on Greater Sage-Grouse but would not affect Greater Sage-Grouse conservation in Wyoming." WY FEIS at 4-13 to 4-14. |
| Coal leasing | • <u>UT</u>: PHMA is "essential habitat" for purposes of the suitability criteria set forth at 43 CFR § 3461.5(o)(1). | • <u>UT</u>: PHMA no longer deemed "essential habitat" and therefore "unsuitable" for coal leasing. UT ROD at 87-88. | • <u>UT</u>: No environmental analysis provided. Change deemed a "clarification." UT FEIS at 2-8, Table 2-1. |
| Travel Management | • <u>UT</u>: plan imposed specific requirements for travel management plans impacting greater sage-grouse. | • <u>UT</u>: eliminates detailed requirements for considering greater sage-grouse in travel management plans. UT ROD at 101-103. | • <u>UT</u>: No environmental analysis provided. |
| Non-energy leasable materials | • <u>NV</u>: PHMA closed to new non-energy mineral leasing. | • <u>NV</u>: restriction now subject to "allocation exception" criteria. NV ROD at 2-35. | • <u>NV</u>: "Because these criteria ensure that projects are either in unsuitable Greater Sage-Grouse habitat; do not result in direct, indirect, or cumulative impacts on Greater Sage-Grouse; or can be offset, with the exception of those needed for public health and safety, no new impacts on Greater Sage-Grouse and its habitat are anticipated." NV FEIS at 4-11. |