Laurence J. ("Laird") Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | Case No. 1:16-cv-00083-BLW |
| *Plaintiffs*, | **DECLARATION OF GRETA ANDERSON** |
| v. | |
| DAVID BERNHARDT, Acting Secretary of Interior; JOSEPH R. BALASH,* Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE, | |
| *Defendants*. | |

*\* Official Defendant automatically substituted per Fed. R. Civ. P. 25(d)*

I, Greta Anderson, declare as follows:

1.    The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2.    I am a member of Western Watersheds Project and WildEarth Guardians.

DECLARATION OF GRETA ANDERSON - 1

3. I am a resident of Tucson, Arizona, where I have lived since 2004.

4. I have a B.A. in Environmental Studies from Prescott College and an M.A. in Geography from the University of Arizona.

5. I am currently the Deputy Director of Western Watersheds Project, a position I have held since 2011. My work for the organization includes overseeing the strategic and administrative direction of the organization by assisting the Executive Director. I am also tasked with completing work relevant to the organization at large, such as writing comments, generating media, and setting policy.

6. I am familiar with WWP's investment in sage-grouse issues and public lands grazing issues from my years of working here and, in particular, because I have been the lead staff person coordinating WWP's efforts on sage-grouse since 2014. On behalf of WWP and other environmental organizations, I took the lead in drafting public comments and protests on the 2015 Sage-Grouse Plans prepared by Bureau of Land Management (BLM) and U.S. Forest Service, and on the proposed 2019 Amendments to those plans. I also communicated with the relevant agencies after the 2015 Plans were approved, to follow up on implementation. As a result, I am closely familiar with the 2019 Plan Amendments and the myriad ways in which they fail to adequately protect sage-grouse.

7. The BLM completed its 2019 Plan Amendments in March 2019 through Records of Decision (RODs) to amend the 2015 Plans for Idaho, Wyoming, Colorado, Utah, Oregon, and Nevada/NE California, based on the BLM's December 2018 Final Environmental Impact Statements (EISs) and May 2018 Draft EISs.  The Forest Service is currently pursuing its own process to the amend the 2015 Plans, and issued Draft EISs for public comment in October 2018.

DECLARATION OF GRETA ANDERSON - 2

8.      In this declaration, I provide: (1) hyperlinks to the six BLM 2019 RODs and Draft and Final EISs, for the convenience of the Court; (2) append and lay the foundation for various materials cited in Plaintiff's opening injunction brief (filed herewith), including **Appendix A** hereto, entitled Summary Table of 2019 Sage-Grouse Plan Amendments; and (3) explain ways the 2019 BLM Plan Amendments will be implemented on the ground in the near or foreseeable future, threatening imminent irreparable harm to the Plaintiff organizations in this case, their staff, members, supporters, and others.

9.      In preparing this declaration, I reviewed and relied on the BLM's Draft and Final EISs for the 2019 Sage Grouse Plan Amendments; the final RODs issued on March 15, 2019; the public comments and protests submitted by WWP and others; and my own professional knowledge. Information about upcoming BLM projects was collected from BLM's RAS data, GIS analysis, BLM's ePlanning website, and BLM records obtained via the Freedom of Information Act (FOIA).

**APPENDICES AND HYPERLINKS TO RECORD DOCUMENTS**

10.      Attached as **Exhibit A** hereto is a Summary Table of the 2019 Sage-Grouse Plan Amendments. The Draft and Final EISs and RODs for the 2019 Plan Amendments span thousands of pages. This Summary Table distills the key plan changes and environmental analysis thereof into a more accessible format, along with citations to the relevant pages in each state ROD and FEIS. This type of summary exhibit of voluminous record materials is permitted under Federal Rule of Evidence 1006. The summaries provided in Exhibit A are true and correct and accurate, to the best of my knowledge.

11.      Attached as **Exhibit B** hereto is a true and correct copy of the comment letters from the U.S. Environmental Protection Agency (EPA) to BLM regarding the 2019 Plan

DECLARATION OF GRETA ANDERSON - 3

Amendment EISs. These letters were accessed from EPA's Environmental Impact Statement (EIS) Database, https://cdxnodengn.epa.gov/cdx-enepa-public/action/eis/search, which contains all EPA comment letters on EISs since 2001, and compiled together into a single pdf document.

12.     Attached as **Exhibit C** hereto is a true and correct copy of the standalone NEPA alternative presented by The Wilderness Society and others as an appendix to their comments on the Northwest Colorado Draft EIS. This document was downloaded from the compilation of public comments available on BLM's ePlanning page for the 2019 Plan Amendments: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=134122. On information and belief, a similar or identical alternative was appended to The Wilderness Society's comments on all six Draft EISs.

13.     Attached as **Exhibit D** hereto is a true and correct copy of a letter, dated July 19, 2017, from the Western Energy Alliance (WEA) to BLM which contains a "wish list" of proposed changes to the 2015 Sage-Grouse Plans. The letter was obtained by the  Western Values Project in response to a Freedom of Information Act (FOIA) request seeking correspondence between industry representatives and staff at the Department of the Interior who worked on Secretary Zinke's sage-grouse review, and is available online at http://westernvaluesproject.org/wp-content/uploads/2017/08/WEA_7-19-2017-1.pdf.

14.     In preparing this declaration, I reviewed the Draft and Final EISs and RODs for the 2019 BLM Plan Amendments. These records are available on BLM's ePlanning website and subject to judicial notice. Figure 1 below provides direct links to the key records. The appendices, public comments, and other materials can be found here:

https://eplanning.blm.gov/epl-front-

DECLARATION OF GRETA ANDERSON - 4

office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectI

d=90121&dctmId=0b0003e880fb63b3.

**FIGURE 1: LINKS TO RECORD DOCUMENTS**

| | Draft EIS (May 2018) | Final EIS (December 2018) | RODs and Approved RMP Amendments (March 2019) |
|---|---|---|---|
| Idaho | https://eplanning.blm.gov/epl-front-office/projects/lup/103344/143598/176713/ID_GRSG_DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103344/163458/199450/2018_Idaho_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103344/168711/205330/IdahoRODandARMPAMarch2019.pdf |
| Nevada / NE California | https://eplanning.blm.gov/epl-front-office/projects/lup/103343/143703/176904/NVCA_GRSG_DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103343/163459/199451/2018_NVCA_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103343/169658/206228/NVCA_2019_ROD_ARMPA_FINAL_03_28_2019.pdf |
| NW Colorado | https://eplanning.blm.gov/epl-front-office/projects/lup/105596/143661/176861/CO_GRSG-DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/105596/163463/199455/2018_Northwest_Colorado_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/105596/168786/205429/2019_NWCO_GRSG_ROD-ARMPA_signed_2019-0314_web.pdf |
| Oregon | https://eplanning.blm.gov/epl-front-office/projects/lup/103348/143724/176960/OR_GRSG-DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103348/163460/199452/2018_Oregon_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103348/168708/205327/2019_Oregon_GRSG_ROD_ARMPA.pdf |
| Utah | https://eplanning.blm.gov/epl-front-office/projects/lup/103346/143742/177012/UT_GRSG_DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103346/163461/199453/2018_Utah_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103346/168792/205436/2019_ROD_and_Utah_Approved_GRSG_RMPA_FINAL_03-14-2019.pdf |
| Wyoming | https://eplanning.blm.gov/epl-front-office/projects/lup/103347/143764/177176/WY_GRSG-DEIS_201805_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103347/163483/199476/2018_Wyoming_GRSG_Proposed_RMPA-Final_EIS_508.pdf | https://eplanning.blm.gov/epl-front-office/projects/lup/103347/168776/205593/WY_ROD_03142019_signed.pdf |

DECLARATION OF GRETA ANDERSON - 5

**WESTERN WATERSHEDS PROJECT'S INTERESTS IN GREATER SAGE-GROUSE CONSERVATION**

15.     Western Watersheds Project is a non-profit, membership conservation organization, which is headquartered in Hailey, Idaho, and currently has offices or staff in Idaho, Wyoming, Arizona, Oregon, Nevada, Montana, and Washington. The organization is recognized as an IRS 501(c)(3) public charity.

16.     Western Watersheds Project has over 9,500 members and supporters throughout the United States, including in California, Colorado, Idaho, Nevada, Oregon, Utah, and Wyoming.

17.     Through the efforts of our staff, members, directors, supporters, and volunteers, Western Watersheds Project is actively engaged in seeking to protect and preserve watersheds, native habitats, fish and wildlife, and other natural resources on public lands across the West, with a particular focus on promoting responsible livestock grazing management on public lands and enforcing the nation's public lands and environmental laws with respect to livestock grazing and related activities.

18.     A large part of the area in which Western Watersheds Project is most active is what many people call the "Sagebrush Sea" —the sagebrush-steppe ecosystem which once stretched across hundreds of millions of acres in the West, including parts of Idaho, Oregon, Washington, Nevada, Utah, Colorado, New Mexico, Wyoming, and Montana. Millions of acres of these sagebrush lands have been lost or degraded as a result of human activities, and they continue to be harmed  by livestock grazing and oil and gas leasing and development.

19.     The greater sage-grouse is an indicator species for the Sagebrush Sea, reflecting the health of sagebrush ecosystems and the hundreds of plant and animal species that rely on this habitat type. Because of the importance of sage-grouse to the American West, Western

DECLARATION OF GRETA ANDERSON - 6

Watersheds Project has been working at the federal level to protect sage-grouse since 2003, when we (along with others) petitioned to list the species under the Endangered Species Act.

20.    We have filed and litigated several lawsuits regarding the species' federal status. First, we successfully challenged the U.S. Fish & Wildlife Service's (Service) 2005 finding that the sage-grouse was "not warranted" for protection under the ESA. This Court held the "not warranted" finding was the product of improper political meddling and reversed and remanded the finding to FWS. *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, No. 06-cv-277-BLW, 535 F. Supp. 2d 1173 (D. Idaho 2007).  As a result of that litigation, and follow-up litigation to spur a timely decision, the Service re-evaluated the species' status and found it was "Warranted-But-Precluded" for listing under the Endangered Species Act, in 2010.

21.    The 2010 Warranted-But-Precluded Finding precipitated the National Greater Sage-Grouse Planning Strategy and resulted in the 2015 BLM and Forest Service Sage-Grouse Land Use Plan Amendments that served, in part, as the basis for the Service's October  2015 "Not Warranted" ESA listing decision.    Western Watersheds Project extensively participated in that planning process.

22.    In addition, WWP has been undertaking litigation against the Bureau of Land Management's Resource Management Plans since at least 2008, when it filed a lawsuit challenging 18 BLM land use plans over 34 million acres in six western states for failing to adequately protect the sage-grouse, among other failings. *See, e.g.*, *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW, 2011 WL 4526746 (D. Idaho 2011) (holding that BLM "test case" RMPs violated NEPA and FLPMA for failing to address sage-grouse conservation needs).

23.    WWP has submitted innumerable comments on public lands in Idaho and other western states where livestock grazing decisions impact sage-grouse habitat. The organization's

DECLARATION OF GRETA ANDERSON - 7

interest in protecting the sage-grouse range from opposing new livestock-related infrastructure to opposing vegetation "treatments" that permanently degraded sage-grouse habitat.

24.     WWP, as an organization, focuses primarily upon the impacts of livestock grazing on public lands. This is a key impact in sage-grouse habitat as well. Cattle and sheep are known to trample and flush and depreciate sage-grouse nests, reduce grass cover and expose nests and juveniles to predation, modify riparian habitats such that they won't provide for sage-grouse nutritional or structural needs, destroy biotic soil crusts that prevent erosion and defend against the spread of invasive weeds, spread invasive species that create unnatural flammable conditions in the sagebrush, and many other direct and indirect impacts of this land use. Livestock grazing also entails infrastructure projects like fencing and water sources that entrap sage-grouse and create opportunities for predators to observe the exposed birds.

25.     The interests of WWP and its members in protecting the sagebrush sea and intact ecological communities will be irreparably harmed by implementation of the 2019 Plan Amendments across the West.  As I describe below, these new plans deviate further from the best available science set forth in the NTT Report and elsewhere and eliminate or weaken numerous protective measures from the 2015 Plans. The 2019 Plan Amendments will allow development that harms sage-grouse by disturbing or destroying sagebrush ecosystems.

**UPCOMING SITE-SPECIFIC APPLICATIONS OF THE 2019 SAGE-GROUSE PLAN AMENDMENTS**

26.     In the subsections below, I describe how the 2019 Plan Amendments, if not enjoined, will be immediately implemented on-the-ground, affecting sage-grouse habitat across the American West.

DECLARATION OF GRETA ANDERSON - 8

**Livestock Grazing - Permit Renewals**

27.    The 2019 Plan Amendments substantially weaken restrictions on harmful livestock grazing in two key ways: first, by weakening the substantive restrictions contained in the sage-grouse habitat objectives table, and second, by lengthening the timeframe for identifying and responding to problematic allotments.

28.    Using the Idaho Plan as an example, the 2019 Plan Amendments "clarified" that the habitat objectives set forth in the 2015 Plans "are not intended to be prescriptive at the allotment level." Idaho FEIS at App-2-12. This is a considerable change from the 2015 amendment that required NEPA analyses of livestock grazing permits and leases to include applicable Habitat Objectives as management thresholds at the allotment level. The 2019 Idaho amendments also expressly replace the 7-inch grass height objective to the more-malleable "adequate nesting cover." *Id.* at App-2-11.

29.    The Idaho amendments also eliminate the requirement for BLM to proactively manage for sage-grouse through the inclusion of management thresholds and defined responses in grazing permits, as they are renewed. *See* ID FEIS at App-2-10 (obscuring the deletion by not marking it in strikethrough). Instead, they only require grazing modifications after a habitat assessment determines that "improper livestock grazing is the causal factor for not meeting or making progress towards achievable habitat objectives or Land Health Standards." *Id.* at App-2-13. This replaces proactive planning, i.e., management responses built into the permits, with reactive management, i.e., management responses that require a permit modification to take effect. This will allow the damage to persist until a habitat assessment is performed, and then for as long as the subsequent planning process might take. Given that Land Health Standards are only ever assessed every ten years or so, improper livestock grazing might persist for over a

DECLARATION OF GRETA ANDERSON - 9

decade before it is assessed, and the changes might not be implemented for quite some time after that. Degradation will be allowed to continue in the interim.

30.     Moreover, under the amended plans in Idaho, permits in SFA and PHMA will no longer be prioritized for permit review and processing. In Idaho, for example, prioritization will be based on the findings of existing Land Health Evaluations, rather than the quality and significance of the sage-grouse habitat (SFA, PHMA, GHMA) or types of habitat (riparian, wet meadows, etc.). Idaho FEIS at App-2-12.

31.     The problem with this approach is that Land Health Evaluations are rarely completed. By conditioning management responses on the LHS having been performed, the amendments effectively eliminate the vast majority of PHMA allotments from prioritization. In the meantime, 10-year grazing permits will continue to be renewed on PHMA allotments with no NEPA analysis or consideration of sage-grouse needs, under the 2015 National Defense Authorization Act (NDAA) amendments to the Federal Land Policy and Management Act (FLPMA). Under the 2015 amendments, these allotments would have been subject to expedited processing due to their habitat significance to sage-grouse, and the attendant Land Health Evaluation would have more quickly identified whether sage-grouse habitat objectives were being met, allowing the agency to adjust the permit terms accordingly.

32.     These problems are not unique to Idaho. The Utah and Wyoming plan amendments, like Idaho, switch from proactive integration of thresholds/responses to reactive responses only after a Land Health Evaluation and NEPA analysis have been completed. *See* UT ROD at 72-73 (see MA-LG-6); WY FEIS at A-21 to A-22. Moreover, the Utah amendments substantially weakened numerous Habitat Objectives. *See id.* at 25-27 (Table 3). Utah also eliminated the permit prioritization requirement altogether. UT ROD at 71.

DECLARATION OF GRETA ANDERSON - 10

33.    These amendments will have immediate on-the-ground impacts for public lands in these states. Hundreds of PHMA and former SFA allotments have never received a Land Health Evaluation, meaning they will no longer be prioritized for permit review and processing. Data compiled by a WWP staffer using BLM records obtained via the Freedom of Information Act (FOIA), BLM's Rangeland Administration System, along with GIS mapping of sage-grouse habitat, revealed that as of 2012, roughly 80% of the PHMA/SFA grazing permits in Idaho were in allotments that had not been evaluated for compliance with Land Health Standards (LHS) in the last decade, if ever. In Utah, over 85% of the PHMA/SFA permits were in allotments that had not been evaluated in the last decade. BLM's RAS data provides no data concerning LHS for many allotments, meaning the figure is likely higher.

34.    Thus, by basing special attention on whether or not allotments are achieving or making progress towards LHS, rather than whether they are located in high-value sage-grouse habitats, the 2019 Plan Amendments remove management focus from most grazing allotments in sage-grouse PHMAs. Harmful livestock grazing on these parcels may remain undetected and persist for years before sage-grouse management restrictions are incorporated into the grazing permits.

35.    Moreover, grazing permits will soon be renewed under the more lax provisions of the 2019 Amendments. Rather than ensure that allotments are evaluated against the habitat objectives developed in the 2015 amendments, the new amendments merely require that the the site-specific conditions of the allotment be evaluated in context of the "desired outcomes." For example, in the Nevada/Northern California amendment, the BLM "clarifies" that the GRSG Habitat Objectives of the 2015 ARMPA/ROD are "desired outcomes" rather than anything binding. The BLM Handbook specifies that "objectives" are specific, measurable, and

DECLARATION OF GRETA ANDERSON - 11

quantifiable in the present (*See* BLM Handbook H-1601-1); "desired outcomes" are long-term and subjective. This change means that grazing regimes in even the most important sage-grouse habitats will be evaluated based on potential rather than actual conditions, precluding immediate course correction even where known habitat variables like grass height and cover aren't meeting the requisite needs of sage-grouse.

### Livestock Grazing - Permit Compliance Checks

36.     Both Utah and Wyoming eliminated the requirement that allotments in PHMA be prioritized for field checks to ensure compliance with permit terms and conditions. UT ROD at 74; WY FEIS at A-22.

37.     This change means that the most important habitats for sage-grouse won't necessarily be monitored at intervals sufficient to observe and address livestock damage. The 2015 amendments inherently recognized that PHMA (and SFA) were critical to the species survival and that management of these areas should be prioritized. The 2019 amendments remove this prioritization, leaving PHMA to the whims of schedules of and budgeting by the agency.

### "Range Improvements" - Existing Projects

38.     The 2019 Plan Amendments in Utah eliminate the requirement that BLM evaluate and modify "structural range improvements" for potential risks to Greater Sage-Grouse and its habitat. *See* UT ROD at 71, 75. Wyoming eliminates this requirement for GHMA. WY FEIS at A-24.

39.     Additionally, Utah's new plan eliminates the more specific requirement that BLM evaluate existing water developments (springs, seeps, etc. and their associated pipelines) in

DECLARATION OF GRETA ANDERSON - 12

greater sage-grouse habitat and determine if modifications are necessary to maintain or improve riparian areas and GRSG habitat. UT ROD at 74.

40.     Countless range improvement projects currently exist on BLM lands throughout the West, including fences, corrals, guards, exclosures, wells, spring developments and water diversions, pipelines, troughs, and stock ponds. These pose numerous risks for sage grouse. As the FWS has found, "development of springs and other water sources to support livestock in upland shrub-steppe habitats can artificially concentrate domestic and wild ungulates in important sage-grouse habitats, thereby exacerbating grazing impacts in those areas." 69 Fed. Reg. 21484, 21489 (April 21, 2004).  Further, "fences constructed for . . . livestock management provide perching locations for raptors and travel corridors for mammalian predators… Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed." *Id.*; *see also* WY FEIS at 4-12 ("evaluation of existing range improvements would likely prevent vegetation from degradation and would result in benefits to habitat and to Greater Sage-Grouse.").

41.     If the 2019 Plan Amendments are not enjoined, countless grazing infrastructure projects across all Wyoming GHMA and Utah PHMA will no longer be monitored to identify and address risks to sage grouse, risking imminent irreparable harm to sage-grouse and their habitat, as BLM itself admits. *See* WY FEIS at 4-12 ("This could result in increased damage to vegetation and habitat, which could result in localized adverse impacts on Greater Sage-Grouse.").

**"Range Improvements" - New Water Developments in Utah**

DECLARATION OF GRETA ANDERSON - 13

42.     Utah eliminated numerous requirement that BLM limit authorizations of new water developments to projects in GRSG habitat. New water developments create additional impacts in areas where livestock didn't previously concentrate, leading to increased use on the surrounding vegetation, increased compaction on soils, and increased presence of livestock in the vicinity. The plan now states that BLM must "manage" new water developments to have an undefined neutral or beneficial effect, but the amendment no longer requires Utah to limit the occurrence of these new impacts.  Additionally, Utah eliminated a requirement that new surface water diversions maintain riparian or wet meadow vegetation hydrology to meet GRSG needs for this habitat type in the summer brood-rearing season. This change means that important wet meadow habitats for sage-grouse can be dewatered without restriction.

**Vegetation Treatments**

43.     The 2019 Plan Amendments eliminated numerous protective restrictions on vegetation treatment projects. For example, the Utah amendments eliminate the requirement that vegetation treatment projects "conserve, enhance, or restore GRSG habitat." UT ROD at 74. This means that vegetation treatments in sage-grouse habitat can be strictly conducted for the sake of improving forage for livestock, without requiring that it also be designed in a way that benefits sage-grouse habitat. The Idaho plan amendments eliminate lek buffer requirements for all vegetation treatment projects designed to improve or protect sage-grouse habitat. ID FEIS at App 2-18. This will potentially allow treatments to impact sage-grouse during vulnerable lekking and nesting periods.

44.     The Utah amendments also eliminate the requirement that BLM "evaluate the role of existing seedings [in PHMA] that are currently composed of primarily introduced perennial grasses to determine if they should be restored to sagebrush or habitat of higher quality for

DECLARATION OF GRETA ANDERSON - 14

greater sage-grouse." UT ROD at 74. Utah also eliminated the requirement that, in PHMA, BLM "monitor for and treat noxious weeds and treat invasive species where needed, associated with existing range improvements." UT ROD at 76. These changes immediately eliminate BLM's obligation to monitor and treat poor habitat conditions, allowing sage-grouse habitat degraded by these conditions to persist  indefinitely.

### Off-Road Vehicle Use Near Utah's Imperiled Sheeprocks Population

45.    Utah's 2019 plan amendments removed GHMA entirely, along with all corresponding lek buffers, Required Design Features, disturbance caps, seasonal restrictions, and mitigation requirements that formerly applied to activities in GHMA.  This is a highly significant change for sage-grouse that will affect all upcoming BLM management decisions in former GHMA lands across the state of Utah.

46.    Of particular concern, the removal of GHMA now allows cross-country off-road vehicle use in two areas totaling over 14,000 acres of potential new OHV travel in sage-grouse habitat.  This area includes habitat for the imperiled Sheeprocks population of sage-grouse. *See* Utah ROD at 99.

47.    Additional off-road vehicle use in this area could be devastating to the Sheeprocks population. The U.S. Fish and Wildlife service found this population to be isolated and of "high risk" of extirpation in its 2013 Greater Sage-Grouse Conservation Objectives Team Report 71–72 ("COT Report"). The Sheeprocks population experienced a nearly 40 percent decrease over the last four years and saw its male numbers drop from 190 in 2006 to just 23 in 2015. It recently tripped a hard trigger under the 2015 Plan. As described in the 2015 Utah ARMPA, this hard trigger "represent[s] a threshold indicating that immediate action is necessary to stop severe deviation from [sage-grouse] conservation objectives."  In February 2017, BLM issued a press

DECLARATION OF GRETA ANDERSON - 15

release calling attention to the serious decline in the Sheeprocks population and stating that it would "prioritize habitat restoration efforts" in the Sheeprocks SGMA. *See* Press Release, BLM Implements Measures to Restore and Maintain Habitat for the Sheeprocks Greater Sage-Grouse Population in Central Utah (Feb. 6, 2017).

48.     Opening up this area to cross-country OHV use could result in habitat loss for the Sheeprocks population, as BLM itself admitted. *See* UT FEIS at 4-22. However, BLM claims that there will be no grouse impacts because its GPS tracking data in the years data was collected indicates that none of the collared birds--which they admit is only a sub-sample of the population--used the areas proposed to be opened to off-highway and cross-country use.  BLM did not indicate that it conducted any site checks or investigations to verify whether this habitat is in fact unoccupied. BLM also failed to consider whether allowing additional degradation of currently unoccupied habitat would impact the long-term resiliency and recovery of the Sheeprocks population to its prior numbers.

49.     If the 2019 Plans are not enjoined, the re-opening of OHV use in the Sheeprocks area will risk speeding the population's trajectory towards extirpation, causing imminent irreparable harm.

**Grazing in Oregon Research Natural Areas (RNAs)**

50.     The Oregon amendments remove the 2015 plan provisions which excluded livestock from the entirety or portions of 13 previously-designated "Research Natural Areas" (RNAs). OR ROD at 1-6. Over 12 million acres of sage-grouse habitat on BLM land is available to livestock and the 2015 ARMPA closed just 22,765 acres—less than 1/5 of one percent—of all the grazing acreage available on sage-grouse habitat on BLM land in Oregon.

DECLARATION OF GRETA ANDERSON - 16

51.     Although the 2015 amendments closed only a small proportion of sage-grouse habitat to grazing, it was significant for conservation and science. As the OR 2015 ARMPA FEIS noted, these areas would be managed "as undisturbed baseline reference areas for the sagebrush plant communities they represent that are important for Greater Sage-grouse. Manage key RNAs for minimum human disturbance allowing natural succession to proceed." *See* 2015 OR ARMPA 2-18 to 2-19. The 2019 Amendments reverse these important grazing closures, nullifying their conservation and research value.

52.     This change will irreparably harm the interests of WWP members in recreating in and around these RNAs. It will also adversely affect WWP's organizational interest in livestock-free research areas. Because so few ungrazed scientific reference areas exist, the 2015 Oregon ARMPA's closure of the RNAs provided a critical opportunity to study the differences across land management. The 2019 Plan Amendments withdrew this opportunity without acknowledging the impacts to science or the sage-grouse.

**Upcoming Phosphate Mining Projects in Southeastern Idaho**

53.     There are several proposals for major phosphate mining projects in southeastern Idaho currently pending and in the final stages of BLM's approval process. These projects are located in greater sage-grouse habitat, and if approved and commenced under the more lenient terms of the 2019 Greater Sage-Grouse Plans Amendments, would result in irreparable harm to the greater sage-grouse.

54.     These projects pose a unique  risk, due to the small and isolated nature of the sage-grouse populations in this region. *See* Greater Sage Grouse Conservation Objectives Team: Final Report ("COT Report") (2013) at 22, 76-77.

DECLARATION OF GRETA ANDERSON - 17

55.     The Dairy Syncline phosphate mine would disturb 2,830 acres, including 277 acres of GHMA.  Under the 2015 Plans, compensatory mitigation would have been required in order to achieve the net conservation gain the 2015 Plans mandated.  However, the Idaho's 2019 amended plan does away with the net conservation gain standard, and requires no compensatory mitigation at all in GHMA.  Thus, the land sale may be able to be completed with no additional mitigation despite the net loss of sage-grouse habitat that would occur.

56.     The J.R. Simplot Company has also proposed a land exchange of 479 acres of sage-grouse GHMA as part of the Dairy Syncline phosphate mine project. Land sales and exchanges are subject to a special provision under the sage grouse plans. Under the 2015 Idaho Plan, the sale would be permitted only if the disposal of the lands would provide a "net conservation gain" to the sage-grouse. The 2019 Plans would allow the sale under a weaker "no net loss" standard, Idaho ROD at 2-11, making the transfer of sage-grouse habitat to Simplot more likely. BLM's approval of the proposed land sale would permanently remove this sage-grouse habitat from the public domain.

57.     The BLM is currently preparing its Final EIS for the Dairy Syncline project. A Final EIS is expected this fall, according to BLM's ePlanning website.

58.     The Caldwell Canyon project, proposed in the same region, poses similar problems. In the case of the Caldwell Canyon project, the project proponent (Bayer/Monsanto) has offered to voluntarily undertake mitigation to the 2015 ARMPAs' net conservation standard to offset impacts from the destruction or modification of 113 acres of GHMA, 868 acres of key habitats, and compromise of two sage-grouse leks the mine expansion would entail.  Because the mitigation is not required, however, the project proponent may renege upon its commitment to undertake mitigation at any time.  This seems likely in the case of the Caldwell Canyon project,

DECLARATION OF GRETA ANDERSON - 18

where the DEIS and mitigation plan for the project make different representations about Bayer/Monsanto's commitments.  Without required mitigation to a net conservation gain standard, losses of sage-grouse habitat in southeastern Idaho will occur from concentrated phosphate mining. BLM released a draft EIS analyzing the project in November 2018.

59.     In sum, the weakened conservation measures under the 2019 Plan Amendments have already been applied and will continue be implemented immediately in countless BLM management decisions across the planning area in the coming weeks and months. A ruling by the Court enjoining those Amendments from taking effect will help ensure that BLM fairly analyzes and discloses the true scope of these 2019 Amendments and their impacts on greater sage-grouse conservation. An injunction would also prevent irreparable harm to sage-grouse, BLM public lands, and the interests of WWP staff, supporters, and member that will otherwise occur if this Administration moves forward to implement the weakened plans.

60.     Finally, at a personal level, my first experience with sage-grouse was seeing a handful flush from a riparian thicket in Idaho in July 2011. I have seen sage-grouse several times since, strutting on leks and nesting in sagebrush. They are remarkable animals, and I hope to be able to share their wonderful and quirky mating displays with my daughter in the future. I truly believe that the current plans' weak protections for this species and its habitat will harm my ability to share this experience with her.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of April, 2019, in Tucson, Arizona.

Greta Anderson

DECLARATION OF GRETA ANDERSON - 19

# EXHIBIT A

*Overview of 2019 Sage-Grouse Plan Amendments*

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Sagebrush Focal Areas | • Included in all states but CO, ND, SD. | • **SFA designation eliminated in all states but OR.** As a result, 8.9 million acres lose the following protections: (1) recommendation for hardrock mineral withdrawal; (2) non-waivable NSO stipulation for oil and gas dev't; (3) prioritization for grazing permit reviews, compliance checks, post-fire treatments. ID FEIS at App-2-3; NV/CA ROD at 2-13; UT ROD at 38; WY FEIS at A-12. | • "The removal of SFA designations would have no measurable effect on the conservation of Greater Sage-Grouse in Idaho because the Management Direction proposed for PHMA would remain in place and continue to protect Greater Sage-Grouse habitat." ID FEIS at 4-10; *see also* CO FEIS at 4-13; NV/CA FEIS at 4-12; UT FEIS at 4-12, 4-42 to 4-42; WY FEIS at 4-9 to 4-10. |
| Compensatory mitigation & Net Conservation Gain standard | • All plans required off-site compensation for unavoidable impacts to birds or habitat as part of the "mitigation hierarchy" (avoidance, minimization, and compensatory mitigation)<br><br>• BLM must require mitigation that achieves a net conservation gain to the species | • **All plans *prohibit* BLM from requiring compensatory mitigation**. Project proponents can volunteer compensatory mitigation or states can require.<br><br>• **CO, ID, NV, UT, WY also downgrade the mitigation standard** from a "net conservation gain" to a "no net loss" (or no clear standard at all). CO ROD at 2-4; ID ROD at 2-13; ID FEIS at App-2-13 to 2-14; NV/CA ROD at 2-14, 2-41 to 2-43; OR ROD at 1-4; UT ROD at 38–42; WY FEIS at A-7 to A-8.<br><br>• UT: avoidance, minimization mitigation only required in PHMA (formerly all habitat). UT ROD at 38, 51. | • "This clarification simply aligns the Proposed Plan Amendment with BLM policy. . . . Any analysis of compensatory mitigation relating to future projects is speculative at this level of land use planning. . . However, the effects of the changes to compensatory mitigation in the Proposed Plan will be nominal, in part, because the BLM will continue to ensure consistency of its actions and authorizations with the land use planning level goals and objectives of the Proposed Plans." ID FEIS at 4-4; *see also* CO FEIS at 4-8; NV/CA FEIS at 4-14; OR FEIS at 4-21 to 4-22; UT FEIS at 4-18; WY FEIS at 4-14.<br><br>• Changing the mitigation standard "would reduce the amount of habitat that would be restored, improved, or protected by the difference between a net gain and a no net loss. . . . It is not possible to state how much benefit would be [lost]. . . . The acres of habitat not restored because of the reduction in the mitigation standard from net gain to no net loss would be much less than one percent of the vegetation treatments completed each year." ID FEIS Appx. 1 at 4-15 to 4-16; *see also* NV/CA FEIS at 4-13 to 4-15; UT FEIS at 4-17 to 4-19; WY FEIS at 4-14 to 4-15.<br><br>• No environmental analysis of applying mitigation only in Utah PHMA. |

---

[1] Citations are provided to the FEIS only where the state ROD lacks a comparison (using underlining and strikethroughs) of the 2015 and 2019 language.

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Lek buffers | • Required in all states; distances based on USGS report | • **Buffer requirements shortened or eliminated in most states**<br><br>• CO: removes prohibition on new leasing 1 mile from active leks (now open subject to NSO subject to exception, modification, waiver). CO ROD at 2-15.<br><br>• UT, CO, NV/CA: replaced language that BLM "will apply" buffers with commitment only to "evaluate" or "assess" buffers. CO ROD at 2-3; NV/CA ROD at 2-9; UT ROD at 47.<br><br>• ID: (1) buffer distances reduced in IHMA, GHMA to USGS minimums; (2) new buffer exceptions; (3) eliminate buffers for vegetation treatment projects. ID FEIS at App-2-16 to 2-19.<br><br>• NV/CA: (1) switches to lower end of buffers from Manier (as opposed to USGS); (2) allows exceptions during NEPA process; (3) allows line officers to shorten, extend, or waive seasonal buffer restrictions. NV/CA ROD at 2-11.<br><br>• UT: 5-mile wind energy buffer now discretionary. UT ROD at 53, 90.<br><br>• WY: expands circumstances in which BLM officers may grant exceptions to lek buffers, including 2-mile buffer during breeding, nesting, brood-rearing. WY FEIS at A-10. | • CO: "Although the additional acres would be available to leasing, their impact on Greater Sage-Grouse would be similar to the No-Action Alternative. This is because surface disturbance, fragmentation, and indirect habitat loss would not be expected to increase due to restrictions on surface disturbance." CO FEIS at 4-5.<br><br>• No environmental analysis of change from "apply" buffers to "evaluate" buffers in any FEIS.<br><br>• ID: "The reduction of buffers in IHMA would not result in increased development around every or even most leks because disturbance in BLM HMAs is limited and not the major threat to Greater Sage-Grouse habitat, however where development occurs nearer than the buffers identified in the No Action those leks would be at an increased risk of being abandoned." Idaho FEIS Appx. 1 at 4-12. "Overall, the impacts of the changes to lek buffers . . . are not quite as protective as those in the No-Action Alternative." *Id.* at 4-3.<br><br>• NV: "The criteria established for modifying or removing seasonal timing restrictions has been revised . . . . Due to the fact that it would be speculative to anticipate at the land use planning level how often and when this exception would be pursued on a project-by-project basis, impacts would be more appropriate at the project scale." NV FEIS at 4-15. No environmental analysis of (1) or (2).<br><br>• UT: "Constructing transmission lines above-ground could increase predator perches, which may lead to increased take of Greater Sage-Grouse and their nests; however, impacts of predator perches would be minimized by conforming [to other plan provisions] . . . . Constructing transmission lines above the ground could also maintain more habitat than the burial of lines." UT FEIS at 4-23.<br><br>• WY: No environmental analysis of broader exception. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Disturbance and Density Caps | • Included in all states<br>• Most states: 3% project-level and total disturbance cap; density cap of 1 energy/mining project per 640 acres (oil and gas; coal; wind; solar; geothermal; other mining)<br>• <u>Wyoming</u>: 5%<br>• <u>Montana</u>: option to move to 5% | • **Eliminated or weakened in ID, UT, NV/CA**<br><br>• <u>ID</u>: removes 3% project-level disturbance cap <u>and</u> eliminate density cap of 1 energy, mining facility per 640 acres. ID FEIS at App-2-4 to 2-6.<br><br>• <u>UT</u>: Allows exceedances of 3% disturbance cap and 1/640 acre density cap in non-habitat or where project will improve habitat. UT ROD at 42–46.<br><br>• <u>NV/CA</u>: disturbance cap can be exceeded under more circumstances ("allocation exception" criteria); USFWS concurrence no longer required. NV ROD at 2-7 to 2-8 (allocation exception criteria at NV ROD at 2-12 to 2-13). | • <u>ID</u>: "Removal of the 3 percent project level disturbance cap would allow BLM to intentionally cluster developments within areas already degraded. . . . Some areas . . . may be further developed even though compensatory mitigation would offset those impacts. . . . Removal of the one energy or mining facility per 640 acres on average density cap would have little effect on Greater Sage-Grouse conservation . . . because Idaho has limited energy or mining development in Sage-grouse habitat . . . Additionally, there are restrictions on where and how energy facilities and salable mineral mining facilities are developed." ID FEIS Appx. 1 at 4-10 to 11.<br><br>• <u>UT</u>: "The ability to exceed the disturbance and density caps could result in loss and degradation of site-specific Greater Sage-Grouse habitat and impacts on local grouse populations. . . . [H]owever, exceedances to the caps would only be allowed if site-level analysis indicates the project . . . will improve the condition of Greater Sage-Grouse habitat. There is a risk that allowing this exceedance could result in the loss of a specific type of habitat that mitigation may not address[.]" UT FEIS at 4-17. |
| Required Design Features (RDFs) | • All states apply a suite of uniform Required Design Features (RDFs) to mitigate adverse impacts. Applicable RDFs are required for all projects in PHMA and GHMA. | • **Partially eliminated or weakened in ID, UT, WY**<br><br>• <u>ID, UT</u>: RDFs no longer mandatory in GHMA. ID FEIS at App-2-8; UT ROD at ii.<br><br>• <u>WY</u>: replaces RDFs "are required" with RDFs "can be applied." WY FEIS at B-1.<br><br>• <u>UT</u>: eliminates requirement of burying transmission, power lines in PHMA. UT ROD at 93. | • <u>ID</u>: "Removal of the requirement to apply RDFs and buffers in existing Greater Sage-Grouse habitat outside of designated habitat management areas would reduce protections to Greater Sage-Grouse and its habitat; however, PHMA and IHMA designations were designed to protect approximately 90 percent of occupied Greater Sage-Grouse leks. . . . This action is not expected to have any measurable population level effects to Greater Sage-Grouse in Idaho." ID FEIS Appx. 1 at 4-8 to 4-9; *see also* UT FEIS at 4-23.<br><br>• <u>WY</u>: No environmental analysis of change.<br><br>• <u>UT</u>: "This change in management could result in both positive and negative impacts on Greater Sage-Grouse, depending on threats in local populations." UT FEIS at 4-23. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| General Habitat Management Areas (GHMA) | • All plans include GHMA (or equivalent) | • **GHMA designation entirely eliminated in UT (502,500 acres),** along with corresponding buffers, RDFs, disturbance caps, seasonal restrictions, mitigation requirements. UT ROD at 36, 49-51, 82, 87, 88, 97 | • <u>UT</u>: "[T]he impacts from the two alternatives would be the same in the long term, though the Proposed Plan Amendment could likely accelerate the effect on resources in the former GHMA. This is because it incentivizes development in [GHMA] over PHMA. . . . [T]here would be no significant effect of accelerating the impacts on the small populations in former GHMA that contain 5 percent of Utah's Greater Sage-Grouse populations and just 0.25 percent of the populations range-wide. In addition, the Proposed Plan Amendment provides that the BLM would replace occupied habitat outside PHMA that is lost to development by creating or improving habitat inside PHMA." UT FEIS at 4-20 to 4-21, 4-48. |
| Adaptive management (soft and hard triggers) | • Plans all include "hard" and "soft" triggers requiring BLM to take corrective action when monitoring data shows that sage-grouse populations fall below specified thresholds. | • <u>NV/CA</u>: replaces hard-wired changes with warning system; easier to remove protections; trigger applied only at lek cluster scale, allowing declines in individual leks. NV/CA FEIS at Appx. D.<br><br>• <u>UT</u>: lengthens timeframe for management response to hard trigger; new qualifications on when corrective strategies must be implemented; easier to remove protections. UT ROD at 54–56.<br><br>• <u>WY</u>: "The Adaptive Management Working Group (AMWG) would define a process to review and reverse adaptive management actions once the identified causal factor is resolved." WY FEIS at 2-18. | • <u>NV/CA</u>: "Habitat triggers have been replaced with a system of adaptive management warnings related to fire risk, wildland fire, anthropogenic and natural disturbances. If these warnings justify a response, this would be considered an adaptive management habitat trigger. Impacts on Greater Sage-Grouse and its habitat from this change to the adaptive management strategy would be beneficial, providing the ability to detect declining populations and/or habitat and change management on the ground with other Federal, state, and local partners." NV/CA FEIS at 4-13.<br><br>• <u>UT</u>: "[N]o additional analysis is necessary." UT FEIS at 4-15.<br><br>• <u>WY</u>: "The only change for adaptive management would be at the implementation level, when the AMWG identifies a process for returning to previous management. The impacts associated with returning to previous management would be the same as those identified in the final EISs for the 2014 and 2015 proposed land use plan amendments and revisions." WY FEIS at 4-14. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Prioritizing oil and gas leasing, development outside habitat | • All states require BLM to prioritize oil and gas leasing and development outside of PHMA and GHMA. | • **Partially or totally eliminated in ID, UT, NV/CA, and WY**<br><br>• UT, NV/CA: eliminates prioritization requirement. UT ROD at 78; NV/CA at 2-32.<br><br>WY: removes prioritization requirement from GHMAs. WY FEIS at A-3. | • WY: Removal of prioritization has "the potential for locally adverse impacts on habitat in GHMA. This would be a result of potentially concentrating development in the GHMA or non-core areas; however, locally adverse impacts would not be likely to affect the conservation of Greater Sage-Grouse in Wyoming." WY FEIS at 4-16.<br><br>UT: "At most, the prioritization objective could potentially result in temporarily deferring a parcel in PHMA from leasing to a later sale, but only in instances of large lease sales where staff capacity would be incapable of analyzing all the nominated parcels. Because the mineral leasing prioritization objective provides no certain or durable protection to PHMA, its removal would not increase threats, since the no surface occupancy stipulation is still in effect." UT FEIS at 4-22. |
| No surface occupancy (NSO) stipulation | • Most plans impose NSO stipulation in PHMA without waivers, exceptions and modifications (WEMs); where WEMs allowed, requires unanimous consent of BLM, state wildlife agencies, and U.S. Fish & Wildlife Service (FWS) | • **Many more loopholes**<br><br>• ID, NV/CA, UT: allow waivers, exceptions, and modifications of NSO for more reasons and eliminate FWS consultation requirement. ID ROD at App-2-7 to App-2-8; NV/CA ROD at 2-32 to 2-33; UT ROD at 79-81;<br><br>• CO: now allow waivers, exceptions, modification to NSO stipulation. CO ROD at 2-16 and G-4 to G-7.<br><br>• UT: allows operators to place infrastructure (e.g., roads, pipelines, power lines) in PHMA without adhering to the NSO stipulation. UT ROD at 80. | • "While allowing the possibility for an exception introduces the potential for an impact . . . , the criteria that must be met prior to approving an exception would either result in the exception not being granted, or in subsequent development having a low potential for impacts. Further, if the exception to the NSO stipulation is granted, and subsequent development would be subject to other minimization measures." UT FEIS at 4-19; *see also* ID FEIS at 4-13; NV/CA FEIS at 4-11.<br><br>• CO: "[N]o impact on Greater Sage-Grouse or Greater Sage-Grouse habitat would occur" due to availability of waivers, exceptions, and modifications. CO FEIS at 4-5.<br><br>• UT: "[The] modification to the NSO stipulation [] could result in some site-specific impacts on Greater Sage-Grouse or their habitat. . . . The construction of such associated infrastructure would remove vegetation associated with habitat, increase predation opportunities on Greater Sage-Grouse and potentially displace birds." UT FEIS at 4-19 to 4-20. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Habitat objectives / Livestock grazing | • **Threshold and Response requirement**: NEPA analysis for grazing permits/lease renewals within SFA and PHMA must include specific management thresholds based on Greater Sage-Grouse Habitat Objectives, and "responses" for when thresholds are exceeded | • **ID, UT, WY eliminate requirement that BLM proactively impose thresholds/ responses** to protect sage-grouse during permit renewals, now requiring management changes only after habitat assessment identifies problem. ID FEIS at App-2-12 to 2-13; UT ROD at 72-73; WY FEIS at A-22.<br><br>• UT, WY: Weaken requirement that existing grazing-related infrastructure be evaluated and modified. UT ROD at 74, 75; WY FEIS at A-24<br><br>• ID, WY, UT: Remove requirements to prioritize permit renewals and/or field checks for PHMA. WY FEIS at A-22; ID FEIS at App-2-12; UT ROD at 71.<br><br>• UT: Eliminates other restrictions including: emergency measures during drought; consideration of permit retirements; restrictions on new livestock infrastructure. UT ROD at 70-76.<br><br>• ID, UT, WY: Weaken certain habitat objectives (e.g., 7" grass height). ID FEIS at App-2-11; UT ROD at 25-27; WY FEIS at 2-25.<br><br>OR: Removes prohibitions on livestock grazing within 13 Research Natural Areas. OR ROD at 1-6. | • "The Proposed RMP Amendment would not have an explicit requirement for analysis of thresholds and responses during permit renewal or modification; however, it would require analysis of one alternative that would allow for adaptive management to meet or make progress toward meeting the wildlife/Special Status Species standard. . . . The impacts . . . would be similar to those for the No-Action Alternative. Localized, adverse impacts on Greater Sage-Grouse in GHMA may occur, but conservation of Greater Sage-Grouse in Wyoming would not be affected." WY FEIS at 4-11 to 4-12; *see also* UT FEIS at 4-13; ID FEIS at 4-14 to 4-15.<br><br>• Removal of infrastructure evaluation "would be unlikely to affect Greater Sage-Grouse conservation." WY FEIS at 4-10 to 4-13. No analysis in UT FEIS.<br><br>• WY: "Allotments in PHMA would not be prioritized for field checks under the Proposed RMP Amendment; however, there would be more discretion to identify the allotments with the highest needs at the local level for monitoring actual use, utilization, use supervision, etc., which may already be those allotments in PHMA." WY FEIS at 4-11; ID FEIS at 4-15.<br><br>• UT: "Changes in the habitat objectives table . . . will have beneficial impacts on management and Greater Sage-Grouse habitat because the indicators and values more accurately reflect vegetation characteristics in Utah . . . ." UT FEIS at 4-19. No environmental analysis of remaining changes in UT.<br><br>• "Seven inches is not a threshold where Greater Sage-Grouse nesting success suddenly disappears. Multiple studies have found successful Greater Sage-Grouse nests in areas that averaged less than 7 inches of herbaceous cover (Connelly et al. 2000)." ID FEIS App. 1 at 4-14; *see also* WY FEIS at 4-10.<br><br>• UT: analysis at OR FEIS 4-3. |

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Habitat boundary adjustments | • Habitat boundary changes require Plan Amendment (public comment) | • <u>ID</u>: boundary adjustments allowed through Plan Maintenance (no public involvement). ID FEIS at App-2-3.<br><br>• <u>UT</u>: boundary adjustments allowed at the project level by BLM staff, based on site surveys. UT ROD at 31-34.<br><br>• <u>UT, ID</u>: eliminates requirement that BLM evaluate project area before authorization to determine if it contains sage-grouse habitat not already designated as PHMA. UT ROD at 52; ID FEIS at App-2-3.<br><br>• | • <u>ID</u>: "If HMA habitat boundary changes were more than minor mapping error fixes, then determining the environmental consequences would not be determined at this time. . . . The BLM anticipates that any impact resulting from a change in map boundaries would be consistent with those described in 2015." ID FEIS Appx. 1 at 4-8.<br><br>• <u>UT</u>: No environmental analysis of change. |
| Exceptions to plan requirements | • Exception process tailored to the specific resource; exceptions not allowed for many provisions; consent of USFWS often required. | • <u>NV</u>: Under new "allocation exception," BLM state director can grant an exception to any stipulation, buffer, timing restriction, etc. if <u>any</u> of the following applies: (1) location is not and lacks potential to be habitat; (2) adverse impacts will be offset; (3) public health, safety concerns; (4) reauthorization of existing infrastructure in previously disturbed sites <u>or</u> expansion that won't result in new impacts; (5) routine administrative function, prior existing use, authorized use, valid existing right, or existing infrastructure (i.e., roads) that serve a public purpose and adverse impacts will be mitigated; (6) non-disposal or exchange of certain lands. This broadens circumstances in which an exception can be granted and eliminates requirement of USFWS consent. NV ROD at 2-12 to 2-13. | • <u>NV</u>: "Because these criteria ensure that projects are either in unsuitable Greater Sage-Grouse habitat; do not result in direct, indirect, or cumulative impacts on Greater Sage-Grouse; or can be offset, with the exception of those needed for public health and safety, no new impacts on Greater Sage-Grouse and its habitat are anticipated above those analyzed in the 2015 Final EIS." NV FEIS at 4-11. |

**Exhibit A to Declaration of Greta Anderson – Overview of 2019 Sage-Grouse Plan Amendments**          **Page 7 of 8**

| Plan Element | 2015 Plans | 2019 Plans[1] | FEIS Analyses of Change |
|---|---|---|---|
| Noise restrictions | • <u>WY</u>: Noise thresholds and monitoring protect leks in all habitat designations. | • <u>WY</u>: Eliminated noise restrictions in GHMA (now applied in PHMA only). WY FEIS at A-11. | • <u>WY</u>: "The impacts associated with clarifying that the noise measurement and monitoring condition of approval (COA) would apply only to leks within Greater Sage-Grouse PHMA would have similar impacts as those described under the No-Action Alternative for the RMPAs and for the RMP revisions. . . . The removal of noise restrictions in GHMA would likely result in localized, adverse impacts on Greater Sage-Grouse but would not affect Greater Sage-Grouse conservation in Wyoming." WY FEIS at 4-13 to 4-14. |
| Coal leasing | • <u>UT</u>: PHMA is "essential habitat" for purposes of the suitability criteria set forth at 43 CFR § 3461.5(o)(1). | • <u>UT</u>: PHMA no longer deemed "essential habitat" and therefore "unsuitable" for coal leasing. UT ROD at 87-88. | • <u>UT</u>: No environmental analysis provided. Change deemed a "clarification." UT FEIS at 2-8, Table 2-1. |
| Travel Management | • <u>UT</u>: plan imposed specific requirements for travel management plans impacting greater sage-grouse. | • <u>UT</u>: eliminates detailed requirements for considering greater sage-grouse in travel management plans. UT ROD at 101-103. | • <u>UT</u>: No environmental analysis provided. |
| Non-energy leasable materials | • <u>NV</u>: PHMA closed to new non-energy mineral leasing. | • <u>NV</u>: restriction now subject to "allocation exception" criteria. NV ROD at 2-35. | • <u>NV</u>: "Because these criteria ensure that projects are either in unsuitable Greater Sage-Grouse habitat; do not result in direct, indirect, or cumulative impacts on Greater Sage-Grouse; or can be offset, with the exception of those needed for public health and safety, no new impacts on Greater Sage-Grouse and its habitat are anticipated." NV FEIS at 4-11. |

# EXHIBIT B

*EPA Comment Letters*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 155
Seattle, WA 98101-3140

OFFICE OF
ENVIRONMENTAL REVIEW
AND ASSESSMENT

August 1, 2018

Bureau of Land Management
Idaho State Office
Attn: Jonathan Beck
1387 S. Vinnell Way
Boise, Idaho 83709

Dear Mr. Beck:

The U.S. Environmental Protection Agency has reviewed the Bureau of Land Management's May 2018 Idaho Greater Sage-Grouse Draft Resource Management Plan Amendment and Environmental Impact Statement (EPA Number 18-0028-BLM/CEQ Number 20180083;) pursuant to Section 309 of the Clean Air Act and the National Environmental Policy Act.

The DEIS describes and analyzes two alternatives for managing greater sage-grouse habitat on approximately 8.8 million acres of BLM administered surface estate and 27 million acres of BLM subsurface federal mineral estate. The No-Action Alternative is a continuation of current management; use of public lands and resources would continue to be managed under the current BLM RMPs, as amended in 2015. The Management Alignment Alternative, the agency's preferred alternative, was derived through coordination with the State and cooperating agencies to align with the State conservation plan and to support conservation outcomes for greater sage-grouse. Major planning issues addressed include Sagebrush Focal Area designations, habitat boundary designations, density and disturbance caps, habitat objectives, energy and minerals, and lands and realty.

The stated purpose of the Resource Management Plan Amendment/Environmental Impact Statement is to enhance cooperation with the states by modifying the approach to greater sage-grouse management in existing RMPs to better align with the individual states' plans and conservation measures and with the Department of Interior's and BLM's policy.[1] The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. EPA has potential concerns due to the DEIS's proposed modifications of protections to the greater sage-grouse; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts are beneficial or detrimental to the species. We are concerned the DEIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, we have rated the DEIS as *Environmental Concerns Insufficient Information* ("EC-2"; see enclosed *Summary of EPA Rating Definitions*). The EPA's recommendations below are focused on improving the clarity and coherence of Section 4.5, "Impacts of the Management Alignment Alternative" of the EIS.

---

[1] DEIS, p. 1-2

**DEIS Section 4.5, 1. Modifying Habitat Designations**

*Habitat management area flexibility and Two-team interagency approach (Management Decision (MD) Special Status Species (SSS) 6 and MD SSS 44)*

The DEIS states Appendix K describes the new interagency teams' responsibilities and sideboards for the Management Alignment Alternative's actions. The DEIS also states the two-team approach should improve the consistency of greater sage-grouse management across property ownership and improve interagency coordination and collaboration in Idaho.[2] We note there is no Appendix K in the DEIS or on the project website. Therefore, we recommend the Final EIS include the referenced Appendix K and explain how the two-team approach improves -- relative to no action - consistency across ownership and interagency coordination and collaboration.

*Modifying Lek Buffers (MD SSS 35)*

We recommend the Final EIS summarize the scientific information used to develop the Management Alignment Alternative's proposal to reduce lek buffers for infrastructure and development in the 2,675,251 acres of Important Habitat Management Areas. The Management Alignment Alternative's proposal on buffers in IHMAs represents a major change relative to the no action alternative. Rather than lek buffers protecting 47% of IHMAs from roads, infrastructure related to energy development and surface disturbance, the Management Alignment Alternative's lek buffers protect 1% of IHMA from roads and 27% from infrastructure related to energy development and surface disturbance. The BLM's Principles and Practices of Integrating Science into Land Management Desk Guide may provide useful guidance to incorporate this information.

We also recommend the Final EIS include relevant information on how the energy and infrastructure threat to greater sage-grouse habitat loss is predicted to be inconsequential in Idaho compared to the wildfire and invasive species threat.[3] The Final EIS could discuss, for example, how many acres of greater sage-grouse habitat have been lost to energy and infrastructure versus acres lost to wildfire and invasive species.

Further, we recommend the Final EIS include additional relevant information to support the DEIS's conclusion that there is "very little"[4] new development or energy and infrastructure in IHMAs in Idaho.

**DEIS Section 4.5, 5. Including Waivers, Exceptions and Modification on No-Surface Occupancy Stipulations**

*MD Mineral Resources (MR) 3*

Under the Management Alignment Alternative, the 2015 Approved Resource Management Plan Amendment MD MR 3 would be amended to remove the requirement for an unanimous finding between BLM, FWS, and the State of Idaho to grant an exception for No Surface Occupancy in fluid minerals development. The unanimous finding requirement would be replaced with coordination with the two-interagency teams. According to the DEIS, "This change is expected to facilitate improved decision making and a more collaborative process for Greater sage-grouse management in Idaho while retaining

---

[2] p. 4-9
[3] p. 4-12
[4] p. 4-12

BLM's decision-making authority."[5] We recommend the Final EIS explain how the two-interagency team process would improve decision making and collaboration relative to no action.

**DEIS Section 4.5, 9. Modifying Mitigation Strategy to Align with the State Mitigation Strategy, Including Standards for No Net Loss.**

*MD Mitigation (MT) 3*

*No Net Loss Mitigation Standard*

Under the Management Alignment Alternative, the 2015 ARMPA Decision Number MD MT 3 and others would be changed from ensuring mitigation that provides a net conservation gain for greater sage-grouse to ensuring mitigation that provides no net loss.

We recommend the Final EIS include an explanation for the suggestion that the difference between no net loss and net gain for compensatory mitigation would be based on proponent's willingness.[6] This could be accomplished by explaining the roles of the BLM and proponents in the BLM's compensatory mitigation decision making process.

*No Mitigation in General Habitat Management Areas*

The DEIS does not include sufficient information for how the BLM evaluated and interpreted science relevant to the decision to remove mitigation from GHMAs. The DEIS states that GHMAs typically contain lower quality or marginal greater sage-grouse habitat and that removing the compensatory mitigation requirement in GHMAs would result in six percent of leks in Idaho having an increased risk of loss and degradation. The DEIS does not explain how the above information was used in the development of this proposal or indicate the level of impact that an increased risk to six percent of leks in Idaho represents. We recommend the Final EIS include a description of how the BLM found, evaluated and interpreted data and science relevant to the decision to remove mitigation in GHMA.

We appreciate the opportunity to comment on the DEIS. If you have any questions regarding these comments, please contact Erik Peterson at (206) 553-6382 or peterson.erik@epa.gov, or you may contact me at (206) 553-1841 or nogi.jill@epa.gov.

Sincerely,

*Jill A. Nogi*

Jill A. Nogi, Manager
Environmental Review and Sediment Management Unit

Enclosure:

1.    U.S. Environmental Protection Agency Rating System for Draft Environmental Statements

---

[5] p. 4-13
[6] p. 4-15



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
**1595 Wynkoop Street**
**Denver, CO  80202-1129**
**Phone 800-227-8917**
**www.epa.gov/region8**

**August 2, 2018**

Ref: 8EPR-N

Mary Jo Rugwell, Wyoming State Director
Bureau of Land Management
Wyoming State Office
5353 Yellowstone Road
Cheyenne, WY 82009
Attn: BLM 1610 (930), Greater Sage-Grouse EIS

Dear State Director Rugwell:

The U.S. Environmental Protection Agency Region 8 has reviewed the U.S. Department of the Interior (DOI), Bureau of Land Management's (BLM) May 2018, *Draft Resource Management Plan Amendment (RMPA) and Environmental Impact Statement (EIS) for the Wyoming Greater Sage Grouse* (CEQ No.20180080 – BLM 1610 (930)), pursuant to Section 309 of the Clean Air Act (CAA) and the National Environmental Policy Act (NEPA).

This RMPA proposes to modify the 2015 Approved Resource Management Plan Amendment (ARMPA) to enhance cooperation with the states by modifying the approach to greater sage-grouse management to better align with the Wyoming state plan and conservation measures as well as with DOI and BLM policy. The 2015 Wyoming ARMPA and other BLM and Forest Service management plans addressing greater sage-grouse habitat loss and fragmentation were the primary basis for the 2015 decision by the U.S. Fish and Wildlife Service (USFWS) to not list the greater sage-grouse under the Endangered Species Act (ESA). The Draft EIS describes and analyzes two alternatives for managing greater sage-grouse habitat on approximately 18 million acres of BLM administered surface estate and 40 million acres of BLM subsurface federal mineral estate and identifies amendments to all ten of the existing BLM Field Office RMPs in Wyoming.

The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. We are concerned that the Draft EIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, the EPA has rated the Draft EIS/RMPA as *Environmental Concerns - Insufficient Information – (EC-2)*. The description of the EPA' s rating system is available at: https://www.epa.gov/nepa/environmental-impact-statement-rating-system-criteria. The enclosed detailed comments include recommendations for improving the assessment and disclosure of the Proposed Action's expected impacts to greater sage-grouse and habitat; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts would be beneficial or detrimental to the species. Specifically, we offer recommendations associated with fluid mineral resource development, assessing cumulative and cross boundary effects, clarifying the mitigation strategy, and improving the effects analysis.

We appreciate the opportunity to participate in the review of this project and are committed to working with you as you prepare the Final EIS. If you would like to discuss our comments, please contact me at (303) 312-6704, or Nat Miullo of my staff at (303) 312-6233 or miullo.nat@epa.gov.

Sincerely,

Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

Enclosure: Detailed Comments

2

**Detailed Comments on the 2018 Wyoming Greater Sage-Grouse Draft Resource Management Plan Amendment and Environmental Impact Statement**

*Fluid Mineral Impacts Information*

The proposed management changes in the Draft EIS allow for an additional level of oil and gas development on surface designated as Habitat Management Areas (HMAs), and prioritizes that development outside of Primary Habitat Management Areas (PHMA). The Draft EIS provides estimates of the current and forecasted HMA acreage expected to be impacted by oil and gas development. We recommend that the Final EIS identify the specific types and amount of each habitat type that would likely be impacted by oil and gas development. In making these estimates, it may be possible to use current and projected lease information, along with oil and gas development scenarios based on oil and gas development rates in nearby areas. This more refined information would be useful to help understand specifically where HMAs may be impacted by oil and gas development.

We note that the Draft EIS also states that prioritizing oil and gas development outside of the PHMA may benefit greater sage-grouse habitat conservation overall by limiting impacts through use of potential no surface occupancy stipulations and other controls. We recommend that the Final EIS identify instances where oil and gas development with similar controls has resulted in habitat conservation improvement, and by how much, for the greater sage-grouse in Wyoming or other states.

We note that most of the 2015 greater sage-grouse analysis was focused on lek habitat. However, BLM has also identified winter concentration, nesting, brood rearing and linkage habitats as having the highest conservation value to maintain sustainable greater sage-grouse populations[1]. We recommend the Final EIS include any new information on winter and brood rearing habitat in Wyoming and consider whether additional mitigation measures are available to protect these seasonal habitats from impacts from oil and gas development. We also recommend the Final EIS include information on whether increased drilling and oil and gas production in greater sage-grouse habitat compared to the 2015 plan would specifically impact any general- or linkage-habitat areas for greater sage-grouse.

*Cumulative, Cross-Boundary Cumulative Impacts*

The Draft EIS focuses on the management of greater sage-grouse within state borders, though substantial portions of identified habitat are on, and presumably cross, those borders. More than half the distance of the Wyoming border with Montana includes designated PHMA and General Habitat Management Areas (GHMA). Almost half of the southwestern border of Wyoming, north of Utah and Colorado is identified as either PHMA or GHMA. A smaller acreage of Wyoming PHMA and GHMA designated habitat lies along the southeastern boarder of Idaho. Comparatively, the smallest amount of Wyoming GHMA touches the border of South Dakota[2]. Given greater sage-grouse populations cross state boundaries and because there are seven BLM state offices revising their plans, we recommend that the Final EIS include a cumulative, cross-boundary effects analysis to assess the combined effects to greater sage-grouse populations and habitats associated with the revisions. Specifically, we recommend

---

[1] "Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountains Region, Including the Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming. . ." September 2015

[2] Map 1-2, pg. 1-5

1

the cumulative effects consider current greater sage-grouse population conditions and trends compared against the expected effects of current management practices.

*Mitigation Standard and Strategy*

The Preferred Alternative in the Draft EIS proposes to modify the "net gain compensatory mitigation standard" included in the 2015 Final EIS/ARMPA. As a result, the Draft EIS does not assess whether the revised mitigation standard would result in a net conservation gain to the species. The EPA recommends the Final EIS include the full revised mitigation strategy including a discussion of the extent to which it differs from the net gain conservation standard and the 2015 impact analysis. The Draft EIS also requests comment on a net conservation standard. Additionally, it notes the DOI and the BLM are evaluating whether the implementation of a compensatory mitigation standard on public lands is appropriate and consistent with applicable legal authorities. CEQ Regulations at 40 CFR Part 1508.20 require mitigation include three components: avoid, minimize, and compensate ("mitigation hierarchy"). The 2015 EIS notes if impacts from BLM actions that result in habitat loss and degradation remain after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the species. If BLM determines compensatory mitigation is not appropriate on public lands, then EPA recommends the Final EIS assess and discuss the impact of this decision on greater sage-grouse habitat, population and conservation status.

*Monitoring and Adaptive Management*

Monitoring is a critical and well-developed component of the Wyoming RMPA and its Adaptive Management Plan given the value of the resource and the large scale of its habitat. The timing of monitoring and the data collected informs adaptive management actions. The Draft EIS incorporates by reference, Appendix D (Core Area Strategy) and Appendix H (Guidelines for Implementation and Adaptive Management) of the 2015 ROD/ARMPA, and other tools, such as the Wyoming Game and Fish Department Protocols for Treating Sagebrush in GHMAs as key guidelines and objectives for conservation success. The Wyoming adaptive management strategy includes a two-tiered system of hard and soft triggers for the greater sage-grouse and its habitat. These triggers identify population and habitat thresholds which, if exceeded, would result in a change in how BLM addresses management of the greater sage-grouse in that area. The Draft EIS references include soft triggers that represent an intermediate threshold where management changes are needed to prevent a severe decline, whereas hard triggers represent a more direct action to stop a severe deviation from the greater sage-grouse conservation objectives. In its October 2015 finding that listing the greater sage-grouse under the Endangered Species Act was not warranted, USFWS states, "Further, in response to monitoring, activities allowable under the Federal Plans may be adjusted based on adaptive management criteria to provide an immediate, corrective response to identified triggers for populations or habitat declines."[3] We recommend the Adaptive Management Plan in Final EIS include the actions that would be taken in the event that soft-trigger and hard-trigger deadlines are not met.

*Improving the Effects Analysis*

The Proposed Action includes management action components (labeled in the 2018 Draft EIS as "Issues") drawn from alternatives analyzed in 2015. The Draft EIS does not include a stand-alone effects

---

[3] https://www.federalregister.gov/documents/2015/10/02/2015-24292/endangered-and-threatened-wildlife-and-plants-12-month-finding-on-a-petition-to-list-greater

analysis for the Proposed Action's combined components and instead relies primarily on the effects analysis in the 2015 EIS. Importantly, the 2015 EIS assessed the impacts of the overall management strategy (i.e. the combination of components) for each Action Alternative and did not independently assess the environmental effects of each component of the alternatives. For the Final EIS, we recommend that BLM consider the combined components in the Proposed Action, in the context of changes since the 2015 FEIS/ARMPA (e.g. withdrawal of Sagebrush Focal Areas and recent modifications to compensatory mitigation policy[4]) to assess overall impacts to greater sage-grouse populations and trends.

---

[4] https://www.blm.gov/policy/im-2018-093

3



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
Denver, CO   80202-1129
Phone 800-227-8917
www.epa.gov/region8

**August 2, 2018**

Ref: 8EPR-N

Edwin L. Roberson, State Director
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, Utah 84101-1345
Attn: BLM 6500 (UT935), Greater Sage-Grouse EIS

Dear Mr. Roberson:

The U.S. Environmental Protection Agency Region 8 has reviewed the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) May 2018 Draft Resource Management Plan Amendment (RMPA) and Environmental Impact Statement (EIS) for the Greater Sage-Grouse in Utah (CEQ No. 20180081- BLM 6500 (UT935), pursuant to Section 309 of the Clean Air Act (CAA) and the National Environmental Policy Act (NEPA).

The Resource Management Plan Amendment (RMPA) proposes to modify the 2015 Approved Resource Management Plan Amendment (ARMPA) to enhance cooperation with the states by modifying the approach to greater sage-grouse management to better align with the Utah state plan and conservation measures, and with DOI and BLM policy. The 2015 Utah ARMPA and other BLM and Forest Service management plans addressing GrSG habitat loss and fragmentation were the primary basis for the 2015 decision by the U.S. Fish and Wildlife Service (USFWS) to not list the GrSG under the Endangered Species Act (ESA).  The Proposed Action would eliminate Sagebrush Focal Areas (SFA) and General Habitat Management Areas (GHMA); allow more exceedances of the disturbance and density caps in the Primary Habitat Management Areas (PHMA); authorize more waivers, exceptions and modifications to No Surface Occupancy (NSO) stipulations in the PHMA; revise the application of lek buffer distances; and eliminate prioritization of mineral leasing outside the PHMA.

The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. We are concerned that the Draft EIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, the EPA has rated the Draft EIS as *Environmental Concerns - Insufficient Information (EC-2)*. The description of the EPA's rating system is available at: https://www.epa.gov/nepa/environmental-impact-statement-rating-system-criteria. The enclosed detailed comments include recommendations for improving the assessment of the Proposed Action's expected impacts to greater sage-grouse and habitat; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts would be beneficial or detrimental to the species. Specifically, we recommend clarifying the linkages between greater sage-grouse science and the Proposed Action, providing the specifics of the mitigation and adaptive management strategies and assessing their ability to respond to changing population and habitat trends. We also recommend the cumulative effects assessment be strengthened by considering the cross-border and population-wide effects of the seven new

management plans on the conservation status of the greater sage-grouse.

We appreciate the opportunity to participate in the review of this project and are committed to working with you as you prepare the Final EIS. If you would like to discuss our comments, please contact me at (303) 312-6704, or Shannon Snyder of my staff at (303) 312-6335 or snyder.shannon@epa.gov.

Sincerely,

Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

2

**Detailed Comments on the 2018 Utah Greater Sage-Grouse Draft Resource Management Plan Amendment and Environmental Impact Statement**

*Connection between the RMPA and greater sage grouse conservation status*

Section 1.2 of the Draft EIS identifies the planning criteria associated with the Preferred Alternative and focuses on modifying protections for greater sage-grouse to conform with state plans and revised policies. We note that the new planning criteria do not include one of the criteria in from 2015 RMP, "maintaining the federal land management planning considerations to protect greater sage-grouse populations and habitats sufficiently so that the species does not warrant listing under the Endangered Species Act (ESA)." We recommend that BLM work with USFWS and Utah Division of Wildlife Resources to assess the impacts from the management changes in this RMPA on greater sage grouse conservation status and include that assessment in the Final EIS.

*Connection between the USGS Report and the proposed changes*

The Draft EIS incorporates new information from a USGS report that synthesized the best available greater sage-grouse science from 2015-2017 and outlines the potential management implications of this new information.[1] This information was used, in part, as the basis for the Proposed Action. The Draft EIS cites this report, but does not specify how the new science from the referenced USGS Report supports each of the changes in the proposed action. The Final EIS would be strengthened by including a clearer linkage between the science in the USGS report, as well as other available science, to the management changes included in the proposed resource management plan amendments.

*Mitigation Strategy*

The Preferred Alternative in the Draft EIS proposes to eliminate the "net gain compensatory mitigation standard," which results in a net conservation gain to the species, because it does not align with the state's mitigation program. The Draft EIS did not carry forward the mitigation strategy from the 2015 ARMPA – Appendix D. As a result, there are few details in the EIS about how mitigation would be implemented under the Proposed Action. For example, while the Draft EIS does state that projects must improve the condition of the greater sage-grouse habitat, it does not specify what is required under Utah's Compensatory Mitigation Rule and how it will apply to the RMPA. As a result, the Draft EIS does not assess whether the revised mitigation standard would result in a net conservation gain to the species. Mitigation is particularly important because the Proposed Action allows for development increases inside the former GHMA and allows for more exceptions to disturbance and density caps and NSO stipulations in the PHMA. The EPA recommends the Final EIS include the full revised compensatory mitigation strategy.

The Draft EIS also requests comment on a net conservation standard. Additionally, it notes the DOI and the BLM are evaluating whether the implementation of a compensatory mitigation standard on public lands is appropriate and consistent with applicable legal authorities. CEQ Regulations at 40 CFR Part 1508.20 require mitigation include three components: avoid, minimize, and compensate ("mitigation hierarchy"). The 2015 EIS notes if impacts from BLM actions that result in habitat loss and degradation

---

[1] https://pubs.usgs.gov/of/2018/1017/ofr20181017.pdf

3

remain after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the species. If BLM determines compensatory mitigation is not appropriate on public lands, then EPA recommends the Final EIS assess and discuss the impact of this decision on greater sage-grouse habitat, population and conservation status.

*Monitoring and Adaptive Management*

Monitoring is a critical component of the Utah RMPA and its Adaptive Management Plan given the value of the resource and the large scale of its habitat. The timing of monitoring and the data collected informs adaptive management actions. Appendix I (Adaptive Management) of the Draft EIS includes an overview of monitoring and states the RMPA contains a Monitoring Framework Plan (Appendix D). Appendix D is not included in the Draft EIS. Without seeing a revised Monitoring Framework Plan, it is difficult to evaluate the monitoring plan in relation to adaptive management plan. The EPA recommends the Final EIS include the revised Monitoring Framework Plan (Appendix D).

The Adaptive Management strategy in the Draft EIS contains a two-tiered system of hard and soft triggers for the greater sage-grouse and its habitat. These triggers identify population and habitat thresholds which, if exceeded, would result in a change in how BLM addresses management of the greater sage-grouse in that area. The Draft EIS notes soft triggers represent an intermediate threshold where management changes are needed to prevent a severe decline, whereas hard triggers represent a more direct action to stop a severe deviation from the greater sage-grouse conservation objectives. For hard triggers, there are automatic adaptive management responses when strategy development and corrective action deadlines are not met, but there is no similar action for soft triggers. In its October 2015 finding that listing the greater sage-grouse under the Endangered Species Act was not warranted, USFWS states, "Further, in response to monitoring, activities allowable under the Federal Plans may be adjusted based on adaptive management criteria to provide an immediate, corrective response to identified triggers for populations or habitat declines."[2] We recommend the Adaptive Management Plan in Final EIS include the actions that would be taken in the event that soft-trigger and hard-trigger deadlines are not met.

*Cumulative, Cross-Boundary Analysis*

The Draft EIS proposes eliminating SFAs and GHMAs, in addition to diminishing the protections that were established for PHMAs. SFA, GHMA and PHMA straddles the borders of Nevada, Idaho, Wyoming and Colorado. The ROD for the 2015 ARMPA emphasizes the importance of SFAs and GHMAs to maintaining the integrity of the PHMA and connectivity to other populations. It also notes these protections were created to support conservation measures for the greater sage-grouse and its habitat not just at a local-level, but on a landscape-level scale. The Draft EIS does not assess how these proposed amendments in Utah may impact populations in nearby states. Given greater sage-grouse populations cross state boundaries and because there are seven BLM state offices revising their plans, we recommend the Final EIS include a cumulative, cross-boundary effects analysis to assess the combined effects to greater sage-grouse populations and habitats associated with the revisions. Specifically, we recommend the cumulative effects consider current greater sage-grouse population conditions and trends compared against the expected effects of current management practices.

---

[2] https://www.federalregister.gov/documents/2015/10/02/2015-24292/endangered-and-threatened-wildlife-and-plants-12-month-finding-on-a-petition-to-list-greater

4

*Improving the Effects Analysis*

The Proposed Action includes components drawn from alternatives analyzed in 2015. The Draft EIS does not include a stand-alone effects analysis for the Proposed Action's combined components and instead relies primarily on the effects analysis in the 2015 EIS. Importantly, the 2015 EIS assessed the impacts of the overall management strategy (i.e. the combination of components) for each Action Alternative and did not independently assess the environmental effects of each component of the alternatives. For the Final EIS, we recommend that BLM consider the combined components in the Proposed Action (including recent modifications to compensatory mitigation policy[3]) to assess its overall impacts to greater sage-grouse populations and trends.

---

[3] https://www.blm.gov/policy/im-2018-093



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
Denver, CO   80202-1129
Phone 800-227-8917
www.epa.gov/region8


August 2, 2018


Ref: 8EPR-N


Bureau of Land Management
Attn: Bridget Kobe Clayton
Colorado Sage-Grouse Coordinator
2815 H Road
Grand Junction, CO 81506


Dear Ms. Clayton:

The U.S. Environmental Protection Agency Region 8 has reviewed the U.S. Department of the Interior, Bureau of Land Management's May 2018, *Northwest Colorado Greater Sage-Grouse Draft Resource Management Plan Amendment (RMPA) and Environmental Impact Statement (EIS) for the Colorado Greater Sage Grouse* (CEQ No. 20180084), pursuant to Section 309 of the Clean Air Act (CAA) and the National Environmental Policy Act (NEPA).

The RMPA proposes to modify the 2015 Colorado greater sage grouse Resource Management Plan (RMP). That RMP and other BLM and Forest Service management plans were part of the basis for the 2015 decision by the US Fish and Wildlife Service not to list the greater sage-grouse under the Endangered Species Act. The main change from the 2015 Colorado greater sage grouse management plan is that it opens lands within one mile of an active lek for fluid mineral leasing with no surface occupancy lease stipulation. It also provides three criteria for allowing exceptions or modifications to new and existing no surface occupancy stipulations for fluid mineral leasing.

The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. We are concerned that the Draft EIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, the EPA has rated the Draft EIS/RMPA as *Environmental Concerns - Insufficient Information – (EC-2)*. The description of the EPA's rating system is available at: https://www.epa.gov/nepa/environmental-impact-statement-rating-system-criteria. The enclosed detailed comments include recommendations for improving the assessment and disclosure of the Proposed Action's expected impacts to greater sage-grouse and habitat; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts would be beneficial or detrimental to the species. Specifically, we recommend improvements in the analysis of the potential impacts from increased oil and gas development for the Proposed Action, and updating the mitigation section to reflect any changes resulting from public comments.

We appreciate the opportunity to participate in the review of this project and are committed to working with you as you prepare the Final EIS. If you would like to discuss our comments, please contact me at (303) 312-6704, or Dana Allen of my staff at (303) 312-6870 or allen.dana@epa.gov.

Sincerely,

Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

2

**Detailed Comments on the 2018 NW Colorado Greater Sage-Grouse Draft Resource Management Plan Amendment and Environmental Impact Statement**

*Potential increase in oil and gas (O&G) development*

The Draft EIS did not include information on the anticipated level of O&G development and potential impacts for the newly leasable resources under greater sage-grouse leks. We recommend the Final EIS identify whether the increased drilling and O&G production would impact any general- or linkage habitat areas and consider whether there is mitigation available for such impacts.

We note that most of the 2015 greater sage-grouse analysis was focused largely on lek habitat. However, BLM has also identified winter concentration, nesting, brood rearing and linkage habitats as having the highest conservation value to maintain sustainable greater sage-grouse populations[1]. We recommend the Final EIS include any new information on winter, nesting and brood rearing habitat in Colorado and consider whether additional mitigation measures are warranted to protect these seasonal habitats from impacts from O&G development. We also recommend the Final EIS include information on whether increased drilling and O&G production in greater sage-grouse habitat compared to the 2015 plan would specifically impact any general- or linkage habitat areas.

*Connection between the RMPA and greater sage grouse conservation status*

Section 1.4 of the Draft EIS identifies the planning criteria associated with the proposed alternative and focuses on modifying protections for greater sage-grouse to conform with state plans and revised policies. We note that the new planning criteria do not include one of the criteria in from 2015 RMP, "maintaining the federal land management planning considerations to protect greater sage-grouse populations and habitats sufficiently so that the species does not warrant listing under the Endangered Species Act (ESA)." We recommend that BLM work with USFWS and Colorado Parks and Wildlife to assess the impacts from the management changes in this RMPA on greater sage grouse conservation status and include that assessment in the Final EIS.

*Potential Changes to Mitigation Strategy*

The Draft RMPA/EIS does not modify the "net conservation gain standard for compensatory mitigation" (page 2-3) that BLM incorporated into its 2015 plan. Instead, the BLM requests public comment on mitigation approaches and implementation; including alternative approaches to requiring compensatory mitigation. If a change in mitigation approach and implementation is developed further in the Final EIS, we recommend including an analysis of Colorado's existing mitigation measures and standards, which include some aspects of compensatory mitigation.

---

[1] "Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountains Region, Including the Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming. . ."  September 2015



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
**75 Hawthorne Street**
**San Francisco, CA  94105**

August 1, 2018

Matthew Magaletti, Project Manager
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard
Reno, NV  89502

Subject:    Nevada and Northeastern California Greater Sage-Grouse Draft Resource
            Management Plan Amendment and Environmental Impact Statement
            (CEQ #20180085)

Dear Mr. Magaletti:

The U.S. Environmental Protection Agency (EPA) has reviewed the above-referenced document pursuant to the National Environmental Policy Act (NEPA), Council on Environmental Quality (CEQ) regulations (40 CFR Parts 1500-1508), and our NEPA review authority under Section 309 of the Clean Air Act.

The stated purpose of the Resource Management Plan Amendment/Environmental Impact Statement (RMPA/EIS) is to enhance cooperation with the states by modifying the approach to greater sage-grouse management in existing Resource Management Plans to better align with the individual states' plans and conservation measures and with the Department of Interior's and Bureau of Land Management's (BLM) policy (pg. ES 2). The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. EPA has potential concerns due to the DEIS's proposed modifications of protections to the greater sage-grouse; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts would be beneficial or detrimental to the species. We are concerned that the Draft RMPA/EIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, we have rated the Draft RMPA/EIS as *Environmental Concerns Insufficient Information* ("EC-2"; see enclosed *Summary of EPA Rating Definitions*). EPA's recommendations below are focused on improving the clarity and coherence of the EIS.

Recommendation #1: Clarify the Basis and Status of Habitat Management Area Designations
According to the Draft RMPA/EIS, fire and invasive plants continue to be major threats to the Nevada and California greater sage-grouse sub-regions and estimates of habitat management areas (HMA) burned in 2016 and 2017 indicate a sharp "increase in potential habitat availability loss during 2017, compared with previous fire seasons." The document states that wildfires burned approximately 1.3 million acres of greater sage-grouse Priority Habitat Management Areas (PHMA), General Habitat Management Areas (GHMA), and Other Habitat Management Areas between 2015-2017. EPA recommends that the Final EIS quantify the acreage that burned in each type of HMA and explain how, if at all, the impacts of fire were factored into the

1

modified HMA designated boundaries. We also recommend that the Final EIS clarify whether the burned lands in the PHMA or GHMA would retain their existing designations or would no longer be designated as PHMA or GHMA.

The Draft RPMA/EIS states that BLM is developing two Great-Basin-Wide Programmatic Environmental Impact Statements (PEISs) to Reduce the Threat of Wildfire and Support Rangeland Productivity and intends to subsequently issue statewide policies for California and Nevada to address the treatment of fire and invasive species in the Nevada and Northeastern California subregions. (pg. 1-10). EPA recognizes the importance of that undertaking. We recommend that the Final EIS for the Greater Sage Grouse RMPA include an update on the status of those PEISs and disclose whether or not they have the potential to result in any changes to Habitat Management Area designations.

Recommendation #2: Clarify the Basis for the Proposed Approach to Project-Specific Analysis
The Draft RMPA/EIS states that future project-specific NEPA analysis will assess the impacts of certain activities in PHMA and GHMA using the lower end of the interpreted range of lek buffer-distances identified in the USGS Report *Conservation Buffer Distance Estimates for Greater Sage-Grouse – A Review* (Open File Report 2014-1239), "unless justifiable departures are determined to be appropriate." (pg. B-1). The USGS report notes that nonbreeding season habitats "may be underrepresented in lek-based designations"[1], and that conservation of such areas can be improved with "knowledge of local and regional patterns of seasonal habitat use". Given the report's indication of the potential underrepresentation of nonbreeding season habitats in lek-based designations, EPA recommends that the Final EIS clarify the basis for determining that project specific analyses should rely on the lower end of the lek buffer distances as the default.

Recommendation #3: Identify Objectives
The planning criteria listed on page 1-6 of the Draft RMPA/EIS include a statement that, "[a]ll activities and uses within Greater Sage-Grouse habitats will be managed to achieve Greater Sage-Grouse objectives…". It is unclear to what objectives this statement refers. EPA recommends that the Final EIS either specify the objectives in question or include a citation to their source document.

Recommendation #4: Disclose Metrics for Required Design Feature Determinations
The Draft RMPA/EIS includes a Required Design Feature (RDF) worksheet to be used to document the rationale for not applying a particular RDF to a site-specific project. The checklist provides three possible reasons for dismissing an RDF. EPA supports the use of a consistent method for RDF determination. We recommend that the Final EIS disclose the metrics that would be used in RDF determination for the types of actions likely to be proposed in PHMA and GHMA designated lands.

Recommendation #5: Disclose Impact Quantification Method to be Used in California
According to the Draft RMPA/EIS, the BLM would require that the State of Nevada's Habitat Quantification Tool (HQT) be used to determine the net change in functional acres attributable to

---

[1] https://pubs.usgs.gov/of/2014/1239/ abstract

a proposed activity and resultant mitigation actions, but this requirement would only apply to BLM-administered lands in Nevada, unless the State of California chooses to adopt the same method of quantification. EPA recommends that the Final EIS explain how the impacts of a proposed project and any pursuant compensatory mitigation would be quantified on BLM-administered lands in California in the event the State of California does not adopt the State of Nevada's HQT.

In addition to the above recommendations, EPA requests that Table 5-1, shown on page 5-2 of the Draft RMPA/EIS, be corrected in the Final EIS to reflect EPA's status as a cooperating agency. EPA accepted BLM's invitation to serve as a cooperating agency for the Greater Sage-Grouse Conservation Land Use Plan amendments via correspondence dated December 19, 2017.

EPA appreciates the opportunity to review this Draft RMPA/EIS. When the FEIS is released, please send one CD to the address above (mail code: ENF-4-2). If you have any questions, please contact me at (415) 972-3521, or contact Anne Ardillo, the lead reviewer for this project, at 415-947-4257 or ardillo.anne@epa.gov.

Sincerely,

Kathleen Martyn Goforth, Manager
Environmental Review Section


Enclosure:  Summary of the EPA Rating System

Cc:    John F. Ruhs, Nevada State Director, Bureau of Land Management
       Jerome E. Perez, California State Director, Bureau of Land Management
       Jeremiah Karuzas, Bureau of Land Management, California State Office

## SUMMARY OF EPA RATING DEFINITIONS*

This rating system was developed as a means to summarize the U.S. Environmental Protection Agency's (EPA) level of concern with a proposed action. The ratings are a combination of alphabetical categories for evaluation of the environmental impacts of the proposal and numerical categories for evaluation of the adequacy of the Environmental Impact Statement (EIS).

## ENVIRONMENTAL IMPACT OF THE ACTION

### *"LO" (Lack of Objections)*

The EPA review has not identified any potential environmental impacts requiring substantive changes to the proposal. The review may have disclosed opportunities for application of mitigation measures that could be accomplished with no more than minor changes to the proposal.

### *"EC" (Environmental Concerns)*

The EPA review has identified environmental impacts that should be avoided in order to fully protect the environment. Corrective measures may require changes to the preferred alternative or application of mitigation measures that can reduce the environmental impact. EPA would like to work with the lead agency to reduce these impacts.

### *"EO" (Environmental Objections)*

The EPA review has identified significant environmental impacts that should be avoided in order to provide adequate protection for the environment. Corrective measures may require substantial changes to the preferred alternative or consideration of some other project alternative (including the no action alternative or a new alternative). EPA intends to work with the lead agency to reduce these impacts.

### *"EU" (Environmentally Unsatisfactory)*

The EPA review has identified adverse environmental impacts that are of sufficient magnitude that they are unsatisfactory from the standpoint of public health or welfare or environmental quality. EPA intends to work with the lead agency to reduce these impacts. If the potentially unsatisfactory impacts are not corrected at the final EIS stage, this proposal will be recommended for referral to the Council on Environmental Quality (CEQ).

## ADEQUACY OF THE IMPACT STATEMENT

### *"Category 1" (Adequate)*

EPA believes the draft EIS adequately sets forth the environmental impact(s) of the preferred alternative and those of the alternatives reasonably available to the project or action. No further analysis or data collection is necessary, but the reviewer may suggest the addition of clarifying language or information.

### *"Category 2" (Insufficient Information)*

The draft EIS does not contain sufficient information for EPA to fully assess environmental impacts that should be avoided in order to fully protect the environment, or the EPA reviewer has identified new reasonably available alternatives that are within the spectrum of alternatives analysed in the draft EIS, which could reduce the environmental impacts of the action. The identified additional information, data, analyses, or discussion should be included in the final EIS.

### *"Category 3" (Inadequate)*

EPA does not believe that the draft EIS adequately assesses potentially significant environmental impacts of the action, or the EPA reviewer has identified new, reasonably available alternatives that are outside of the spectrum of alternatives analysed in the draft EIS, which should be analysed in order to reduce the potentially significant environmental impacts. EPA believes that the identified additional information, data, analyses, or discussions are of such a magnitude that they should have full public review at a draft stage. EPA does not believe that the draft EIS is adequate for the purposes of the NEPA and/or Section 309 review, and thus should be formally revised and made available for public comment in a supplemental or revised draft EIS. On the basis of the potential significant impacts involved, this proposal could be a candidate for referral to the CEQ.

*From EPA Manual 1640, Policy and Procedures for the Review of Federal Actions Impacting the Environment.

4



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 155
Seattle, WA 98101-3140

OFFICE OF
ENVIRONMENTAL REVIEW
AND ASSESSMENT

August 1, 2018

Jim Regan-Vienop, Planning and Environmental Coordinator
Bureau of Land Management Oregon State Office
Attn: Draft EIS for Greater Sage-Grouse Conservation
P.O. Box 2965
Portland, Oregon 97208

Dear Mr. Regan-Vienop:

The U.S. Environmental Protection Agency has reviewed the Bureau of Land Management's May 2018 Oregon Greater-Sage Grouse Draft Resource Management Plan Amendment and Environmental Impact Statement (CEQ Number 20180082; EPA Number 18-0024-BLM) pursuant to Section 309 of the Clean Air Act and the National Environmental Policy Act.

The DEIS describes and analyzes two alternatives for managing livestock grazing in greater sage-grouse habitat on approximately 22,000 acres of BLM-administered surface estate in 13 key Research Natural Areas. The No-Action Alternative is a continuation of current management; use of public lands and resources would continue to be managed under current BLM Resource Management Plans, as amended in 2015. The Management Alignment Alternative was derived through discussion and coordination with the Governor's Office and cooperating agencies to support the State conservation plan and conservation outcomes for the greater sage-grouse. The stated purpose of this current Resource Management Plan Amendment/Environmental Impact Statement is to enhance cooperation with the states by modifying the approach to greater sage-grouse management in existing RMPs to better align with individual states' plans and conservation measures and with the Department of Interior's and BLM's policy.[1]

The EPA supports coordination among federal, state, local, and tribal authorities for consistent and effective conservation of imperiled species. EPA has potential concerns due to the DEIS's proposed modifications of protections to the greater sage-grouse; however, we defer to the expertise of the U.S. Fish and Wildlife Service and appropriate state wildlife management agencies regarding the extent to which those impacts would be beneficial or detrimental to the species. We are concerned the DEIS does not provide sufficient information to fully assess the impacts of the proposed action. For this reason, we have rated the DEIS as *Environmental Concerns Insufficient Information* ("EC-2"). A copy of our rating system is attached. EPA's recommendations below are focused on improving the clarity and coherence of the EIS.

**Livestock Grazing in Research Natural Areas**

The BLM's consideration of livestock grazing in Research Natural Areas is in response to the State of Oregon's November 30, 2017 scoping input that suggested the BLM determine a recommended approach *(to closure of certain RNAs to livestock grazing)* as part of this planning process. The current RMPA/DEIS Scope of Analysis section states the document will assess the following issues:

---

[1] DEIS, p. 1-2

1. Whether and how making areas unavailable to livestock grazing addresses specific threats to greater sage-grouse and greater sage-grouse habitat, as identified in the U.S. Fish and Wildlife Service's Conservation Objectives Team Final Report (2013).

2. Whether the vegetation communities of interest in the key RNAs can be protected and studied with smaller areas of grazing exclusion and still meet the stated 2015 Record of Decision/Approved Resource Management Plan Amendments purposes to:

    a. Serve as areas for comparison for managed areas in the rest of the greater sage-grouse habitat, and

    b. Function as areas for baseline vegetation monitoring for those specific plant communities with no management activities.

3. Whether having the key RNAs available to grazing and managed under the previous district management plan provisions will preclude the BLM from achieving the research (or scientific study) purposes of the 2015 ROD/ARMPA.

Our review finds the DEIS does not include sufficient information to support the BLM's conclusions for each of these three key issues. We recommend the following information be included to improve the EIS's analysis of the key issues.

- Regarding Issue #1: The DEIS includes researchers' views of whether making areas unavailable to livestock grazing addresses threats to greater sage-grouse. We recommend, in addition to the researchers' views, the Final EIS also include a summary of the BLM's determination on whether making areas unavailable addresses threats.

- Regarding Issue #2: The DEIS indicates the no-action alternative would cover 48 vegetation communities that would represent the variability of conditions in Oregon's greater sage-grouse habitat.[2] The DEIS indicates the action alternative would cover nine vegetation communities and provide a limited representation of variability.[3] The DEIS does not state whether providing a limited representation of variability would meet stated 2015 ROD/ARMPA purposes. We recommend the Final EIS include a summary of the BLM's determination of whether providing a limited representation of variable vegetation communities meets the relevant 2015 ROD/ARMPA purposes.

- Regarding Issue #3: We recommend the Final EIS include the key research purposes of the 2015 ROD/ARMPA. We further recommend the Final EIS summarize the BLM's determination of whether management under previous district management provisions will preclude the BLM from achieving the quoted or specifically referenced key research purposes of the 2015 ROD/ARMPA.

---

[2] p. 4-9
[3] p. 4-11

2

**Adaptive Management**

In its October 2015 finding that listing the greater sage-grouse under the Endangered Species Act was not warranted, the USFWS states, "Further, in response to monitoring, activities allowable under the Federal Plans may be adjusted based on adaptive management criteria to provide an immediate, corrective response to identified triggers for populations or habitat declines."[4] We, therefore, recommend the BLM consider a deadline-related management response to incentivize more immediate corrective actions when necessary, and to discuss this in the FEIS. Consider, for example, turning a soft trigger monitoring result into an automatic hard trigger management response if relevant soft trigger adaptive management deadlines are not met.

**Connection between the RMPA and the Endangered Species Act**

We recommend the FEIS include information related to the BLM's approach to maintaining the USFWS determination that an ESA listing is not warranted for greater sage grouse. We note the State of Oregon's interest in maintaining a not warranted finding:

> ...given that the species, its habitat, and ESA considerations are connected across political boundaries, Oregon stresses the importance of ensuring such state-based processes together roll-up to form a coherent outcome across the western range that supports sage-grouse conservation and maintains its "not warranted" status under the federal ESA.[5]

We appreciate the opportunity to comment on the DEIS. If you have any questions regarding these comments, please contact Erik Peterson at (206) 553-6382 or peterson.erik@epa.gov, or you may contact me at (206) 553-1841 or nogi.jill@epa.gov.

Sincerely,

Jill A. Nogi, Manager
Environmental Review and Sediment Management Unit

Enclosure:

1.   U.S. Environmental Protection Agency Rating System for Draft Environmental Statements

---

[4] Accessed online 6/14/18 at: https://www.federalregister.gov/documents/2015/10/02/2015-24292/endangered-and-threatened-wildlife-and-plants-12-month-finding-on-a-petition-to-list-greater
[5] State of Oregon 2017 Scoping Comment Letter

3



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 155
Seattle, WA 98101-3123

OFFICE OF
ENVIRONMENTAL REVIEW
AND ASSESSMENT

December 20, 2018

Mr. Jim Regan-Vienop, Planning and Environmental Coordinator
Bureau of Land Management Oregon State Office
Draft EIS for Greater Sage-Grouse Conservation
P.O. Box 2965
Portland, Oregon 97208

Dear Mr. Regan-Vienop:

The U.S. Environmental Protection Agency has reviewed the Bureau of Land Management's November 2018 Oregon Greater-Sage Grouse Final Resource Management Plan Amendment and Environmental Impact Statement (CEQ Number 20180298; EPA Number 18-0024-BLM) pursuant to Section 309 of the Clean Air Act and the National Environmental Policy Act.

Our review finds that new information in section 4.5 of the Final EIS is responsive to our August 2018 recommendations on the three key issues set forth under the EIS's Scope of Issues and Analysis and has resulted in an improved analysis. For example, on the second key issue, whether vegetation communities of interest can be studied with smaller areas of grazing exclusion, we commend the BLM for including new information which more clearly defines the issue and provides a basis for choice among options for agency decision makers and the public.

> Based on determinations in the 2015 *Approved Resource Management Plan Amendments* (ARMPA) that the 13 *Research Natural Areas* (RNAs) identified for closure along with the 2 RNAs already closed to livestock grazing (*the No Action Alternative*) were likely the minimum number of sites needed, the BLM assumes that retaining livestock grazing in the 13 key RNAs (*the Proposed Plan Amendment*) would not provide sufficient variability of sites needed to meet the research purposes identified in the 2015 ARMPA or provide the same level of support to Sagebrush and Sage-Grouse Science Need #2.[1] (Italics added)

We appreciate the opportunity to comment on the FEIS. If you have any questions regarding these comments, please contact Erik Peterson at (206) 553-6382 or peterson.erik@epa.gov, or you may contact me at (206) 553-1841 or nogi.jill@epa.gov.

Sincerely,

Jill A. Nogi, Manager
Environmental Review and Sediment Management Unit

---

[1] Final EIS, p. 4-8



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 155
Seattle, WA 98101-3140

OFFICE OF
ENVIRONMENTAL REVIEW
AND ASSESSMENT

December 20, 2018

Bureau of Land Management
Idaho State Office
Attn: Jonathan Beck
1387 S. Vinnell Way
Boise, Idaho 83709

Dear Mr. Beck:

The U.S. Environmental Protection Agency has reviewed the Bureau of Land Management's November 2018 Idaho Greater Sage-Grouse Final Proposed Resource Management Plan Amendment and Environmental Impact Statement (EPA Number 18-0028-BLM, CEQ Number 201800293;) pursuant to Section 309 of the Clean Air Act and the National Environmental Policy Act.

In our August 2018 comments on the Draft EIS, we recommended that the Final EIS include a description of how the BLM evaluated and interpreted the data and science relevant to the decision to reduce lek buffers within Important Habitat Management Areas and to remove buffers and mitigation requirements within General Habitat Management Areas. We appreciate that, for the FEIS, lek buffers have been increased relative to the DEIS, and mitigation requirements for General Habitat Management Areas are now included. Larger buffers and broader application of mitigation requirements will result in improved protection for Greater Sage-Grouse.

Regarding our recommendation to describe how data and science relevant to the decision was evaluated and interpreted, we appreciate this addition in the FEIS's Idaho-Specific Comment Responses:

> **Response:** The science surrounding lek buffer distances comes from the USGS's Conservation Buffer Distance Estimates for Greater Sage-Grouse. Other detailed information comes from the SGTF *(Idaho Sage-grouse Task Force)*. A suite of lek buffer distances have been analyzed using the most current science. Although, within the Great Basin Region; needs, threats, and utilization of public lands varies State to State.[1]

To the extent possible and as appropriate, we recommend that the Record of Decision further disclose the detailed information that came from the Idaho Sage-grouse Task Force. Clarity regarding how project-related decisions are made improves stakeholders' ability to effectively participate in land management.

---

[1] Final EIS, p. App-4-14

We appreciate your consideration of our comments. If you have any questions regarding these comments, please contact Erik Peterson at (206) 553-6382 or peterson.erik@epa.gov, or you may contact me at (206) 553-1841 or nogi.jill@epa.gov.

Sincerely,

Jill A. Nogi, Manager
Environmental Review and Sediment Management Unit

2

# EXHIBIT C

*Standalone Alternative*

*Proposed by The Wilderness Society et al.*

*in Comments to BLM*

Proposed Alternative to Maintain the "Not Warranted" Finding

The 2015 Sage-grouse Plans were the basis for the U.S. Fish and Wildlife Service (FWS) finding that listing the greater sage-grouse under the Endangered Species Act (ESA) is no longer warranted. This decision was based on a determination that the plans provide sufficient certainty regarding their implementation and effectiveness and must not be threatened by this amendment process.

The surest way to maintain the not warranted decision would be to maintain the current 2015 Sage-grouse Plans by adopting the "no action" alternative in this amendment process, which would still provide sufficient flexibility to adapt through implementation. However, recent instruction memoranda and policy changes (such as rescinding guidance on mitigation) that alter implementation of the 2015 plans are already undermining their effectiveness. The changes to the 2015 plans that are currently under review further jeopardize the structure and function of the plans and, as a result, risk the important protections that safeguard habitat and support FWS's not warranted finding.

The collaborative work that went into creating the original plans should be honored. To the extent that DOI and BLM are committed to making some changes to the plans while also maintaining necessary protections to justify the Fish and Wildlife Service's finding, this proposed alternative highlights key elements to be incorporated in the plans, including maintaining current provisions and clarifying or improving others. This alternative is further supported by the 2018 U.S. Geological Survey report (https://doi.org/10.3133/ofr20181017), which found that research since 2015 reinforces the science underlying the structure and function of the 2015 Sage-grouse Plans.

The following describes the key elements of our recommended alternative. Additional detail regarding implementation of the elements is available in technical comments.

1.  Overall, the plans must explicitly commit to maintaining the FWS "not warranted" decision. The purpose and need of the 2018 amendments to seek better cooperation with states by modifying the management approach in the plans must be reconciled and made consistent with the purpose and need of the 2015 Sage-grouse Plans to conserve, enhance, and restore sage-grouse habitat by eliminating or minimizing threats to their habitat identified in the FWS 2010 finding that listing under the ESA was warranted. Without ongoing conservation, enhancement and restoration of habitat, the already impacted habitat and risks of further harm that led to the FWS 2010 finding will not be sufficiently addressed in these plans to maintain the FWS 2015 finding that listing is no longer warranted.

2.  Certainty that the plans will be implemented and protections applied must be maintained. Language included in all the plans stating that they may be changed or undermined through secretarial orders, by re-classifying management as merely recommendations (such as in the Nevada DEIS) or by permitting modification through interagency teams (such as in the Idaho DEIS) must be removed and replaced with statements that any changes to the plans will be subject to public review and input, and conducted through a plan amendment as needed.

3.  No surface occupancy stipulations must be maintained for oil and gas development in priority habitats. Preventing destruction of greater sage-grouse habitat is critical to avoiding harm while permitting development.

4.  Waivers, exceptions and modifications to oil and gas lease stipulations must be subject to narrow and specific criteria so they are consistently and reliably applied, and can be effective as intended. In addition, applications for and responses to waivers, exceptions and modifications should be tracked and made available to the public.

1

5. The requirement to prioritize oil and gas leasing and development outside of sage-grouse habitats must be maintained and clarified so that it is a meaningful tool to reduce habitat destruction and fragmentation. Prioritization should be based on analyzing factors such as the condition of habitat and oil and gas potential to make informed decisions about when the best approach would be to prioritize other proposed lease or permits, or even defer leasing or phase development in order to ensure habitat is protected.

6. Existing disturbance caps must be maintained to limit harm to habitat. Disturbance caps serve as a backstop that limits harm to habitat and provides needed certainty.

7. Prescribed buffer distances (both those limiting activities and those setting out areas for analyzing and addressing impacts) must be maintained to guide analysis of impacts and limit harm to habitat.

8. Mitigation must be applied through the mitigation hierarchy (avoid, minimize, then compensate) and, at a minimum, apply a "no net loss" standard so that while a range of multiple uses continue, their impacts are addressed. Avoidance should include avoiding locating rights-of-ways in habitat. Mitigation programs must incorporate a set of recognized principles related to mitigation, and continue to provide for application of compensatory mitigation at greater than 1:1 ratios, where necessary to address factors such as the full suite of harms and the uncertainty of success for specific mitigation measures, including where state programs provide for such approaches. The 2015 Sage-grouse Plans were premised on the understanding that ongoing activities in habitat would result in ongoing damage to habitat, so that opportunities to enhance and expand habitat must be provided in order for the species to ultimately survive.

9. Adaptive management provisions such as "hard" and "soft" triggers must be maintained, along with provisions for public notice and comment when they are triggered, to show that monitoring of effectiveness is ongoing and management is adjusted as needed.

10. All sage-grouse habitat must be subject to specific management approaches. While the strongest protections should continue to apply to the most important habitat, managing general habitat is also important for maintaining, improving, restoring and expanding habitat overall. Protections that were included in Sagebrush Focal Area designations should be incorporated into Priority Habitat Management Areas, where appropriate. The General Habitat Management Areas in Utah must be maintained; eliminating GHMA in Utah would hamper sage-grouse recovery in the state and have grave implications for habitat designations in other states. Similarly, proposals to remove management protections associated with GHMA in Idaho must not be adopted, since they effectively undercut the meaning of the habitat classification.

11. Sage-grouse habitat must be retained in federal ownership and not transferred to state control in order to maintain certainty of management across these lands, as well as habitat connectivity.

12. Travel planning should be carried out to address the risks of habitat destruction and fragmentation acknowledged in the plans.

13. A more specific approach to managing noxious weeds and invasive species should be developed and included to address this significant threat. The 2018 report issued by Western Association of Fish and Wildlife Agencies (updating a 2013 report) summarizing policy, fiscal and science challenges land managers have encountered in control and reduction of invasive grasses and fire cycle, with a focus on the greater sage-grouse found ongoing gaps and also recommended that the agencies continue working on a "landscape-scale approach to fire and land management and further enhance collaborative, science–based approaches to management activities within the Sagebrush Biome."

2

2018 Gap Report, p. 46. Following these recommendations and committing to developing a more detailed strategy is needed.

14. Specific habitat objectives for all aspects of the sage-grouse lifecycle should be defined, as discussed in the 2018 USGS report, which highlight the need to address the full range of sage-grouse habitat.

15. In addition, to meet the overall goals of the plans and habitat objectives to conserve, enhance and restore sage-grouse habitat, the plans should develop and incorporate specific restoration targets for PHMA to incentivize activities to reduce disturbance and the threat from noxious weeds.

# EXHIBIT D

*Western Energy Alliance Letter to BLM*



July 19, 2017

*Via Electronic Mail and Overnight Delivery*

Greater Sage Grouse Review Team
U.S. Department of the Interior
1849 C Street, NW
Washington D.C. 20240

Re:    **Economic Impacts of Greater Sage Grouse Federal Land Use Plans**

Dear Review Team:

Western Energy Alliance (the Alliance) submits this letter and information for your consideration during your review of the greater sage-grouse (GrSG) federal land use plans pursuant to Secretarial Order 3349.

The Alliance represents over 300 companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas across the West. Alliance members are independents, the majority of which are small businesses with an average of fifteen employees. Our industry plays an important role in the economic wellbeing of the western States, and our production is a strong contributor toward American energy security.

The oil and natural gas industry generates approximately 173,860 jobs in the 13 western states, and approximately 62% of these jobs (107,700) are located in four states where greater sage grouse are found:  Montana, Colorado, Wyoming, and Utah.

The economic benefits of oil and gas production in the West are significant. Western producers are proud to provide 21% of the nation's oil and 25% of natural gas production while impacting less than 0.07 percent of public lands. Our industry generates $84.3 billion in annual economic impact nationwide, and in 2016 the industry contributed $13.3 billion in taxes to local, state and federal governments. Onshore producers return $54.12 in royalties and lease revenues for each dollar spent by the government administering the federal onshore program.

**Economic Impact.**  The 2015 GrSG federal land use plans are severely restrictive and have tremendous detrimental economic and job impacts to the oil and gas industry.  An economic analysis by John Dunham & Associates (JDA) reports that these restrictions will result in:

- loss of approximately 9,276 oil and gas jobs;
- reduced annual economic growth of approximately $2.4 billion; and,

1775 Sherman St., Ste 2700    Denver, CO 80203
P 303.623.0987   F 303.893.0709   W WesternEnergyAlliance.org

- loss of annual federal and state tax revenues of approximately $351 million.[1]

This analysis utilized the IMPLAN model. A copy of this economic analysis is attached.

In the West, states and counties rely on a healthy and robust oil and natural gas industry to balance state budgets and fund education, public safety, and infrastructure projects. Most states require companies to pay severance, property, and other types of taxes as well as royalties on the energy they produce. Western states also have school trust funds funded by productive activities like oil and natural gas development on state lands.

**Targeted Oil and Gas Restrictions from GrSG Plans.** The oil and gas specific restrictions in the GrSG plans result in increased costs due to limitations on activities, and reduce new oil and gas development. The primary restrictions of concern to the Alliance are:

- Overly expansive and burdensome lek buffers (e.g., 3.1 miles) and noise buffers;

- Inconsistent and overly burdensome density and disturbance caps;

- Failure to define, recognize and respect Valid Existing Rights;

- Inconsistent and overly burdensome No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL) lease stipulations;

- BLM's unlawful ceding of authority to U.S. Fish and Wildlife Service for approval of exception, waiver or modification of NSO, CSU, and TL stipulations;

- Imposition of unlawful and overly broad compensatory mitigation and net conservation gain requirements;

- Undue leasing prohibitions and restrictions;

- Arbitrary and unduly burdensome "Required Design Features;"

- Unsupported and overly broad designations of priority habitat management areas; and,

- Arbitrary exemptions for renewable transmission projects (e.g., surface disturbance cap exemption counted against oil and gas development cap).

These provisions are contrary to the President's Executive Order, titled "Promoting Energy Independence and Economic Growth," and Secretary Zinke's Order 3349, "American Energy Independence." The above provisions should be removed and the land use plans revised so that a proper balance is struck between recognizing and utilizing state conservation plans for the species and continued economic development and growth to ensure American energy independence and dominance.

**Revision of the Land Use Plans is a Necessity.** Given the expansive and unduly burdensome restrictions in these plans, it is critical that Interior revise the land use plans rather than simply seeking to make limited changes. Moreover, the States should have

---

[1] These numbers are based upon analysis of Scenario Two in the attached economic analysis, which tracks with the restrictions contained in the final federal land use plans issued in 2015.

WESTERN ENERGY ALLIANCE

primary management authority over the conservation of the GrSG because it is not a listed species, and the States have more local expertise.

State efforts, such as in Montana, Utah, and Wyoming, provide a more sensible and adaptive approach to GrSG management while balancing future economic growth that is entirely lacking in the current plans which utilize a federal, command and control, one-size-fits-all approach.

**Additional Considerations.**  The Alliance also provides the following additional considerations for review of the GrSG federal land use plans:

1. **Rescission of 2016 Instruction Memoranda**

   The instruction memoranda issued in 2016 should each be rescinded in their entirety, as these guidelines further exacerbate the unduly burdensome restrictions of the GrSG plans.

2. **Issuance of Instruction Memoranda on Valid Existing Rights**

   While the GrSG Records of Decision and land use plans liberally utilize the phrase "valid existing rights" – it is not defined anywhere in the plans, and is imposed and implemented in a manner that disregards these rights.  "Valid Existing Rights" should be explicitly defined as any lease, permit or authorization issued or granted prior to the date of issuance of the GrSG Records of Decision.

3. **Review of Alliance's Data Quality Act challenges**

   In 2015, the Alliance submitted a series of Data Quality Act challenges to Interior on: (1) BLM's National Technical Team Report; (2) the USFWS's Conservation Objectives Team Report; (3) the USGS GrSG Monograph; and, (4) the USGS "Conservation Buffer Distance Estimates for Greater Sage-Grouse—A Review"[1] (the Buffer Report).  These reports contain significant data quality flaws, omissions, and fundamental scientific errors, yet were still utilized as foundational elements for formulation of the GrSG plans.

   The Interior GrSG Review Team should review the Alliance's Data Quality Act submissions to identify key scientific and data flaws that need to be addressed and corrected in the revised GrSG plans.

4. **Revisions to Habitat Mapping and Habitat Designations**

   The habitat designations reflected in the current land use plans are based on computer mapping exercises built around overly burdensome and far reaching leks and buffers that are not supported by science, resulting in inaccurate and overbroad habitat designations.

WESTERN ENERGY ALLIANCE

The plans should be revised to provide States with primacy in designating habitat and expressly allow for adaptation of designation habitat based upon local conditions and data from State recommendations.  The revised plans and RODs should also include an express provision that affords site-specific ground-truthing of habitat areas on a project-specific basis.

**5. Guiding Principles for Management Provisions**

As Interior and BLM move forward to revise the GrSG plans and RODs, the following guiding principles should be in the forefront:

- Viable management strategies in the RMPAs and RODs must be:  (1) based on science; (2) designed to promote certainty, affordability, flexibility, simplicity, and accessibility; and, (3) operationally and legally viable.

- RMPAs must provide a platform that allows for transparency and regulatory certainty at the project level.

- Conserve high-quality habitat where it makes the greatest ecological difference, while balancing economic activity and recognizing valid existing rights.

- Provide adaptability to improve the effectiveness and efficiency of BLM management.

Thank you for your time and consideration.  The Alliance looks forward to continued dialog regarding these important issues on a going forward basis.

Please do not hesitate to contact us if you have any questions or would like additional information.

Sincerely,

Kathleen M. Sgamma
President

**WESTERN ENERGY ALLIANCE**