Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, and PRAIRIE HILLS AUDUBON SOCIETY,<br><br>*Plaintiffs*,<br><br>v.<br><br>DAVID BERNHARDT, Acting Secretary of Interior; JOSEPH R. BALASH*, Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE,<br><br>*Defendants*. | Case No. 1:16-cv-00083-BLW<br><br>**FIRST SUPPLEMENTAL COMPLAINT\*\***<br><br>**<u>Injunctive Relief Requested</u>**<br><br>*\*\*Filed Pursuant to Court Order ECF No. 138* |

*\* Official Defendant automatically substituted per Fed. R. Civ. P. 25(d)*

### INTRODUCTION

1.      Plaintiffs bring this First Supplemental Complaint to halt and reverse the Trump Administration's actions to rescind or weaken greater sage-grouse protections adopted by Federal Defendants in the 2015 Greater Sage-Grouse Plans, which are the subject of the original Complaint in this action, ECF No. 1.

FIRST SUPPLEMENTAL COMPLAINT --                                    1

2.     Aggressively implementing President Trump's self-styled "energy dominance agenda" for public lands, the Department of Interior (DOI) and its agency, the Bureau of Land Management (BLM), have arbitrarily and unlawfully weakened federal land management measures designed to protect the greater sage-grouse, including by: (a) amending most of BLM's 2015 Sage-Grouse Plans to remove or water down sage-grouse management protections and allow further harmful oil and gas development, livestock grazing, and other actions to degrade and fragment sage-grouse habitats; (b) abruptly cancelling the proposed withdrawal of 10 million acres of Sagebrush Focal Areas—the single most important set of sage-grouse habitats—from new mining claims; and (c) rescinding prior policies requiring compensatory mitigation for energy development and other industrial activities that damage sage-grouse habitats.

3.     The Trump Administration falsely asserts that these actions build upon and improve the 2015 Plans. In truth, they universally decrease protections for the greater sage-grouse, remove key regulatory mechanisms on which the U.S. Fish and Wildlife Service based its 2015 decision that greater sage-grouse no longer warranted ESA protection, and will hasten the greater sage-grouse's decline toward extinction.

4.     As detailed below, these actions violate multiple requirements of the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA), and are arbitrary and capricious under the Administrative Procedure Act (APA), requiring reversal by this Court.

5.     The Forest Service is embarked on a similar process as BLM and intends to finalize its own sage-grouse plan amendments in coming months, to similarly weaken or rescind existing management protections for sage-grouse on Forest Service lands.  If necessary, Plaintiffs will move to amend this supplemental complaint to include those actions once final.

FIRST SUPPLEMENTAL COMPLAINT --                                                    2

6.     Because the Trump Administration's actions to weaken sage-grouse protections will allow substantial new energy development and other actions to further degrade and fragment sage-grouse habitats and populations, Plaintiffs seek emergency injunctive relief to maintain the status quo and prohibit implementation of BLM's recent 2019 Sage-Grouse Plan Amendments. Those plan amendments will have immediate and irreparable consequences on sage-grouse habitats and populations, including opening up previously-closed lands to oil and gas leasing, and allowing ground-disturbing activities on lands subject to "No Surface Occupancy" requirements under the 2015 Sage-Grouse Plans.

7.     As Plaintiffs stated in their original Complaint, the 2015 Sage-Grouse Plans are more protective of sage-grouse than the Federal Defendants' prior land use plan provisions. The 2015 Plans are also more protective than the weakened plans adopted by the Trump Administration. Accordingly, the 2015 Sage-Grouse Plans should remain in effect until the Court has adjudicated Plaintiffs' claims in this First Supplemental Complaint and in the original Complaint, and Defendants have corrected the deficiencies alleged therein.

## JURISDICTION AND VENUE

8.     As set forth in Plaintiffs' original Complaint ¶ 10, ECF No. 1, jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action and the claims in this First Supplemental Complaint arise under the laws of the United States, including FLPMA, 43 U.S.C. §§ 1301 *et seq.*; NEPA, 42 U.S.C. §§ 4321 *et seq.*; the APA, 5 U.S.C. §§ 701 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; and the Equal Access to Justice Act (EAJA), 28 U.S.C. §§ 2412 *et seq.*

9.     The actions challenged in this First Supplemental Complaint are final agency actions properly subject to judicial review under the APA; and an actual, justiciable controversy

FIRST SUPPLEMENTAL COMPLAINT --                                            3

now exists between Plaintiffs and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–06.

10.     As the Court previously held in this matter, ECF No. 86, venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff Western Watersheds Project resides in this district and a substantial part of the events or omissions giving rise to the claims herein occurred within Idaho. Venue remains proper in this district for the claims in the First Supplemental Complaint, including because Plaintiffs challenge BLM's recent March 2019 weakening of Idaho land use plans, and the other actions challenged herein affect sage-grouse populations and habitats in Idaho and across the range of greater sage-grouse, harming Plaintiffs and their interests.

11.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 701.

## PARTIES

12.     The Plaintiffs named in this First Supplemental Complaint are those identified in the original Complaint ¶ 18, ECF No. 1, *i.e.,* Western Watersheds Project, WildEarth Guardians, Center for Biological Diversity, and Prairie Hills Audubon Society.

13.     Plaintiffs timely submitted comments and protests to BLM on its recent plan amendments and otherwise exhausted all required administrative remedies before bringing this First Supplemental Complaint.

14.     Plaintiffs and their staff, members, and supporters are harmed by Defendants' legal violations challenged in this First Supplemental Complaint. Defendants' violations injure the aesthetic, commercial, conservation, scientific, recreational, educational, wildlife preservation, procedural, and other interests of Plaintiffs and their staff, members, and

supporters. These are actual, concrete injuries caused by Defendants' violations of law, for which judicial relief is required to remedy those harms. The relief sought herein would redress these injuries. Plaintiffs have no adequate remedy at law.

15.     The Defendants in this First Supplemental Complaint include all Defendants named in the original Complaint ¶ 23, with the addition of David Bernhardt, the current Acting Secretary of Interior and the architect of the actions challenged herein, and the automatic substitution of Joseph R. Balash, who is the current Assistant Secretary of the Interior for Lands and Minerals Management, pursuant to Fed. R. Civ. P. 25(d).

## SUPPLEMENTAL STATEMENT OF FACTS

**Procedural Background**

16.     Plaintiffs filed the Complaint in this action on February 25, 2016, to challenge the final Environmental Impact Statements (EISs), Records of the Decision (RODs), and federal land use plan amendments that BLM and Forest Service approved in September 2015 as the culmination of their National Greater Sage-Grouse Planning Strategy (jointly called the "2015 Sage-Grouse Plans" herein). *See* Complaint ¶¶ 1–13, 84–133.

17.     The Complaint acknowledged that the 2015 Sage-Grouse Plans represent a step forward in sage-grouse conservation, but identified legal, scientific, and factual deficiencies demonstrating that they do not adequately ensure sage-grouse conservation into the future. These include Defendants' failure to take a range-wide "hard look" at sage-grouse populations, habitats, threats, and conservation needs; failure to address likely impacts of climate change upon sage-grouse habitats and populations; failure to prioritize the designation of Sage-Grouse "Areas of Critical Environmental Concern" (ACECs) under FLPMA; and adoption of inadequate

FIRST SUPPLEMENTAL COMPLAINT --                                                5

buffers and other measures to protect key habitats and populations from major threats, including energy development, livestock grazing, rights-of-way, and other human actions. *Id.* ¶¶ 134–312.

18.     The Court approved a Case Management Order on June 1, 2016, setting litigation deadlines. ECF No. 37. Federal Defendants subsequently submitted the Administrative Record for the 2015 Sage-Grouse Plans, ECF Nos. 87–88.

19.     On March 3, 2017, the Court denied Federal Defendants' motion to sever and transfer venue, ECF No. 86.

20.     Because the new Trump Administration began the process to review and revise the 2015 Sage-Grouse Plans soon thereafter, as described below, further litigation on Plaintiffs' challenges in the original Complaint have effectively been on hold pending further final actions on the Plans. *See* ECF Nos. 94–116.

**Trump Administration's "Energy Dominance" Agenda**

21.     After President Trump assumed office in January 2017, he announced a new "energy dominance" agenda for public lands management, and his Administration began working aggressively to dismantle protections for public lands and their resources in order to promote fossil fuel development. Ryan Zinke, Trump's initial Secretary of Interior, and David Bernhardt, a former energy industry lawyer and lobbyist who was Deputy Secretary under Zinke and is now Acting Secretary of Interior, led the charge in that effort.

22.     On March 28, 2017, President Trump issued Executive Order (EO) 13783, "Promoting Energy Independence and Economic Growth," which directed that all executive departments and agencies "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend,

FIRST SUPPLEMENTAL COMPLAINT --                                                                    6

revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law."

23.     On March 29, 2017, Zinke issued Secretarial Order (SO) 3349, "American Energy Independence," which directed all bureaus within DOI, including BLM, to examine their actions restricting domestic energy development.

24.     The actions challenged in this First Supplemental Complaint flow from these directives, under which the Trump Administration has flouted and disregarded existing laws and regulations in its efforts to serve the interests of the oil and gas, livestock, and other industries that dominate the current Administration and exploit western public lands.

**Revoking DOI Compensatory Mitigation Requirements**

25.     One of the first steps taken by the Trump Administration to undermine environmental protection on public lands was to eviscerate policies requiring compensatory mitigation of unavoidable impacts from development of public lands.

26.     The federal government's reliance on compensatory mitigation dates back almost three decades, but DOI's comprehensive mitigation policies took shape during the Obama Administration and are now being reversed unlawfully by the Trump Administration.

27.     On October 31, 2013, former Interior Secretary Sally Jewell issued Secretarial Order 3330, "Improving Mitigation Policies and Practices of the Department of the Interior," to establish a "coordinated Department-wide, science-based strategy to strengthen mitigation practices so as to effectively offset impacts of large development projects of all types through the use of landscape-level planning, banking, in-lieu fee arrangement, or other possible measures."

28.     In response to SO 3330, the DOI issued an April 2014 report, "A Strategy for Improving the Mitigation Policies and Practices of the Department of Interior" (hereafter,

"Mitigation Strategy Report"), which addressed at length the science supporting compensatory mitigation and the statutory grounds for adopting such mitigation policies under NEPA, FLPMA, ESA, Fish and Wildlife Coordination Act, and many others.

29.     The Mitigation Strategy Report cited in particular FLPMA's requirements that public lands be managed "on the basis of multiple use and sustained yield" and "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resources, and archeological values," 43 U.S.C. § 1701(a)(7)–(8). It explained that "[u]nder the broad discretion afforded by FLPMA, BLM can condition uses of the public lands authorized through various instruments (e.g., rights-of-way, permits, licenses, easements, etc.) on the implementation of mitigation measures intended to reduce impacts."

30.     DOI and BLM thereafter implemented SO 3330 and the Mitigation Strategy Report in numerous ways, including through adopting Instruction Memoranda (IMs), Department Manual provisions, and incorporating compensatory mitigation requirements into the 2015 Sage-Grouse Plans to require that unavoidable adverse impacts of energy development and other activities in sage-grouse habitats result in a "net conservation gain" for the species.

31.     On December 21, 2016, Interior Solicitor Memorandum M-37039, "The Bureau of Land Management's Authority To Address Impacts of its Land Use Authorizations Through Mitigation," further detailed how FLPMA provides BLM with authority to "identify and require appropriate mitigation" in the land use planning context, thus confirming the legal authority of BLM to require compensatory mitigation under the 2015 Sage-Grouse Plans.

32.     Once the Trump Administration took office, then-Interior Secretary Zinke rescinded SO 3330 through his SO 3349 and directed Interior bureaus and offices to review all actions taken under SO 3330 for possible reconsideration, modification, or rescission.

FIRST SUPPLEMENTAL COMPLAINT --                                                                 8

33.     On December 22, 2017, then-Deputy Secretary Bernhardt issued Order No. 3360, which followed up on SO 3349 and directed that BLM "revise and reissue" its IMs on offsite mitigation. Order No. 3360 also stated that several sections of DOI and BLM manuals and handbooks concerning mitigation were "inconsistent with EA 13783 and SO 3349 [and] are hereby rescinded."

34.     On June 30, 2017, the new Acting Solicitor of the Interior, Daniel H. Jorjani— another industry lawyer installed by the Trump Administration—issued Solicitor Opinion M-37046, which formally revoked and withdrew M-37039.

35.     In M-37046, Acting Solicitor Jorjani cited SO 3349 as the major grounds for revoking and withdrawing M-37039, but also asserted that "[w]ithdrawal of M-37030 is appropriate because it attempted to answer an abstract question—whether BLM generally has authority to require mitigation when authorizing uses of the public lands—without the context of specific factual circumstances or application of specific statutory and regulatory provisions governing a particular authorization or type of authorization."

36.     On December 6, 2018, BLM issued IM 2019-018 which prohibited BLM officials, effective immediately, from requiring compensatory mitigation from public land users. As justification for this mandate, IM 2019-018 asserted that "FLPMA does not explicitly mandate or authorize the BLM to require public land users to implement compensatory mitigation as a condition of obtaining authorization for the use of the public lands." This radical re-interpretation of BLM's authority under FLPMA is unsupported by any independent or sound legal analysis.

37.     As alleged further below, BLM subsequently cited and relied on M-37046 and/or IM 2019-018 in revising the 2015 Sage-Grouse Plans to jettison their requirements for

FIRST SUPPLEMENTAL COMPLAINT --                                                        9

compensatory mitigation, wrongly contending that BLM lacks authority under FLPMA or other statutes to require compensatory mitigation for actions that cause unavoidable harms to the public lands.

**DOI Process to Weaken the 2015 Sage-Grouse Plans**

38.     Once in office, the Trump Administration also moved quickly to begin gutting the 2015 Sage-Grouse Plans, even while denying it was doing so.

39.     On June 7, 2017, then-Interior Secretary Zinke issued Secretarial Order 3353, "Greater Sage-Grouse Conservation and Cooperation with Western States," which directed that a DOI "Sage-Grouse Review Team" be assembled to review the 2015 Sage-Grouse Plans and recommend modifications to "enhance State involvement," among other directives.

40.     Unlike the prior NTT Technical Team convened to provide science-based conservation recommendations for the National Greater Sage-Grouse Planning Strategy, *see* Complaint ¶¶ 85–103, SO 3353 did not require that members of the new DOI Sage-Grouse Review Team be scientists or sage-grouse experts. In fact, the members of the Review Team were closely tied to the oil and gas, coal, and other industries, who lacked scientific background in sage-grouse conservation. The public, including groups representing conservation interests, was excluded from this process.

41.     There was no public notice or comment period allowed for the DOI Sage-Grouse Review Team report.

42.     However, the oil and gas industry provided substantial input to the DOI Sage-Grouse Review Team, including a letter submitted by the Western Energy Alliance (WEA) dated July 19, 2017, which complained about numerous aspects of the 2015 Sage-Grouse Plans,

FIRST SUPPLEMENTAL COMPLAINT --                                                                        10

including the following "wish list" of alleged problems with the Plans that it recommended

weakening to benefit the oil and gas industry:

(a) "Overly expansive and burdensome lek and noise buffers,"

(b) "Inconsistent and overly burdensome density and disturbance caps,"

(c) "Inconsistent and overly burdensome No Surface Occupancy (NSO)" and other lease

stipulations,

(d) "BLM's unlawful ceding of authority to U.S. Fish and Wildlife Service for approval

of exception, waiver or modification of NSO" and other lease stipulations,

(e) "Imposition of unlawful and overly broad compensatory mitigation and net

conservation gain requirements,"

(f) "Undue leasing prohibitions and restrictions,"

(g) "Arbitrary and unduly burdensome 'Required Design Features'" (RDFs), and

(h) "Unsupported and overly broad designations of priority habitat management areas."

43.     On August 4, 2017, the DOI Sage-Grouse Review Team issued its "Report In

Response To Secretarial Order 3353," which made recommendations for numerous

modifications of the 2015 Sage-Grouse Plans to relax restrictions on oil, gas and other fossil fuel

development in sage-grouse habitats.

44.     The August 2017 Report included every one of the changes identified by WEA in

its July 2017 letter, quoted above. The Report recommended amendments to the 2015 Sage-

Grouse Plans to "modify or remove SFA [Sagebrush Focal Area] fluid mineral stipulations,"

revising "processes for calculating the amount of surface disturbance and the density of energy

and mining facilities" and "mitigation and net conservation gain," loosening "hard triggers"

under adaptive management provisions of the Plans, providing greater flexibility in "Required

FIRST SUPPLEMENTAL COMPLAINT --                                                          11

Design Features" for energy development projects, and altering priority habitat designations, among other industry-sponsored recommendations.

45.     The same day, then-Secretary Zinke issued a memorandum to then-Deputy Secretary David Bernhardt directing Bernhardt "to ensure implementation of the recommendations and direct BLM . . . to immediately begin implementing the short- and long-term recommendations in the Report."

46.     On October 24, 2017, then-Deputy Secretary Bernhardt issued a "Review of the Department of Interior Actions that Potentially Burden Domestic Energy," calling for review of BLM's Sage-Grouse Plans with the purpose of "giving appropriate weight to the value of energy and other development on public lands" and making them "consistent" with SO 3349.

47.     Bernhardt explicitly stated that the objective of BLM's review of the sage-grouse plans would be that "industry will have greater certainty in leasing, exploration and production activities due to availability of acreage for oil and gas development," and that "the BLM will measure success by assessing changes in industry's interest in nominating acreage for competitive sale and developing existing leases in areas affected by the Greater Sage-grouse amendments to RMPs."

**BLM Abruptly Cancels SFA Mineral Withdrawal Proposal.**

48.     In its March 2010 Finding for ESA listing of greater sage-grouse, the U.S. Fish and Wildlife Service identified habitat disturbance and fragmentation caused by hard-rock mining operations as a threat to greater sage-grouse that supported the Service's determination that ESA listing of the species was warranted. *See* Complaint ¶¶ 39–40.

49.     The 2015 Sage-Grouse Plans established SFAs as "a subset of priority habitat most vital to the species persistence within which [the Service] recommend[s] the strongest

FIRST SUPPLEMENTAL COMPLAINT --                                                                12

levels of protection."  The SFAs were based on the "Priority Areas for Conservation" (PACs) identified by the U.S. Fish and Wildlife Service's 2013 "Conservation Objectives Team" Report (COT Report), which it termed "key habitats essential for sage-grouse conservation" and "highly important for long-term viability of the species." *See id.* ¶¶ 104–07.

50.     The 2011 NTT Report recommended withdrawing all priority sage-grouse habitat from mineral development, and the 2013 COT Report similarly recommended that BLM "[a]void new mining activities and/or any associated facilities within occupied habitats, including seasonal habitats."

51.     As part of the National Greater Sage-Grouse Planning Strategy, and at the same time it approved the 2015 Sage-Grouse Plans, BLM initiated a process under FLPMA and NEPA to withdraw some 10 million acres of SFAs from mineral entry and development under the federal mining laws for 20 years. *See* BLM, "Notice of Proposed Withdrawal; Sagebrush Focal Areas; Idaho, Montana, Nevada, Oregon, Utah, and Wyoming and Notice of Intent to Prepare an Environmental Impact Statement," 80 Fed. Reg. 57,635 (Sept. 24, 2015), *as corrected by* 80 Fed. Reg. 63,583 (hereafter, "SFA Withdrawal Notice").

52.     That SFA Withdrawal Notice explained that such SFA mineral withdrawal was needed because conditions placed on mining operations under the 2015 Sage-Grouse Plans "would not adequately constrain nondiscretionary uses, which could result in loss of critical sage-grouse habitat." *Id.*

53.     In its October 2015 Finding that ESA listing was "not warranted" for the greater sage-grouse, the U.S. Fish and Wildlife Service expressly relied upon this proposed SFA mineral withdrawal in finding that adequate regulatory mechanism exist to address the threats facing

sage-grouse. *See* 80 Fed. Reg. 59,857, 59,916 (Oct. 2, 2015). That Finding also conveyed the Service's "support [for] the recommendations for mineral withdrawal in SFAs[.]" *Id.*

54.     Pursuant to the SFA Withdrawal Notice, BLM began a NEPA process to evaluate the proposed withdrawal and published a Draft EIS in December 2016. The Draft EIS considered five alternatives, including changing the configuration and acreage of the lands proposed for mineral withdrawal, and not implementing the withdrawal at all (the "No Action" alternative).

55.     After the Trump Administration assumed office and launched its "energy dominance" agenda for the public lands, DOI and BLM abruptly halted the SFA mineral withdrawal proposal without completing the ongoing NEPA process.

56.     On October 11, 2017, BLM published a "Notice of Cancellation of Withdrawal Application and Withdrawal Proposal and Notice of Termination of Environmental Impact Statement for the Sagebrush Focal Area Withdrawal in Idaho, Montana, Nevada, Oregon, Utah and Wyoming," 82 Fed. Reg. 47,248 (Oct. 11, 2017) (hereafter, "SFA Mineral Withdrawal Cancellation Notice").

57.     The SFA Mineral Withdrawal Cancellation Notice provided no explanation for abruptly halting the withdrawal process, other than asserting that "BLM has determined that the lands are no longer needed in connection with the proposed withdrawal."

58.     A BLM press release issued the same day called the SFA withdrawal proposal "a complete overreach," and asserted that BLM's cancellation was "[b]ased on a recent analysis and review of data available that showed that future mining is not a significant threat to sage grouse habitat."

59.     BLM did not disclose any such "analysis and review of data" either in the SFA withdrawal NEPA process or otherwise. BLM also failed to discuss the scientific literature

FIRST SUPPLEMENTAL COMPLAINT --                                                    14

underscoring the importance of protecting SFAs from the adverse impacts of surface mining on sage-grouse habitats.

60.     BLM has never publicly assessed or disclosed how the SFA Mineral Withdrawal Cancellation Notice alters the environmental consequences of the 2015 Sage-Grouse Plans, or undermines the U.S. Fish and Wildlife Service's October 2015 "not warranted" ESA listing for greater sage-grouse.

**BLM and Forest Service Amendments to the 2015 Sage-Grouse Plans**

61.     On the same day it published the SFA Mineral Withdrawal Cancellation Notice, BLM also announced its public process to weaken the 2015 Sage-Grouse Plans in accordance with Trump's "energy dominance" agenda, the WEA July 2017 wish list, and the August 2017 DOI Report. *See* BLM, "Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare Associated Environmental Impact Statements or Environmental Assessments," 82 Fed. Reg. 47,248 (Oct. 11, 2017).

62.     That Notice of Intent cited a March 21, 2017 decision of the U.S. District Court for the District of Nevada holding that BLM violated NEPA by failing to prepare a supplemental EIS for inclusion of SFAs in the 2015 Sage-Grouse Plans for Nevada and Northeastern California—even though that ruling was appealed—and stated that "[i]n order to comply with that decision and to address issues raised by various interested parties, the BLM intends to consider the possibility of amending some, all or none" of the 2015 Sage-Grouse Plans, and allowed public scoping comments. *Id.*

63.     The Forest Service published a similar scoping notice on November 21, 2017 "to solicit public comments on greater sage-grouse land management issues that could warrant land management plan amendments." 82 Fed. Reg. 55,346 (Nov. 21, 2017).

FIRST SUPPLEMENTAL COMPLAINT --                                                              15

64.     The Forest Service subsequently published a "Supplemental Notice of Intent" for its scoping period in June 2018. *See* 83 Fed. Reg. 28,608 (June 20, 2018). As a result, the Forest Service's process for revising and weakening the 2015 Sage-Grouse Plans is on a slower path than BLM's.

65.      In response to the BLM October 2017 Notice of Intent, Plaintiffs submitted extensive scoping comments and scientific literature and citations to support maintaining and improving the 2015 Sage-Grouse Plans, in accordance with the best available science, instead of weakening the plans as sought by industry groups and by their supporters in the Trump Administration.

66.     Numerous other individuals, groups, agencies and scientists also submitted comments underscoring the need to maintain and strengthen sage-grouse protections on BLM lands, not weaken them as desired by the oil and gas and other industries.

67.     These comments included a letter dated October 13, 2017 from seventeen leading sage-grouse researchers and scientists, including former federal and state agency scientists, opposing the weakening of the 2015 Sage-Grouse Plans under the proposals raised by the DOI Report and oil and gas special interests.

68.     On May 2, 2018, BLM released six Draft EISs for proposed amendments to its 2015 Sage-Grouse Plans in Idaho, Colorado, Wyoming, Utah, Nevada/Northeastern California, and Oregon, and allowed a 90-day public comment period. *See* 83 Fed. Reg. 19,801 (May 4, 2018).

69.     BLM's May 2018 Draft EISs asserted that BLM was proposing only to "improve" the 2015 Sage-Grouse Plans by "building" on them while allowing greater flexibility by states in sage-grouse management. Those assertions were, and remain, false and misleading.

FIRST SUPPLEMENTAL COMPLAINT --                                                          16

70.     BLM failed to address serious concerns raised by the U.S. Environmental

Protection Agency (EPA) and others about the potential impacts of the plan amendments. For

example, the EPA issued comment letters on each Draft EIS that critiqued BLM's attempt to tier

to the environmental analysis in the 2015 Plans, its failure to address discrete impacts on winter

and brood-rearing habitats, and its failure to explain how the proposed amendments were

supported by greater sage-grouse science. EPA also expressed an overarching "concern[] that the

Draft EIS does not provide sufficient information to fully assess the  impacts of the proposed

action."

71.     As explained in more detail in the Complaint ¶¶ 108–17, 154–68, 274–76, the

2015 Sage-Grouse Plans utilized 15 different EISs to amend or revise 98 BLM and Forest

Service land use plans in 10 western states—yet never provided any overarching or range-wide

analysis of sage-grouse habitats, populations, threats, and needed conservation measures. By

fragmenting analysis into the many separate EISs without any comprehensive range-wide

analysis, the 2015 Sage-Grouse Plans thus violated NEPA and the APA.

72.     BLM's May 2018 Draft EISs perpetuated and exacerbated these legal violations.

BLM again fragmented its NEPA analysis into separate state-by-state reviews and did not

undertake any overarching or range-wide NEPA analysis. They also failed to propose any

increased protections for greater sage-grouse, instead focusing on ways to weaken the 2015

Sage-Grouse Plans in ways recommended by WEA and other state and industry interests.

73.     The proposed alternatives in BLM's May 2018 Draft EISs noted that "DOI and

the BLM are evaluating whether the implementation of a compensatory mitigation standard on

public lands is appropriate and consistent with applicable legal authorities," but assumed, in their

discussion of alternatives and environmental consequences, that compensatory mitigation

elements of the 2015 Sage-Grouse Plans would remain in effect.  The Draft EISs therefore did not give the public notice that Defendants would propose to remove compensatory mitigation nor allow adequate public comment on it.

74.     The Draft EISs further undermined public disclosure and reasoned decision-making by burying significant effects of the proposed changes in appendices and tables, and declining to disclose the existence or environmental consequences of significant changes in sage-grouse habitat management.

75.     In response to the May 2018 Draft EISs, Plaintiffs again submitted detailed, science-based comments to BLM opposing the proposed weakening of the 2015 Sage-Grouse Plans and recommending numerous ways to strengthen them, including by improving their priority habitat protections and management restrictions to protect sage-grouse from energy development and other threats.

76.     On October 5, 2018, the Forest Service released Draft EISs for revising its 2015 Sage-Grouse Plans in Idaho, Nevada, Utah and Wyoming, and allowed a public comment period until January 3, 2019. 83 Fed. Reg. 50,331 (Oct. 5, 2018). Similar to BLM's, these draft proposed plan amendments and NEPA documents did not take any range-wide "hard look" at sage-grouse habitats, populations, threats, and conservation needs; and did not propose to evaluate any improvements to better protect and conserve sage-grouse populations and habitats on Forest Service lands.

77.     In response, Plaintiffs submitted detailed, science-based comments to the Forest Service opposing the proposed weakening of the 2015 Sage-Grouse Plans and recommending numerous ways that their sage-grouse protections be strengthened.

FIRST SUPPLEMENTAL COMPLAINT --                                              18

78.     On or about November 26, 2018, BLM released its Proposed Resource

Management Plan Amendments (PRMPAs) and Final Environmental Impact Statements (Final

EISs) to amend or revise BLM's 2015 Sage-Grouse Plans in Idaho, Northwest Colorado,

Wyoming, Utah, Nevada/Northeastern California, and Oregon, and opened a 30-day public

protest period and 60-day Governors' consistency review period.

79.     However, notice of the PRMPAs and Final EISs was not published in the Federal

Register until December 7, 2018 (and December 10, 2018 for Utah), *see* 83 Fed. Reg. 63,161, 83

Fed. Reg. 63,527, thus creating public confusion over when the protest period ended under

BLM's applicable regulations. Because public notice was not given until December, the Final

EISs are referenced hereafter as the "December 2018 Final EISs."

80.     As with the May 2018 Draft EISs, the December 2018 Final EISs did not take any

range-wide "hard look" at sage-grouse habitats, populations, threats and conservation needs; and

only addressed ways to weaken the 2015 Sage-Grouse Plans in response to state and industry

demands, rather than address improving their sage-grouse protections.

81.     Plaintiffs submitted timely protests of the PRMPAs and Final EISs despite the

confusion caused by the federal government shutdown, and even though the shutdown prevented

the public from communicating with BLM and obtaining further information.

**BLM's 2019 Plan Amendments**

82.     On March 15, 2019, Acting Secretary Bernhardt announced that BLM issued six

Records of Decision ("2019 BLM RODs") and adopted final Resource Management Plan

Amendments to BLM's 2015 Sage-Grouse Plans in Idaho, Colorado, Wyoming, Utah,

Nevada/Northeastern California, and Oregon, based on the December 2018 Final EISs. Together,

FIRST SUPPLEMENTAL COMPLAINT --                                                    19

the March 2019 BLM RODs and December 2018 Final EISs are called "2019 BLM Plan Amendments" in this First Supplemental Complaint.

83.     The 2019 BLM RODs are as follows:

A.     "Idaho Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment," signed by Acting Idaho State Director Peter J. Ditton on March 14, 2019. This "Idaho ROD" amended 24 BLM land use plans with sage-grouse habitat in Idaho.

B.     "Northwest Colorado Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment," signed by Colorado State Director Jamie E. Connell on March 14, 2019. This "NW Colorado ROD" amended 6 BLM land use plans with sage-grouse habitat in northwestern Colorado.

C.     "Wyoming Greater Sage-Grouse Approved Resource Management Plan Amendment and Record of Decision," signed by Wyoming State Director Mary Jo Rugwell on March 14, 2019. This "Wyoming ROD" amended 10 BLM land use plans with sage-grouse habitat in Wyoming.

D.     "Record of Decision and Approved Utah Greater Sage-Grouse Resource Management Plan Amendment," signed by Utah State Director Edwin L. Roberson on March 14, 2019. This "Utah ROD" amended 14 BLM land use plans with sage-grouse habitat in Utah.

E.     "Nevada and Northeastern California Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment," signed jointly by Nevada State Director Jon K. Ruby and California State Director Joseph Stout on March 15, 2019. This "Nevada/NE California ROD" amended three BLM land use plans with sage-grouse habitat in California and eight in Nevada.

FIRST SUPPLEMENTAL COMPLAINT --                                                        20

F.      "Oregon Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment," signed by Acting Oregon/Washington State Director Theresa M. Hanley on March 15, 2019. This "Oregon ROD" amended 8 BLM land use plans with sage-grouse habitat in Oregon.

84.     On March 20, 2019, BLM published Notices of Availability of these 2019 BLM RODs, and stated that the plan amendments were "effectively immediately" on the dates the respective RODs were signed. *See* 84 Fed. Reg. 10322–10330 (Mar. 20, 2019).

85.     These 2019 BLM Plan Amendments made numerous fundamental changes to the 2015 Sage-Grouse Plans and weakened their protections for sage-grouse and sage-grouse habitat over an estimated 51 million acres across Idaho and six other western states. Plaintiffs cannot be certain of the precise number of total acres impacted by the 2019 BLM Plan Amendments because BLM failed and refused to prepare any NEPA-compliant document addressing the proposed changes and their impacts in any comprehensive fashion or range-wide scale.

86.     The 2015 Sage-Grouse Plans for Montana, and North and South Dakota, were not changed in the 2019 BLM Plan Amendments, but Defendants have provided no analysis of how the changes in other states may have cumulative or synergistic impacts with the 2019 Plan Amendments.

87.     The 2019 BLM Plan Amendments repeatedly asserted that the revisions made to the 2015 Sage-Grouse Plans would improve sage-grouse conservation and are consistent with the best available science. Such assertions are false and misleading, as confirmed by the abundant science already in the Administrative Record before the Court from the 2015 Sage-Grouse Plans and the additional science submitted by Plaintiffs for the 2017 Plan Amendments, as Plaintiffs will demonstrate in their briefings before this Court.

FIRST SUPPLEMENTAL COMPLAINT --                                                        21

## DEFECTS IN 2019 BLM PLAN AMENDMENTS

88.     While not identical across all states, the 2019 BLM Plan Amendments contain

some or all of the following defects:

### *Elimination of Sagebrush Focal Areas (SFAs) and Recommendation of SFA Mineral Withdrawal Cancellation*

89.     The 2019 BLM Plan Amendments eliminated SFAs—the most important habitat

for long-term survival and recovery of the species—in all states but Montana and Oregon, and

downgraded SFAs to the less protective Priority Habitat Management Area (PHMA) designation.

This change removed many added protections that SFAs provided in the 2015 Plans, such as

non-waivable prohibition on surface disturbance for fluid mineral leasing (in Idaho, Utah,

Nevada and California), and their prioritization for habitat restoration, monitoring and

evaluation, and grazing permit reviews.

90.     BLM failed to adequately examine the environmental impacts of removing SFAs.

Its conclusory statements that removing SFAs will not result in significant environmental

impacts overlook the important protections afforded by the SFA designation, beyond mineral

withdrawal, and fail to meet NEPA's "hard look" standard.

91.     BLM also violated NEPA by failing to address the direct, indirect, and cumulative

effects of the SFA Mineral Withdrawal Cancellation during the 2019 Plan Amendments process,

just as it did when making the cancellation decision itself.

### *Removal of Compensatory Mitigation and Net Conservation Standard*

92.     Consistent with the Trump Administration's reversal of compensatory mitigation

requirements, as detailed above, the 2019 BLM Plan Amendments remove two crucial elements

of the 2015 Sage-Grouse Plans—the "compensatory mitigation" requirement and related "net

conservation gain" standard.

FIRST SUPPLEMENTAL COMPLAINT --                                                      22

93.     These features of the 2015 Sage-Grouse Plans had been adopted to mitigate for unavoidable adverse impacts to sage-grouse or their habitats from energy development and other BLM-approved actions in sage-grouse habitats, by requiring off-site mitigation to provide a "net conservation gain" to the species, consistent with the best available science.

94.     The 2019 BLM Plan Amendments now expressly prohibit BLM from requiring compensatory mitigation, unless otherwise required by state policies or law, and remove the phrase "net conservation gain" from plans in Idaho, Utah, and Wyoming. Without these requirements, the amended plans depend entirely on private parties to voluntarily compensate for degradation to sage-grouse habitat, or on the states to impose such mitigation, and fail to provide any assurance that residual impacts to sage-grouse will be offset.

95.     These significant amendments to the 2015 Sage-Grouse Plans were introduced after the May 2018 Draft EISs had already been circulated for public comment, through issuance of "Errata Sheets," shielding them from public scrutiny.

96.     BLM's abandonment of federally-mandated compensatory mitigation and the "net conservation gain" standard was arbitrary, capricious, and contrary to law under NEPA and the APA for numerous reasons, including because:

A.     BLM proposed these amendments after issuing the Draft EISs that assumed continued implementation of compensatory mitigation from the 2015 Plans, and failed to prepare a supplemental EIS to evaluate and obtain comment on their environmental effects, as required by NEPA and 40 C.F.R. § 1502.9(c)(1);

B.     BLM failed to take the required "hard look" at their impacts, instead falsely claiming that the removal of mandatory compensatory mitigation was a mere "clarification" and

disclaiming any obligation to evaluate the environmental impact of these changes at the planning stage; and

C.      The amendments were based on a fundamentally erroneous legal premise that BLM lacks the authority under FLPMA and other statutes to require public land users to implement compensatory mitigation.

### *Weakening of Required Design Features Through So-Called "Clarification"*

97.     BLM's 2019 Plan Amendments significantly weaken the 2015 Sage-Grouse Plans' requirement that all projects in greater sage-grouse habitat apply a suite of Required Design Features (RDFs) to help mitigate adverse impacts.

98.     For example, the Wyoming ROD replaced language from the 2015 Sage-Grouse Plans which stated that "RDFs are *required*" to instead state that "RDFs . . . *can be applied, as necessary and when appropriate*. . . . based on the applicability and *suitability* of that particular project" (emphasis added).

99.     This amendment would give BLM officials discretion they did not formerly enjoy under the 2015 Sage-Grouse Plans to waive RDF requirements if they decide the features are not "appropriate," "necessary," or "suitable." BLM failed to explain the meaning of these terms or how they will be applied in practice.

100.    Instead, BLM stated that it will work with states "outside of the planning process" to develop guidance on clarification on the proper application of RDFs, thereby unlawfully sidestepping NEPA and FLPMA land use planning requirements.

101.    BLM also mischaracterized this amendment as a mere "clarification" and disavowed any obligation to evaluate the environmental effects of this new loophole, in violation of NEPA and the APA.

FIRST SUPPLEMENTAL COMPLAINT --                                                      24

102.    In other states, BLM entirely removed the RDF feature in General Habitat

Management Areas (GHMA). The Idaho ROD downgraded RDFs to voluntary Best

Management Practices (BMPs) in GHMA. In the Utah ROD, the elimination of the GHMA

designation also means that these habitats will no longer be protected by the RDFs.

103.    By significantly weakening the mandatory nature of RDFs, these amendments

narrow the circumstances in which RDFs are imposed and reduce the conservation benefit of this

key plan component. BLM failed to adequately analyze or acknowledge the potential

environmental impacts stemming from this plan amendment, either alone or in conjunction with

the other ways BLM has weakened the 2015 Sage-Grouse Plans.

### *Weakening of Protective Measures for and Outright Elimination of GHMA*

104.    The 2019 BLM Plan Amendments substantially reduce the protective measures

applied to sage-grouse habitat designated as General Habitat Management Areas (GHMA).

105.    BLM eliminated the GHMA designation entirely in Utah, removing protections

for approximately 620,000 acres of sage-grouse habitat. A large portion of these now-

unprotected acres fall in the Uinta Basin—where rampant oil and gas development has already

caused sage-grouse populations to plummet. As Plaintiffs pointed out in their scoping comments,

some or all of these GHMA areas should originally have been classified as Priority Habitat

Management Areas (PHMA), given the number of birds they support.

106.    BLM's 2019 Plan Amendments weakened protections for sage-grouse in GHMA

in other states as well. The Wyoming ROD, for example, removes any obligation to prioritize oil

and gas leasing and development outside of GHMA. In Idaho, the amendments similarly

eliminate the prioritization requirement for GHMA, reduce lek buffers from 3.1 miles to

0.6miles, eliminate compensatory mitigation, and downgrade mandatory RDFs to optional "Best Management Practices" (BMPs) in GHMA.

107.    As Plaintiffs noted in their comments and protests, removal of these protections for GHMA will hasten the decline of the sage-grouse.

### *Weakened Disturbance and Density Caps*

108.    BLM's 2019 Plan Amendments in Idaho, Utah, and Wyoming also weakened the protective surface disturbance cap in priority sage-grouse habitats, even though the 2015 Sage-Grouse Plans already allowed disturbance beyond the thresholds recommended by agency scientists in the NTT and COT Reports. *See* Complaint ¶¶ 234–46.

109.    The Idaho ROD, for example, entirely removed the project-scale disturbance and density caps, allowing projects to totally destroy habitat locally, and expanded the circumstances in which BLM can permit disturbance cap exceedances at the sage-grouse population level.

110.    The Utah ROD also expanded the circumstances in which BLM may permit an exceedance of the 3% disturbance cap. Whereas the 2015 Sage-Grouse Plans allowed an exceedance only where a "net conservation gain to the species will be achieved," the 2019 Plan Amendments allow a cap exceedance if "doing so will improve the condition of Greater Sage-Grouse habitat in comparison to siting a project outside the designated corridor."

111.    The Utah ROD also softened the requirement that BLM prohibit further anthropogenic disturbance once the 3 percent disturbance cap is exceeded on all lands.

112.    Research shows that sage-grouse decline as the amount of nearby surface disturbance (from roads, oil and gas wells, buildings, and other anthropogenic features) increases. Nonetheless, BLM failed to disclose the nature and extent of the disturbance cap

FIRST SUPPLEMENTAL COMPLAINT --                                                            26

changes, analyze the potentially significant environmental impacts of these plan changes, or provide a rational explanation for these changes, in violation of NEPA and the APA.

### *Major Reductions in Protective Lek Buffers*

113.    The 2019 BLM Plan Amendments significantly reduced or eliminated the mandatory buffers around leks in designated habitat areas, even though the lek buffers in the 2015 Plans were already less than what the best available science indicates is necessary.

114.    In states including Idaho, Colorado, and Utah, BLM drastically reduced existing lek buffers by several miles. The new lek buffers have no basis in science and are less than what the sage-grouse requires.

115.    Additionally, in states including Colorado, BLM substantially reduced the certainty that disturbance buffers will be implemented, replacing language stating that lek buffers "will be applied" with language committing only to "evaluate" lek buffers during project approvals.

116.    These amendments substantially reduce safeguards for sage-grouse breeding and other habitats, without any reasoned justification.

117.    BLM also failed to meaningfully evaluate the potential impacts of these smaller lek buffers on breeding and nesting sage-grouse and concluded, without a rational basis, that the changes would have "no additive effect" on the greater sage-grouse.

### *Elimination of Noise Restrictions Outside of PHMA*

118.    The Wyoming ROD significantly reduced the 2015 Sage-Grouse Plan protections against anthropogenic noise. Specifically, they eliminate the requirement that BLM limit new project noise levels in GHMA and connectivity corridors.

119.    They also softened the mandatory nature of the noise restrictions in PHMA through the addition of this caveat: "These measures would be considered at the site-specific project level *where and when appropriate*." This loophole gives BLM officials new discretion to avoid implementation of noise restrictions. BLM failed to provide any plan guidance or direction on when noise restrictions would be deemed "inappropriate," thereby unlawfully sidestepping NEPA and FLPMA land use planning requirements. BLM also failed to take the required "hard look" and the impacts of these plan changes.

### *Changes to the Hard and Soft Triger Adaptive Management*

120.    The 2019 BLM Plan Amendments included a series of measures undermining the 2015 Plans' mechanism of "hard and soft triggers" requiring BLM to take corrective action when monitoring data shows that sage-grouse populations fall below specified thresholds.

121.    The Nevada/NE California ROD, for example, weakened the hard and soft triggers, changing the warnings and triggers systems to apply only at the lek cluster scale. This could allow individual leks to blink out without corrective management action, and undermines the site-specific management measures aimed at preventing impacts to each lek.

122.    The Utah ROD similarly substantially undermined the certainty that concrete measures will be taken once adaptive management "triggers" are met, by lengthening time-frames for management response and introducing qualifications on when corrective strategies must be implemented.

### *Relaxed Protections Against Adverse Impacts of Livestock Grazing*

123.    Livestock grazing is ubiquitous across the sage-grouse range and a substantial threat to sage-grouse habitats. Nonetheless, the 2019 BLM Plan Amendments weakened the already inadequate protections against livestock grazing in several ways, including by:

A.      Eliminating or weakening the requirement that BLM impose terms and conditions for achieving sage-grouse "habitat objectives" into allotment management plans or grazing permits, as they are renewed, and by mischaracterizing the change as a mere "clarification";

B.      Permitting the agency to "adjust" the habitat objectives with plan "maintenance, or amendment," the former of which can be accomplished without any public involvement or recourse;

C.      Removing the requirements that allotments in SFA and PHMA be "prioritized" for field checks to ensure compliance with the terms and conditions of grazing permits;

D.      Walking back required conformance with the scientifically-recommended 7-inch grass height objectives in the 2015 Plans based on misrepresentations of recent scientific analysis of phenological timing of cover studies;

E.      Reducing or eliminating requirements for the impacts of grazing-related infrastructure to be evaluated and modified;

F.      Removing prohibitions on livestock grazing within 13 Oregon Research Natural Areas;

G.      Misleadingly claiming that changes to livestock grazing management must be done through fully processing permit renewals, undercutting BLM's own authority to adjust livestock grazing management on a temporary or emergency basis; and

H.      Removing the SFA designation and corresponding obligation to prioritize these high-quality habitats for land health evaluations and grazing permit reviews.

124.    These changes were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law. Moreover, BLM's conclusory and unsupported statements throughout the

Final EISs that these amendments would result in only "minimal" impacts to the sage-grouse fail

to meet the "hard look" standard required by NEPA.

125.     BLM's 2019 Plan Amendments are further false and misleading in claiming that

BLM will review and revise grazing permits, upon renewal, to ensure they contain terms and

conditions sufficient to meet sage-grouse habitat requirements.

126.     BLM failed to disclose—much less take the NEPA required "hard look" at—the

fact that BLM has been automatically renewing grazing permits on the same terms and

conditions under so-called grazing "riders" and Section 3023 of the 2015 National Defense

Authorization Act, P.L. 113-291 ("2015 NDAA"), without any NEPA analysis and without

incorporating sage-grouse habitat objectives, including to ensure sage-grouse habitats are not

impaired by livestock grazing.

127.     This Court is well aware of the fact that BLM is routinely renewing grazing

permits under the 2003 grazing rider and/or 2015 NDAA, including in priority sage-grouse

habitats in Idaho, without ensuring that grazing practices satisfy sage-grouse habitat needs and

without modifying grazing to ensure sage-grouse habitat needs are met. *See, e.g.,* Memorandum

Decision and Order, *Western Watersheds Project v. Zinke et al.,* No. 4:08-cv-435-BLW (D.

Idaho Sept. 27, 2018), ECF No. 296 (addressing BLM grazing permit renewals in key sage-

grouse habitats in southern Idaho).

128.     Just it did in the 2015 Sage-Grouse Plans, *see* Complaint ¶ 185, BLM's 2019 Plan

Amendments wholly avoided disclosing these legal changes governing its grazing permit

renewals, and falsely asserted that BLM will actively review and revise grazing permits to

protect sage-grouse habitats, when that is not in fact true or accurate.

FIRST SUPPLEMENTAL COMPLAINT --                                                                   30

### *Relaxed Protections Against Fluid Mineral (Oil and Gas) Development*

129.    The 2019 BLM Plan Amendments achieved the Trump Administration's pre-determined objective of increasing availability of sage-grouse habitat for oil and gas leasing and development, and significantly weakened protections specific to oil and gas development in several key ways.

130.    First, BLM eliminated or substantially weakened the 2015 Sage-Grouse Plans' requirement that BLM prioritize oil and gas leasing and development outside of designated sage-grouse habitat.  The prioritization requirement was eliminated completely in Utah; eliminated for GHMA in Idaho and Wyoming; and limited to other sage-grouse habitats in Wyoming to situation in which BLM has an administrative "backlog" of parcel nominations. BLM also falsely characterized its changes to the prioritization requirement as mere "clarifications," even though they depart from the plain language and intent of the 2015 Sage-Grouse Plans.

131.    Second, the 2019 BLM Plan Amendments open up new areas to fluid mineral leasing. The Colorado ROD opens up some 224,000 acres of sage-grouse habitat within one mile of active leks, which was formerly closed to new leasing.

132.    Third, by eliminating SFAs, the 2019 BLM Plan Amendments reduce the certainty that high quality habitat is adequately protected from oil and gas development. Prior to the 2019 amendments, SFAs (outside Wyoming) were the only habitat designation subject to a No-Surface Occupancy (NSO) stipulation for oil and gas development without the possibility of waiver or modification, guaranteeing that those limited areas would remain free from new oil and gas infrastructure and activity. The elimination of SFAs in Colorado, Idaho, Nevada, and Utah eliminates this certainty, and increases the likelihood of new surface-disturbing industrial activity within the species' best remaining "strongholds."

133.    Fourth, multiple state-level plans reduce the certainty that the NSO stipulation will be applied in PHMA by expanding the criteria for BLM to issue exceptions, modification, and waivers in a broader array of circumstances, and by eliminating the requirement that BLM obtain consent from the U.S. Fish and Wildlife Service when granting such exceptions, modification, and waivers. The Colorado ROD also unlawfully delegates to counties the authority to determine in the first instance that exceptions or modifications should apply.

134.    These changes are unsupported by any rational basis and their significant environmental effects were not adequately disclosed in the Draft or Final EISs, in violation of NEPA and the APA.

### *Failure to Follow Best Available Science*

135.    NEPA requires environmental analyses to use high quality information and accurate scientific analysis, 40 C.F.R. § 1500.1(b), and "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements," 40 C.F.R. § 1502.24.

136.    The BLM NEPA Handbook also directs the BLM to "use the best available science to support NEPA analyses and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed." BLM Handbook H-1790-1 at 55.

137.    The Data Quality Act and interpreting guidance expand on this obligation by requiring BLM to use best available science and supporting studies conducted in accordance with sound and objective scientific practices. *See* Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub. L. No. 106-554, § 515; *see also* BLM, Information Quality Guidelines (Apr. 2, 2018).

FIRST SUPPLEMENTAL COMPLAINT --                                                              32

138.    The 2019 BLM Plan Amendments flout these requirements by wholly omitting discussion of applicable science, misrepresenting the science, and failing to address how they weaken existing sage-grouse protections, including the many ways identified in this First Supplemental Complaint and in Plaintiffs' comments and protests.

### *Failure to Consider A Reasonable Range of Alternatives*

139.    BLM formulated an impermissibly narrow "purpose and need" for the proposed 2019 Plan Amendments, and failed to consider a reasonable range of alternatives, including any alternatives that would have been more protective for the greater sage-grouse.

140.    The stated purpose and need for the 2019 BLM Plan Amendments was: (1) enhance cooperation and coordination with states; (2) better align with recent federal policy changes; and (3) to provide added management flexibility.

141.    Relying on this flawed purpose and need, BLM's 2019 Plan Amendments analyzed only two alternatives: the "No Action" alternative (of keeping the 2015 Sage-Grouse Plans in effect, with no modification), and the so-called "Management Alignment Alternative," under which BLM only considered modifications that weaken or rescind sage-grouse protections.

142.    Moreover, BLM effectively analyzed only a single alternative after determining that the "no action" alternative would not meet the stated purpose and need.

143.    This narrow purpose and need statement skewed the NEPA process at the outset because it constrained BLM's consideration of alternatives to those that would align with the Trump Administration's "energy dominance" agenda, decrease regulatory certainty by adding "flexibility," or align with state plans.

144.    The purpose and need statement was also unreasonable in light of the statutory context, including BLM's multiple use mandate under FLPMA, and the driving force for the

FIRST SUPPLEMENTAL COMPLAINT --                                                    33

2015 Sage-Grouse Plans—ensuring the conservation of greater sage-grouse on public lands to avoid the need for ESA listing.

145.    Moreover, BLM's claim that the "Management Alignment" alternative only responded to issues identified by various states was disingenuous because, in reality, that alternative was largely defined by the August 2017 Report based on the "wish list" of measures proposed by WEA in its July 2017 letter.

146.    BLM also unreasonably rejected proposed alternatives that would both strengthen protections for sage-grouse and improve consistency with state plans.

### *Failure to Evaluate or Disclose Baseline Conditions*

119.    None of the 2019 BLM Plan Amendments reveal or assess the current population trends of sage-grouse either in the affected states or across the sage-grouse range, making it impossible to understand how the they will affect BLM's conservation of sage-grouse populations locally, regionally, or range-wide.

120.    BLM also falsely asserted that conditions "have not appreciably changed" since 2015 without acknowledging that millions of acres of sage-grouse habitat in the West have burned in wildfires since 2015, millions more acres of sage-grouse habitat have been newly leased for oil and gas development, or that sage-grouse populations in at least Wyoming, Montana, Oregon, and Utah showed precipitous declines in 2018.

### *Misleading and Incomplete Analysis of the Significant Weakening Effect of these Amendments*

121.    BLM provided a misleading, incomplete, and superficial assessment of the potential environmental effects of the 2019 Plan Amendments.

122.     The Final EISs rely on vague statements, devoid of any analysis, about potential impacts of the weakened plans. For instance, BLM repeatedly stated that the effects of certain changes will be "minimal" and "localized" without any quantified or detailed information.

123.     BLM also entirely failed to evaluate the impacts of significant changes it characterized as mere "clarifications"—such as the removal of compensatory mitigation, or elimination of requirements to prioritize oil and gas development outside of sage-grouse habitat—or of the added discretion and loopholes it has built into the 2019 Plan Amendments.

124.     In downplaying the lost conservation benefit of measures that BLM eliminated from the 2015 Sage-Grouse Plans, BLM also failed to acknowledge the abundant scientific evidence that BLM itself cited in adopting the 2015 Sage-Grouse Plans as demonstrating that these measures are important for the conservation of the greater sage-grouse.

125.     BLM's NEPA analysis also rested on false assumptions about the effectiveness of the remaining plan elements. For example, with regard to livestock grazing, BLM assumed that it will be able to incorporate protective terms and conditions during grazing permit renewals, but in reality, permits are commonly renewed automatically under the existing terms and conditions, without any NEPA analysis, as described above.

126.     Finally, despite removing key planks supporting the U.S. Fish and Wildlife Service's 2015 "Not Warranted" determination, BLM asserts that the 2019 Plan Amendments are not likely to affect the conservation of greater sage-grouse population in any state. This conclusion is arbitrary, capricious, and unsupported by any record evidence or analysis.

127.     For these and other reasons, BLM's analysis of the environmental effects of its 2019 Plan Amendments is deeply flawed, in violation of NEPA and the APA.

***Insufficient Analysis of Cumulative and Synergistic Impacts***

FIRST SUPPLEMENTAL COMPLAINT --                                                                   35

128.     NEPA requires adequate disclosure of the cumulative impacts of the proposed

action "when added to other past, present, and reasonably foreseeable future actions regardless of

what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7.

129.     By fragmenting the analysis of its 2019 Plan Amendments into six separate EISs,

BLM failed to adequately assess the cumulative, range-wide impacts of the Plan Amendments

and related threats to sage grouse across its range, just as it did when adopting the 2015 Sage-

Grouse Plans.

130.     The December 2018 Final EISs each purport to address cumulative impacts of the

plan amendments, but none do so at a range-wide scale; and none account for the differences

between the amended plans and unamended plans.

131.     Moreover, the so-called "cumulative effects analysis" in each Final EIS is

woefully inadequate, for numerous reasons.

132.     First, BLM's list of past and future projects that will contribute to the cumulative

impacts omitted numerous massive development projects. In Utah, for example, BLM failed to

mention the Greater Chapita Wells Natural Gas Infill Project, which could involve the drilling of

2,808 natural gas wells in prime sage-grouse habitat. In Wyoming, the list omitted the Normally

Pressured Lance, Continental Divide/Creston, and Converse County oil and gas projects, all of

which will involve drilling thousands of oil and gas wells in prime sage-grouse habitat.

133.     Second, BLM falsely claimed that the 2015 Sage-Grouse Plans meet its current

obligation to prepare a cumulative effects analysis. However, as alleged in the Complaint ¶¶

154–68, 273–76, the EISs for the 2015 Sage-Grouse Plans themselves failed to satisfy NEPA's

requirements for a "hard look" at cumulative impacts. New circumstances and information—

such as the millions of acres of sage-grouse habitat in the West have burned in wildfires since

FIRST SUPPLEMENTAL COMPLAINT --                                                          36

2015, and precipitous declines of sage-grouse populations in at least Wyoming, Montana, Oregon, and Utah in 2018—also preclude BLM's reliance on this outdated analysis.

134.     Third, BLM failed to analyze the cumulative effects of its 2019 Plan Amendments with the proposed U.S. Forest Service land use plan amendments for sage-grouse habitat. These actions are closely related, and under applicable NEPA regulations, they should have been discussed in the same NEPA document. *See* 40 C.F.R. § 1508.25 (a)(1).

### *Failure to Consider the Synergistic Impacts of Climate Change on Greater Sage-Grouse and the Sagebrush Steppe*

135.     Relatedly, BLM also failed, as it did when adopting the 2015 Sage-Grouse Plans, to analyze the cumulative and synergistic impacts of climate change on sage-grouse habitats and populations. *See* Complaint ¶¶ 169–82.

136.     This is a significant omission, given that federal and independent scientists project that the sagebrush steppe will contract substantially with hotter and drier conditions associated with climate change in the semi-arid West. The synergistic impacts of climate change—including larger and more frequent wildfires and droughts, and invasions of cheatgrass and other non-native vegetation—will further reduce and fragment sage-grouse habitats.

137.     The Final EISs omit any discussion of these important cumulative impacts, much less evaluate how the 2019 Plan Amendments will further imperil sage-grouse by threatening further loss and degradation of habitats that may be vital for the species' survival in the face of climate change.

### *Arbitrary Selection of the "Environmentally Preferable Alternative" and Failure to Identify "Practical" Mitigation Measures That Were Not Adopted*

138.     NEPA regulations require a ROD to identify the alternative considered to be "environmentally preferable." 40 C.F.R. § 1505.2(b). That term ordinarily means the alternative

FIRST SUPPLEMENTAL COMPLAINT --                                                           37

that best protects, preserves, and enhances historical, cultural, and natural resources. *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 (Mar. 23, 1981). The ROD must also "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).

139.    Further underscoring the lack of critical analysis of the environmental effects of the plan amendments, and in violation of these NEPA regulations, BLM's 2019 RODs assert that the "No Action" alternative and the selected "Management Alignment Alternative" were equally "environmentally preferable." This conclusion defies all logic and is contrary to abundant evidence that the 2019 Plan Amendments are less protective of the greater sage-grouse and other natural resources than the 2015 Sage-Grouse Plans.

140.    Moreover, BLM's 2019 RODs either falsely assert that the plan amendments incorporate "[a]ll practicable means to avoid and/or minimize environmental harm," or they fail to make such a determination altogether, in violation of NEPA. BLM failed to explain why the mitigation measures removed from the 2015 Plans, or the countless other scientifically-recommended but unadopted mitigation measures, were not deemed "practicable."

### *Failure to Prioritize Designation of Sage Grouse ACECs*

141.    As alleged in the Complaint ¶¶ 64–74, 260–71, 277–81, FLPMA imposes the statutory duty on BLM to prioritize the designation and protection of Areas of Critical Environmental Concern (ACECs) in the land use planning process. Relatedly, NEPA requires evaluation of a full range of alternatives, including potential designation of ACECs.

142.    The 2015 Sage-Grouse Plans violated these requirements by failing to prioritize the designation and protection of Sage-Grouse ACECs. In the 2019 Plan Amendments, BLM

FIRST SUPPLEMENTAL COMPLAINT --                                                    38

perpetuated and aggravated these FLPMA and NEPA violations by failing even to consider an alternative to designate and protect any Sage-Grouse ACECs.

## SUPPLEMENTAL CLAIMS FOR RELIEF

### First Supplemental Claim for Relief –
### 2019 BLM Plan Amendments Violate NEPA and APA

143.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

144.     This First Supplemental Claim for Relief challenges Defendants' violations of NEPA, 42 U.S.C. §§ 4321 *et seq*., and NEPA's implementing regulations, 40 C.F.R. §§ 1500 *et seq*., in approving the challenged BLM 2019 Plan Amendments. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

145.     As alleged in more detail above and in the Complaint ¶¶ 45–54, NEPA requires that federal agencies fully involve the public and take a "hard look" at all direct, indirect, and cumulative impacts of their proposed actions, using high-quality information, accurate scientific analyses, and scientific integrity. NEPA also requires a "hard look" at a reasonable range of alternative actions; and that cumulative or synergistic impacts of related actions be considered together in a single programmatic EIS.

146.     The 2019 BLM Plan Amendments violated NEPA by failing to take the requisite "hard look" at their potential impacts on greater sage-grouse populations and habitat. As identified in detail above, the 2019 Plan Amendments roll back key protections of the prior 2015 Sage-Grouse Plans in numerous ways, including by eliminating the designation with the most protections (SFA); by relaxing once-mandatory measures through sweeping exceptions and waivers and added discretion; and by outright removing other restrictions.

147.     BLM largely dismissed the adverse effects of these changes as "minimal" and without "appreciable additive impact" on the sage-grouse. The December 2018 Final EISs

FIRST SUPPLEMENTAL COMPLAINT --                                                              39

provide no evidence or analyses to support such a conclusion and lack the "hard look" required

under NEPA. BLM also excluded certain amendments—such as changes to the applicability of

Required Design Features—from its environmental analysis.

148.    BLM also violated its obligation under NEPA to consider a reasonable range of

alternatives in the May 2018 Draft EISs and December 2018 Final EISs. The one alternative that

BLM did consider were effectively dictated by the energy industry and certain states, and only

involved weakening or rescinding protections from the 2015 Sage-Grouse Plans. BLM refused to

consider any alternatives to strengthen or improve sage-grouse protections on public lands and

the federal mineral estate, in violation of NEPA.

149.    BLM further violated NEPA by failing to supplement the Draft EISs after making

substantial changes to the proposed actions and adding alternatives that were not analyzed and

subject to public comment in the draft EIS. 40 C.F.R. § 1502.9(c). Major changes since the Draft

EISs included BLM's (unsubstantiated and unlawful) disclaimer of its authority to require

compensatory mitigation for unavoidable environmental harm, as well as the previously-

undisclosed delegation of lease stipulation exemption and modification determinations to

counties. These changes introduced between the Draft EISs and Final EISs are substantial and

highly relevant to the environmental impacts of the proposed actions.

150.    BLM's 2019 RODs and supporting Final EISs further violated NEPA and the

APA by failing to adhere to—or even acknowledge—the best available science concerning sage-

grouse habitats, threats, and necessary conservation measures, and instead relying on industry

and state complaints about "undue burdens" from the 2015 Sage-Grouse Plans in order to

weaken or rescind sage-grouse protections.

151.     Additionally, the 2019 RODs violated NEPA, implementing regulations, and the APA by arbitrarily asserting that that 2015 Sage-Grouse Plans were not "environmentally preferable" to the weakened 2019 BLM Plan Amendments and by failing to disclose its rationale for rejecting "practicable means to avoid or minimize environmental harm" were adopted. *See* 40 C.F.R. § 1505.2.

152.     The 2019 BLM RODs and supporting Final EISs further violated NEPA and the APA by failing to provide any comprehensive analysis of threats to sage-grouse populations and habitats, or of how the 2019 BLM Plan Amendment rescind or weaken the conservation measures adopted in the 2015 Sage-Grouse Plans to address those threats.

153.     Because of the foregoing violations, BLM's 2019 Plan Amendments are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**Second Supplemental Claim for Relief –**
**2019 BLM Plan Amendments Violate FLPMA And APA**
**(Arbitrary and Capricious Decision-Making)**

154.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

155.     This Second Supplemental Claim for Relief challenges BLM's 2019 Plan Amendments as arbitrary and capricious under FLPMA and the APA, 5 U.S.C. § 706(2).

156.     FLPMA imposes procedural and substantive statutory requirements upon Defendants' management of the public lands in question here, including mandates that BLM develop land use plans for the public lands, 43 U.S.C. § 1712(a); and that such public lands "shall" be managed "for multiple use and sustained yield." 43 U.S.C. § 1732(a).  FLPMA further

mandates that the Secretary of Interior "shall" take any action necessary to prevent "unnecessary or undue degradation" of public lands.  43 U.S.C. § 1732(b).

157.    Pursuant to these and other authorities, Defendants adopted the 2015 Sage-Grouse Plans based on the National Greater Sage-Grouse Planning Strategy, for the purposes of adopting adequate land management protections to conserve greater sage-grouse across its range and avoid ESA listing.

158.    Through the 2019 BLM Plan Amendments, Defendants have jettisoned or weakened many of the conservation protections for sage-grouse adopted in the 2015 Sage-Grouse Plans, without adequate or meaningful analysis and explanation.  As stated above, the 2019 BLM Plan Amendments are based on Final EISs and RODs that make false or misleading statements about the Plan Amendments and their impacts, which are contrary to the factual record and the best available science.

159.    When an agency changes policy or reverses a prior decision, and the new policy or decision rests upon factual findings that contradict those that underlay its prior policy or decision, the agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Vill. of Kake v. U.S. Dep't og Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fed. Comm. Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

160.    An agency's failure to provide such a reasoned explanation makes the policy or decision change arbitrary and capricious. *Id.*

161.    Here, Defendants failed to provide a reasoned explanation for their departure from the 2015 Sage-Grouse Plans. They ignored or contradicted previous factual findings and analyses

FIRST SUPPLEMENTAL COMPLAINT --                                              42

about the conservation needs of the greater sage-grouse that underlay the 2015 Sage Grouse Plan

Amendments, without a reasoned basis.

162.    Defendants also entirely failed to consider important aspects of the problem,

namely the role of the 2015 Sage Grouse Plans in the U.S. Fish and Wildlife Service's decision

not to list the greater sage-grouse under the Endangered Species Act. They also offered

explanations for their decisions that run counter to the available evidence.

163.    Because of the foregoing deficiencies and defects, BLM's 2019 Plan

Amendments are arbitrary, capricious, an abuse of discretion, not in accordance with law under

the APA, 5 U.S.C. § 706, and have caused or threaten serious prejudice and injury to the rights

and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### Third Supplemental Claim for Relief – 
### 2019 BLM Plan Amendments Violate FLPMA and APA 
### (Failure to Prioritize Designation of Sage-Grouse ACECs)

164.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

165.    This Third Supplemental Claim for Relief challenges the 2019 BLM Plan

Amendments for violating FLPMA Section 202(c), which mandates that the Secretary of Interior

(and thus BLM) must give priority to the designation and protection of Areas of Critical

Environmental Concern (ACECs) in the land use planning process. *See* 43 U.S.C. § 1712(c)(3).

This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

166.    FLPMA defines ACECs as "areas within the public lands where special

management attention is required . . . to protect and prevent irreparable damage to important

historic, cultural, or scenic values, fish and wildlife resources or other natural systems or

processes, or to protect life and safety from natural hazards." *Id*. § 1702(a).

FIRST SUPPLEMENTAL COMPLAINT --                                                              43

167.    Among the statutory criteria to be considered in land use planning, FLPMA Section 202(c) places a <u>priority</u> on the designation and protection of ACECs. *See* 43 U.S.C. § 1712(c)(3) ("In the development and revision of land use plans, the Secretary <u>shall</u> . . . <u>give priority to the designation and protection of areas of environmental concern</u>") (emphasis added).

168.    Other FLPMA provisions reflect this same Congressional directive that BLM give priority to ACECs in the planning and administration of the public lands. *See* 43 U.S.C. § 1701(11) (FLPMA statement of policy requiring "regulations and plans for the protection of public land areas of critical environmental concern be promptly developed"); *id.* § 1711(a) (requiring that the Secretary "shall prepare and maintain . . . an inventory of public lands and their resources and other values . . . giving priority to areas of critical environmental concern").

169.    BLM's 2019 Plan Amendments violated FLPMA by failing to consider any alternative(s) for designation and protection of Sage-grouse ACECs, much less undertake designation and protection of Sage-grouse ACECs as the facts and law require.

170.    Because of the foregoing violations, BLM's 2019 Plan Amendments are arbitrary, capricious, an abuse of discretion, not in accordance with law under FLPMA and the APA, and have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**Fourth Supplemental Claim for Relief –**
**2019 BLM Plan Amendments Violate FLPMA and APA**
**(Unnecessary and Undue Degradation, And Permanent Impairment)**

171.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

172.    This Fourth Supplemental Claim for Relief challenges the 2019 BLM Plan Amendments for violating FLPMA's requirements that BLM must manage the public lands in

FIRST SUPPLEMENTAL COMPLAINT --                                                                  44

order to prevent unnecessary and undue degradation ("UUD") and permanent impairment to the quality of the environment. *See* 43 U.S.C. §§ 1702(c), 1732(b). This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

173.   FLPMA directs that the Secretary of Interior (and hence BLM) must "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The obligation to avoid "unnecessary and undue degradation" is a substantive one, and BLM is required to deny approval of an action if UUD cannot be avoided.

174.   Similarly, FLPMA provides that the Secretary "shall manage the public lands under principles of multiple use and sustained yield," which means, *inter alia*, "without permanent impairment of the productivity of the land and the quality of the environment." 43 U.S.C. §§ 1702 (c), 1732(a) (emphasis added). FLPMA's obligation to avoid "permanent impairment . . . to the quality of the environment" is a substantive limitation on BLM's actions, and BLM is required to deny approval of an action is the action will "permanently impair" the environment.

175.   FLPMA's "non-impairment" provision elevates the protection of the "environmental quality" of public lands as an "important objective" of public lands management. Thus, the "non-impairment" mandate is not a factor to be balanced in determining whether to approve a project on public lands, but is a non-discretionary mandate to judge the propriety of moving forward with an agency action.

176.   Under FLPMA's "non-impairment" requirement, BLM must disapprove of any action that will have a fixed or enduring impact damaging, weakening or diminishing the environmental quality of the public lands.

FIRST SUPPLEMENTAL COMPLAINT --                                                                 45

177.    In the 2019 Plan Amendments, BLM capitulated to oil and gas and other industry interests that seek to exploit public land resources for profit and worked to weaken or rescind protections from the 2015 Sage-Grouse Plans to allow further development within key sage-grouse habitats, thereby causing unnecessary and undue degradation and permanent impairment of the public lands and resources, in violation of FLPMA.

178.    Because of the foregoing deficiencies and defects, BLM's 2019 Plan Amendments are arbitrary, capricious, an abuse of discretion, not in accordance with law under FLPMA and the APA, and have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

<u>Fifth Supplemental Claim for Relief</u> –
**SFA Mineral Cancellation Notice Violates NEPA and APA**

179.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

180.    This Fifth Supplemental Claim for Relief challenges BLM's October 2017 SFA Mineral Withdrawal Cancellation Notice, 82 Fed. Reg. 47,248 (Oct. 11, 2017) as violating NEPA, NEPA regulations, and the APA. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

181.    As alleged in more detail hereinabove, the withdrawal of 10 million acres of SFAs from location and entry under the federal mining laws was an important component of the 2015 Sage-Grouse Plans and expressly considered and endorsed by the U.S. Fish and Wildlife Service in its October 2015 "not warranted" ESA listing determination for greater sage-grouse.

182.    Protection of the highest value sage-grouse habitats, as contained in the designated SFAs, from degradation and fragmentation associated with mineral entry and

FIRST SUPPLEMENTAL COMPLAINT --                                                    46

development is critical to the conservation of sage-grouse habitats and populations, and to prevent a decline of the species to ESA listing.

183.    The SFA Mineral Withdrawal Cancellation Notice abruptly halted the SFA mineral withdrawal proposal without completing the ongoing NEPA process, facilitating advance public notice or comment, or providing a rational explanation for its abrupt change in position.

184.    The SFA Mineral Withdrawal Cancellation Notice violated NEPA by making a final decision on the proposed SFA withdrawal without preparing a Final EIS. Under NEPA, the duty to prepare an EIS is triggered by the existence of a "proposal[] for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.23 (defining "proposal"). The term "major Federal actions" includes failures to act. 40 C.F.R. § 1508.18. The issuance of a Final EIS must precede the agency's final decision on the proposal to ensure that agency decision-makers examine and consider environmental factors before acting.

185.    Because Defendants issued the Mineral Withdrawal Cancellation Notice without first completing the EIS process or providing a reasoned explanation their action, Defendants violated NEPA, 42 U.S.C § 4332(2)(C); 40 C.F.R. § 1502.9(c)(1)(ii), and the APA's requirement for rational, rather than arbitrary, decisionmaking, 5 U.S.C. § 706(2)(A).

186.    Defendants also provided an insufficiently reasoned explanation for the decision to cancel the proposed SFA withdrawal, rendering the decision arbitrary and capricious. In particular, Defendants ignored—and indeed contradicted without any supporting evidence—their own prior analysis demonstrating the risks of mineral development to the greater sage-grouse and the conservation benefits of the proposed SFA mineral withdrawal.

FIRST SUPPLEMENTAL COMPLAINT --                                                    47

187.    Because of the foregoing deficiencies and defects, BLM's October 2017 SFA

Mineral Withdrawal Cancellation Notice was arbitrary, capricious, an abuse of discretion, not in

accordance with law under NEPA and the APA, and has caused or threaten serious prejudice and

injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### Sixth Supplemental Claim for Relief:
### Declaratory Relief on Compensatory Mitigation

188.    This Sixth Supplemental Claim for Relief seeks declaratory relief holding that

DOI and BLM have legal authority to require compensatory mitigation under FLPMA and other

statutory authorities to offset unavoidable harm to sage-grouse habitats and populations from

discretionary actions authorized on the public lands and federal mineral estate. This claim is

brought pursuant to the Declaratory Judgement Act, 28 U.S.C. § 2201 *et seq.*

189.    As alleged in more detail above, the 2015 Sage-Grouse Plans included

requirements for compensatory mitigation that were reversed in BLM's 2019 Plan Amendments

based on SO 3349, SO 3360, M-37046, and/or IM 2019-018.

190.    BLM's 2019 Plan Amendments rely on legally mistaken and erroneous assertions

that FLPMA and other statutes do not authorize BLM to require compensatory mitigation, which

cite or rely on these authorities.

191.    There is a present, live and existing dispute between Plaintiffs and Defendants

over the legal authority of DOI and BLM to require compensatory mitigation under FLPMA and

other authorities, including to protect and conserve sage-grouse habitats and populations on the

public lands and federal mineral estate.

192.    Through the 2019 BLM Plan Amendments and in other actions, Defendants have unlawfully determined not to require compensatory mitigation for energy development and other authorizations on public lands, harming Plaintiffs and their staff and members.

193.    Plaintiffs request that the Court adjudicate and declare that DOI and BLM have legal authority under FLPMA and other statutes to require compensatory mitigation under FLPMA and other statutory authorities to offset unavoidable harm to sage-grouse habitats and populations from discretionary actions authorized on the public lands and federal mineral estate, and that the 2019 BLM Plan Amendments are arbitrary, capricious and contrary to law in eliminating requirements for compensatory mitigation based on Defendants' unlawful interpretation of their statutory authorities to require compensatory mitigation.

## SUPPLEMENTAL PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Order, adjudge, and declare that the 2019 BLM Plan Amendments violated NEPA, FLPMA, their implementing regulations and policies, and/or the APA under Plaintiffs First, Second, Third and/or Fourth Supplemental Claims for Relief;

B.    Reverse, set aside, and vacate BLM's 2019 Plan Amendments;

C.    Enter preliminary injunctive relief prohibiting Defendants from implementing the 2019 BLM Plan Amendments and maintaining the 2015 Sage-Grouse Plans in effect, until Plaintiffs' supplemental claims herein are adjudicated on the merits;

D.    Order, adjudge, and declare that BLM's October 2017 SFA Mineral Withdrawal Cancellation Notice violated NEPA and/or the APA, and reverse, set aside and vacate such Notice, under Plaintiffs' Fifth Supplemental Claim for Relief;

E.      Enter declaratory relief under Plaintiffs' Sixth Supplemental Claim for Relief, holding that DOI and BLM have legal authority to require compensatory mitigation under FLPMA and other statutory authorities to offset unavoidable harm to sage-grouse habitats and populations from discretionary actions authorized on the public lands;

F.      Enter such other declaratory and/or injunctive relief as Plaintiffs may specifically request hereafter;

F.      Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this First Supplemental Complaint pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

G.      Grant such further relief as the Court deems necessary or appropriate in order to remedy Defendants' violations of law, vindicate the interests of Plaintiffs and the public, and preserve and protect the public lands and resources at issue.

Dated this 3rd day of May, 2019.              Respectfully submitted,

                                              /s/ Laurence ("Laird") J. Lucas
                                              Laurence ("Laird") J. Lucas (ISB # 4733)
                                              Todd C. Tucci (ISB # 6526)
                                              Sarah Stellberg (ISB #10538)
                                              *Advocates for the West*
                                              P.O. Box 1612
                                              Boise, ID 83701
                                              (208) 342-7024
                                              (208) 342-8286 (fax)

                                              Attorneys for Plaintiffs