BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
Washington Group Plaza IV
800 East Park Boulevard, Suite 600
Boise, Id 83712-7788
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Deputy Assistant Attorney General

LUTHER L. HAJEK
BARCLAY T. SAMFORD
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov
        clay.samford@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, | ) ) ) Case No. 1:16-cv-00083-BLW |
| Plaintiffs, | ) ) |
| v. | ) ) **DEFENDANTS' OPPOSITION TO** |
| | ) **PLAINTIFFS' MOTION FOR** |
| DAVID BERNHARDT, Secretary of the Interior, *et al.*, | ) **PRELIMINARY INJUNCTION** ) |
| Defendants. | ) ) ) |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

      I.      2015 Plan Amendments ..................................................... 2

      II.     Litigation Challenging the 2015 Plan Amendments ................................. 4

      III.    Agency Review of the 2015 Plan Amendments ......................................... 5

      IV.    Cancellation of the Proposed Withdrawal of Sagebrush Focal Areas ........ 6

      V.     The 2019 Plan Amendments .................................................................... 7

STANDARDS OF REVIEW ........................................................................................... 13

      I.      Judicial Review under the Administrative Procedure Act ........................ 13

      II.     Standard for Obtaining Preliminary Injunctive Relief ............................. 13

ARGUMENT .................................................................................................................. 14

      I.      Plaintiffs Are Not Likely to Succeed on the Merits ................................. 14

            A.     BLM's Purpose and Need Statement and Range of
Alternatives Complied With NEPA ............................................... 15

                  1.     BLM's Purpose and Need Statement Reflects the
Agency's Obligation to Coordinate With States
Regarding Wildlife Management. .................................... 15

                  2.     BLM Considered a Reasonable Range of Alternatives .... 18

            B      BLM Took a Hard Look at the Impacts of the 2019 Plan
Amendments ................................................................................. 20

                  1.     BLM Did Not Misrepresent the Impacts of the 2019
Plan Amendments ......................................................... 21

                  2.     BLM Took a Hard Look at Changes in Sage-Grouse
Conditions Since 2015 ................................................... 28

                  3.     BLM Took a Hard Look at Cumulative Impacts ............. 30

            C.     BLM Was Not Required to Prepare a Supplemental DEIS for
Its Proposed Changes to Compensatory Mitigation ...................... 35

II.     Plaintiffs Have Failed to Demonstrate Irreparable Harm ......................... 40

      A.    Oil and Gas Development ............................................................. 41

      B.    Mining ........................................................................................ 45

      C.    Off-Highway Vehicle Use ........................................................... 46

      D.    Rights-of-Way ............................................................................ 47

      E.    Grazing ....................................................................................... 48

III.    The Balance of the Harms and the Public Interest Weigh Against an
      Injunction ......................................................................................... 49

IV.    Any Injunctive Relief Should Be Narrowly Tailored .............................. 50

CONCLUSION ................................................................................................. 50

## TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
   705 F.3d 1073 (9th Cir. 2013) ...................................................................... 15, 18

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
   988 F.2d 146 (9th Cir. 1993) ............................................................................. 50

*Amigos Bravos v. BLM., No. 6:09-cv-37*,
   2011 WL 7701433 (D.N.M. Aug. 3, 2011) ....................................................... 42

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ..................................................................................... 40, 42

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
   126 F.3d 1158 (9th Cir. 1997) ........................................................................... 15

*Blanco v. Burton*,
   No. 06-cv-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006) ......................... 42

*Calence, LLC v. Dimension Data Holdings, PLC*,
   222 F. App'x 563 (9th Cir. 2007) ...................................................................... 23

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ........................................... 14, 15, 20, 35, 36

*Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) ............................................................................. 40

*Colo. River Indian Tribes v. Dep't of Interior*,
   No. 14-cv-2504, 2015 WL 12661945 (C.D. Cal. June 11, 2015) ...................... 18

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ........................................................................... 49

*Friends of the Earth (TOC), Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ........................................................................................... 50

*Friends of Yosemite Valley v. Norton*,
   194 F. Supp. 2d 1066 (E.D. Cal. 2002) ............................................................. 22

*Golden Gate Salmon Ass'n v. Ross*,
   No. 17-cv-1172, 2018 WL 3129849 (E.D. Cal. June 22, 2018) ......................... 23

*Headwaters, Inc. v. BLM*,
   914 F.2d 1174 (9th Cir. 1990) ........................................................................... 18

*Humane Soc'y of the U.S. v. Gutierrez*,
   523 F.3d 990 (9th Cir. 2008) ............................................................................. 40

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
   545 F.3d 1147 (9th Cir. 2008) ........................................................................... 36

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) .......................................................................................... 49

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
  2015 WL 9700887 (W.D. Wash. Jan. 7, 2015) ........................................................... 40

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002) ........................................................................................ 39

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .......................................................................................... 13

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) ........................................................................................ 20

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................................ 13

*McFarland v. Kempthorne*,
  545 F.3d 1106 (9th Cir. 2008) ........................................................................................ 13

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) .......................................................................................... 18

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................................................ 14

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .................................................................................. 18, 19

*Norton v. S. Utah Wilderness*,
  All., 542 U.S. 55 (2004) ............................................................................................ 17, 40

*Nw. Ecosystem All. v. Rey*,
  380 F. Supp. 2d 1175 (W.D. Wash. 2005) ..................................................................... 16

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) ........................................................................................ 13

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
  817 F. Supp. 2d 1290 (D. Or. 2011) ............................................................................... 41

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*,
  56 F.3d 1060 (9th Cir. 1995) .................................................................................... 18, 35

*Or. Nat. Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) .......................................................................................... 28

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) .......................................................................................... 50

*Otter v. Jewell*
  227 F. Supp. 3d 117 (D.D.C. 2017) .................................................................................. 5

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
    693 F.3d 1084 (9th Cir. 2012) ........................................................................... 35

*Pac. Coast Fed'n of Fishermen's Assn's v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008) .............................................................. 41

*Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ........................................................................... 34

*Protect Our Cmtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ............................................................................. 18

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010) ........................................................................... 13

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)............................................................................................ 14

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ............................................................................. 21

*Seattle Audubon Soc'y v. Moseley*,
    80 F.3d 1401 (9th Cir. 1996) ............................................................................. 18

*Sierra Club v. BLM*,
    786 F.3d 1219 (9th Cir. 2015) ........................................................................... 34

*Slope Borough v. Minerals Mgmt. Serv.*,
    No. 3:07-cv-45, 2007 WL 1106110 (D. Alaska Apr. 12, 2007)............................ 42

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .................................................................... 14, 47

*Tribal Vill. of Akutan v. Hodel*,
    859 F.2d 662 (9th Cir. 1988) ............................................................................. 42

*U.S. v. Sutter*,
    348 F.3d 789 (9th Cir. 2003) ............................................................................. 22

*W. Expl. LLC v. U.S. Dep't of the Interior*,
    No. 15-cv-491, 2015 WL 7195156 (D. Nev. Nov. 16, 2015).................................. 21

*W. Watersheds Project v. Kenna*,
    610 F. App'x 604 (9th Cir. 2015) ....................................................................... 20

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)............................................................................................ 49

*Western Exploration v. U.S. Dept. of the Interior*,
    250 F. Supp. 3d 718 (D. Nev. 2017)...................................................................... 5

*Western Exploration v. U.S. Dept. of the Interior*,
    250 F. Supp. 3d 718 (9th Cir. June 13, 2017)........................................................ 5

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) .............................................................. 15, 17, 18, 20, 35, 36, 39

*Wilderness Soc'y v. U.S. Forest Serv.*,
  630 F.3d 1173 (9th Cir. 2011) ..................................................................................... 39

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................... 13, 14, 23, 40, 49

**Statutes**

Administrative Procedure Act
  5 U.S.C. §§ 701-06 ..................................................................................................... 13

  5 U.S.C. § 706(2)(A) .................................................................................................... 13

*Forest and Rangeland Renewable Resources Planning Act*,
  16 U.S.C. § 1604(a) ....................................................................................................... 4

  16 U.S.C. § 1604(i) ........................................................................................................ 4

*Mineral Leasing Act,*
  30 U.S.C. § 226(g) ....................................................................................................... 41

*National Environmental Policy Act,*
  42 U.S.C. § 4331(a) ..................................................................................................... 22

  42 U.S.C. § 4332(2)(C).................................................................................................. 14

  42 U.S.C. § 4332(2)(C)(iii)............................................................................................ 15

*Federal Land Policy and Management Act,*
  43 U.S.C. § 1712.............................................................................................................. 4

  43 U.S.C. § 1712(c)(9).................................................................................................. 17

  43 U.S.C. § 1732(b) ................................................................................................. 17, 45

  43 U.S.C. §§ 1701(a) .................................................................................................... 17

**Regulations**

40 C.F.R. § 1501.3............................................................................................................ 14

40 C.F.R. § 1502.14.......................................................................................................... 15

40 C.F.R. § 1502.15.......................................................................................................... 29

40 C.F.R. § 1502.21 .................................................................................................... 26, 30

40 C.F.R. § 1505.2(b) ...................................................................................................... 22

40 C.F.R. § 1508.25.......................................................................................................... 34

40 C.F.R. § 1508.25(a)(1)................................................................................................. 34

40 C.F.R. § 1508.25(c)...................................................................................................... 30

40 CFR § 1503.4(a)(2) ............................................................................................... 36

40 CFR § 1508.20 ......................................................................................................37

43 C.F.R. § 1601.0-6 ................................................................................................. 19

43 C.F.R. § 1610.5-3(a) ............................................................................................. 4

43 C.F.R. § 2091.5-1(b)(1) ........................................................................................ 6

43 C.F.R. § 2310.1-4 ................................................................................................. 6

43 C.F.R. § 24.3 ........................................................................................................ 17

43 C.F.R. § 2801.9 .................................................................................................... 47

43 C.F.R. § 3162.3-1 ........................................................................................... 41, 42

43 C.F.R. § 3809 ....................................................................................................... 45

Defs.' Opp'n to Mot. for Preliminary Inj.

**INTRODUCTION**

In 2015, BLM and the Forest Service amended or revised 98 land use plans in 10 States in an effort to better protect Greater Sage-Grouse habitat throughout the West. Those Plan Amendments were challenged by numerous States, industry, and environmental groups, including Plaintiffs in this case, in twelve lawsuits. In 2019, BLM issued six new Plan Amendments that reflect the agency's efforts to better cooperate and collaborate with States, which manage Sage-Grouse within their borders, and to refine the Plan Amendments based on recent policy updates and new science. Each 2019 Plan Amendment is State-specific, amending the land use plans within the borders of a single State or States and establishing a framework through which BLM will collaborate with that State's Sage-Grouse protection efforts. Every Plan Amendment retains key protections for Sage-Grouse, including mitigation requirements and habitat designations which limit development.

Plaintiffs, who were sufficiently dissatisfied with the 2015 Plan Amendments to challenge them in this Court, now seek to enjoin BLM's efforts to refine those Plan Amendments. But they are not entitled to such extraordinary relief. They are not likely to succeed on the merits of their National Environmental Policy Act ("NEPA") claims because they do not attack the NEPA analysis for each of the six distinct 2019 Plan Amendments, each of which includes different terms and requirements. Instead, they conflate the Plan Amendments, substituting generalizations for the plan-specific allegations necessary to support an injunction. Likewise, their asserted harms are a laundry list of projects and developments, many of which are not imminent because they would require additional analysis and decision-making before any changes could occur on the ground. Plaintiffs make no effort to demonstrate how each relevant Plan Amendment is likely to result in any specific alleged harms. BLM, the public, and the numerous stakeholders involved in the multi-year effort to improve and refine the Plan

Defs.' Opp'n to Mot. for Preliminary Inj.                                                                    1

Amendments have a strong interest in consistent State and federal management of Sage-Grouse habitat, and that interest far outweighs Plaintiffs' speculative injuries. Because Plaintiffs have failed to meet their burden, this Court should deny their motion for a preliminary injunction.

**BACKGROUND**

The Greater Sage-Grouse is a large ground-dwelling bird dependent on the sagebrush steppe ecosystem of the Western United States. In recent decades, the Sage-Grouse population has declined due to many factors, such as the fragmentation and loss of habitat caused by energy development, fire, agriculture, and encroachment by pinyon and juniper trees. 75 Fed. Reg. 13,910, 13,924-62, 13,986 (Mar. 23, 2010). As the population has declined, federal and State agencies have worked together to conserve the Sage-Grouse and its habitat. *See, e.g.,* ID 175.[1]

In 2010, the U.S. Fish and Wildlife Service ("FWS") found that listing of the Sage-Grouse under the Endangered Species Act ("ESA") was "warranted, but precluded by higher priority listing actions." 75 Fed. Reg. at 13,910. FWS found that existing regulatory mechanisms, including BLM and Forest Service land use plans which govern nearly 60% of remaining Sage-Grouse habitat, were inadequate to protect the species. *Id.* at 13,919, 13,973-82.

## I.    2015 Plan Amendments

Beginning in December 2011, BLM and the Forest Service launched a planning process to incorporate Sage-Grouse conservation measures into their land use plans in ten western States. *See* 76 Fed. Reg. 77,008 (Dec. 9, 2011). The agencies' strategy was built on the 2006 Greater Sage-Grouse Comprehensive Conservation Strategy developed by the Western Association of Fish and Wildlife Agencies ("WAFWA"). BLM established a National Technical Team ("NTT"), comprised of resource specialists from BLM, FWS, the U.S. Department of

---

[1] Citations with a prefix of "ID," "UT," "WY," "NVCA," "CO," "OR," or "RANGEWIDE" are to the Preliminary Administrative Record, lodged on May 31, 2019. ECF No. 146. For clarity, these citations omit the preliminary zeroes (i.e., Bates-stamp "ID_0000175" is "ID 175").

Agriculture, the U.S. Geological Survey ("USGS"), and State agencies. *See* IDMT_0114037, 0114078, 0114207.[2] The team produced the NTT Report which identified conservation measures to protect Sage-Grouse. *See id.* Subsequently, FWS convened a Conservation Objectives Team ("COT"), which also was composed of representatives from federal and State entities. *See* IDMT_0114080-81. The COT Report, issued in March 2013, analyzed the primary threats to Sage-Grouse survival and identified Priority Areas for Conservation. *Id.*

In September 2015, following the completion of a four-year planning process, the agencies issued records of decision ("RODs") adopting final Plan Amendments covering two regions and 15 sub-regions ("2015 Plan Amendments"). Altogether, the 2015 Plan Amendments amended or revised 98 land use plans to conserve Greater Sage-Grouse and its habitat.

The 2015 Plan Amendments divided Sage-Grouse habitat into three primary categories: (1) Priority Habitat Management Areas ("PHMA"), containing the highest value habitat, (2) General Habitat Management Areas ("GHMA"), containing other land that is occupied seasonally or year round by Sage-Grouse, and (3) Other Habitat Management Areas, containing additional unmapped habitat that contains seasonal or connectivity habitat. The 2015 Plan Amendments also identified a subset of PHMA, known as Sagebrush Focal Areas ("SFA"), which was recommended for withdrawal from location and entry under the Mining Law of 1872. The 2015 Plan Amendments then set forth goals, objectives, and conservation measures applicable to each type of habitat. *E.g.*, IDMT_0114142-46. For the most part, the 2015 Plan Amendments did not require any immediate action by the agencies or other entities; instead, conservation measures would be applied when the agencies made site-specific decisions such as issuing grazing permits or oil and gas leases.[3] *See* IDMT_0114133, 0114228.

---

[2] Citations with "IDMT," "FS," and "BUF" prefixes are citations to the administrative records for the 2015 Plan Amendments, which were lodged with this Court in 2017. ECF Nos. 87, 88.
[3] Both the Forest Service and BLM manage lands through a staged process. The first stage is the development of a broad management plan, setting forth goals and guidelines for a particular area.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                3

Following the issuance of the 2015 Plan Amendments, FWS concluded that listing of the

Sage-Grouse under the ESA was not warranted. *See* 80 Fed. Reg. 59,858 (Oct. 2, 2015). FWS

found that one of the key circumstances that had changed since its 2010 "warranted, but

precluded" finding was the adoption of regulatory mechanisms through federal and State plans

that substantially reduced the risks to the species in approximately 90% of its habitat. *Id.*

## II.    Litigation Challenging the 2015 Plan Amendments

The 2015 Plan Amendments were challenged in 12 lawsuits in seven district courts.[4] One

of the primary allegations raised by plaintiffs in that litigation was that the 2015 Plan

Amendments were inconsistent with State Sage-Grouse conservation plans. *See, e.g.,* Compl.for

Decl. and Inj. Relief, *Herbert v. Jewell*, No. 2:16-cv-101 (D. Utah Feb. 4, 2016).

Two cases challenging the 2015 Plan Amendments progressed to judgment in the district

court and are now on appeal. In *Otter v. Jewell*, the court granted summary judgment to the

---

*See* 16 U.S.C. § 1604(a) (Forest Service); 43 U.S.C. § 1712 (BLM). At the second stage, the agencies propose, analyze, and approve specific projects; for example, a grazing permit or a right-of-way. *See* 16 U.S.C. § 1604(i) (Forest Service); 43 C.F.R. § 1610.5-3(a) (BLM).

[4] *See W. Expl. LLC v. U.S. Dep't of the Interior*, No. 15-cv-491 (D. Nev. filed Sept. 23, 2015) (challenging 2015 Plan Amendments for Nevada and Northeastern California sub-region); *Otter v. Jewell*, No. 1:15-cv-1566 (D.D.C. filed Sept. 25, 2015) (challenging 2015 Plan Amendments for Idaho and Southwestern Montana sub-region); *Wyo. Stock Growers Ass'n v. U.S. Dep't of the Interior*, No. 2:15-cv-181 (D. Wyo. filed Oct. 14, 2015) (challenging 2015 Plan Amendments for Wyoming); *Wyo. Coal. of Local Governors v. U.S. Dep't of the Interior*, No. 2:16-cv-41 (D. Wyo. filed Mar. 1, 2016) (same); *Herbert v. Jewell*, No. 2:16-cv-101 (D. Utah filed Feb. 4, 2016) (challenging 2015 Plan Amendments for Utah sub-region); *W. Watersheds Project v. Schneider*, No. 16-cv-83 (D. Idaho filed Feb. 25, 2016) (challenging 2015 Plan Amendments for multiple sub-regions); *Am. Expl. & Mining Ass'n v. U.S. Dep't of the Interior*, No. 16-cv-737 (D.D.C. filed Apr. 19, 2016) (same); *W. Energy All. v. U.S. Dep't of the Interior*, No. 16-cv-112 (D.N.D. filed May 12, 2016) (same); *Harney Soil & Water Conservation Dist. V. U.S. Dep't of the Interior*, No. 16-cv-2400 (D.D.C. filed Dec. 7, 2016) (same); *Cahill Ranches v. U.S. Dep't of the Interior*, No. 1:17-cv-960 (D. Or. filed June 19, 2017) (challenging 2015 Plan Amendments for Oregon); *Bd. of Comm'rs v. U.S. Dep't of the Interior*, No. 17-1199 (D. Colo. filed May 15, 2017) (challenging 2015 Plan Amendments for Colorado), *Tugaw Ranches v. U.S. Dep't of the Interior*, No. 18-159 (D. Idaho filed April 11, 2018) (challenging 2015 Plan Amendments for Idaho under Congressional Review Act).

---

Defs.' Opp'n to Mot. for Preliminary Inj.                                                4

United States, finding that the Governor of Idaho and the Idaho State Legislature failed to demonstrate that the 2015 Plan Amendments caused them the injury-in-fact required to establish standing. 227 F. Supp. 3d 117 (D.D.C. 2017), *appeal filed*, No. 17-5050 (D.C. Cir. Mar. 28, 2017). In *Western Exploration LLC v. U.S. Dep't of the Interior*, the court similarly held that the State of Nevada and several counties failed to establish standing. 250 F. Supp. 3d 718, 731-32 (D. Nev. 2017), *appeal filed*, No. 17-16220  17-16220 (9th Cir. June 13, 2017). The Nevada Court, however, did find that one Nevada County had standing and held that BLM and the Forest Service had violated NEPA by failing to prepare a supplemental Environmental Impact Statement ("EIS") to address the designation of SFAs, which occurred between the draft EISs ("DEIS") and final EISs ("FEIS"). *Id.* The remaining cases have been stayed as the agencies revisit the amendments.

III.    **Agency Review of the 2015 Plan Amendments**

On June 7, 2017, the Secretary of the Interior issued Secretary's Order No. 3353 to enhance cooperation between BLM and States that contain Sage-Grouse habitat. RANGEWIDE 1. Among other things, Secretary's Order No. 3353 directed Department of the Interior ("Interior") agencies to "review" the "plans and programs that States already have in place to ensure that the 2015 Sage-Grouse Plans adequately complement State efforts to conserve the species," and to review the 2015 Plan Amendments to identify any "provisions that may require modification or rescission . . . in order to give appropriate weight to the value of energy and other development of public lands within BLM's overall multiple-use mission . . . ." RANGEWIDE 2-3. In response, on August 4, 2017, the Interior review team recommended modifying the 2015 Plan Amendments to better align with individual State plans and better balance BLM's multiple-use mission. RANGEWIDE 7-19.

## IV.    Cancellation of the Proposed Withdrawal of Sagebrush Focal Areas

The 2015 Plan Amendments recommended that Interior initiate an administrative process to withdraw 10,000,000 acres of SFAs from location and entry under the Mining Law of 1872, subject to valid existing rights. Based on that recommendation, BLM published a Notice of Proposed Withdrawal in the Federal Register. 80 Fed. Reg. 57,635-01 (Sept. 24, 2015). The Notice immediately segregated the lands from location and entry for two years to preserve the status quo while Interior determined which, if any, lands should be withdrawn. *See* 80 Fed. Reg. at 57,635. BLM prepared a DEIS evaluating the withdrawal. 81 Fed. Reg. 96,478 (Dec. 30, 2016). On September 24, 2017, the segregation expired by operation of law. *See* 82 Fed. Reg. 47,248-01 (Oct. 11, 2017); 43 C.F.R. § 2091.5-1(b)(1).

In October 2017, BLM, acting under 43 C.F.R. § 2310.1-4, cancelled the withdrawal application and proposal. *See* 82 Fed. Reg. at 47,248. BLM explained that when it issued the Notice of Proposed Withdrawal, neither BLM nor FWS had comprehensively analyzed the impacts of the withdrawal; that analysis was to be developed as part of the NEPA analysis of the withdrawal. RANGEWIDE 331. After completing a DEIS as well as a Mineral Potential Report and Reasonably Foreseeable Development scenario, BLM concluded that withdrawal was not needed to conserve Sage-Grouse. RANGEWIDE 332, 336-39. BLM found that the benefit of the proposed withdrawal to Sage-Grouse was negligible: over the next 20 years locatable mineral exploration and mining was anticipated to affect less than 0.1% of the 10,000,000 acres proposed for withdrawal, and would not cause significant loss or fragmentation of Sage-Grouse habitat or negatively affect populations or leks. RANGEWIDE 334. In contrast, withdrawal would reduce anticipated annual economic output supported by mining by more than $500 million. RANGEWIDE 338. BLM concluded that withdrawal of 10,000,000 acres, with the corresponding economic harm, to prevent impacts to less than 10,000 acres was "not the best use

Defs.' Opp'n to Mot. for Preliminary Inj.                                                        6

of this tool," and thus cancelled the proposed withdrawal and terminated the associated NEPA process. RANGEWIDE 339. BLM also terminated the associated NEPA process. *Id.*

## V.    The 2019 Plan Amendments

On October 11, 2017, following the report under Secretary's Order No. 3353, BLM began a public planning process to consider amending the 2015 Plan Amendments to bring them into closer alignment with State plans and conservation strategies while preventing impacts that would require listing the Sage-Grouse under the ESA. *See* 82 Fed. Reg. at 47,248; ID 5. On May 4, 2018, after a scoping process that included public comment, 15 public open houses in 10 western States, and meetings with the Western Governors' Association Sage Grouse Task Force, BLM released DEISs and Draft Plan Amendments for six States. *See, e.g.,* ID 805; UT 875; WY 966. On December 10, 2018, after considering public comment, BLM released proposed Plan Amendments and FEISs for protest. *See, e.g.,* ID 155; UT 249; WY 276. Finally, on March 15, 2019, BLM issued six RODs and Resource Management Plan Amendments for Greater Sage-Grouse Conservation for Oregon, Colorado, Idaho, Utah, Nevada/Northeastern California, and Wyoming ("2019 Plan Amendments"). ID 1; UT 1; WY 1; NVCA 1; CO 1; OR 1.

The 2019 Plan Amendments build on their 2015 predecessors, incorporating three years of on-the-ground experience working with the States to conserve Sage-Grouse and its habitat. *See, e.g.,* ID 6. The 2019 Plan Amendments modify BLM's underlying land use plans, including some of the allocations, objectives, and management decisions made through the 2015 Plan Amendments, but the majority of the provisions of the 2015 Plan Amendments remain in place.[5] The 2019 Plan Amendments continue to designate approximately 29 million acres of BLM-administered sagebrush habitat as PHMA, where the management priority is to avoid disturbance to Sage-Grouse and minimize impacts that cannot be avoided. *See, e.g.*, ID 6; UT 12; WY 6.

---

[5] The 2015 Plan Amendment for Montana and the Dakotas remains in place. BLM did not amend the 2015 Montana/Dakotas Plan Amendment as part of the 2019 Plan Amendment process.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    7

Another 23 million acres remain GHMA, where avoidance and minimization are applied flexibly, consistent with both local conditions and State objectives for species management. *Id.*

The 2019 Plan Amendments are designed to continue conserving the Sage-Grouse and its habitat while reflecting and supporting the various conservation approaches taken by the States within their jurisdictions. In addition to recognizing the jurisdiction and expertise of the individual State wildlife agencies, the RODs reflect BLM's determination that greater federal-State coordination will lead to improved outcomes for the species. *See, e.g.,* WY 6.

Because the 2019 Plan Amendments respond to local needs and conditions, they are each unique. Nonetheless, the primary common plan components are discussed below.

*Sagebrush Focal Areas*. The 2015 Plan Amendments identified a subset of lands as SFAs, which were recommended for withdrawal from the Mining Law and would be managed under "No Surface Occupancy" ("NSO") restrictions for fluid mineral leasing, without exceptions. *See, e.g.,* ID 837; WY 313. In the 2019 Plan Amendments, BLM eliminated the SFA designation in all States except Oregon, finding that managing SFA lands under the PHMA designation would fully protect Sage-Grouse. *See, e.g.,* ID 880; WY 356-57. Withdrawal of the lands was not necessary to protect Sage-Grouse, and fluid mineral leasing in PHMA is subject to NSO stipulations with narrow exceptions designed to ensure that Sage-Grouse habitat is not disturbed. *See* ID 423 (describing exceptions to NSO requirements in Idaho); UT 304 (same for Utah); CO 36 (allowing NSO exceptions where there is no impact on Greater Sage-Grouse); *cf.* WY 13 (no changes from 2015 PHMA NSO requirements); OR 7-8 (same); NVCA 14-17 (same)). BLM found that these changes would not significantly alter impacts from the 2015 Plan Amendments because the project development criteria and the criteria for invoking the exceptions to NSO leasing stipulations effectively protect Sage-Grouse and its habitat. ID 203; UT 379; CO 193-94.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    8

***Compensatory Mitigation***. The 2015 Plan Amendments required BLM, when authorizing third-party actions in Sage-Grouse habitat that would result in habitat loss and degradation after the implementation of all applicable avoidance and minimization measures, to impose additional compensatory mitigation to ensure a "net conservation gain" to the species. In July 2018, BLM determined that it lacked authority under FLPMA to impose compensatory mitigation and issued a new policy providing that while BLM will continue to consider compensatory mitigation voluntarily proposed by public land users, it lacks authority to compel public land users to implement compensatory mitigation, unless it is specifically permitted by a law other than FLPMA. RANGEWIDE 312. BLM later updated its policy to provide that BLM will also consider compensatory mitigation "requested by a State or required as part of a State plan, program or authorization." RANGEWIDE 306.

Consistent with the new compensatory mitigation policy, the 2019 Plan Amendments remove the requirement for BLM to impose compensatory mitigation to ensure "net conservation gain" on a project-by-project basis, and instead require BLM to consider compensatory mitigation when it is required or recommended by the State or when offered voluntarily by a project proponent. *See, e.g.*, NVCA 208-11 (outlining requirements for coordinating with the State of Nevada to integrate mitigation required or recommended by the State); WY 328-31 (same for Wyoming); CO 163-64 (same for Colorado). To align the 2019 Plan Amendments with State mitigation policies and programs, the 2019 Plan Amendments adopt slightly different formulations of mitigation objectives depending on the State's approach. For example, the Idaho Plan Amendment incorporates a plan-level goal of "no net loss" to the species, ID 171-72; the Nevada Plan Amendment adopts Nevada's goal of "net conservation gain," NVCA 244; the Utah Plan Amendment describes the objective as "to minimize or eliminate threats affecting the status of [Sage-Grouse] or to improve the condition of [Sage-Grouse] habitat" across the planning area,

Defs.' Opp'n to Mot. for Preliminary Inj.                                                                 9

UT 322; and Colorado requires, "avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions," CO 25. To ensure State compensatory mitigation programs are properly evaluated and applied to project authorizations, BLM has entered (or is currently negotiating) memoranda of agreement with each State. ID 191-92, 985; WY 311, 1083; CO 177-78, 662; NVCA 200; OR 124; UT 333.

In addition to State-required or voluntary compensatory mitigation, BLM will continue to require avoidance, minimization, and other on-site mitigation to conserve Sage-Grouse and its habitat when approving projects. BLM will also continue to undertake actions to reduce the threats to Sage-Grouse habitat, such as fire and invasive species. *See, e.g.,* UT 378 (noting that in fiscal year 2018, BLM spent $29 million to treat approximately 500,000 acres of Sage-Grouse habitat, and expects to invest another $17 million in fiscal year 2019); WY 27 (noting that since 2015 BLM has committed over $15 million to complete more than 230 Sage-Grouse habitat improvement projects in Wyoming). BLM expects that the combination of project-specific avoidance and mitigation requirements, State-required compensatory mitigation, voluntary improvements by third parties, and BLM habitat-improvement projects will continue to increase the quality and quantity of Sage-Grouse habitat and bolster Sage-Grouse populations. *See, e.g.,* UT 378-79; NVCA 245.

***Disturbance and Density Caps***. The 2019 Plan Amendments for Oregon, Nevada/California, Colorado, and Wyoming did not modify the 2015 Plan Amendments' density and disturbance caps on activities in Sage-Grouse habitat. The Idaho Plan Amendment removes the project-level cap to give BLM the flexibility to allow intentional clustering of development within already-degraded areas while keeping overall disturbance at the Biologically Significant Unit ("BSU") level within the 3% cap. ID 420-21. The 2019 Utah Plan Amendment allows for additional flexibility by allowing the 3% cap to be exceeded where the project will improve the

condition of Sage-Grouse habitat. UT 297-300. BLM found that these changes would have no significant impact on the Sage-Grouse or its habitat. *See, e.g.,* UT 376-77.

*Lek Buffers.* The 2019 Plan Amendments continue to provide for buffers around active leks, establishing buffer distances that vary with the type of proposed action and the habitat involved. *See, e.g.,* ID 41-43 (lek buffer distances); WY 686, 702 (lek buffer distances unchanged from 2015); UT 58 (refer to lek buffer distances in USGS 2014); NVCA 330 (same). The 2019 Plan Amendments also provide agency officials with discretion to determine when departures from the default buffer distances are appropriate, but require that departures not negatively impact the Sage-Grouse or its habitat.[6] BLM does not expect the changes to lek buffers to significantly alter the impacts on Sage-Grouse from the 2015 Plan Amendments because any site-specific departures are narrowly circumscribed to situations where they would not harm Sage-Grouse and would require additional analysis. *See, e.g.,* ID 203 (finding little difference in impacts between 2015 and 2019 lek buffer approach); CO 193 (changes to buffers would not increase surface disturbance); NVCA 189-90 (2019 Plan Amendment merely clarifies lek buffers).

*Livestock Management.* Rather than rigidly setting a priority of review for grazing permits and mandating specific management thresholds in all grazing permit renewals as the 2015 Plan Amendments did, the 2019 Plan Amendments allow BLM the flexibility to prioritize

---

[6] *See* ID 42 (allowing departure from lek buffers only if, with input from the State, BLM determines, based on best available science, landscape features, and other existing protections, that a buffer-distance other than the default offers the same or greater level of protection to Sage-Grouse and its habitat); UT 135 (allowing departures to increase or decrease the buffer based on local data, best available science, landscape features, and other existing protections); WY 409 (allowing exceptions to buffers on a case-by-case basis subject to site-specific analysis, mitigation, and consultation with the Wyoming); CO 36 (allowing exception to buffers for fluid mineral leasing under NSO stipulations where there will be no impact on Sage-Grouse); NVCA 330 (allowing departures to decrease or increase buffers based on local information and data, best available science, landscape features, and other existing protections).

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    11

review and modification of those grazing permits where grazing is actually impairing the ability of the area to meet desired habitat characteristics. *See, e.g.,* ID 25; WY 320-23; UT 326; NVCA 252 (no changes to grazing from 2015 Plan Amendments); CO 32 (same). BLM found these changes would not have significant environmental effects. *See* ID 204; WY 358-59. In Oregon, BLM removed the 2015 prohibition on livestock grazing in specific Research Natural Areas, finding the prohibition was not necessary to address threats to the Sage-Grouse. OR 11-13.

**Habitat Objectives.** Most of the 2019 Plan Amendments[7] modify habitat objectives to reflect local variation and clarify that habitat objectives were never intended to be applied inflexibly across the range.[8] This clarification that managers have the flexibility to use the best available information for local conditions is fully consistent with the 2015 Plan Amendments, which recognized that the habitat objectives in those Plan Amendments may not be "applicable to the site-specific conditions of the project or activity" and that a "determination on whether the objectives have been met will be based on the specific site's ecological ability" to meet desired conditions. IDMT 126338. BLM determined that the modification of habitat objectives and clarification that BLM should account for best available science and local conditions would not significantly impact Sage-Grouse or its habitat. *See* ID 219; WY 357; UT 379; NVCA 262.

---

[7] Habitat objectives were not changed in the Colorado or Oregon. *See* CO 165; OR 94

[8] ID 1888 (noting habitat objectives in the 2015 FEIS "are not land health standards but are quantitative measures that help inform the special status species habitat land health standard" for Sage-Grouse); WY 319 (noting that the values in the habitat objectives tables are to "be considered as initial references and do not preclude development of local desired conditions or utilizing other indicators/values, based on site selection preferences of the local population and ecological site capability of sagebrush communities"); UT 292 (noting habitat objective values are based on micro-site vegetation data combined with broad vegetation, climatic, and elevation data); NVCA 220 (Habitat Objectives in the 2015 FEIS "are desired habitat conditions that are broad goals based on Greater Sage-Grouse habitat selection that may not be achievable in all areas. The ability of a site to achieve the objectives should be based on site potential, ecological site descriptions, state-and-transition models, etc.").

**STANDARDS OF REVIEW**

### I.    Judicial Review under the Administrative Procedure Act

Agency decisions are reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). In accordance with that standard, an agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and quotation marks omitted). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

### II.    Standard for Obtaining Preliminary Injunctive Relief

A preliminary injunction is "an extraordinary and drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, a plaintiff must demonstrate four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008). A party *must* demonstrate a "likelihood of success on the merits" in order to obtain a preliminary injunction. *Munaf v. Geren*, 553 U.S. 674, 690 (2008). Furthermore, a party seeking preliminary injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting a "possibility" of irreparable harm standard). The Ninth Circuit has held that, notwithstanding the *Winter* decision, a preliminary injunction may issue if the plaintiffs can show "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."[9] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

**ARGUMENT**

**I.      Plaintiffs Are Not Likely to Succeed on the Merits**

Plaintiffs move for a preliminary injunction on the basis of their NEPA claims. NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3. The requirements of NEPA are procedural. *See Robertson*, 490 U.S. at 351. In reviewing the sufficiency of an EIS, a court should evaluate whether the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). A court should not "substitute its judgment for that of the agency," *id.*, and should not "'fly speck' an EIS and hold it insufficient on the basis of

---

[9] Defendants do not believe that the "serious question" version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                                    14

inconsequential, technical deficiencies." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997). Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block*, 690 F.2d at 761. Because BLM fully complied with NEPA, Plaintiffs are not likely to succeed on the merits of their claims.

> A.    **BLM's Purpose and Need Statement and Range of Alternatives Complied With NEPA**

NEPA requires an EIS to evaluate "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14. Because the range of alternatives must "relate to the purposes of the project," *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013), an agency must first "specify the underlying purpose and need to which the agency is responding." *Id.* § 1502.13. Both BLM's purpose and need statement and range of alternatives for the 2019 Plan Amendments are reasonable in light of the regulatory context and BLM's statutory direction to balance the conservation of wildlife with other uses of public lands and to coordinate with and respect the sovereign interests of the States, which manage wildlife within their borders.

> 1.    **BLM's Purpose and Need Statement Reflects the Agency's Obligation to Coordinate With States Regarding Wildlife Management.**

Courts afford agencies "considerable discretion to define the purpose and need of a project" because preparing an EIS "necessarily calls for judgment, and that judgment is the agency's." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (citations omitted). Here, BLM explained that the purpose and need for the 2019 Plan Amendments "is to modify the approach to Greater Sage-Grouse management in existing land use plans through 1) enhancing cooperation and coordination with [the relevant State] and tribes where applicable, 2) align with DOI and BLM policy directives that have been issued since

2015, and 3) incorporate updated local science, research, and information to better align with [the State's] Greater Sage-Grouse conservation plan." *E.g.*, UT 273; CO 157. Plaintiffs object to this statement on the grounds that it omits any reference to Sage-Grouse conservation. Pls.' Mot. for Prelim. Inj. 19-20, ECF No. 124-1 ("Pls. Mot."). This objection is baseless for three reasons.

First, Plaintiffs' objection overlooks the context of the 2019 Plan Amendments. Less than four years earlier, BLM completed a comprehensive planning process culminating in the 2015 Plan Amendments, the purpose and need of which was to "conserve, enhance, and/or restore" Sage-Grouse habitat by "reducing, eliminating, or minimizing threats to that habitat." *E.g.*, IDMT_0114087. In 2017, the Secretary of the Interior issued Secretary's Order No. 3353, which directed BLM to "enhance cooperation with the Eleven Western States primarily responsible for the management and conservation of Sage-Grouse." RANGEWIDE 2. In response, six BLM State Offices prepared EISs that considered whether to modify elements of the 2015 Plan Amendments to improve cooperation with their respective States, enhance consistency with State Sage-Grouse conservation plans, and implement recent BLM policy directives. As BLM explained in the 2019 Plan Amendments, its goal was not to eliminate the conservation measures of the 2015 Plan Amendments but to consider more limited "refinements" to those Plan Amendments. *See, e.g.*, CO 169; OR 89. Where BLM's aim is to improve a discrete aspect of existing plans, the agency may properly limit its purpose and need statement to that single goal. *See Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175, 1186-87 (W.D. Wash. 2005) (Where agency is modifying existing standard, purpose and need statement may reasonably reflect "the ways in which [the standard] was frustrating the Agencies' ability to achieve the Plan's goals").

Second, Plaintiffs' objection ignores the plain language of the purpose and need statements. The statements specifically state that one of the purposes of the 2019 Plan Amendments is to "better align with" each State's "Sage-Grouse conservation plan." *E.g.*,

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    16

NVCA 182-83. Thus, BLM did not exclude Sage-Grouse conservation, as Plaintiffs allege; it reasonably focused the 2019 Plan Amendments on ensuring that BLM's Sage-Grouse conservation efforts are better aligned with the conservation efforts of its State counterparts.[10]

Third, Plaintiffs wrongly assume that FLPMA's inclusion of wildlife habitat within BLM's multiple use mission somehow subsumes the agency's entire mission. *See* Pls. Mot. 20. To the contrary, "[w]here an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist.*, 376 F.3d at 866. Wildlife habitat is only one component of BLM's multiple-use mission, which requires that the agency balance myriad competing interests and resources. 43 U.S.C. §§ 1701(a), 1702(c); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) ("'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put[.]"). Another responsibility is coordinating with States in the development of land use plans, including the management of wildlife by the States. ID 170; *see also, e.g.*, 43 U.S.C. § 1712(c)(9) (directing Secretary of Interior to "coordinate" land use planning with State and local governments and make land use plans "consistent with State and local plans to the maximum extent" possible); 43 U.S.C. § 1732(b) ("[N]othing in this Act shall be construed as . . . enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife."); 43 C.F.R. § 24.3 (affirming concurrent State jurisdiction over wildlife on federal

---

[10] *E.g.*, ID 170 ("As the sovereign entities with the lead role in managing game species, including Greater Sage-Grouse, States play a critical role in conserving the Greater Sage-Grouse and its habitat."); WY 5 (BLM and "State partners have declared their desire to avoid the need to list Greater Sage-Grouse under the Endangered Species Act (ESA)."); NVCA 20 ("The approved plan will continue to ensure that the BLM complies with its special status species policy, including the commitment to 'implement measures to conserve species and their habitats . . . and promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.'").

lands); *accord, e.g.*, UT 266. BLM need not tackle every issue before it in a single action. *See*

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995). The

agency properly and reasonably crafted the 2019 Plan Amendments for the purpose of fulfilling

its duty under FLPMA and recent policy guidance, to better coordinate its Sage-Grouse

conservation efforts with the States. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 580

(9th Cir. 2016) (upholding purpose and need statement that reflected agency's policy goals and

directives as "fully consistent with the agency's duty to consider federal policies"); *Colo. River*

*Indian Tribes v. Dep't of Interior*, No. 14-cv-2504, 2015 WL 12661945, at *22 (C.D. Cal. June

11, 2015) (holding citations to "statutory, executive and administrative authority are an accepted

means by which an agency may" express a project's purpose and need (citing *Muckleshoot*

*Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999))).

### 2.   BLM Considered a Reasonable Range of Alternatives

Under NEPA, the alternatives analysis should "describe and analyze 'every reasonable

alternative within the range dictated by the nature and scope of the proposal.'" *Alaska Survival*

705 F.3d at 1087. An agency need not consider alternatives that are "unlikely to be implemented

or [are] inconsistent with its basic policy objectives." *Seattle Audubon Soc'y v. Moseley*, 80 F.3d

1401, 1404 (9th Cir. 1996). "Nor is an agency required to undertake a 'separate analysis of

alternatives which are not significantly distinguishable from alternatives actually considered, or

which have substantially similar consequences.'" *Westlands Water Dist.*, 376 F.3d at 868

(quoting *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990)). NEPA "does not

impose a numerical floor on" the number of "alternatives to be considered." *Native Ecosystems*

*Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

BLM considered a wide range of alternatives in its DEISs, including all the alternatives

evaluated in detail during the 2015 Plan Amendment NEPA process, as well as additional

alternatives suggested by the public during the scoping process. *E.g.*, UT 913-17; OR 115-20.[11] The agency reasonably decided not to analyze most of these additional alternatives in detail because they did not meet the agency's purpose and need, were inconsistent with BLM policies, conflicted with available research, or substantially overlapped with the agency's two primary alternatives and thus did not merit separate analysis. *Id.* Ultimately, BLM analyzed two alternatives in depth for each 2019 Plan Amendment: (1) the No Action alternative, which would not change the 2015 Plan Amendments, and (2) the Management Alignment Alternative, which would better align BLM's Plan Amendments with State plans and policies. *E.g.,* UT 15-18.

Plaintiffs challenge two aspects of BLM's consideration of alternatives: they allege that BLM failed to consider (1) any alternative to its Proposed Action and (2) viable alternatives proposed by commenters. Both allegations are without merit. Plaintiffs first contend that BLM effectively failed to consider any alternatives to its Preferred Alternative because BLM predetermined that the "No Action" alternative would not meet the stated purpose and need. Pls. Mot. 21. This is false and misleading. The citation that Plaintiffs rely on to support their allegation is from the Idaho ROD. *Id.* The ROD is issued *after* the completion of the NEPA process. *See* 43 C.F.R. § 1601.0-6. BLM properly considered the No Action alternative throughout all its DEISs and FEISs and then, based on that analysis, reasonably determined in its final decision that the No Action alternative would not achieve the purpose and need of enhancing cooperation and coordination with the States. *See, e.g.*, UT 982-1030; *see also* 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (explaining no action alternative need not meet agency's purpose and need).

Plaintiffs next allege that BLM failed to consider "viable alternatives that fell between

---

[11] BLM considered different alternatives for each Plan Amendment based on the specific interests and needs of each State and State-specific comments received. *Compare, e.g.*, UT 913-52 *with* CO 587-93.

Defs.' Opp'n to Mot. for Preliminary Inj.                                          19

the 'no action' and 'management alignment' extremes," though the only particular alternative they identify is the Wilderness Society's proposal. Pls. Mot. 22. Although the Wilderness Society acknowledged BLM's purpose and need of improving collaboration with the States, its proposal was focused solely on Sage-Grouse conservation techniques and offered no specific suggestions about how to enhance alignment with State policies and programs. Decl. of Greta Anderson, Ex. C, ECF No. 124-2 ("Anderson Decl"). As BLM explained in its response to the Wilderness Society's protest, the proposed alternative was not in line with the agency's stated purpose and need. ID 132. This approach was entirely appropriate as "the EIS only needs to consider in detail alternatives that would address . . . the Project's stated purposes and needs." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1072 (9th Cir. 2012); *see also W. Watersheds Project v. Kenna*, 610 F. App'x 604, 606 (9th Cir. 2015) ("The level of detail required in an EIS is also directly tied to the scope of its parameters and purpose."). Because Plaintiffs have failed to identify a viable alternative that satisfies BLM's stated purpose and need that the agency did not consider, their challenge to the range of alternatives fails. *League of Wilderness Defs.*, 689 F.3d at 1072.

More broadly, the purpose of NEPA's alternatives requirement is not to ensure the consideration of every conceivable alternative but rather to "foster[] informed decision-making and informed public participation." *Westlands Water Dist.*, 376 F.3d at 868 (quoting *Block*, 690 F.2d at 767). These purposes were clearly fulfilled here as evidenced by the detailed and substantial comments submitted by the public, including the Wilderness Society, *see, e.g.*, RANGEWIDE 801; UT 189, and BLM's careful review of those comments and of a wide range of potential alternatives. *E.g.*, UT 913-20; ID 10-11; ID 589-767; OR115-20; ID 79.

**B.      BLM Took a Hard Look at the Impacts of the 2019 Plan Amendments**

Plaintiffs allege that BLM failed to take the "hard look" required by NEPA by (1)

Defs.' Opp'n to Mot. for Preliminary Inj.                                              20

misrepresenting the content and impacts of the 2019 Plan Amendments; (2) failing to evaluate whether and how baseline conditions had changed since 2015; and (3) failing to adequately analyze cumulative impacts.

Plaintiffs' argument should be rejected at the outset because it improperly relies on extra-record declarations that purport to explain why Plaintiffs' "experts" disagree with BLM's analysis. *See* Pls.' Mot. 24-28 (relying on "experts" Braun, Connelly, and Haak to support allegations). These declarations are not proper in an APA case where review is limited to the administrative record. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (holding reviewing courts may not look to extra-record evidence "to determine the correctness or wisdom of the agency's decision"); *W. Expl. LLC v. U.S. Dep't of the Interior*, No. 15-cv-491, 2015 WL 7195156, at *2 (D. Nev. Nov. 16, 2015) (prohibiting use of expert witnesses at preliminary injunction hearing to question the merits of an agency decision). Even if the Court could consider them, BLM is the expert agency and its determinations as to how best to balance the conservation of Sage-Grouse with many other authorized land uses are owed deference. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994.

Apart from their improper reliance on extra-record evidence, Plaintiffs' hard look allegations are belied by the extensive DEISs, FEISs, and RODs, which demonstrate that BLM reasonably considered all potential environmental impacts directly or indirectly resulting from the 2019 Plan Amendments.

### 1.  BLM Did Not Misrepresent the Impacts of the 2019 Plan Amendments

Plaintiffs' allegation that BLM "misrepresented" the 2019 Plan Amendments turns on the agency's statements that the 2019 Plan Amendments are based on "the best available science and data" and are "equally environmentally preferable" to the 2015 Plan Amendments. First, Plaintiffs criticize BLM's determination that the 2015 and 2019 Plan Amendments are equally

environmentally preferable because they believe the 2019 Plan Amendments remove Sage-Grouse protections. But the "environmentally preferable" alternative is a term of art in NEPA analysis that incorporates principles of comity and multiple use management as well as conservation. The NEPA regulations require, in an EIS, that an agency "[i]dentify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable." 40 C.F.R. § 1505.2(b). The Council on Environmental Quality ("CEQ") has defined the environmentally preferable alternative as "the alternative that will promote the national environmental policy as expressed in NEPA's Section 101." 46 Fed. Reg. at 18,028. Section 101 of NEPA, in turn, declares it the policy of the United States, "in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

BLM determined that the 2015 and 2019 Plan Amendments are "equally environmentally preferable" because the 2019 Plan Amendments "retain[] many of the management actions contained in the 2015 decisions" while "enhanc[ing] cooperation and coordination with the State" and "reducing inconsistencies between BLM's land use plans and the State's approach to protecting and conserving Greater Sage-Grouse." *E.g.*, ID 10-11. This determination was reasonable in light of the declared purposes of NEPA, which include "cooperation with State and local governments" and "attain[ing] the widest range of beneficial uses of the environment without degradation." 42 U.S.C. § 4331(a), (b)(3); *see also Friends of Yosemite Valley v. Norton*, 194 F. Supp. 2d 1066, 1120-21 (E.D. Cal. 2002) (upholding agency's selection of environmentally preferable alternative based on full range of policy goals in Section 101 of NEPA), *reversed in part on other grounds by* 348 F.3d 789 (9th Cir. 2003).

Moreover, Plaintiffs' laundry list of ways in which the 2019 Plan Amendments "gut" the 2015 Plan Amendments' Sage-Grouse protections is misleading, not least because Plaintiffs conflate the six Plan Amendments and fail to appreciate how the various aspects of the Plan Amendments interact with one another.[12] *See* Pls. Mot. 24-25. In fact, as explained below, the 2019 Plan Amendments retain many of the protections of the 2015 Plan Amendments and, where they modify the prior Plan Amendments, do so in ways that eliminate ineffective requirements and reduce inconsistencies with State Sage-Grouse plans while minimizing adverse impacts to Sage-Grouse.

*Sage-Grouse Focal Areas ("SFA").* While the 2019 Plan Amendments remove the SFA designation in all States except Oregon, lands previously designated as SFA are now designated as PHMA and retain nearly all of the same protections, including NSO requirements in most circumstances. *E.g.*, ID 172, 186; CO 212; ID 423 (describing limited exceptions to NSO requirements in Idaho); CO 36 (allowing NSO exceptions where there is no impact on Sage-Grouse). BLM's decision to eliminate an unnecessary category of habitat designation was reasonable given that BLM manages PHMA and SFA lands in a similar manner.[13] The only other notable characteristic of the SFAs was not that BLM would manage them differently under

---

[12] Plaintiffs' motion focuses on the Idaho Plan Amendment and fails to identify any alleged deficiencies in the other five Plan Amendments. Pls.' Mot. 24. Their attempt to incorporate by reference further unidentified and uncited arguments and examples contained in their 348 pages of declarations, *id.* at 25, is improper as it seeks to circumvent the Court's page limits, which have already been extended, ECF No. 126. *See Golden Gate Salmon Ass'n v. Ross*, No. 17-cv-1172, 2018 WL 3129849, at *1 (E.D. Cal. June 22, 2018) (Declarations "are meant to support, not supplant, briefs."); *Calence, LLC v. Dimension Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007) (upholding district court's refusal to consider arguments incorporated by reference).

[13] *See, e.g.*, WY 356 ("no additional impacts" from elimination of SFAs because SFAs managed same as PHMAs); CO 627 ("no appreciable additive impact" from elimination of SFAs); ID 8 (explaining SFAs were "redundant" with PHMAs since both generally have NSO requirements); NV 242 (finding only two additional projected mines in absence of SFA).

Defs.' Opp'n to Mot. for Preliminary Inj.                                        23

its land use plans, but instead that BLM recommended these areas for withdrawal from location and entry under the Mining Law of 1872. But after BLM had the opportunity to fully analyze the proposed withdrawal, the agency decided the withdrawal is not necessary to protect Sage-Grouse, as it would have protected only 9,000 acres rangewide from surface disturbance over a 20 year period and only have affected 0.58% of male Sage-Grouse birds. ID 208; RANGEWIDE 336-39. Given the negligible benefit of SFAs and the fact that PHMAs are subject to strict restrictions on surface occupancy and other conservation requirements, BLM's elimination of the SFA designation was reasonable.

*Lek buffers.* While it is true that BLM has adjusted lek buffers in some States, it has done so advisedly based on the unique circumstances of each State and in coordination with existing State Sage-Grouse plans. For example, in Idaho, the lek buffer distances have not changed for PHMAs but were reduced in Important Habitat Management Areas ("IHMAs") and are smallest in GHMAs. ID 775-76; ID 9. These changes align BLM's plan with the Idaho's three-tier approach to habitat protection. *Id.* The Utah and Colorado Plan Amendments allow for greater flexibility in the application of lek buffers based on site-specific factors, and the Utah Amendments align lek buffers in that State with State guidelines and address confusion over how lek buffers are applied. UT 135, 279; CO 24. BLM expects these changes to lek buffers to have minimal impact on Sage-Grouse due to the restrictions on surface disturbance in PHMAs, including NSO and mitigation requirements and disturbance caps. *E.g.*, CO 205, 212; WY 376.

*Density and disturbance caps.* Contrary to Plaintiffs' allegation, BLM did not remove all density and disturbance caps in Idaho. Pls.' Mot. 24. The 2019 Idaho Plan Amendments retain the 3% disturbance cap in PHMA and IHMA in any given BSU. *E.g.*, ID 184, 420. Although they remove the density and disturbance caps at the project analysis area level, BLM reasonably found that the change would allow BLM to intentionally cluster developments within areas

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    24

already degraded by activities in Sage-Grouse habitat provided that the overall disturbance within the BSU remains below 3%. ID 9, 171, 216. The 2019 Idaho Plan Amendment also removed the cap of one energy or mining facility per 640 acres on average in PHMA, finding the cap unnecessary because Idaho has limited energy and mineral development in Sage-Grouse habitat. ID 880. The Utah and Nevada/Northeastern California Plan Amendments have retained the 3% disturbance caps in both BSUs and proposed project analysis areas, and density caps allow for only one energy or mining facility per 640 acres. NVCA 31-32, 168, 170-71; UT 52-56, 296-99.

*Requirements for Design Features ("RDFs").* Plaintiffs implicitly acknowledge, in Idaho, there is no change to RDFs in PHMA and IHMA. ID 186-87. Although in GHMA BLM has made the RDFs non-mandatory and instead considers them to be best management practices that should be applied unless technically or economically impracticable, ID 424, that change merely allows for greater local, on-the-ground flexibility. Likewise, in Wyoming, BLM acknowledged the 2015 Plan Amendment generated confusion regarding when RDFs should be applied and explained that not all RDFs are advisable or appropriate for every project. WY 307-08, 264. Instead, RDFs should be applied as appropriate to each particular project based on its unique features. *Id.*

*Compensatory mitigation.* BLM's decision to eliminate BLM-imposed compensatory mitigation requirements was reasonable because it was based on the agency's analysis of its own statutory authorities: BLM determined that it lacks authority under FLPMA to require compensatory mitigation.[14] *E.g.*, ID 170-71, 191. However, BLM continues to require onsite mitigation, *e.g.*, ID 14, and will still allow compensatory mitigation so long as it is voluntary, or required or recommended by the State rather than BLM. *E.g.*, OR 6. For example, because

---

[14] Plaintiffs do not challenge this determination in their preliminary injunction motion.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                25

Oregon "requires compensatory mitigation as a component of compliance with the State's mitigation plan, program, or authority, BLM Oregon will incorporate and enforce that compensatory mitigation as a condition of BLM Oregon-issued permits or authorizations." *Id.*; *see also* OR 18 (explaining that 2019 Oregon Plan Amendments retain the net conservation gain standard from the 2015 Plan Amendments). Because every State has developed or is developing its own compensatory mitigation or net conservation benefit guidelines which BLM intends to adopt or defer to, the claim that the 2019 Plan Amendments reduce compensatory mitigation opportunities is purely speculative. ID 191; WY 327; CO 164, 548; OR 93, 121; UT 265; NVCA 32, 200.

Second, Plaintiffs allege BLM "misrepresented" the 2019 Plan Amendments by claiming to rely on the best available science when, allegedly, the 2019 Plan Amendments are inconsistent with documents that Plaintiffs consider to represent the best available science, including the NTT and COT reports. But the record amply demonstrates that BLM considered numerous new studies and data as part of the planning process. It coordinated with the States to gather State-specific data, *e.g.*, ID 197, and asked USGS to prepare an annotated bibliography of all Sage-Grouse science published since January 2015 and a report summarizing the potential management implications of this new science. *E.g.*, CO 182-83 (discussing post-2015 Sage-Grouse science). In addition, BLM evaluated all scientific literature provided by commenters and updated its analysis as appropriate to reflect that new information. *E.g.*, UT 645-47. And BLM incorporated more recent data into its analysis, including the increase in wildfire in Sage-Grouse habitat in 2016 and 2017. *E.g.,* UT 335.

Plaintiffs' allegations that BLM failed to consider the NTT and COT reports are belied by the record. As encouraged by NEPA, 40 C.F.R. § 1502.21, BLM incorporated by reference the 2015 FEISs and RODs, which discussed the NTT and COT reports at length. *See, e.g.*, OR 115-

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    26

16; ID 617; CO 170; BUF 1386-87. Where appropriate, the 2019 Plan Amendments also addressed the NTT and COT reports. For example, in the Oregon FEIS, BLM acknowledged that the COT report identified unauthorized grazing as a threat to Sage-Grouse but went on to explain that "properly managed grazing may benefit the species" and the closure of certain Research Natural Areas ("RNAs") to grazing "would not address any threats to Greater Sage-Grouse habitat identified in the COT report . . . that may exist within the boundaries of the RNAs." OR 155.[15] Equally important, however, in seeking to locate the best available science, BLM properly considered more recent data and information than the 2011 NTT report and the 2013 COT report where available.[16] *See, e.g.*, OR 154-57; CO 182-83.

Plaintiffs also allege that BLM failed to address FWS's 2015 "not warranted" determination. Pls. Mot. 25. This is false. BLM acknowledged the FWS determination in every DEIS and FEIS and recognized that it was based in part on FWS's finding that the 2015 Plan Amendments, and in particular their compensatory mitigation requirements, "were adequate regulatory mechanisms" to protect Sage-Grouse. *E.g.*, WY 365; ID 207. BLM then explained that, although the agency lacks authority under FLPMA to require compensatory mitigation, the 2019 Plan Amendments do not propose "any action that would preclude proponents from offering compensatory mitigation." *E.g. id*.; ID 204-05. Elsewhere, as appropriate, BLM explained how particular proposed changes squared with FWS's "not warranted" determination.

---

[15] *See also* ID 61 ("The application of the foundational elements of Idaho's Sage-Grouse Management Plan are consistent with the [COT] report and apply across all land ownerships in Idaho.").

[16] Plaintiffs claim that Drs. Braun and Connelly explain why the 2019 Plan Amendments are inconsistent with the NTT and COT report. Pls. Mot. 24-25. But the portions of Dr. Braun's declaration cited by Plaintiffs do not provide any such explanation. Dr. Connelly states that the 2019 Plan Amendments contradict the NTT and COT reports because they "call for increasing energy and mineral development in important sage-grouse habitat, including within PHMA." ECF No. 124-5 ¶ 46. But he fails to acknowledge that PHMA was also open to mineral leasing under the 2015 Plan Amendments. *See, e.g.,* ID 423-24.

*See, e.g.*, OR 13 (in deciding to keep 13 RNAs open to grazing, noting that FWS found in its 2015 determination "that well-managed grazing practices can be compatible with sagebrush ecosystems and Greater Sage-Grouse persistence"); UT 139, 143 (accounting for FWS's listing decision in discussion of disturbance and density caps).

Finally, Plaintiffs contend that BLM disregarded "critical comments" from EPA. Pls. Mot. 26. In fact, the documents submitted by Plaintiffs demonstrate that BLM revised its NEPA documents in response to EPA comments and that EPA approved of those revisions. *See* Anderson Decl., Ex. B, ECF No. 124-2 at 55 (stating that BLM's revisions have "resulted in an improved analysis" and commending the agency "for including new information which more clearly defines the issue and provides a basis for choice among the options for agency decision makers and the public").[17]

Because Plaintiffs' allegations of misrepresentation themselves misrepresent the record and BLM's careful consideration of a wide range of data, science, and other information, Plaintiffs are not likely to succeed on the merits.

### 2.   BLM Took a Hard Look at Changes in Sage-Grouse Conditions Since 2015

Plaintiffs claim that BLM failed to evaluate whether and how the "baseline" conditions affecting Sage-Grouse have changed since BLM issued the 2015 Plan Amendments. Pls. Mot. 26. In particular, they claim that BLM overlooked the "millions of acres" of Sage-Grouse habitat burned in wildfires and leased for oil and gas development, and evidence that Sage-Grouse populations have declined since 2015. *Id.*

The establishment of a "baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental

---

[17] *See also* Anderson Decl., Ex. B at 56 (EPA "appreciate[s] that, for the FEIS, lek buffers have been increased relative to the DEIS, and mitigation requirements for [GHMA] are now included.").

Defs.' Opp'n to Mot. for Preliminary Inj.                                        28

consequences of a proposed agency action." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016). It is a part of NEPA's requirement that an EIS "succinctly describe the environment of the area(s) to be affected . . . by the alternatives under consideration[.]" *Id.* (quoting 40 C.F.R. § 1502.15).

Plaintiffs' challenge to BLM's evaluation of baseline conditions is premised on a statement by BLM that Plaintiffs have taken out of context. BLM did not state that "conditions have not appreciably changed" since 2015. Rather, BLM said in reference to cumulative impacts that "the nature and context of the cumulative effects scenario has not appreciably changed since 2015." *E.g.*, ID 206. In so stating, BLM recognized that its NEPA analysis for the 2015 Plan Amendments, incorporated by reference into the NEPA for the 2019 Plan Amendments, had already anticipated and analyzed a range of cumulative impacts and that the circumstances underlying that prior analysis had not substantially changed. *E.g.*, *id.* ("Conditions on public land have changed little since the 2015 FEISs, and to the extent that there have been new actions or developments, the impacts associated with those actions or developments are in line with the projections in the 2015 FEISs regarding reasonably foreseeable actions and effects."); OR 168-69 (same). Plaintiffs have not even attempted to demonstrate that post-2015 developments such as additional leasing and wildfires are not within the cumulative impacts already foreseen and analyzed by BLM in 2015 and incorporated by reference in 2019.

Moreover, BLM devoted a full chapter of each FEIS (Chapter 3: Affected Environment) to evaluating the changes to the environmental conditions affecting Sage-Grouse since 2015. Overall, BLM found a less than 1% increase in estimated disturbance of Sage-Grouse habitat from 2015 to 2017. *E.g.*, CO 181. From 2012 to 2015, there was a less than 1% decrease in sagebrush availability in PHMAs within BSUs. *Id.* In regards to wildfire, BLM considered all wildfires that occurred in the planning areas since 2015 and calculated the number of acres of

Defs.' Opp'n to Mot. for Preliminary Inj.                                                        29

Sage-Grouse habitat affected. *E.g.*, WY 344. The FEISs also discuss BLM's intent to develop additional tools to protect habitat from wildfire, including two programmatic EISs for fuel breaks, fuel reduction, and rangeland restoration. *E.g.,* NVCA 229; UT 350 (based on recent studies, areas treated to reduce impact of wildfire "can be quickly used by" Sage-Grouse as habitat). Likewise, BLM considered current mineral development, including acreage open to leasing and anticipated future projects. *E.g.*, UT 355-57; ID 199; CO 184-85. BLM also considered Sage-Grouse population trends since 2015. *E.g.*, CO 184; NVCA 228. For example, in Utah, BLM found that, since 2015, of the 12 populations monitored, only one met any of the adaptive management triggers that could suggest a population decline. UT 340-41. Corrective management was applied to that location. *Id.* In Oregon, BLM identified a 14% population increase in 2016 followed by a 7.7% decrease in 2017 and discussed adaptive management triggers for various populations within the State. OR 131-32. This approach—incorporating relevant prior analysis by reference and supplementing it as needed—is encouraged by NEPA. 40 C.F.R. § 1502.21.

In short, Plaintiffs' claim that BLM failed to consider changes to baseline conditions since 2015 is premised on a false assertion that BLM simply ignored recent developments like wildfires, population changes, and mineral development projects. Where the FEISs each include an entire chapter devoted to changes since 2015, Plaintiffs' allegations are not likely to succeed.

### 3. BLM Took a Hard Look at Cumulative Impacts

NEPA requires that BLM consider the cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c). A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. BLM met these requirements by devoting a

substantial portion of its impacts discussion in each EIS to cumulative impacts. First, BLM

incorporated the 2015 Plan Amendments' cumulative impacts discussion because "the nature and

context of the cumulative impacts scenario have not appreciably changed since 2015." *E.g.*, ID

208. BLM also incorporated the cumulative impacts discussion from its 2016 DEIS for the

proposed SFA withdrawal. As BLM explained, the analysis of the no-action alternative in that

document addresses the impacts of the 2019 Plan Amendments, since it assumed a scenario in

which the SFAs would not be withdrawn from mineral development. *Id.* BLM then focused its

discussion in the EISs for the 2019 Plan Amendments on additional cumulative impacts,

including using quantitative analysis "to provide a comprehensive range-wide view of

cumulative impacts." *Id.*

Plaintiffs contend that BLM failed to take a hard look at the cumulative impacts of the

2019 Plan Amendments in three ways: (1) by "fragmenting" its analysis into six separate EISs

and thereby failing to conduct a rangewide analysis of cumulative impacts to Sage-Grouse; (2)

by failing to address specific foreseeable actions; and (3) by failing to consider the cumulative

impact of the 2019 Plan Amendments when taken together with BLM's decision to cancel the

withdrawal of SFAs to mineral development and the Forest Service's proposed plan

amendments. Pls. Mot. 28-29. None of these allegations is likely to succeed.

First, BLM analyzed rangewide cumulative impacts in its six EISs. Every EIS includes an

appendix titled "Cumulative Impacts Supporting Information" that contains a list of "Rangewide

Impacts from Past, Present, and Reasonably Foreseeable Actions." *E.g.*, CO 409. These impacts

include proposed BLM actions, such as programmatic EISs for habitat restoration and wildfire

fuel breaks; continued oil and gas leasing and development; wildfires; proposed tree removals;

and locatable mineral projects across Sage-Grouse habitat. CO 409-24. Because the cumulative

impacts analysis is rangewide, BLM included data from Montana and the Dakotas even though

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    31

those Plan Amendments were not revised in the 2019 Plan Amendment process. CO 424.

As BLM explained in each EIS, it utilized the WAFWA management zones in its assessment of cumulative impacts because those zones reflect areas in which "vegetative communities comprising Greater Sage-Grouse habitat as well as the Greater Sage-Grouse populations are responding similarly to environmental factors and management decisions."[18] *E.g.*, ID 209. Thus, the zones provide a means of assessing rangewide impacts on a biologically meaningful scale since threats to Sage-Grouse vary based on local and regional factors such as "climate, land use patterns, and topography." *Id.* This method of analyzing cumulative impacts does not improperly "fragment" the analysis, but rather provides a valuable lens through which to assess with greater precision the on-the-ground impacts of rangewide threats. *See, e.g.,* ID 211-24; UT 211-12. Indeed, BLM would violate NEPA if it were to equate the impacts of, for example, grazing rangewide without accounting for how those impacts may manifest differently in different regions.

Second, BLM addressed all past, present, and reasonably foreseeable actions that could contribute to significant cumulative impacts to Sage-Grouse. Plaintiffs identify five specific actions and threats that they contend BLM failed to consider: the Greater Chapita Wells Natural Gas Infill Project in Utah; the Normally Pressured Lance, Continental Divide/Creston, and Converse County oil and gas projects in Wyoming; and climate change. BLM did not address the Greater Chapita Wells project in Utah because the proponent withdrew the project on June 18, 2018, well before the FEISs were completed. Decl. of Quincy Bahr ("Bahr Decl.") Decl. ¶ 22. In Wyoming, BLM specifically acknowledged that it is "currently analyzing two large-scale natural gas development projects (the Normally Pressured Lance and the Converse County Natural Gas

---

[18] Plaintiffs do not challenge BLM's use of the WAFWA management zones in their motion.

Defs.' Opp'n to Mot. for Preliminary Inj.                                              32

Projects) and one uranium mine (Lost Creek expansion)." WY 346. It also included the current leasing of 812,123 acres and the future leasing of up to 198,588 acres for oil and gas development in Wyoming its cumulative impacts analysis. WY 545. This current and future leasing includes all foreseeable oil and gas projects on federal lands, including those identified by Plaintiffs. As for climate change, BLM incorporated its analysis of cumulative impacts from the 2015 Plan Amendments, which address climate change. *See, e.g.*, IDMT 114584; IDMT 114587; IDMT 114920. Where newer, post-2015 information concerning the impacts of climate change on Sage-Grouse habitat and resources was available, BLM utilized it. *E.g.*, ID 502; OR 158. Notably, Plaintiffs have failed to identify any relevant new information that BLM allegedly overlooked.

Third, BLM took into account its 2017 cancellation of the proposed SFA withdrawal and the Forest Service's proposed plan amendments in its cumulative impacts analysis. As BLM explained, the 2019 Plan Amendments essentially adopt the no action alternative from BLM's 2016 DEIS for the withdrawal. *E.g.*, ID 206, 208. For that reason, BLM incorporated by reference the cumulative impacts analysis from the 2016 DEIS. *Id.* BLM also explained that the cancellation of the withdrawal had "negligible cumulative impacts" when considered alongside the 2019 Plan Amendments because the "[c]onservation benefits of a future withdrawal would be minimal." ID 208.

BLM also considered the Forest Service's proposed plan amendments, which cover only about 8% of Sage-Grouse habitat, FS 140054, noting that the

> cumulative impacts resulting from the implementation of the alternatives in this
> RMPA/EIS may be influenced by other actions, as well as activities and
> conditions on other public and private lands, including . . . the concurrent Forest
> Service planning effort to amend land management plans for National Forests in
> Idaho, Montana, Nevada, Utah, Colorado, and Wyoming, which were previously
> amended in September 2015 to incorporate conservation measures to support the
> continued existence of the Greater Sage-Grouse.

*E.g.*, ID 206; *see also* ID 144. BLM explained that the "[s]pecific details" of the Forest Service's proposed changes "are not yet known, but it is anticipated they propose alignment with State management plans and strategies." ID 457, 465, 467. Thus, the effect of the Forest Service plan amendments would likely be to "help to align the Forest Service's plan to be more consistent with" State plans and "provide the adequate management actions necessary to protect and conserve the Greater Sage-Grouse." ID 465.

In citing 40 C.F.R. § 1508.25, Plaintiffs allege that BLM plan amendments and the Forest Service plan amendments are "connected actions" under NEPA that must be discussed in the same EIS. Actions are connected if they

> (i) Automatically trigger other actions which may require environmental impact statements.
>
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1). The Ninth Circuit applies "an independent utility test to determine whether multiple actions are so connected as to mandate consideration in a single EIS. The crux of the test is whether each of two projects would have taken place with or without the other and thus had independent utility." *Sierra Club v. BLM*, 786 F.3d 1219, 1226 (9th Cir. 2015) (quotation marks omitted). "The purpose of this requirement is to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1087 (9th Cir. 2011).

Here, the BLM and Forest Service plan amendments have independent utility and do not meet any of the criteria for connected actions in § 1508.25(a)(1). Neither action is dependent

upon the other; the two sets of plan amendments are being developed by two separate agencies that operate under different statutory authorities to implement two different processes for land use planning. While both sets of plan amendments address Sage-Grouse, each operates independently and could exist without the other as shown by the fact that BLM is now utilizing its 2019 Plan Amendments despite the fact that the Forest Service is still operating under its 2015 Plan Amendments. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1098-99 (9th Cir. 2012) (holding two projects are not connected despite commonalities where they have "overlapping, but not co-extensive, goals"); *Nw. Res. Info. Ctr., Inc.*, 56 F.3d at 1068-69 (holding two projects that both benefit salmon in Pacific Northwest not connected). Moreover, the purpose of the connected action requirement—to prevent agencies from obscuring the significance of environmental impacts by dividing up a project into multiple parts—is not served by requiring BLM and the Forest Service to develop a single EIS, as BLM's EIS acknowledges that its plan amendments may potentially have a significant impact on the environment. *See, e.g.*, WY 305, 308; *see also Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1099 (rejecting connected action claim when there was no evidence that agency tried to avoid its duty to analyze all potential impacts).

C.    **BLM Was Not Required to Prepare a Supplemental DEIS for Its Proposed Changes to Compensatory Mitigation**

Although BLM changed its approach to compensatory mitigation between the DEIS and FEIS for the 2019 Plan Amendments, that change did not result in substantial, unanalyzed additional impacts requiring a Supplemental EIS ("SEIS"). An agency need not prepare an SEIS for every change occurring between the DEIS and FEIS. *Westlands Water Dist.*, 376 F.3d at 873. Such a requirement would frustrate the purposes of NEPA by deterring agencies from changing their proposals in response to information received during the comment period. *Block*, 690 F.2d

at 771. An SEIS should be prepared only when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)-(ii). The touchstone is whether the change "will have a significant impact on the environment in a manner not previously evaluated or considered." *Westlands Water Dist.*, 376 F.3d at 873; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008).

NEPA regulations also expressly contemplate that agencies will modify alternatives or develop alternatives "not previously given serious consideration" in response to comments received on a DEIS, 40 CFR § 1503.4(a)(2), and the statute thus affords agencies the "flexibility to modify alternatives canvassed in the DEIS to reflect public input," *Block*, 690 F.2d at 771. NEPA does not require supplementation as long as the action proposed in a FEIS is "qualitatively within the spectrum of alternatives that were discussed in the draft." 46 Fed. Reg. at 18,035. In determining whether an SEIS is required, the Ninth Circuit has urged courts to consider: (1) whether the new action is "within the range of alternatives the public could have reasonably anticipated the [agency] to be considering," and (2) "whether the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform the [agency] of the public's attitudes toward the chosen alternative." *Block*, 690 F.2d at 772.

Plaintiffs present an overly simplified version of BLM's approach to compensatory mitigation in the DEISs and FEISs. The preferred alternatives in the six DEISs differed based on the unique issues facing each State. Thus, while the preferred alternatives in three States (Colorado, Oregon, and Nevada/California) retained the "net conservation gain" standard for mitigation from the 2015 Plan Amendments, *e.g.*, NVCA 795, the other three (Utah, Idaho, and Wyoming) altered the approach to compensatory mitigation. In Utah, BLM proposed replacing

"net conservation gain" with a requirement that a project "improve the condition of" Sage-Grouse habitat. UT 919. In Wyoming, BLM proposed removing the net conservation gain requirement and instead adopting Wyoming's compensatory mitigation framework. WY 1008-09. And in Idaho, BLM proposed replacing the net conservation gain standard with a "no net loss" requirement. ID 829, 844. In addition, every DEIS alerted the public that BLM was "evaluating whether the implementation of compensatory mitigation standard on public lands is appropriate and consistent with applicable legal authorities" and requested "public comment about how the BLM should consider and implement mitigation with respect to the Greater Sage-Grouse." *E.g.*, ID 861; NVCA 809.

After BLM issued the DEISs, it completed its evaluation of its legal authorities with regard to mitigation under FLPMA and issued Instruction Memorandum ("IM") 2018-093 (later modified by IM 2019-018) clarifying the agency's position on compensatory mitigation requirements. BLM determined that "FLPMA does not explicitly mandate or authorize the BLM to require public land users to implement compensatory mitigation as a condition of obtaining authorization for the use of BLM-administered lands." *E.g.*, ID 170. Thus, while BLM has discretion to require mitigation through avoidance, minimization, and other onsite mitigation, it generally lacks legal authority to require offsite compensatory mitigation (compensating for adverse impacts of a project by "replacing or providing substitute resources or environments" in other areas, UT 1041). As BLM explained in all of its FEISs, this change meant that BLM would "continue to apply the mitigation hierarchy as described in the CEQ regulations at 40 CFR § 1508.20; however, the BLM would focus on avoiding, minimizing, rectifying, and reducing impacts over time." *See, e.g.,* ID 172. This change, however, does not preclude compensatory mitigation for projects on BLM-managed lands: BLM will incorporate compensatory mitigation measures when required by the State or when offered voluntarily by a project proponent. *E.g.,* ID

191; ID 14. To this end, BLM has developed memoranda of agreement with the States to "guide the application of the mitigation hierarchy and compensatory mitigation actions for future project authorizations" on BLM-administered lands in that State. *E.g.*, NVCA 200; ID 191-92; OR 124; WY 311; UT 333; CO 177.

Because BLM's DEISs approached compensatory mitigation differently, the FEISs varied in the extent to which the elimination of compensatory mitigation represented a change. In some States, the FEIS's proposed alternative matched BLM's proposal in the DEIS. For example, in Wyoming, the DEIS had already proposed adopting Wyoming's compensatory mitigation requirements in lieu of BLM's net conservation gain standard, WY 1008-09, and the FEISs retained that approach. WY 327. In Idaho, to better reflect the State's mitigation framework, the DEIS considered changing from a net conservation gain standard to a no net loss standard. *See* ID 818. The FEIS reflected this same approach with minimal refinements. *See* ID 193-94.

In the States that retained the net conservation gain standard in the DEIS, the change in the FEIS was not so substantial as to require an SEIS. First, as explained above, BLM will continue to require other forms of mitigation, such as avoidance and minimization. Second, BLM will require public land users to comply with all applicable State standards, including those relating to compensatory mitigation. And, in the States that do not require compensatory mitigation, BLM has committed to evaluating any State recommendations for compensatory mitigation through the NEPA process for proposed actions affecting Sage-Grouse. *See, e.g.*, NVCA 65-67, 210-11; OR 17; CO 25. Third, all of the DEISs included an alternative in which BLM would not require any compensatory mitigation. Each DEIS incorporated by reference the "entire range of alternatives evaluated through the 2015 planning process." *E.g.*, ID 832. These included the 2015 no action alternative, which did not contain any mandatory mitigation. *See*

Defs.' Opp'n to Mot. for Preliminary Inj.                                                          38

IDMT 114322.

Fourth, BLM specifically alerted the public to its concerns regarding its legal authority to require compensatory mitigation and requested comment on compensatory mitigation. Numerous commenters submitted comments on that issue, demonstrating that the public was well aware that BLM was reconsidering its authority as part of the NEPA process. *E.g.*, RANGEWIDE 850-53. Fifth, the public, including Plaintiffs, had the opportunity to comment on the FEIS/Proposed Plan Amendments during the protest period, and they did so. *See, e.g.*, ID 83, 142-45, 1590-91; WY 234, 1214-15; UT 193, 195-96, 240; OR 39; CO 85; NVCA 94. In those letters, Plaintiffs and other commenters commented on the changes in the Proposed Plan Amendments, including BLM's decision that it lacked legal authority to impose compensatory mitigation and its plan to defer to State compensatory mitigation requirements. *See, e.g.*, ID 1590-91; WY 242, 1214-15; UT 195-96. BLM fully considered and responded to those comments following the conclusion of the protest period. *See, e.g.*, ID 116-17, 125-26, 144-45. This opportunity to comment "before the adoption of the final rule . . . further alleviated the need to prepare a separate supplemental EIS." *Wyoming v. USDA*, 661 F.3d 1209, 1262 n.39 (10th Cir. 2011); *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002) (noting that the public was permitted an opportunity to comment on a FEIS before a rule was finalized), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Sixth and finally, Plaintiffs have not even attempted to demonstrate how BLM's decision to defer to State compensatory mitigation requirements and to focus its own requirements on other forms of mitigation such as avoidance and minimization of impacts would result in a "significant impact" that was "not previously evaluated or considered." *Westlands Water Dist.*, 376 F.3d at 873.

For all of these reasons, Plaintiffs are not likely to succeed on their claim that BLM was required to prepare an SEIS.

## II.     Plaintiffs Have Failed to Demonstrate Irreparable Harm

Plaintiffs fail to demonstrate that it is "likely," not just possible, that they will suffer substantial and immediate irreparable injury to their interests before a decision on the merits can be rendered. *Winter*, 555 U.S. at 22.  As an initial matter, injunctive relief does not follow as a matter of course merely because Plaintiffs allege harm to the environment. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (reversing preliminary injunction premised on presumption of irreparable harm when an agency fails to evaluate the environmental impact of a proposed action); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) ("[I]njunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation [of NEPA] is found."). Instead, Plaintiffs must demonstrate specific instances of irreparable harm to obtain preliminary injunctive relief.

Since the Plan Amendments generally will be implemented through site-specific actions they do not result in immediate changes on the ground and their promulgation alone does not cause Plaintiffs' injury. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 70 (2004) ("[A] land use plans is generally a statement of priorities; it guides and constrains actions, but it does not (at least in the usual case) prescribe them."). Instead, Plaintiffs must show that they will be harmed through specific implementation decisions. *See* Order at 4, *W. Exploration LLC v. U.S. Dep't of the Interior*, No. 3:15-cv-491-MMD-VPC (Dec. 8, 2015) (ECF No. 56) ("*W. Exploration* Order") (explaining that the 2015 Plan Amendments would "guide land management decisions in greater sage grouse . . . habitat throughout Nevada"). Further, to demonstrate irreparable harm, Plaintiffs must show significant population-level effects to Sage-Grouse. *See Humane Soc'y of the U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008) (killing of .3 to 4.4% of protected salmon did not warrant injunctive relief); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 2015 WL 9700887, at *8 (W.D. Wash. Jan. 7, 2015) ("Courts that have found irreparable harm

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    40

stemming from the deaths of a small number of individual animals have done so when the 'loss of those individuals would be significant for the species as a whole.'" (quoting *Pac. Coast Fed'n of Fishermen's Assn's v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008))); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (denying injunctive relief where the plaintiffs failed to show that the challenged plan would "harm the species as a whole").

Plaintiffs allege that implementation of the 2019 Plan Amendments in a variety of contexts, including oil and gas leasing, mining, and grazing, will cause imminent irreparable harm to Sage-Grouse. *See* Pls. Mot. 15-18, 31-34. Many of the actions they complain about are not imminent. For actions that will occur in the next several months, Plaintiffs fail to show any difference between implementing the projects under the 2019 Plan Amendments and the 2015 Plan Amendment that that would result in irreparable harm to Sage-Grouse populations. Moreover, in seeking blanket injunctive relief, Plaintiff ignore the fact that they will have the opportunity to challenge individual actions that may harm Sage-Grouse populations.

### A.    Oil and Gas Development

Plaintiffs allege harm from oil and gas leasing and specific oil and gas development projects and upcoming oil and gas lease sales. Each of these actions is addressed below.

*Oil and Gas Leasing.* BLM has planned lease sales in June and September in Wyoming, Colorado, Utah, and Nevada. *See* Pls. Mot. 16-17. The issuance of leases, assuming they are in Sage-Grouse habitat, will not result in imminent harm to Sage-Grouse because a lease does not authorize immediate development. No development can occur on a lease until BLM determines whether, and under what conditions, it will approve specific development proposals. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1. That decision is made through review of an application for a permit to drill ("APD"), which BLM may approve following additional NEPA compliance,

subject to any necessary conditions of approval. *See* 43 C.F.R. § 3162.3-1; *Amigos Bravos v. BLM.*, No. 6:09-cv-37, 2011 WL 7701433, at *5 (D.N.M. Aug. 3, 2011). Plaintiffs claim that the stipulations in the leases will be weaker based on the application of the 2019 Plan Amendments. *See* Pls. Mot. 33. That is incorrect. In Wyoming, the stipulations will be the same as they would have been under the 2015 Plan Amendments. Decl. of Duane W. Spencer ("Spencer Decl.") ¶ 6. Likewise in Utah, the stipulations will be largely the same, but may include certain exceptions and waivers. Bahr Decl. ¶¶ 16-19. Thus, until the lease sales are held, it remains uncertain what parcels will be leased and what mitigation BLM will require for each lease. *See id.* ¶ 16.

Because lease sales do not authorize ground disturbing activity, courts have consistently held that merely holding an oil and gas lease sale does not result in the irreparable harm to the environment necessary for granting a preliminary injunction. *See Amoco*, 480 U.S. at 544-45 (reversing preliminary injunction regarding oil and gas lease because "injury to subsistence resources from exploration was not at all probable"); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (dissolving a preliminary injunction regarding an oil and gas lease sale and finding that "none of the activities of the lease sale stage results in harm to the environment"); *Blanco v. Burton*, No. 06-cv-3813, 2006 WL 2366046, at *15-19 (E.D. La. Aug. 14, 2006) (denying injunction and finding that holding an offshore oil and gas lease sale did not result in imminent environmental harm); *N. Slope Borough v. Minerals Mgmt. Serv.*, No. 3:07-cv-45, 2007 WL 1106110, at *4 (D. Alaska Apr. 12, 2007) (denying preliminary injunction regarding an oil and gas lease sale). Therefore, Plaintiffs are not entitled to an injunction based speculation about the outcomes of upcoming oil and gas lease sales.

*Normally Pressured Lance Project*. The Normally Pressured Lance ("NPL") Project is an oil and gas development project in the Pinedale and Rock Springs Fields Offices in southwestern Wyoming. NPL Project Record of Decision ("ROD") at 2, Spencer Decl. Ex. 1.

The decision does not approve specific APDs or rights-of-way ("ROW"), but it allows Jonah Energy to seek approval of APDs or ROWs for up to 3,500 oil and gas wells subject to the terms of the NPL Project ROD. *Id.* at 3. The NPL Project was approved prior to the issuance of the 2019 Plan Amendments and incorporates conservation measures for Sage-Grouse that are consistent with the prior 2015 Plan Amendments. *See id.* Certain mitigation measures in the NPL Project ROD were developed to be consistent with the 2015 Plan Amendments and may be modified in accordance with "current guidance." NPL Project ROD at 8. However, the principal mitigation measures for Sage-Grouse, including the density and disturbance criteria and the timing and distance restrictions, remain unchanged following the issuance of the 2019 Plan Amendments. Spencer Decl. ¶ 10.

Contrary to Plaintiffs' assertions, *see* Decl. of Michael Saul ¶ 26(a), ECF No. 124-16 ("Saul Decl."), the potential revisions to noise restrictions will not result in imminent harm to Sage-Grouse. The NPL Project ROD contains a 10 dB noise level restriction for new projects near leks during the spring breeding, nesting, and brood-rearing season from March 1 to May 15. NPL Project ROD at 9. The 2019 Wyoming Plan Amendment contains the same noise restriction, but it only applies in PHMA. WY 43 (MD SSS 12). The NPL Project ROD, however, also contains additional potential mitigation, unaffected by the 2019 Plan Amendments, limiting noise levels below 10 dB near leks during the same time periods. NPL Project ROD at 22-23. Therefore, the noise restrictions that will be applied to the development of the NPL Project may be the same or substantively similar to what they would have been under the 2015 Plan Amendment. Moreover, there is no risk of imminent harm due to changes in the noise restrictions because the time period for the noise restrictions—March 1 to May 15—has already passed for the year. NPL Project ROD at 9.

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    43

Lek buffers for the NPL Project are the same as they were under the 2015 Plan Amendments: 0.6 miles within PHMA and 0.25 miles outside of PHMA. *Compare* NPL Project ROD at 8 *with* WY 41-42 (MD SSS 5 and MD SSS 6). Plaintiffs also argue that there may be no compensatory mitigation, *see* Saul Decl. ¶ 26(a), but this claim is entirely speculative.  As they acknowledge, compensatory mitigation may be applied in accordance with the State of Wyoming's mitigation strategy. *See* WY 17-18. Accordingly, Plaintiffs have failed to show that the differences between the 2015 and 2019 Plan Amendments, as applied to the NPL Project, will result in imminent irreparable harm.

***Other oil and gas development projects***. Plaintiffs also allege harm based on the Moneta Divide Project, Jonah Infill Project, Converse County Project, and the Continental Divide/Creston Infill Project, all of which are in Wyoming. *See* Pls. Mot. 16. Of those projects, only the Continental Divide/Crestone and Jonah Infill Projects have been approved. Spencer Decl. ¶¶ 12, 13. As already noted, the 2019 Wyoming Plan Amendment does not significantly change the restrictions on oil and gas leasing. Plaintiffs fail to demonstrate imminent irreparable harm to Sage-Grouse populations from these projects that is traceable to changes in the 2019 Plan Amendments. APDs and ROWs relating to those projects will be made available to the public before they are approved, and Plaintiffs can challenge such approvals if they will irreparably harm Sage-Grouse populations.

The Moneta Divide and Converse County projects are not imminent. On the Moneta Divide Project, BLM has circulated a DEIS, and public comments are due July 2019. Spencer Decl. ¶ 14. BLM anticipates issuing an FEIS in September, and making a decision in late 2019 or early 2020. *Id.* Likewise, a DEIS for the Converse County Project has been circulated for public comment, and BLM anticipates issuing an FEIS in September and a decision in late 2019 or

early 2020. *Id.* ¶ 8. Plaintiffs can challenge the projects when decisions are issued; at this juncture the Projects pose no imminent irreparable harm to Plaintiffs' interests.

**B.      Mining**

Plaintiffs also allege harm from coal, gold, and phosphate mining. Pls. Mot. 17, 33; Saul Decl. ¶¶ 27-28; Decl. of John Carter ¶¶ 22-23, ECF No. 124-4. All of the projects they identify in Idaho, however, are still proposals, not active projects approved by BLM. As Plaintiffs acknowledge, BLM circulated a DEIS for the Caldwell Canyon Project in Idaho in November 2018. Decl. of Mary D'Aversa ¶ 8. BLM issued an FEIS in May and expects to issue a decision in mid-July. *Id.* BLM also has issued a DEIS for the Dairy Syncline Project and expects to issue a FEIS this fall. *Id.* ¶ 14. BLM does not expect to issue a decision until February 2020. *Id.*

Similarly, a number of mining projects have been proposed in Nevada, but many of them have not yet been approved. *See* Decl. of Brian Amme ("Amme Decl.") ¶ 9. These proposed projects will go through a public approval process. *Id.* ¶ 11. Therefore, Plaintiffs will have the opportunity to provide comments on these projects before they are approved, *see id.*, and they will be able to challenge the decisions approving them if they are approved.

BLM has recently approved some mining projects, including the Gold Rock Mine Project, Greater Phoenix Mine Project (gold), Gold Bar Mine Project, and the Bald Mountain North and South Operations Area Project (gold), which were approved between August 2016 and September 2018. Amme Decl. ¶ 8. The mitigation measures associated with these projects have not changed as a result of the 2019 Plan Amendments. *Id.* Plaintiffs' general assertion that mitigation will be relaxed, Saul Decl. ¶ 28, is without basis. The mining of locatable minerals, such as gold, is governed by the Mining Law of 1872, which was largely unaffected by the passage of FLPMA. *See* 43 U.S.C. § 1732(b). In approving mining plans of operation, BLM must follow the Mining Law and BLM's implementing regulations at 43 C.F.R. § 3809. *See*

Defs.' Opp'n to Mot. for Preliminary Inj.                                                                45

Amme Decl. ¶ 5. Given that mining operations are governed by the Mining Law, the specific management directives in the 2019 Plan Amendments regarding locatable minerals are minimal and are mostly unchanged from the 2015 Plan Amendments. *See* NVCA 58. As before, BLM is required to consider the management directives for special status species, *e.g.*, density caps and lek buffers, but only "to the extent allow by law," *i.e.*, the Mining Law. *Id.* (MD MR 15). Plaintiffs fail to demonstrate as to any particular mining plan of operations that application of the 2019 Plan Amendments will result in less restrictive mitigation that would pose imminent harm to Sage-Grouse. Moreover, in Nevada, BLM will apply Nevada's Conservation Credit System, which requires a project proponent to achieve a net conservation gain for Sage-Grouse. Amme Decl. ¶¶ 6, 10, 12.

Finally, in February 2019, BLM issued a lease to Alton Coal Development LLC for the development of a coal mine. Bahr Decl. ¶ 10. The record of decision for the project was issued in August 2018, prior to the issuance of the 2019 Plan Amendments. *Id.* ¶ 11. The lease stipulations were developed in accordance with the 2015 Plan Amendments and cannot be changed without going through a new authorization process with applicable NEPA review. *Id.*

C.    **Off-Highway Vehicle Use**

Plaintiffs allege that Sage-Grouse will be harmed because the Utah Plan Amendment opens 14,000 acres of Sage-Grouse habitat for off highway vehicle ("OHV") use. *See* Pls. Mot. 17; Anderson Decl. ¶¶ 45-49. Plaintiffs are incorrect. The Utah Plan Amendment designates the 5-Mile Pass (6,320 acres) and the Sahara Sand Dunes (7,900 acres) as open for OHV travel. UT 109. The Utah Plan Amendment clearly States, however, that these areas will remain "limited" to existing routes until BLM completes a Section 106 process under the National Historic Preservation Act. UT 110. Therefore, off route travel in these areas is not imminent. Bahr Decl. ¶ 5. Further, even if cross country travel is eventually permitted following the Section 106 process,

Defs.' Opp'n to Mot. for Preliminary Inj.                                                        46

it is not likely to impact Sage-Grouse. *Id.* ¶ 6. As explained in the Utah FEIS, "a review of GPS tracking data for Greater Sage-Grouse in the Sheeprocks area indicates that none of the collared birds (a sub-sample of the total population) use the areas proposed to be made available to cross-country use again." UT 382; *see also* UT 449 (map of Utah trails and travel management); UT 864-67 (maps showing leks in the Sheeprocks Area); Bahr Decl. ¶ 6.

### D. Rights-of-Way

Plaintiffs generally allege harm from pending ROW applications in Idaho, Nevada/California, Utah, and Wyoming. Pls. Mot. 18, 32. They allege, for example, that the Idaho FEIS refers to 123 pending ROW applications. *See* Saul Decl. ¶ 29; *see also* ID 198. Plaintiffs make similarly general allegations about pending ROW applications in Nevada/California, Utah, and Wyoming. *See* Saul Decl. ¶ 29. They make no effort, however, to identify particular ROW applications, to explain what the ROW applications are for, or show that, if the ROW applications are granted, they will cause imminent irreparable harm to Sage-Grouse. These general allegations are insufficient to warrant injunctive relief. *See All. for the Wild Rockies*, 632 F.3d at 1135 (in order to obtain injunctive relief, a plaintiff must show "actual and irreparable injury").

Moreover, the 2019 Plan Amendments do not authorize any ROWs; instead, the BLM authorizes ROWs through independent, project-specific decisions. *See, e.g.*, 43 C.F.R. § 2801.9. When authorizing ROWs, BLM has broad discretion to incorporate protective terms and conditions to control or prevent damage to environmental values, such as fish and wildlife habitat. *Id.* § 2805.12(a)(8)(iii)(A). The 2019 Plan Amendments do not constrain BLM's discretion to incorporate terms and conditions to protect Sage-Grouse habitat or even to deny proposed ROWs because of their impacts to Sage-Grouse habitat. Moreover, if BLM issues ROWs affecting Sage-Grouse habitat, Plaintiffs can challenge those decisions.

Defs.' Opp'n to Mot. for Preliminary Inj.                                    47

### E.   Grazing

Plaintiffs allege harm due to livestock grazing and range improvements. *See* Pls. Mot. 18, 32. They allege that irreparable harm will occur due to changes in the permit renewal process. *See* Anderson Decl. ¶¶ 28-35. Even if changes to grazing permits will occur when those permits are renewed, Plaintiffs can challenge those permits at that time. Bahr Decl. ¶ 27; Spencer Decl. ¶ 3. At this point, Plaintiffs' assertions that the future amendment of grazing permits will result in irreparable harm to particular Sage-Grouse populations is speculative.

Plaintiffs also claim that changes to the Plan Amendments in Wyoming and Utah eliminated the need to prioritize field checks to ensure compliance with permit terms and conditions. *See* Anderson Decl. ¶¶ 36-37. This not entirely true. The requirement to prioritize field checks in PHMA is retained in the Cody and Worland RMPs, and the Buffalo RMP prioritizes field checks in priority habitat. Spencer Decl. ¶ 4. The Lander RMP never required field checks. *Id.* In Wyoming and Utah, BLM's grazing regulations and guidance contain sufficient requirements for monitoring and managing livestock grazing in accordance with land health standards. *Id.*; Bahr Decl. ¶ 23.

Further, Plaintiffs claim that "countless grazing infrastructure projects" will not be sufficiently monitored to prevent harm to Sage-Grouse. Anderson Decl. ¶ 41. The fact that BLM has changed specific provisions regarding the monitoring of grazing infrastructure does not mean that such projects will go unmonitored. Bahr Decl. ¶ 24; Spencer Decl. ¶ 5. BLM will continue to monitor grazing infrastructure as necessary to avoid harm to Sage-Grouse. *Id.* Moreover, in Utah, range improvements are identified in more specific management actions. Bahr Decl. ¶ 24.

Finally, Plaintiffs allege harm from the decision in the Oregon Plan Amendment to make all or portions of 13 Research Natural Areas ("RNAs") available to livestock grazing. *See* Anderson Decl. ¶ 51; OR 8. Grazing in these areas, however, never ceased under the 2015 Plan

Amendments, which allowed BLM up to five years to implement grazing reductions or removals. *See* OR 147. Therefore, there will be no immediate change to grazing in the RNAs under the 2019 Plan Amendments.

In sum, Plaintiffs have failed to demonstrate immediate irreparable harm to Sage-Grouse populations from the 2109 Plan Amendments. *See W. Exploration* Order at 16 (denying a preliminary injunction in a challenge to the 2015 Plan Amendments).

**III.    The Balance of the Harms and the Public Interest Weigh Against an Injunction**

The balance of the harms and the public interest weigh against an injunction. "When the Government is a party, these . . . two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A court may withhold injunctive relief based on the public interest even if doing so would "be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). *See also Winter*, 555 U.S. at 26 (denying an injunction based on public interest despite injury to plaintiffs).

The Court should deny the request for a preliminary injunction because the government and numerous stakeholders who were involved in the development of the Plan Amendments have an interest in having them remain in place. An injunction would undo over two years of significant coordination and cooperation with States of Idaho, Wyoming, Utah, Nevada, California, Colorado, and Oregon and the public. *See*, *e.g.*, ID 16-17. Equitable considerations also weigh against an injunction based on the significant expenditure of public funds that went toward the development of the plans. *Cf. Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (declining to vacate a rule listing a species, in part, because of the significant resources that were expended in preparing the rule).

Further, if the Court issues an injunction, it could lead the affected States, counties, and industry groups to seek to reinstate their challenges to the 2015 Plan Amendments, which have

Defs.' Opp'n to Mot. for Preliminary Inj.                                                    49

largely been stayed during the development of the 2019 Plan Amendments. The re-initiation of the prior lawsuits would generate significant and potentially unnecessary litigation. *Cf. Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 151 (9th Cir. 1993) (declining to vacate rule, in part, because of the potential disruptive consequences of vacating rule on interim basis).

## IV.    Any Injunctive Relief Should Be Narrowly Tailored

Even if injunctive relief were warranted, it should be narrowly tailored to address only the specific injuries and legal violations found by the Court. *See Friends of the Earth (TOC), Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 193 (2000) (Injunctive relief should be "no broader than required by the precise facts."); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (An injunction must be "narrowly tailored to give only the relief to which plaintiffs are entitled."). If the Court found that Plaintiffs have demonstrated imminent irreparable harm, it should narrowly tailor any injunctive relief to avoid the specific harm, rather than imposing the blanket six-State injunction sought by Plaintiffs.

## CONCLUSION

Because Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims, they will suffer irreparable harm, and the balance of harms weighs in their favor, their request for a preliminary injunction of the 2019 Plan Amendments should be denied.

Respectfully submitted this 31st day of May, 2019.

BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar
No. 261501
Assistant United States Attorney
District of Idaho
Washington Group Plaza IV
800 East Park Boulevard, Suite 600
Boise, Id 83712-7788

Defs.' Opp'n to Mot. for Preliminary Inj.                                                50

Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Deputy Assistant Attorney General

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
BARCLAY T. SAMFORD
U.S. Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov
          clay.samford@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2019, I caused the foregoing to be electronically filed with the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Counsel for Plaintiff Western Watersheds Project

Laurence J. Lucas
llucas@advocateswest.org

Todd C. Tucci
ttucci@advocateswest.org

Counsel for Intervenor-Defendant Western Energy Alliance

Bret A. Sumner
bsumner@bwenergylaw.com

Malinda Morain
mmorain@bwenergylaw.com

Paul A. Turcke
pat@msbtlaw.com

Cherese De'Dominiq McLean
cdm@msbtlaw.com

Intervenor-Defendants Wyoming Stock Growers Ass'n and Petroleum Ass'n of Wyoming

David C. McDonald
dmcdonald@mslegal.org

John L. Runft
JRunft@runftsteele.com

Intervenor-Defendants Idaho Power Co. and Pacificorp

Andrew J. Pieper
andrew.pieper@stoel.com

Beth S. Ginsberg
bginsberg@stoel.com

Kevin J. Beaton
kjbeaton@stoel.com

Defs.' Opp'n to Mot. for Preliminary Inj.                                                      52

Jason T. Morgan
jtmorgan@stoel.com

Intervenor-Defendant State of Wyoming

Erik Edward Petersen
erik.petersen@wyo.gov

James Kaste
James.kasted@wyo.gov

Paul A. Turcke
pat@msbtlaw.com

Intervenor-Defendants National Cattlemen's Beef Ass'n and Public Lands Council

Caroline Lobdell
clobdell@wrlegal.org

Candice M. McHugh
cmmchugh@mchughbromley.com

Christopher M. Bromley
cbromley@mchughbromley.com

Amicus State of Utah, Governor Gary R. Herbert, and School and Inst. Trust Lands Admin.

Laurence M. Bogert
mbogert@parsonsbehle.com

William Gerry Myers III
wmyers@hollandhart.com


                                        */s/ Luther L. Hajek*
                                        Luther L. Hajek


Defs.' Opp'n to Mot. for Preliminary Inj.                                    53