William G. Myers III (ISB #5598)
Murray D. Feldman (ISB #4097)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, ID  83701-2527
(208) 342-5000
wmyers@hollandhart.com
mfeldman@hollandhart.com
*Counsel for Intervenor-Defendant Governor Gary R. Herbert*

Robert H. Hughes (USB #9787)
(admitted *pro hac vice*)
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT  84111
(801) 536-6746
RHughes@ParsonsBehle.com
*Counsel for Intervenors-Defendants State of Utah and State of Utah School
and Institutional Trust Lands Administration*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, and PRAIRIE HILLS AUDUBON SOCIETY, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID BERNHARDT, Secretary of Interior; JOSEPH R. BALASH, Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE, et al. <br><br> Defendants. | Case No. 1:16-cv-83-BLW <br><br> **UTAH'S MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [Dkt. 124]** |

## **Table of Contents**

Table of Authorities ............................................................................................................ ii

Introduction..........................................................................................................................1

I.      Preliminary Injunction Standard Of Review......................................................................1

II.     WWP Cannot Shoulder Its Heavy Burden To Show Irreparable Harm During The Pendency Of The Litigation If A Preliminary Injunction Is Not Issued. .............................2

        A.     Oil And Gas Leasing/Development. ......................................................................3

        B.     Coal/Gold/Phosphate Mining..................................................................................3

        C.     Off-Highway Vehicle Use. .....................................................................................4

        D.     Rights-of-Ways. ......................................................................................................5

        E.     Grazing....................................................................................................................6

        F.     Removal of GHMA..................................................................................................7

        G.     Removal of Sagebrush Focal Areas. .......................................................................8

        H.     Compensatory Mitigation. ......................................................................................9

III.    The Balance of Equities and Public Interest Disfavor WWP. ...........................................10

        A.     The equities of an injunction do not "tip sharply" toward WWP. .........................10

        B.     A preliminary injunction is not in the interest of Utahns......................................12

Conclusion ........................................................................................................................13

## Table of Authorities

**Page(s)**

### Cases

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................................................2

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ..............................................................................................10

*Herbert v. Jewell*,
   2:16-cv-101 (D. Utah filed Feb. 4, 2016) .............................................................................11

*Idaho Farm Bureau Fed. v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ................................................................................................10

*King v. Saddleback Junior College Dist.*,
   425 F.2d 426 (9th Cir. 1970) ..................................................................................................2

*Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Service*,
   No. 4:11-cv-212-CWD, 2011 WL 4015662 (D. Idaho Sept. 9, 2011) ....................................2

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................................................1

### Statutes

42 U.S.C. 4331(a) ...............................................................................................................10, 12

43 U.S.C. 1712(c)(9) ................................................................................................................11

54 U.S.C. § 306108 ....................................................................................................................4

Utah Code Ann. § 23-14-1(2)(a) (West 2019) .........................................................................12

Utah Code Ann. §§ 79-2-501, *et. seq.* (West 2019) ..................................................................9

Utah Admin. Code r. 634-3-2 .....................................................................................................9

Utah Admin. Code r. 634-3-3(26) ..............................................................................................9

### Other Authorities

43 C.F.R. § 2804.25(a)(4) ...........................................................................................................5

43 C.F.R. § 2804.29(a) ...............................................................................................................5

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
   2948 (3d ed. April 2019 update) .............................................................................................2

**Introduction**

Intervenors-Defendants Governor Gary Herbert, the State of Utah, and the Utah School and Institutional Trust Lands Administration (collectively, "Utah") oppose Plaintiffs' (collectively, "WWP") request for an injunction of the Federal Defendants' (collectively, "BLM") 2019 sage-grouse plan amendments during the pendency of this litigation.[1]  Utah is actively and successfully conserving its sage-grouse habitat and populations.  BLM's 2019 plan amendments both recognize and augment Utah's achievements and continuing efforts.  A preliminary injunction would unnecessarily disrupt this federal/state cooperation and would, until the defendants prevail on the merits of WWP's claims, harm the birds, their habitat, and the citizens of Utah in the interim.

The Court should deny the preliminary injunction motion because WWP is not likely to suffer irreparable harm in Utah during the pendency of the litigation and the balance of equities and public interest are in Utah's favor.  BLM amply refutes WWP's likelihood of success on the merits of its NEPA claims that underpin its preliminary injunction motion.  Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("BLM Br."), Dkt. 149, at 14-39.  Utah joins in those arguments.

**I.    Preliminary Injunction Standard Of Review.**

Both WWP and BLM ground their arguments in the familiar four-part test for a preliminary injunction enunciated by the Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  *See* Pls.' Opening Br. in Supp. of Mot. for Prelim. Inj. ("WWP Br."), Dkt. 124-1, at 18; BLM Br. at 13.

Post-*Winter*, the Ninth Circuit clarified this test such that WWP must now establish serious questions going to the merits, a balance of hardships that tips sharply in its favor, a

---

[1] This brief is filed pursuant to the Court's order, Dkt. 136.

likelihood of irreparable injury, and that the injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

A preliminary injunction is an "extraordinary and drastic remedy" to be awarded only upon a clear showing of entitlement.  *Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Service*, No. 4:11-cv-212-CWD, 2011 WL 4015662, at *6 (D. Idaho Sept. 9, 2011) (citation omitted).  Such is the burden that WWP carries to restore the discarded portions of the 2015 sage-grouse plans that were superseded in March of 2019 when BLM issued its Records of Decision ("ROD") and amended sage-grouse plan amendments in Utah and six other states.  *See*, *e.g.*, UT 1-182[2] ("2019 Plan").

A preliminary injunction may, if appropriate, restore the parties to the status quo ante during the adjudication of the merits of the case.  *King v. Saddleback Junior College Dist*., 425 F.2d 426, 427 (9th Cir. 1970), *cert. den.* 404 U.S. 979 (1971); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. April 2019 update).  Consequently, and due to the weakness of WWP's claims, any injunction would be short-lived and any ensuing benefit to WWP must be balanced against any harm to Utah that an injunction would occasion.

## II. WWP Cannot Shoulder Its Heavy Burden To Show Irreparable Harm During The Pendency Of The Litigation If A Preliminary Injunction Is Not Issued.

WWP can only meet its burden of persuasion establishing irreparable harm through a "clear showing" of "substantial proof."  *Native Ecosystems Council & Alliance for the Wild Rockies,* 2011 WL 4015662, at *7 (citation omitted).  The irreparable harm prerequisite is

---

[2] Utah adopts BLM's citation protocol for the Preliminary Administrative Record lodged with the Court, Dkt. 146.  To avoid redundancy (Dkt. 134), Utah focuses its argument on the BLM Utah ROD and FEIS while joining the arguments of BLM and the other intervenors regarding the other RODs.

"[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Id*. (citation omitted).

### A.     Oil And Gas Leasing/Development.

WWP merely speculates that BLM will authorize extensive oil and gas development, arguing that BLM is "expected to approve permits to drill and rights-of-way in the imminent future." WWP Br. at 16. However, WWP's argument and attached declarations lack any actual citation of new oil and gas developments approved or likely to be approved in the imminent future in Utah sage-grouse habitat as a result of the 2019 Plan. *See* WWP Br. at 16-17, 31.

Further, WWP's statement that "BLM is also continuing to aggressively offer oil and gas leases in sage-grouse habitats in . . . Utah" does not establish any harm resulting from the 2019 Plans. WWP Br. at 17. As BLM notes, merely offering up a parcel for lease neither authorizes ground disturbing activity nor equates to irreparable harm since the lease does not authorize any permanent disturbance to habitat. BLM Br. at 42. WWP has failed to allege the likelihood of any actual or imminent irreparable harm resulting from oil and gas leasing and development in Utah as a result of the 2019 Plan.

### B.     Coal/Gold/Phosphate Mining.

WWP also failed to allege any concrete irreparable harm relating to mining of coal, gold, or phosphate in Utah as a result of the 2019 Plan. WWP argues that "BLM is expected to approve new coal leases and gold and phosphate mining projects in . . . Utah." WWP Br. at 17. However, a close review of the declarations of Mr. Saul and Ms. Anderson relied upon by WWP to establish irreparable harm fail to point to any specific mining project in Utah in sage-grouse habitat that is causing or will cause irreparable harm. *See* Saul Decl., Dkt. 124-16, ¶¶ 27–28; Anderson Decl., Dkt. 124-2, ¶¶ 53-59. WWP's speculative laundry list of some "future harm"

and the lack of any allegations identifying the likelihood of concrete injury from mining in Utah should result in this Court dismissing WWP's motion.

      C.      **Off-Highway Vehicle ("OHV") Use.**

WWP incorrectly alleges that BLM will irreparably harm sage-grouse habitat by opening up 14,000 acres of Little Sahara and Five Mile Pass to cross-country travel. WWP Br. at 17; Anderson Decl., Dkt. 124-2, ¶¶ 45-49. WWP's argument fails for the following reasons.

First, WWP would have the Court ignore BLM's analysis that there is no sage-grouse habitat in this area because it was open to cross-country travel for over twenty-five years prior to the 2015 plan. UT 353, 382. The 2015 designation to limit travel was not intended to conserve sage-grouse but was only a result of the broad-scale, statewide mapping exercise that erroneously pulled in small portions of Little Sahara and Five-Mile Pass recreation areas while the remaining portions of those areas are still designated as open to cross-country travel. *Id*.

Second, WWP neglects to note that the area in question is actually designated as "limited" in the 2019 Plan until, at some future date, BLM completes the National Historic Preservation Act Section 106[3] OHV area designation process that includes: (1) identifying areas of potential effect; (2) conducting an identification process for artifacts; (3) making a finding of effects; and, if necessary, (4) developing an historic properties treatment plan. UT 109-10. Until that process is complete, the area will remain closed to OHV use. Whenever, at some future date, the Section 106 process is completed, the applicable portions of the areas identified by WWP as being open may revert to being open to cross-country use, consistent with prior OHV allocations. *Id.* at 110. Because of the extensive timeline to complete the necessary Section 106 review, off-road travel in the Sheeprocks area is not an imminent harm to WWP. *See* Bahr Decl., Dkt. 149-3, ¶ 5.

---

[3] 54 U.S.C. § 306108.

Further, even if cross-country travel is eventually permitted following the Section 106 process, the action of opening up approximately 14,000 acres to OHV travel will not cause irreparable harm to sage-grouse. *Id.* As BLM noted in its NEPA analysis, the area in question does not contain any actual, occupied sage-grouse habitat. UT 382. The best available data, including a review of GPS tracking data for sage-grouse in the Sheeprocks area, indicates that none of the collared birds use or rely upon the areas proposed to be made available to cross-country use again. *Id.*

    **D.**    **Rights-of-Ways ("ROW").**

Though WWP alleges that 380 pending right-of-way (ROW) applications are on file with BLM Utah, there is, once again, no evidence of on-the-ground irreparable harm. *See* WWP Br. at 18, 32. A ROW application, similar to a lease, is insufficient to cause harm to WWP. While BLM processes a ROW application, the applicant has no more right to use BLM land than does any member of the public. 43 C.F.R. § 2804.29(a). In analyzing the effect of the 2019 Plan on ROWs, BLM stated, "no additional impacts from those described in the Draft EIS and 2015 Final EIS are expected." UT 513. Beyond noting the number of pending ROW applications in Utah, WWP has not identified how any particular ROW applications likely harm WWP or sage-grouse habitat. Actions approving any ROWs would require separate NEPA analysis. 43 C.F.R. § 2804.25(a)(4). When authorizing ROWs that could impact sage-grouse, BLM will include site-specific considerations to protect sage-grouse as required by law. *Id.* at §§ 2801.9, 2805.12.

Even if WWP pointed to a specific ROW application that was being approved after the 2019 Plan, they would not be able to show irreparable harm. As noted by BLM in analyzing the impacts of the 2015 plans,[4] BLM found "the increased protections from the 2015 Final EIS have

---

[4] References to the 2015 plan refer to the *Utah Greater Sage-Grouse Approved Resource Management Plan*, BLM, September 2015 (available at https://eplanning.blm.gov/epl-front-office/projects/lup/103346/143744/177014/Utah_ARMPA.pdf).

UTAH'S MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION- 5

not resulted in a large decrease in ROW applications or an increase in rejected applications; therefore, the changes proposed under the Proposed Plan Amendment are not expected to result in large changes to the rate of development across the range, or in its economy." UT 404.  In the 2019 Plan, little has changed in permitting ROWs in priority sage-grouse habitat in Utah.  *See*, *e.g.*, UT 101-06.  Once again, WWP's generalized, speculative allegations do not satisfy WWP's burden to establish the likelihood of irreparable harm.

### E. Grazing.

As pointed out in BLM's brief, the updates to the grazing section in the 2019 Plan will not result in imminent or irreparable harm to WWP.  BLM Br. at 48-49.  In Utah, the modifications to grazing actions focused not on grazing in general, but on the actual threat to sage-grouse resulting from improper livestock grazing, which is a focus of the State's management and strategies.  UT 280.

The 2019 Plan did not eliminate BLM's duty to impose terms and conditions in allotment plans or grazing permits in Utah.  Instead, BLM will focus its efforts on eliminating *improper* grazing.  The 2019 Plan clearly states that, in Utah, BLM is to implement changes in grazing management through grazing authorization modifications, or allotment management plan implementation whenever improper grazing is causing an allotment to not meet rangeland health standards as prescribed by the applicable Resource Management Plan ("RMP") and BLM's grazing regulations.  *See* UT 82.  Thus, BLM will continue to implement practices to eliminate impacts from improper grazing not only to sage-grouse but to the range generally.

Additionally, BLM found that, generally, the existing conditions of livestock grazing in Utah remain the same as described in the 2015 Final EIS.  UT 352.  Since there has been no change in existing conditions from pre-2015, WWP cannot credibly argue that sudden and irreparable damage to sage-grouse habitat will occur during this litigation due to the 2019 Plan.

Finally, WWP is complaining that BLM has "walk[ed] back" from conformance with the 7-inch grass height objective and is causing harm by "adjust[ing]" habitat objectives through plan maintenance without any public involvement. WWP Br. at 15. However, this is not true in Utah. In the 2015 plan, BLM Utah did not prescribe a 7-inch grass height. *See* UT 301. Instead, the 2015 plan sought to "provide overhead and lateral concealment from predators." *Id*. The 2019 Plan continues to identify a strategy to provide overhead and lateral concealment from predators and specific grass heights will be based on the grass measurements consistent with watershed assessments. *Id*.

### F.     Removal of GHMA.

The removal of General Habitat Management Areas ("GHMA") from the 2019 Plan is not likely to cause irreparable harm to WWP. *See* WWP Br. at 13. Unlike states where GHMA makes up a substantial portion of habitat, the removal of GHMA in Utah allows BLM to prioritize management of Priority Habitat Management Areas ("PHMA") that conserves nearly 96% of sage-grouse in the State. UT 381. GHMA in Utah contains 1/4 of one percent of sage-grouse populations rangewide. *Id.*

BLM is maintaining management strategies to continue to carry forward its main goal of maintaining and increasing sage-grouse abundance. UT 30. BLM has included management provisions to improve and restore historical sage-grouse habitat outside of PHMA to support populations and to maintain or enhance connectivity. UT 41. Similarly, outside of PHMA, BLM will implement sage-grouse management actions included in the RMPs and project-specific mitigation measures for activities that may impact sage-grouse. *See* UT 61. Finally, outside of PHMA, BLM will avoid removal of sagebrush and minimize development that creates a physical barrier to sage-grouse movement. *Id*. at 62-63.

BLM will continue to mitigate impacts to sage-grouse in areas formerly known as GHMAs and continue to allow for connectivity. WWP cannot show that the removal of GHMA is likely to irreparably harm it during this litigation.

### G. Removal of Sagebrush Focal Areas ("SFA").

BLM's decision to remove 181,100 acres of BLM surface estate and 52,200 acres of split federal estate lands, known as SFAs, and manage those lands as PHMA will not irreparably harm WWP. *See* UT 48. First, by operation of law, the two-year mineral withdrawal on 10 million acres of SFAs westwide expired on September 24, 2017. RANGEWIDE 322. In Utah, BLM actually found that no development from foreseeable mining would occur in SFAs over the proposed 20-year withdrawal period, with or without the SFA designation. RANGEWIDE 431. Therefore, the cancellation of the SFA designation will not harm sage-grouse since the crux of SFA designation was to limit mining.

Further, SFAs in Utah are still protected by PHMA status. *See* UT 13. Fluid mineral leasing will continue to be subject to no-surface-occupancy stipulations with narrow exceptions that could potentially allow for development in *non*-habitat if sage-grouse habitat connectivity is not disturbed. UT 89-90. As already mentioned, BLM will continue to manage grazing in PHMA lands formerly labeled as SFAs through management of grazing authorization modifications or allotment management plan implementation whenever improper grazing is causing an allotment to not meet rangeland health standards as prescribed by the local RMP and BLM's grazing regulations. *See* UT 82-83. Thus, the renaming of SFAs to PHMA will not cause irreparable harm to WWP since BLM will continue to protect and enhance sage-grouse habitat in PHMA.

### H. Compensatory Mitigation.

WWP suggests that it will be harmed if BLM's new approach to compensatory mitigation is not enjoined. WWP Br. at 11-12. Utah has worked since 2015 to develop strategies to provide for compensatory mitigation when actions impacting sage-grouse habitat cannot be avoided or minimized. To align mitigation strategies between BLM and the State, the 2019 Plan notes that BLM will continue to "'minimize or eliminate threats affecting the status of [Greater Sage-Grouse] or to improve the condition of [Greater Sage-Grouse] habitat' across the planning area." UT 17. The State of Utah's Compensatory Mitigation Program (Program) was established by the Utah Legislature under Utah Code Ann. §§ 79-2-501, *et. seq.* (West 2019), and formalized through Utah Admin. Code r. 634-3, *et. seq.* (2019). The intent of the Program is to offset the impacts of permanent disturbance to sage-grouse habitat in Utah. Utah Admin. Code r. 634-3-2.

The State recommends that for every one acre of sage-grouse habitat permanently disturbed on any land, regardless of ownership, four acres of restored or preserved habitat should be provided to offset disturbance. *Id.* at 634-3-3(26). Before authorizing third-party actions that result in habitat loss and degradation in PHMA, BLM has committed, among other things, to: (1) notify Utah to determine if the State requires or recommends any additional mitigation— including compensatory mitigation—under State regulations, policies, or programs related to the conservation of sage-grouse; (2) consider the State's recommendations; and (3) ensure mitigation outcomes are consistent with the State of Utah's mitigation strategy and principles outlined in the State's Conservation Plan for Greater Sage-Grouse. UT 49-50.

On each element of the 2019 Plan, WWP lacks the "substantial proof" needed to make a "clear showing" that it is likely to suffer irreparable harm during the pendency of this litigation in the absence of an injunction.

**III.     The Balance of Equities and Public Interest Disfavor WWP.**

When a governmental entity is a party, the balance of equities and public interest analyses merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), *cert. den.* 573 U.S. 947 (2014); Def. Br. at 49.

**A.     The equities of an injunction do not "tip[] sharply" toward WWP.**

Congress declared in NEPA that the Federal government's policy is to cooperate with States "to foster and promote the general welfare and to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a).

Significant expenditure of BLM and Utah's time, talent, and treasury tips the balance away from WWP. *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995); BLM Br. at 49. Here, BLM's proposed RMP amendments for Utah alone and accompanying Final EIS cost BLM approximately $348,000 to develop and produce. UT 249. That amount does not include the subsequent cost of the ROD and final approved RMP amendments. Utah has spent an average of over $300,000 a year to manage state and federal sage-grouse plan development and implementation. Clarke Decl., Dkt. 129-2, ¶ 8. Further, Governor Herbert has personally expended countless hours and resources to develop the comprehensive statewide sage-grouse conservation plan. *Id*. To continue to implement the statewide conservation strategy, the State has, and will continue to, direct that an annual average of $7.6 million be spent on sage-grouse habitat restoration projects throughout the State. *Id.* ¶ 7.

BLM's goals and objectives for managing sage-grouse habitat in Utah have not substantially changed since 2015. *See* UT 30-41. The main goal of the 2015 plan was, and still is, to "maintain and/or increase [sage-grouse] abundance and distribution by conserving, enhancing or restoring the sagebrush ecosystem upon which populations depend in collaboration

with other conservation partners." UT 30.  The main objectives for reaching this goal have seen little change from 2015 to 2019, with the majority of changes being adoption of local habitat objectives.  *See* UT 30-41.

Although the goals and objectives have largely stayed the same, WWP is asking this Court to now enjoin the implementation of conservation plans that are the result of cooperative federalism between the states and BLM.  A preliminary injunction would undo Utah's and BLM's significant efforts to manage sage-grouse habitat in Utah in recognition of the uniqueness of that habitat.  The 2019 Plan recognizes Utah's unique, "naturally fragmented" habitat characterized by mountains, broad valleys, and deep canyons creating a patchwork of intact blocks and disconnected islands of habitat.  UT 176-77.  The 2019 Plan respects that natural reality.

Governor Herbert, through his Public Lands Policy Coordinating Office, protested BLM's lack of sensitivity to that uniqueness displayed in the 2015 plan.[5]  Additionally, he filed with BLM a 61-page Consistency Review on July 29, 2015 pursuant to 43 U.S.C. 1712(c)(9).[6] When BLM ignored his protests in its September 15, 2015 Protest Resolution Report, Utah took BLM to federal court.  *Herbert v. Jewell*, 2:16-cv-101 (D. Utah filed Feb. 4, 2016).  Utah has since agreed to stay its lawsuit in light of BLM's willingness to partially align its 2015 plan with the State's substantial efforts.  *See, e.g.*, *id.* (Eighth Joint Status Rep., Dkt. 140, ¶¶ 3, 5, filed June 10, 2019).  The court granted the stay.  *Id.*, Dkt. 142 (June 11, 2019).

---

[5] Letter from Kathleen Clarke, Director, Public Lands Policy Coordinating Office, to BLM Director (June 29, 2015) (available in the Administrative Record lodged in *Herbert v. Jewell*, 2:16-cv-101 (D. Utah), at UT 4005-4035).

[6] Letter from Governor Gary Herbert to Jenna Whitlock, Acting BLM State Director, and Nora Rasure, Regional Forester (July 29, 2015) (available in the Administrative Record lodged in *Herbert v. Jewell*, 2:16-cv-101 (D. Utah), at 4355-4417).

BLM responded by more closely aligning its RMPs with the State's conservation science and plans.  UT  1109-11 (BLM developed the 2019 Plan "to improve alignment with State management strategies and plans" . . . "in collaboration with Utah Governor Gary Herbert, State wildlife managers, and other[s].").  The 2019 Plan amends fourteen RMPs throughout Utah, enhancing cooperation with the State, incorporating the best available science, and aligning with the State's conservation plan.  Bahr Decl., Dkt. 149-3, ¶ 4.

Finally, the balance of harms cannot tip sharply in WWP's favor because a temporary injunction would not remedy WWP's concerns.  Here, the status quo ante restored by a temporary injunction would return BLM to its management of sage-grouse habitat under the 2015 plan that WWP also challenges through its original complaint (Dkt. 1).  Thus, WWP's perceived harms will not be resolved, only mollified, placing at most a light thumb on the scale in WWP's direction.  Stated differently, WWP's initial and supplemental complaints belie the notion that it wants to return to the status quo ante that a preliminary injunction would effectuate.

      **B.**      **A preliminary injunction is not in the interest of Utahns.**

NEPA fosters federal and state cooperation in creating and maintaining sage-grouse habitat in which "man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations . . . ." 42 U.S.C. 4331(a).[7]

As the trustee and custodian of all wildlife within the State, including sage-grouse, Utah asks this Court to protect the public interest by allowing BLM the discretion to prioritize its management of sage-grouse habitat in Utah and to work closely with the State in a coordinated manner to conserve sage-grouse, as required by State law.  *See* Utah Code Ann. § 23-14-1(2)(a) (West 2019).

---

[7] *See* BLM Br. at 22.

WWP suggests that BLM has simply capitulated to the State's desire to exploit sage-grouse habitat. WWP Br. at 8. This portrayal misrepresents the reality of cooperation between the federal and state agencies. BLM and Utah have not only prioritized their joint focus on conserving sage-grouse in PHMA, but efforts have been taken to bring the plans closer together in other respects. For example, the State of Utah has modified the habitat disturbance cap in its plan from 5% cap above the 2013 baseline level to only 3% to more closely align with BLM's 2019 Plan. UT 19.

It is in the interest of Utahns to protect the enhanced alignment, cooperation, and coordination between the State's conservation plan and BLM's land use plans. *See* UT 16. Harmonizing the conservation efforts will continue to "improve the BLM's and the State's ability to marshal resources to conserve, enhance, and restore Greater Sage-Grouse habitat in an efficient and coordinated manner." *Id*. The 2019 Plan was written to align BLM's management priorities with the State's conservation priorities to protect and conserve over 95% of the species throughout the State. *Id.*

## Conclusion

A preliminary injunction would disrupt Utah's day-to-day cooperation with BLM to conserve over 95% of its sage-grouse population—an enormous federal/state effort years in the making at great public expense. WWP is not likely to suffer irreparable harm if the preliminary injunction is denied. For the foregoing reasons, WWP cannot meet every element of the test for a preliminary injunction and its motion should be denied.

Respectfully submitted this 14th day of June, 2019.

    Respectfully submitted,

    HOLLAND & HART LLP

    By: /s/ William G. Myers III

    *Counsel for Intervenor-Defendant*
    *Governor Gary R. Herbert*

    PARSONS BEHLE & LATIMER

    By: /s/ Robert S. Hughes

    *Counsel for Intervenors-Defendants*
    *State of Utah and State of Utah School and*
    *Institutional Trust Lands Administration*

**Certificate of Service**

      I HEREBY CERTIFY that on the 14th day of June, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Laurence J. Lucas
llucas@advocateswest.org
Sarah Stellberg
sstellberg@advocateswest.org
Todd C. Tucci
ttucci@advocateswest.org
*Counsel for Plaintiffs*

Luther L. Hajek
luke.hajek@usdoj.gov
Barclay T. Samford
clay.samford@usdoj.gov
Christine Gealy England
christine.england@usdoj.gov
*Counsel for Federal Defendants*

Bret A. Sumner
bsumner@bwenergylaw.com
Malinda Morain
mmorain@bwenergylaw.com
Paul A. Turcke
pat@msbtlaw.com
Cherese De'Dominiq McLain
cdm@msbtlaw.com
*Counsel for Intervenor Defendant Western Energy Alliance*

David C. McDonald
dmcdonald@mslegal.org
John L. Runft
jrunft@runftsteele.com
*Counsel for Intervenors Defendants Wyoming Stockgrowers Association and Petroleum Association of Wyoming*

Andrew J. Pieper
andrew.pieper@stoel.com
Beth S. Ginsberg
bsginsberg@stoel.com
Kevin J. Beaton
kjbeaton@stoel.com
Jason T. Morgan
jason.morgan@stoel.com
*Counsel for Intervenors Defendants Idaho Power Company and Pacificorp*

Caroline Lobdell
clobdell@wrlegal.org
Candice M. McHugh
cmchugh@mchughbromley.com
Christopher Michael Bromley
cbromley@mchughbromley.com
*Counsel for Intervenors Defendants National Cattlemen's Beef Association and Public Lands Council*

Erik Peterson
erik.petersen@wyo.gov
*Counsel for Intervenor-Defendant State of Wyoming*

                                      /s/ William G. Myers III
                                      for HOLLAND & HART LLP

13090782_1

UTAH'S MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION- 15