Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

WESTERN WATERSHEDS PROJECT,
WILDEARTH GUARDIANS, CENTER
FOR BIOLOGICAL DIVERSITY, and
PRAIRIE HILLS AUDUBON SOCIETY,

     *Plaintiffs*,

     v.

DAVID BERNHARDT, Secretary of
Interior; JOSEPH R. BALASH,* Assistant
Secretary of Interior; BUREAU OF LAND
MANAGEMENT; and U.S. FOREST
SERVICE,

     *Defendants*.

Case No. 1:16-cv-00083-BLW

**PLAINTIFFS' REPLY TO FEDERAL
DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

*\* Official Defendant automatically substituted
per Fed. R. Civ. P. 25(d)*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

I.     PLAINTIFFS' EXPERT DECLARATIONS ARE PROPER ........................................... 1

II.    FEDERAL DEFENDANTS PROVIDE A MISLEADING AND INCOMPLETE ACCOUNT OF THE 2019 SAGE-GROUSE PLAN AMENDMENTS .......................... 3

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR NEPA CLAIMS ................... 6

      A.    BLM Failed to Analyze a Reasonable Range of Alternatives .......................... 7

            1.    BLM Formulated an Impermissibly Narrow Purpose and Need ...... 7

            2.    BLM Refused to Consider Alternatives Other Than Its Proposed Action ............................................................................... 9

            3.    BLM Unreasonably Rejected Viable Alternatives from Commenters ................................................................................... 11

      B.    BLM Failed to Take a "Hard Look" at Adverse Impacts on Sage-Grouse ..... 11

            1.    BLM Misrepresented the 2019 Plan Amendments ......................... 12

            2.    BLM Failed to Evaluate Baseline Condition Changes Affecting Sage-Grouse .................................................................... 16

            3.    BLM Insufficiently Analyzed Cumulative Impacts ........................ 17

      C.    BLM Failed to Prepare a Supplemental EIS to Address the Removal of Mandatory Compensatory Mitigation ........................................................... 19

IV.   INJUNCTIVE RELIEF IS NEEDED TO AVOID IRREPARABLE HARM ................ 21

      A.    Imminent, Species-Level Harm to Sage-Grouse Is Not Required ................. 22

      B.    Subsequent Public Processes During Site-Specific Implementation Will Provide No Relief ........................................................................................ 23

      C.    Irreparable Harm is Imminent During the Pendency of this Case ................. 23

      D.    Elimination of the Grazing Restriction in Oregon's RNAs ........................... 24

V.    BALANCE OF HARDSHIPS AND PUBLIC INTEREST ........................................... 24

VI.   THE PLANS MUST BE ENJOINED IN THEIR ENTIRETY ...................................... 25

CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Alaska v. Andrus*,
    580 F.2d 465 (D.C. Cir. 1978) ......................................................................... 16

*Asarco, Inc. v. U.S. Environmental Protection Agency*,
    616 F.2d 1153 (9th Cir. 1980) ........................................................................... 2

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ............................................................... 9, 21, 23

*Center for Biological Diversity v. Bureau of Land Management*,
    698 F.3d 1101 (9th Cir. 2012) ........................................................................... 2

*Clapper v. Amnesty International*,
    568 U.S. 398, 401 (2013)................................................................................. 24

*Dubois v. U.S. Department of Agriculture*,
    102 F.3d 1273 (1st Cir. 1996) ......................................................................... 21

*Friends of the Bow v. Thompson*,
    124 F.3d 1210 (10th Cir. 1997) ....................................................................... 20

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ........................................................................... 9

*Idaho Watersheds Project v. Hahn*,
    307 F.3d 815 (9th Cir. 2002) ............................................................................. 3

*Kern v. Bureau of Land Management*,
    284 F.3d 1062 (9th Cir. 2002) ......................................................................... 19

*Klamath Siskiyou Wildlands Center v. Bureau of Land Management*,
    No. 1:17-CV-00997-CL, 2019 WL 1553673 (D. Or. Feb. 20, 2019) .............................. 8

*Klamath–Siskiyou Wildlands Center v. Bureau of Land Management*,
    387 F.3d 989 (9th Cir. 2004) ........................................................................... 19

*League of Wilderness Defenders. v. Connaughton*,
    No. 3:12-CV-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) ............................. 19

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999) ............................................................................. 9

*National Audubon Society v. U.S. Forest Service,*
    46 F.3d 1437 (9th Cir. 1993) ................................................................. 2

*National Parks Conservation Association v. Bureau of Land Management,*
    606 F.3d 1058 (9th Cir. 2010) ................................................................7

*Natural Resources Defense Council v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) ............................................................ 16

*Natural Resources Defense Council v. U.S. Forest Service,*
    421 F.3d 797 (9th Cir. 2005) ............................................................... 10

*North Buckhead Civic Association v. Skinner,*
    903 F.2d 1533 (11th Cir. 1990) .......................................................... 11

*Northern Plains Research Council v. Surface Transportation Board,*
    668 F.3d 1067 (9th Cir. 2011) ...................................................... 16, 17

*Northwest Ecosystem Alliance v. Rey,*
    380 F. Supp. 2d 1175 (W.D. Wash. 2005).............................................. 8

*Oregon Natural Desert Association v. Bureau of Land Management,*
    625 F.3d 1092 (9th Cir. 2008) ............................................................... 9

*Oregon Natural Research Council Action v. U.S. Forest Service,*
    445 F. Supp. 2d 1211 (D. Or. 2006) .................................................... 10

*Oregon Natural Resources Council Fund v. Brong,*
    492 F.3d 1120 (9th Cir. 2007) ............................................................. 18

*Pacific Coast Federation of Fisherman's Associations v. Blank,*
    693 F.3d 1084 (9th Cir. 2012) ............................................................. 19

*Russell Country Sportsmen v. U.S. Forest Service,*
    668 F.3d 1037 (9th Cir. 2011) ............................................................. 20

*Sierra Forest Legacy v. Rey,*
    577 F.3d 1015 (9th Cir. 2009) ............................................................. 10

*Sierra Forest Legacy v. Sherman,*
    646 F.3d 1161 (9th Cir. 2011) ........................................................ 3, 10

*W. Watersheds Project v. Rosenkrance,*
    No. 4:09-CV-298-EJL, 2011 WL 39651, at *11 (D. Idaho Jan. 5, 2011) ...................... 16

*Western Watersheds Project v. Abbey,*
    719 F.3d 1035 (9th Cir. 2013) ............................................................. 10

*Westlands Water Dist. v. U.S. Department of Interior*,
  376 F.3d 853 (9th Cir. 2004) ....................................................................... 7, 20

*Western Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2010) ........................................................... 1, 15, 16, 23

*Winter v. Natural Resources Defense Council*,
  555 U.S. 7 (2008) ................................................................................................ 22

**Statutes**

43 U.S.C. § 1701(7)-(8) ............................................................................................ 9

43 U.S.C. § 1712(c)(1) ............................................................................................. 8

43 U.S.C. § 1732(a) ................................................................................................ 22

**Regulations**

40 C.F.R. § 1502.9(c)(i) ..................................................................................... 19, 20

40 C.F.R. § 1502.14 .................................................................................................. 7

40 C.F.R. § 1508.7 .................................................................................................. 17

40 C.F.R. § 1508.25(a) ...................................................................................... 17, 18

43 C.F.R. § 1610.3-2 ................................................................................................ 9

43 C.F.R. § 1610.4-5 ............................................................................................. 7, 9

43 C.F.R. § 1610.5-3(a) .......................................................................................... 22

**Other Authorities**

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act
Regulations, 46 Fed. Reg. 18,026 (March 23, 1981) .................................................. 16

Notice of Availability of the Draft Greater Sage-grouse Proposed Land Management Plan
Amendments and Draft Environmental Impact Statement for the Intermountain and Rocky
Mountain Regions, 80 Fed. Reg. 50,331 (Oct. 5, 2018) .............................................. 19

12-Month Finding on a Petition to List Greater Sage-Grouse (Centrocercus urophasianus) as an
Endangered or Threatened Species, 80 Fed. Reg. 59,858 (Oct. 2, 2015) ..................... 13, 20

BLM Handbook H-1790 – National Environmental Policy Act (2008) ......................... 8

BLM Manual 6840 – Special Status Species Policy (2008) ........................................ 8

## INTRODUCTION

Federal Defendants' injunction opposition, ECF No. 149, repeats misrepresentations and omissions made in BLM's 2019 Plan Amendments to argue the Court should deny injunctive relief.  Such tactics do not refute Plaintiffs' showing that the 2019 Plans flout sage-grouse science and weaken land management protections, threatening irreparable harm to sage-grouse populations and habitats. As explained below, Defendants' arguments seeking to excuse BLM's NEPA violations fail under well-established caselaw, including *Western Watersheds Project v. Kraayenbrink,* 632 F.3d 472 (9th Cir. 2010). Because BLM refused to consider any reasonable alternatives, relied on inaccurate and one-sided analysis of its pre-ordained path, and never took a range-wide look at the cumulative effects of the weakened plans, Plaintiffs are likely to prevail on their NEPA claims, warranting injunctive relief.

Even though the 2019 Amendments are in effect, Defendants claim any harm from them is so distant that no injunction is needed. But since March, BLM has approved oil and gas drilling, rights-of-way, grazing, and other actions in sage-grouse habitat under the weaker 2019 Plans. Additional ground-disturbing actions are imminent, threatening irreparable harm to sage-grouse and to Plaintiffs' members and the public. An injunction is thus vital to preserve the status quo ante by maintaining the 2015 Sage-Grouse Plans in effect while Plaintiffs' challenges to the 2019 BLM Plan Amendments are adjudicated.

## ARGUMENT

## I.   PLAINTIFFS' EXPERT DECLARATIONS ARE PROPER.

Federal Defendants do not even attempt to refute the declarations of Plaintiffs' experts Drs. Braun, Connelly, and Haak (ECF Nos. 124-3, 124-5, 124-7), which explain how the 2019 Amendments weaken sage-grouse protections contrary to science and threaten irreparable

population and habitat losses. Defendants argue instead the declarations are impermissible extra-record evidence that merely disagree with BLM. Def. Opp. at 21. That is flatly wrong.

First, the Court may properly consider Plaintiffs' expert declarations to determine whether BLM failed to consider important factors in its NEPA analysis. *See Ctr. for Biol. Diversity v. BLM*, 698 F.3d 1101, 1123 n. 14 (9th Cir. 2012). Considering extra-record evidence is warranted "where the plaintiff alleges 'that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug.'" *Nat'l Audubon Soc. v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir. 1993) (citation omitted); *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not").

Here, the expert declarations show that BLM's EISs failed to consider crucial factors, including sage-grouse connectivity, Braun Decl. ¶¶ 4, 24–25, 37; Haak Decl. ¶¶ 59, 64, 71; recent habitat loss and fragmentation, Haak Decl. ¶ 58; Braun Decl. ¶¶ 32, 45; Connelly Decl. ¶¶ 5, 56; and range-wide cumulative impacts, Braun Decl. ¶¶ 4, 46–47. They also establish that BLM "outright misrepresent[ed]" research and "largely ignore[d] recommendations made by numerous scientists and managers," including the COT and NTT Reports. Connelly Decl. ¶¶ 30, 39–42, 48. These are substantial omissions, not mere disagreement between experts—indeed, Defendants do not offer any scientific expert to refute Drs. Braun, Connelly, and Haak.

Second, Defendants ignore that such expert declarations are also appropriate to establish that irreparable harm will result if the 2019 Plan Amendments are not enjoined. *See Idaho*

*Watersheds Project v. Hahn*, 307 F.3d 815, 833–34 (9th Cir. 2002) (reviewing extra-record

declaration when considering injunction); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

422 F.3d 782, 797 (9th Cir. 2005) (affirming preliminary injunction based upon extra-record

expert declarations). When considering expert evidence on this prong, Defendants' employees

receive no deference for their opinions about whether an injunction should issue. *See Sierra*

*Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011).

## II.     FEDERAL DEFENDANTS PROVIDE A MISLEADING AND INCOMPLETE ACCOUNT OF THE 2019 SAGE-GROUSE PLAN AMENDMENTS.[1]

Appendix A to Plaintiffs' opening brief summarized how the 2019 BLM Plan

Amendments removed or weakened sage-grouse protections from the 2015 Plans. As with

Plaintiffs' expert declarations, Defendants do not even attempt to refute that summary. But

Defendants' brief offers misleading and inaccurate descriptions of the 2019 Plan Amendments,

*see* Def. Opp. at 7–12, that Plaintiffs must correct here, including the following:

***"New Science."*** Defendant's opening paragraph claims the 2019 Amendments were

based on "new science." The record shows otherwise. As part of the 2019 Amendment process,

BLM requested preparation of a USGS bibliography of new sage-grouse science (Carter et al.

2018) and a related synthesis (Hanser et al. 2018). *See* OR 128. However, with the exception of a

single vegetation objective, BLM never claimed that this new science supported weakening the

2015 Plans—a point EPA raised in its comments. *See* Anderson Decl., Ex. B at 41 (ECF No.

124-2). Plaintiffs' experts confirm that it does not. *See* Braun Decl. ¶ 18; Connelly Decl. ¶ 48.

***Lek buffers.*** Defendants claim the 2019 Amendments "continue to provide for buffers

around active leks" without disclosing what the plans jettison. Def. Opp. at 11. Defendants

---

[1] Citations with an asterisk in the state prefix (e.g., "ID*") are to the administrative records for
the 2015 Plan Amendments, which were lodged with this Court in 2017. ECF Nos. 87, 88.

ignore that the 2019 Plan Amendments reduced buffer distances in Idaho and Utah;[2] expanded when BLM may grant exceptions to lek buffers in Wyoming, Utah, and Idaho;[3] and eliminated other mandatory lek buffer requirements entirely, instead using them only as a tool for assessing impacts during the NEPA process in Colorado and Nevada/California.[4] Noise buffers were also eliminated or weakened in Idaho and Wyoming GHMA.[5]

Neither do the plans "require that departures [from lek buffers] not negatively impact the Sage-Grouse or its habitat," as Defendants claim (Def. Opp. at 11). The Wyoming plan eliminated this requirement and now gives BLM virtually unlimited discretion to grant such exceptions,[6] while the Idaho plan now permits departures where it is "impracticable" to relocate the project and impacts are avoided "to the extent reasonable[.]"[7] The Utah plan allows departures so long as they will not cause total lek extirpation,[8] and the Colorado plan no longer requires mandatory lek buffers at all.[9]

*Livestock Management*. Defendants misleadingly describe the changes to BLM grazing

---

[2] ID 433 (Appendix B – reducing lek buffers in IHMA and GHMA); UT 100 (MA-RE-1) (shortening 5-mile wind energy buffer to 3.1 miles).

[3] WY 409 (MD SSS 5, 6, and 9); UT 136 (Appendix B); UT 100 (MA-RE-1) (wind energy buffer now discretionary); ID 042 (exceptions added where: (1) "impracticable" to move project and impacts avoided "to the extent reasonable" or (2) impacts are minor and avoided "to the extent reasonable").

[4] CO 162 (MD SSS-2) (trading "BLM will apply the lek buffer[s]" for "BLM will evaluate the lek buffer distances during project-specific NEPA analyses"); NVCA 34 (MD SSS 3) (similar).

[5] *See* ID 45 (downgrading noise buffer to a seasonal restriction; making it a mere "best management practice" in GHMA by moving buffer from "Appendix B" to "Appendix C."

[6] WY 409 (MD SSS 5, 6, 9) (allowing exceptions "on a case-by-case basis").

[7] ID 042.

[8] *Compare* UT* 85622 (actions allowed within buffers "only if . . . a buffer-distance other than the distance identified above offers the same or greater level of protection to GRSG and its habitat"); *with* UT 135–36 ("The BLM may approve actions in PHMA within the applicable lek buffer-distance identified above if: . . . Other mitigation measures have been developed . . . [to] maintain lek persistence and the use of adjacent nesting habitat.").

[9] CO 162 (MD SSS-2) (replacing "BLM will apply the lek buffer-distances" with "BLM will evaluate the lek buffer distances during project-specific NEPA analyses").

management under the 2019 Amendments. The 2015 Plans directed BLM to prioritize SFAs and PHMAs for grazing permit reviews and Rangeland Health assessments, to quickly detect and improve harmful grazing management in sage-grouse habitats. Under the Idaho and Utah Amendments, priority instead will now be given only to allotments already found to not comply with Rangeland Health Standards. *See* UT 81–82 (MA LG 2, 4, 5); ID 428–29 (MD LG 15).

Defendants omit that most BLM allotments—and the majority of sage-grouse allotments—have not been evaluated under Rangeland Health Standards in the last decade to actually detect such issues. *See* Anderson Decl. ¶ 33. Moreover, the new plans no longer prioritize the completion of such assessments on sage-grouse parcels. Thus, under BLM's new approach, land health issues on sage-grouse allotments will be identified and addressed more slowly, if ever; yet Defendants entirely disregard this consequence. Their Bahr Declaration also falsely asserts that "before a grazing permit is renewed, BLM must perform a land health evaluation to determine if the lands are meeting the land health standards." Bahr Decl. ¶ 25 (ECF No. 149-3). As this Court has seen, BLM now routinely renews grazing permits without conducting land health evaluations or NEPA analysis under the FLPMA Section 402 amendments in the 2015 National Defense Appropriations Act (NDAA). *See W. Watersheds Project v. Zinke*, No. 4:08-cv-00435-BLW (ECF No. 296) (D. Id. 2018). BLM's EISs misleadingly omitted that key fact, just as its briefing does before this Court.

***Habitat Objectives.*** Changes to BLM's habitat objectives go well beyond mere "clarification" regarding local variation, as Defendants would have it. The Utah, Wyoming, and Idaho Amendments no longer require BLM to proactively incorporate sage-grouse habitat objectives into grazing permits.[10] Instead, the plans now require integration of these objectives

---

[10] UT 82–83 (MA LG 6); WY 420–41 (MD LG 4); ID 428 (MD LG 16).

only after: (1) a Rangeland Health assessment has been completed, (2) such assessment identifies grazing as the causal factor in not meeting habitat objectives, and (3) BLM performs full permit processing and NEPA review. *Id.* Given BLM's backlog in doing Rangeland Health assessments, and the fact that the 2015 NDAA now allows BLM to indefinitely postpone full permit processing when renewing grazing permits, this change makes it even more unlikely that BLM will ever modify harmful grazing to account for sage-grouse habitat needs.

   ***Disturbance and Density Caps.*** Defendants incorrectly assert that the 2019 Amendments for Nevada/California did not modify the density and disturbance caps. Def. Opp. at 10. In fact, they were weakened in Nevada through the new "Allocation Exception," which allows BLM to waive these caps based on any one of six broadly worded criteria, including promises to use compensatory mitigation to offset habitat impacts. NV/CA 36–37. Similarly, the Utah Amendment now allows exceedances of disturbance and density caps if the proponent will "improve" sage-grouse habitat through off-site mitigation. UT 56 (MA-SSS-3B). These changes thus give up guaranteed habitat protections under the 2015 Plans for uncertain future mitigation.

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR NEPA CLAIMS.

   Plaintiffs have amply demonstrated their likelihood of success on three distinct NEPA claims. The record shows that BLM donned blinders at the gate, refusing to consider any alternative more protective of sage-grouse than its preordained outcome. The agency then refused to candidly address adverse effects or scientific criticism of that lone alternative. The agency's cumulative effects analysis was also riddled with omissions and never evaluated cumulative impacts to greater sage-grouse across its range. Any one of these NEPA violations is sufficient to warrant injunctive relief.

A.       **BLM Failed to Analyze a Reasonable Range of Alternatives.**

NEPA and BLM's planning regulations require the agency to "develop several complete alternatives for detailed study" when developing or amending land-use plans. 43 C.F.R. § 1610.4-5. BLM considered only one. Defendants offer no adequate justification for this choice, nor have they shown that their single alternative "sharply defin[ed] the issues and provid[ed] a clear basis for choice among options," 40 C.F.R. § 1502.14, rendering the EISs invalid.

1.       <u>BLM Formulated an Impermissibly Narrow Purpose and Need</u>

While agencies enjoy "considerable discretion" to define an action's purpose and need, Defendants fail to recognize such discretion "is not unlimited." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). A purpose and need statement cannot "unreasonably narrow[] the agency's consideration of alternatives" or disregard statutory objectives. *NPCA v. BLM*, 606 F.3d 1058, 1071 (9th Cir. 2010). BLM fails on both counts here.

First, BLM unreasonably defined its purposes so narrowly that only a single alternative—its "Management Alignment Alternative"—would accomplish its stated goals. Every other alternative was rejected as imposing more constraints on development in conflict with SO 3353 and other federal policy, *see, e.g.*, ID 27 ("additional constraints on land uses or development without a documented need would not meet the purpose of SO 3353"), or as not having been requested by the states, *see, e.g.*, ID 589, 592. Even the "No Action" alternative was not seriously considered, as BLM found it also would not meet the stated purpose and need, and thus only included it in the EISs because that is required by 40 C.F.R. § 1502.14(d). Limiting its consideration of alternatives this way violated NEPA. *See Klamath Siskiyou Wildlands Ctr. v. BLM*, No. 1:17-CV-00997-CL, 2019 WL 1553673, at *5 (D. Or. Feb. 20, 2019) ("no action" cannot be the only alternative where it doesn't meet purpose and need).

Second, BLM's stated purpose and need failed to incorporate its FLPMA mandate to ensure land use plans are consistent with multiple use/sustained yield principles. 43 U.S.C. § 1712(c)(1). BLM's NEPA Handbook H-1790, at 37, identifies a "purpose and need" for land use plan revisions as "to ensure that public lands are managed according to the principles of multiple use identified in FLPMA while maintaining the valid existing rights and other obligations already established." BLM's Special Status Species Policy requires considering an additional objective to "minimize the likelihood of and need for listing of these species under the ESA." BLM Manual 6840 at .02(B), .04D2. BLM properly included both objectives in its purpose and need statement for the 2015 Plans but unlawfully refused to do so here.

Defendants cite *NW Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175 (W.D. Wash. 2005), to argue that where BLM's "aim is to improve a discrete aspect of existing plans, the agency may properly limit its purpose and need statement to that goal." Def. Opp. at 16. But while the agencies there pursued a narrow amendment to the Northwest Forest Plan, they still defined the purpose and need to include their statutory mandates "to continue providing for the diversity of plant and animal communities as required by NFMA" and conserving "species at risk of being listed under the [ESA]"). *Id.* at 1186–87. Thus, *Rey* confirms Plaintiffs' position that even narrow plan amendments must reflect—not defy—the agency's statutory mandates.

Defendants also assert that BLM's purpose and need statement implicitly considered sage-grouse conservation by seeking alignment with state "conservation plans." Def. Opp. at 16–17. But the states' desired changes were less protective of sage-grouse than BLM's 2015 Plans, even if nominally derived from "conservation" plans. Neither can BLM lawfully defer its FLPMA and special status species obligations to state counterparts. *Cf.* 43 C.F.R. § 1610.3-2 (requiring consistency with state plans only to the extent consistent with federal law). And of

course, BLM fails to explain why, if its objectives *did* include sage-grouse conservation, it rejected every more conservation-oriented alternative for failing to meet its purpose and need.

Neither is the unduly narrow purpose and need justified by Defendants' argument that FLPMA requires coordination with states. Def. Opp. at 17. Plaintiffs do not argue sage-grouse conservation was the *only* proper purpose of the 2019 Plan Amendments, just that it was a necessary one. FLPMA encourages state-federal cooperation, but that does not override its multiple use/sustained yield and other mandates, including to preserve "habitat for . . . wildlife" and "ecological" values of public land, 43 U.S.C. § 1701(7)–(8). BLM cannot ignore these FLPMA requirements by solely "coordinating" with states, as it has improperly done here.

    2.    <u>BLM Refused to Consider Alternatives Other Than Its Proposed Action.</u>

Defendants falsely represent that BLM "considered a wide range of alternatives." Def. Opp. at 18. In truth, BLM analyzed only the "Management Alignment" and "No Action" alternatives—and even "No Action" was not seriously considered. This was plainly inadequate "to permit a reasoned choice." *Calif. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). It also violates BLM's regulations, which require BLM to "develop several complete alternatives for detailed study" in land-use planning. 43 C.F.R. § 1610.4-5. The Ninth Circuit has repeatedly invalidated land use plan EISs that fail to consider varied management alternatives. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008); *ONDA v. BLM*, 625 F.3d 1092 (9th Cir. 2008); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999).

Defendants argue that BLM "considered" other alternatives presented during scoping but eliminated them from further consideration. Def. Opp. at 19. However, alternatives not considered in detail cannot be used to meet the agency's obligations to "rigorously explore" alternatives. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013).

Neither can Defendants legitimately claim that BLM "considered . . . all of the alternatives evaluated in detail during the 2015 Plan Amendment NEPA process." Def. Opp. at 18. BLM's EISs for the 2019 Amendments merely "incorporated by reference" the 2015 alternatives but also eliminated them from detailed study because they "were predicted to result in a loss of development opportunities." *See e.g.,* ID 831–33.[11]

Moreover, the Ninth Circuit has flatly rejected this "incorporation" approach under nearly identical circumstances. *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015 (9th Cir. 2009); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011). There, the Ninth Circuit addressed an EIS evaluating forest plan amendments by the Bush Administration that weakened special status species protections based on "new policy priorities." *Sherman*, 646 F.3d at 1171. The EIS included only "no-action" and "proposed action" alternatives but purported to "incorporate by reference" seven alternatives considered and rejected when the species protections were originally adopted in 2001. *See Rey,* 577 F.3d at 1021. The Ninth Circuit held this violated NEPA due to the "new objectives" of the 2004 amendments. *Id.*; *Sherman*, 646 F.3d at 1169. *See also Abbey*, 719 F.3d at 1052 (change in the legal landscape precluded incorporation of previously-analyzed alternatives); *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (alternatives analysis must account for changed circumstances); *ONRC Action Council v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1224–25 (D. Or. 2006) (similar).

These cases are controlling here. The starkly different objectives for the 2019 Amendments prevent BLM from "incorporating" its 2015 Plans' alternatives analysis. The legal landscape has also shifted, through Trump's Executive Orders promoting "energy dominance"

---

[11] BLM listed the 2015 alternatives in "Alternatives Considered but not Analyzed in Detail" and explained that they would not meet the purpose of SO 3353. *See e.g.,* ID 831–33.

and DOI's new legal position on compensatory mitigation; as have on-the-ground conditions, through wildfires, population declines, and other habitat threats. Thus, BLM's consideration of a range of alternatives in 2015 does not excuse its failure to do so now.

      3.    <u>BLM Unreasonably Rejected Viable Alternatives from Commenters.</u>

As noted in Plaintiffs' opening brief, the Wilderness Society and other commenters suggested numerous alternatives that advanced BLM's goal of aligning with state management plans while retaining or improving conservation measures in the 2015 plans.[12] BLM rejected them all, asserting they "failed to meet the purpose and need of the RMPA because they did not comply with Secretarial Order 3353 and the purpose and need for the proposed Plan Amendment, and therefore constitute unreasonable alternatives." *See, e.g.*, ID 131–32. The Court should reject this rationale, because agencies must analyze alternatives that "would only partly meet the goals of the project" if they "have a less severe environmental impact than the preferred alternative." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990). Moreover, BLM's dismissal of these alternatives only confirms the flaw in its purpose and need statement: that it foreclosed any true "alternatives" analysis at all, in violation of NEPA.

     **B.**     **BLM Failed to Take a "Hard Look" at Adverse Impacts on Sage-Grouse.**

Defendants mount virtually no defense of the quality of BLM's NEPA analysis, instead arguing the merits of the plan changes—a point irrelevant to Plaintiffs' NEPA claims—while failing to discuss, much less defend, BLM's *analysis* of each change. *See* Def. Opp. at 23–26. This failure to engage with the FEISs is unsurprising, given how grossly deficient they are.

---

[12] BLM's comment responses summarized some but not all of these requests. *See, e.g.*, ID 616 ("An alternative should reflect the standards of the conservation checklist"); ID 616 ("An alternative should reflect NSO prescriptions for all [GRSG] habitat"); ID 589 ("'hard' and 'soft' triggers . . . should be maintained"); ID 592 ("Existing disturbance caps should be maintained").

Because BLM failed to take the required NEPA "hard look" at direct, indirect, and cumulative impacts of its 2019 Plan Amendments, injunctive relief is warranted.

1.    <u>BLM Misrepresented the Nature and Effect of the 2019 Plan Amendments.</u>

BLM's "hard look" violations begin with its misrepresentations about its plan changes. Significant amendments for which the Court will find no analysis in the FEISs include:

- Adding discretionary waivers and modifications to Wyoming's lek buffers. WY 409 (MD SSS 5 and MD SSS 6).
- Eliminating Wyoming's "Required Design Features" in GHMA and replacing prior language that RDFs "are required" with "can be applied." WY 458.
- Downgrading Idaho's noise buffer from a year-round to a seasonal restriction. *Compare* ID 775–76 *with* ID 41– 42, 47.
- Exempting from lek buffers Idaho vegetation treatments "designed to improve or protect GRSG habitat." ID 423 (MD SSS 35).
- Replacing Colorado's requirement that BLM must "apply" lek buffers with weaker direction to utilize lek buffer distances as "the evaluation area around leks" in NEPA reviews. CO 162 (MD SSS-2).
- Expanding circumstances in which Nevada/California's seasonal timing restriction can be waived. NVCA 31–33 (MD SSS 2, 3).
- Eliminating numerous management restrictions for Utah grazing allotments in sage-grouse habitat. UT 325–28 (MA LG 1–18).
- Delaying adaptive management responses in Utah. UT 316–19 (MA SSS 7).
- Eliminating provision that Utah PHMA is "unsuitable" for new coal leasing. UT 330 (MA MR 18).

BLM also purported to "analyze" various plan changes by tiering to the 2015 FEISs, but these only addressed the cumulative effects of each complete alternative, not individual plan components in isolation. EPA raised similar concerns with this approach, as it avoided any comprehensive effects analysis. *See* Anderson Decl., App B at 37–38.

Where BLM did evaluate particular plan changes, it presented a conclusory, one-sided analysis that failed to evaluate the toll of amendments that decrease certainty of habitat protection, adopt less prescriptive management direction, and result in slower management response times. BLM's treatment of compensatory mitigation—an overarching component of all the 2015 Plans—is illustrative. BLM deemed the elimination of federally-mandated

compensatory mitigation at a net gain standard to be a mere "clarification" with "nominal" effect.[13] In truth, it removed a key regulatory mechanism FWS cited as justifying its 2015 ESA "not warranted" finding for sage-grouse, because of the "additional certainty" it would provide.[14]

BLM asserted that vegetation treatments will offset the loss of federally-mandated compensatory mitigation, without acknowledging the past failures of such treatments or studies concluding that sage-grouse "did not benefit from, or were negatively affected by, prescribed fire and mechanical sagebrush removal." OR 130. Nor will state mitigation programs offset this loss, as BLM claimed. Five of the seven state programs require far less than the 2015 Plans, a factor the agency studiously ignored. *See* Supp. Saul Decl. ¶¶ 46–76.  BLM also failed to acknowledge that it simultaneously amended its plans to allow operators to waive other restrictions—such as lek buffers and disturbance caps—if they "offset" impacts through state compensatory mitigation programs.[15] As a result of these related changes, compensatory mitigation may actually *facilitate* habitat destruction under the 2019 Plan Amendments. BLM never disclosed or evaluated these adverse impacts, again violating the NEPA hard look requirement.

BLM's also attempted to downplay harmful effects in its discussion of the elimination of GHMA protections in Utah. While acknowledging this change will allow development to increase in GHMA—without protections provided under the 2015 Utah Plan—BLM nonetheless concludes that the impacts "*would be the same* in the long term." UT 380. This defies logic. BLM reasons that that opening up GHMA will incentivize new development in those areas over PHMA, but without acknowledging that development was formerly incentivized out of sage-grouse habitat altogether. BLM also failed to address impacts on existing projects in GHMA,

---

[13] *See, e.g.,* UT 377; OR 167–70; CO 195–96; ID 171–73; WY 295; NVCA 244–45.
[14] 80 Fed. Reg. 59,858, 59,881–82 (Oct. 2, 2015).
[15] *See, e.g.*, UT 56 (MA-SSS-3B); CO 174–75 (NSO-2); ID 031; NVCA 215.

such as grazing permits. And BLM wrongly claims that potential actions to "create" or "improve" habitat within PHMA will offset the loss of GHMA, when its own science confirms that habitat treatments can harm sage-grouse populations. OR 130.[16] BLM's characterization also overlooks that now-eliminated GHMA is concentrated in northeast Utah, where oil and gas development is a leading threat to sage-grouse populations. UT 444. This will foreseeably result in—indeed, is already resulting in—more and denser oil and gas development within the remaining Uintah Basin sage-grouse habitats. *See* Supp. Saul. Decl. ¶¶ 8–9.

The EISs also failed to address relevant environmental concerns and scientific literature, as the expert declarations of Drs. Braun, Connelly, and Haak establish. Numerous plan changes weaken or eliminate protections in ways that BLM itself acknowledged may cause localized impacts.[17] However, the EISs failed to grapple with the resulting effects on habitat connectivity and genetic/habitat diversity. *See* Haak Decl. ¶¶ 8, 59, 64, 70–71; Braun Decl. ¶¶ 4, 24–25, 37. BLM either failed to address or "outright misrepresent[ed]" other sage-grouse research, Connelly Decl. ¶¶ 39–40, 42, and "largely ignore[d] recommendations made by numerous scientists and managers," notably including the COT and NTT Reports, *id.* ¶¶ 48, 42, 30. Defendants merely argue that BLM already considered the NTT and COT Reports in 2015, never admitting the 2019 Plan Amendments go against multiple recommendations of those reports—and can only point to an isolated reference to the COT report in Oregon's 2018 FEIS. Def. Opp. at 27.  Ignoring the science that provided the benchmark for the 2015 Plans and FWS' "not warranted" finding again

---

[16] Similar misrepresentations and generalities are found in all of the plans. *See, e.g.*, UT 380 ("there would be no impact on Greater Sage-Grouse from the waiver"); UT 382 (no impact from removing prioritization of mineral leasing outside sage-grouse habitat); ID 681–82 (listing reasons why lek buffer restrictions are inconsequential without grappling with the science showing that harms that are likely to result).

[17] *See, e.g.,* UT 380–81 (loss of peripheral populations in GHMA); ID 882 (loss of leks in IHMA and GHMA due to buffer reductions).

contravenes NEPA's "hard look" requirements. *See Kraayenbrink*, 632 F.3d at 491–94

(reversing where BLM gave "short shrift" to its own science, "improperly minimize[d] negative

side effects," and "entirely failed to address an important aspect of the problem").

BLM also failed to address serious criticism from the EPA, again violating NEPA. *See*

*Kraayenbrink*, 632 F.3d at 492–93. EPA's comment letters on each DEIS expressed "concern

[that] the DEIS does not provide sufficient information to fully assess the impacts of the

proposed action." Anderson Decl. App. B at 30, 34, 39, 44, 47, 51. EPA's specific comments

included the following:

- Absence of a purpose, analysis, or consultation related to maintaining the FWS "not warranted" ESA determination. *Id.* at 41, 46, 53.
- Failure to specify how any new science supports each plan amendment. *Id.* at 41 ("The Draft EIS cites this [USGS] report, but does not specify how the new science . . . supports each of the changes in the proposed action."); *id.* at 32 ("The DEIS does not include sufficient information for how the BLM evaluated and interpreted science relevant to the decision to remove mitigation from GHMA").
- Failure to address connectivity and cross-border impacts. *Id.* at 36, 42.
- "Tiering" to the 2015 EISs which themselves never evaluated effects of 2019 plan elements in isolation. *Id.* at 37 – 38, 43.
- Failure to consider additional winter habitat protections. *Id.* at 36, 46.
- Lack of any detail about the new mitigation strategy. *Id.* at 37, 41.
- Failure to explain key findings. *Id.* at 31 (claim of "improved coordination"); *id.* (claim of comparatively "inconsequential" threats); *id.* at 31 (claim of "little" development in IHMA); *id.* at 48 (decision to use lower end of lek buffer range)
- Lack of critical analysis. *Id.* 36, 46 (suggesting analysis of specific habitat types likely impacted by oil and gas development); *id.* at 47 (suggesting data on the acreage that burned in each habitat type).

Defendants provide no evidence that such concerns were addressed in the FEISs. Rather, they

seize on isolated comments from the only FEIS letters EPA prepared—for Idaho and Oregon[18]—

---

[18] EPA posted DEIS comment letters for all states, but FEIS comment letters for only Oregon and Idaho. *See* https://cdxnodengn.epa.gov/cdx-enepa-public/action/eis/search.

to suggest that all concerns were resolved. Def. Opp. at 28.  They were not.[19] BLM's failure to

address EPA's criticism underscores the insufficiency of its analysis. *See Alaska v. Andrus*, 580

F.2d 465, 475 (D.C. Cir. 1978) (EPA's conclusion that the EIS was unsatisfactory "g[ave] rise to

a heightened obligation on [BLM's] part to explain clearly and in detail its reasons for

proceeding"); *NRDC v. Hodel,* 865 F.2d 288, 297–99 (D.C. Cir. 1988).

  A final egregious example is BLM's claim that the 2019 Plan Amendments are an

"equally environmentally preferable" alternative to the 2015 Plans. But as Plaintiffs have

documented in their expert and standing declarations, the 2019 Amendments are less protective

of sage-grouse and the public lands they inhabit, and thus far from environmentally preferable.[20]

  By flatly misrepresenting its 2019 plan changes, ignoring key science, and disregarding

critical comments from EPA, BLM violated its core NEPA duties, demonstrating Plaintiffs are

likely to prevail and warranting injunctive relief. *See Kraayenbrink*, 632 F.3d at 491.

  2. <u>BLM Failed to Evaluate Baseline Condition Changes Affecting Sage-Grouse.</u>

  BLM had a NEPA duty to evaluate how "baseline" conditions may have changed since

its last analysis in the 2015 Plans. *See N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d

1067, 1083–86 (9th Cir. 2011). BLM's assessment of baseline conditions in Chapter 3 of each

FEIS failed to meet this duty. These sections never provided updated assessments of current

sage-grouse population trends in the affected states, aside from listing populations that exceeded

---

[19] The Oregon FEIS letter does not suggest that BLM addressed EPA's concerns about adaptive management and ESA listing, and the Idaho FEIS letter does not indicate that BLM responded to EPA's criticisms on whole host of other issues. *Id.* at 31–32.

[20] CEQ defines the "environmentally preferable alternative" as "the alternative that will promote the national environmental policy as expressed in NEPA's Section 101." 46 Fed. Reg. 18,026, 18,028 (Mar. 23, 1981). CEQ explains that "[o]rdinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources." *Id.*

hard triggers. BLM also made no effort to analyze current habitat conditions and fragmentation through field inspection or GIS mapping—even though such analysis can be readily performed, as Dr. Haak demonstrates. *See* Haak Decl. ¶¶ 24–30, 47–56. For example, BLM mentioned, but failed to analyze the effect of, recent habitat loss and fragmentation from fires and oil and gas leasing. *See* Braun Decl. ¶¶ 32, 45 ("BLM essentially ignored analyzing either current habitat conditions and fragmentation"); Connelly Decl. ¶¶ 5, 56 ("I could not find an analysis of the impacts of these wildfires on sage-grouse populations and habitat"). And BLM never disclosed or analyzed the scope of its recent and extensive oil and gas leasing and development actions in sage-grouse habitats, as Dr. Haak has done. *Id.* ¶¶ 52–54.

Without adequate baseline knowledge of sage-grouse populations, habitat, and trends, BLM failed to satisfy its NEPA "hard look" duty. *See N. Plains*, 668 F.3d at 1085–86.

3.  <u>BLM Insufficiently Analyzed Cumulative Impacts.</u>

NEPA requires adequate disclosure of the cumulative impacts of the proposed action "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7. If separate proposed actions themselves are connected or cumulative, they must be analyzed in a single EIS. *Id.* § 1508.25(a). Here, BLM improperly fragmented its analysis into six EISs, in violation of 40 C.F.R. § 1508.25(a), and then *also* failed to conduct any meaningful cumulative impacts analysis within each EIS, in violation of 40 C.F.R. § 1508.25(c).

The first problem with the cumulative effects analysis is its geographic scope. BLM analyzed effects exclusively at the WAFWA Management Zone scale, never addressing the broader question of how the plans will impact conservation of sage-grouse as a species range-wide. *See* Braun Decl. ¶¶ 46–47. This segmented analysis is precisely what 40 C.F.R. § 1508.25

is meant to prevent. The analysis for each WAFWA zone also consisted of vague and conclusory analysis and asserted, each time, that the changes will result in "no appreciable additive impacts" to sage grouse. *See, e.g.*, NVCA 261, 264, 266, 269, 271. These "generalized statements and suppositions" fail to meet BLM's "hard look" burden. *W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 WL 39651, at *11 (D. Idaho Jan. 5, 2011).

BLM also failed to analyze the cumulative impacts of the 2019 plan changes in connection with other past, present, and foreseeable actions. Simply listing these actions in an Appendix misses the point. A cumulative impact analysis must separately describe related projects, their environmental effects, *and* "consider the[ir] interaction" with the proposed project. *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007). Moreover, for many of these past or future actions, a description of potential effects on sage-grouse is either absent or unhelpful. *See, e.g.*, NVCA 620 (describing the effect of "water development" without reference to sage-grouse). When listed effects include habitat loss, BLM consistently concluded, without explanation, that management standards "should" address "most" of the impacts. *See, e.g.*, NVCA 626. BLM repeats this conclusory and vague analysis for a host of major impacts, including oil and gas, transmission lines, tar sands, coal leases, and prospecting. *Id.* at 624–29.

BLM also omitted numerous actions from its analysis, including large-scale oil and gas developments in key sage-grouse habitat. Defendants suggest that the NPL and Converse County gas projects were considered, but they get only passing reference in an unrelated section of Wyoming's FEIS. WY 346. Defendants provide no answer for why the massive Continental Divide/Creston oil and gas project was omitted from the analysis. Also missing is the SFA mineral withdrawal cancellation. BLM claims that it adequately considered this action by tiering

to the 2016 DEIS analyzing the proposed withdrawal.[21] However, BLM cannot tier to an uncompleted, draft NEPA document. *See League of Wilderness Defs. v. Connaughton*, No. 3:12-CV-02271-HZ, 2014 WL 6977611, at *10 (D. Or. Dec. 9, 2014) ("the Forest Service cannot tier its analysis to a forthcoming, uncompleted NEPA document"); *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002) (explaining that this "circumvents the purpose of NEPA").

Although Defendants reject the contention that the proposed Forest Service amendments should have been included in BLM's EISs, Def Opp. at 33–34, BLM nonetheless failed to analyze the cumulative effects of these parallel efforts. The statement that "cumulative impacts . . . may be influenced by . . . by the concurrent Forest Service planning effort" hardly constitutes analysis. ID 206. The specific details of those proposed plans were released on October 2018, *see* 80 Fed. Reg. 50,331 (Notice of Availability of DEISs), and should have been considered. Thus, BLM completely evaded its "duty to fully study the combined effects of" those foreseeable changes in not considering the proposed Forest Service amendments with its own. *Pac. Coast Fed'n of Fisherman's Ass'ns v. Blank*, 693 F.3d 1084, 1099 (9th Cir. 2012).

Finally, tiering to the cumulative-effects analysis of the 2015 Plans does not cure these defects. That analysis obviously did not encompass either the significantly-changed provisions of 2019 Plan Amendments or other significant developments. *See* 40 C.F.R. § 1502.9(c)(ii) (supplemental analysis required if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

In short, "the potential for . . . serious cumulative impacts is apparent here, such that the subject requires more discussion" than BLM's FEIS provide. *Klamath–Siskiyou Wildlands Ctr.*

---

[21] BLM did not complete a FEIS before deciding to cancel the mineral withdrawal—a decision Plaintiffs challenge in this case. *See* First Supp. Compl. ¶¶ 48–60, 179–187 (ECF No. 139).

*v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004).

      **C.**       **BLM Failed to Prepare a Supplemental EIS to Address the Removal of Mandatory Compensatory Mitigation.**

      BLM violated NEPA by not circulating for public comment a supplemental draft EIS after it elected, between the DEIS and FEIS stage, to eliminate mandatory compensatory mitigation from the plans. A supplement to a draft or final EIS is required if the "agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(i). Where an agency changes the alternatives considered in the draft EIS, supplementation can be avoided only if: (1) the new alternative is a "minor variation" and (2) "qualitatively within the spectrum of alternatives that were discussed in the draft [EIS]." *Russell Country Sportsmen v. U.S. Forest Serv*., 668 F.3d 1037, 1045 (9th Cir. 2011).[22]

      BLM's defense is to suggest that this change was a minor variation in its Management Alignment Alternative. The record shows otherwise. Mandatory compensatory mitigation for a net conservation gain was a fundamental element of the 2015 Sage Grouse Plans designed to assure that residual impacts not prevented by other plan elements would be offset so that sage-grouse habitat would not suffer further declines. *See, e.g.*, WY9* 041681 (listing compensatory mitigation as a "Key Component"). It was also a basis for the FWS's 2015 ESA "not warranted" determination. 80 Fed. Reg. at 59,881–82. State mitigation programs will not fill this gap. *See supra* III.B.3 at 13. Thus, the change in BLM's alternative was more than "minor." *Cf. Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218–19 (10th Cir. 1997) (increase in environmental impact more likely to be a substantial change).

---

[22] Defendants conflate two different legal standards. *Westlands Water Distric v. DOI*, 376 F.3d 853 (9th Cir. 2003) and its "significant impact" language apply to 40 C.F.R. § 1502.9(c)(1)(ii), which requires an SEIS due to "significant new circumstances," while § 1502.9(c)(1)(i) requires only that the change to the proposed action be "relevant to environmental concerns."

The Draft EISs did not disclose that BLM would eliminate mandatory compensatory mitigation, much less explain the scheme BLM would use in its place. They stated only that BLM was "evaluating whether the implementation of a compensatory mitigation standard on public lands is appropriate and consistent with applicable legal authorities." *See, e.g.*, ID 834. The Draft EISs assumed, in both their discussion of alternatives and environmental effects, that compensatory mitigation would remain in effect. *See, e.g.*, ID 885. Thus, the public was never given notice or opportunity to comment on this change or BLM's evaluation of its impacts.

BLM also argues that it "incorporated by reference" the 2015 alternatives, some of which did not require compensatory mitigation. However, BLM did not suggest it was reconsidering any of these 2015 alternatives. The DEISs listed them as "Alternatives Considered but Not Analyzed in Detail" and determined they were inconsistent with the purpose of SO 3353. *See, e.g.*, ID 831–33 ("all of the previously analyzed alternatives . . . were predicted to result in a loss of development opportunities"); *see also* ID 816–17 (listing the net mitigation standard, but not the requirement itself, as "Topics Retained for Further Consideration"). Even if it had, BLM cannot avoid an SEIS by picking and choosing elements of previously-considered alternatives, especially where they have synergistic effects. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292–93 (1st Cir. 1996) (SEIS required where agency chose a "different configuration" of previously-considered alternatives); *Block*, 690 F.2d at 772 (amalgamation of alternatives could not be fairly anticipated by reviewing the draft EIS).

## IV.   INJUNCTIVE RELIEF IS NEEDED TO AVOID IRREPARABLE HARM.

Injunctive relief is necessary to preserve the status quo ante and prevent irreparable injury by maintaining the 2015 Sage-Grouse Plans in effect while Plaintiffs' challenges to the 2019 BLM Plan Amendments are adjudicated. BLM approvals of discretionary actions affecting sage-

grouse habitats must now follow the 2019 Plan Amendments. *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). Those BLM approvals include issuance of oil and gas leases; drilling permits; rights-of-way for roads, pipelines, and powerlines; coal and phosphate mining approvals; livestock grazing permit renewals; and vegetation treatments. *See* Saul Decl. ¶¶ 22–31 (ECF No. 124-16); Anderson Decl. ¶¶ 26–59. The Supplemental Saul Declaration, submitted herewith, provides an updated list of projects approved or pending under the 2019 Plan Amendments.

The 2019 Plans have also immediately impacted BLM's management of sage-grouse habitat in other ways, including by: (a) altering how BLM prioritizes grazing permit renewals; (b) altering how BLM monitors degradation from livestock grazing and existing range infrastructure; and (c) expanding criteria for waivers, exceptions, or modifications. *See* Pls.' Opening Br. App. A; Saul Decl. ¶¶ 14–21; Anderson Decl. ¶¶ 26–59.

In short, Plaintiffs have abundantly established that "irreparable injury is likely in the absence of an injunction," *Winter v. NRDC*, 555 U.S. 7, 22 (2008), thus warranting injunctive relief. Defendants' arguments that irreparable harm is not imminent are easily rejected.

## A.   Imminent, Species-Level Harm to Sage-Grouse Is Not Required.

Defendants first argue that Plaintiffs have not demonstrated that any species-level impacts are imminent as a result of the 2019 Plan Amendments. Def. Opp. at 29. This misunderstands Plaintiffs' showing of irreparable harm. Plaintiffs' declarants nowhere state that their recreational and other interests in the lands affected by BLM's plan amendments derive only from the persistence of sage-grouse as a species. BLM's new plans weaken restrictions on grazing, oil and gas development, hardrock mining, and other projects in ways that harm recreational users, just as they do sage-grouse populations. *See* Carter, Donnelly, Hartl, Herman, Horning, Kerr, Miller, Molvar, Ratner, and Silver Declarations (ECF Nos. 124-4 to 124-16)

(detailing each individual's harms in specific areas impacted by 2019 amendments).

Plaintiffs and the public also face immediate irreparable injury from BLM's issuance—more frequently, with minimal or no public notice, and without FWS concurrence—of waivers, exceptions, or modifications to protective stipulations. Saul Decl. ¶¶ 35–38. Absent an injunction, Plaintiffs and others will be irreparably deprived of their ability to participate in this process, as there is no feasible means of discovering, participating in, or contesting these actions prior to habitat-disturbing activity.

Thus, imminent species-level harm to sage-grouse is not required. Even so, Plaintiffs have shown that the plans risk irreversible destruction of sage-grouse habitat and impacts to greater sage-grouse breeding, behavior, and survival. *See* Braun, Connelly, Haak Declarations.

**B.    Subsequent Public Processes During Site-Specific Implementation Will Provide No Relief.**

Defendants' argument that Plaintiffs should wait to challenge the 2019 Plan Amendments until site-specific decisions are issued is specious and unworthy of serious discussion. There will be no subsequent public process for most of the management decisions affected by the 2019 Plan Amendments, given BLM's rampant use of "Categorical Exclusions" (CXs) and "Determinations of NEPA Adequacy" (DNAs) to avoid site-specific NEPA review. *See* Supp. Saul Decl. ¶¶ 5, 7. Neither does BLM reconsider RMP-level decisions during site-specific implementation, as might obviate the need for injunctive relief. *See Block*, 690 F.2d at 763 ("the promise of site-specific EIS's in the future is meaningless if later analysis cannot [re]consider" plan-level decisions). This piecemeal approach would also be inefficient and prejudicial. "Plaintiffs are 'taking advantage of what may be their only opportunity to challenge the [2019 Plan Amendments] on a nationwide, programmatic basis.'" *Kraayenbrink*, 632 F.3d at 486.

**C.      Irreparable Harm is Imminent During the Pendency of this Case.**

Defendants also assert that numerous site-specific implementations threaten no imminent harm because they will occur months from now. Def. Opp. 43, 44.  These harms nonetheless warrant injunctive relief under Rule 65 as they are "certainly impending," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 401 (2013), and will likely occur before this Court issues a decision on the merits. Defendants were given 8 months to prepare the administrative record for the 2015 Plan Amendments, *see* ECF No. 37, and will no doubt make a similar request here. The staggered briefing forced by intervenor participation will only further slow an ultimate decision on the merits. Thus, the harms from project approvals anticipated within the coming year (e.g., Caldwell Canyon, Dairy Syncline, Converse County, Moneta Divide), and those impacting sage-grouse during the spring 2020 breeding and nesting period, must be considered.

**D.      Elimination of the Grazing Restriction in Oregon's RNAs**

Defendants contend that there will be no harm to Oregon's Research Natural Areas (RNAs) from the 2019 decision to remove the 2015 restriction on grazing on these lands, because grazing "never ceased under the 2015 Plan Amendments." Def Opp. at 48–49.[23] Even assuming the 2015 ROD gave BLM 5 years to implement the restriction, that deadline is June 2020—before this case is likely to be resolved on the merits. If not enjoined, the 2019 Amendments will allow grazing to continue after that date in the RNAs, perpetuating habitat degradation and eliminating the opportunity for natural successional processes important for sage-grouse research. This imminent irreparable harm further supports injunctive relief.

---

[23] It is not apparent how BLM justified this continued grazing as the 2015 ROD defined the closure as an "Immediate Decision" that went "into effect when the ROD is signed." *See* OR* 3450 (Obj. LG 2), OR* 3451 (MD LG 1). By regulation, grazing permits cannot be cancelled without 2-years prior notice, but that date has long gone. 36 C.F.R. 222.4(a)(1).

## V.      BALANCE OF HARDSHIPS AND PUBLIC INTEREST

On the other side of the balancing, Defendants do not credibly argue that they or the public would be harmed by this injunction. They suggest that "expenditure of public funds that went toward the development of the plans" would be wasted if an injunction is granted. Def. Opp. at 49. But public funds sunk on an unlawful action do not render it lawful, nor do they warrant keeping BLM's unlawful plans in place while this case is adjudicated on the merits.  If BLM conducts a proper NEPA analysis upon remand by this Court, and finds that its amendments are consistent with sage-grouse needs and legal mandates, then these efforts will not be wasted. (Note: Plaintiffs will further address balancing of harms and the public interest in their reply to Intervenors' opposition briefings, filed June 14, 2019).

## VI.     THE PLANS MUST BE ENJOINED IN THEIR ENTIRETY.

Finally, Defendants argue that any relief should be narrowly tailored but suggest no practical mechanisms for how the 2019 Plan Amendments might somehow be partially enjoined. BLM's identical NEPA violations require the Court to reverse and set aside the 2019 Plans entirely once it adjudicates the merits. (Note: Plaintiffs will further address the scope of injunctive relief in their reply to Intervenors' opposition briefings, filed June 14, 2019).

<u>CONCLUSION</u>

Plaintiffs respectfully pray that the Court grant the requested preliminary injunction.

Dated this 17th day of June, 2019.          Respectfully submitted,

*/s/ Sarah Stellberg*
Sarah Stellberg (ISB #10538)
Laurence ("Laird") J. Lucas (ISB # 4733)
Todd C. Tucci (ISB # 6526)
*Advocates for the West*

Attorneys for Plaintiffs