IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, and PRAIRIE HILLS AUDUBON SOCIETY, <br><br> Plaintiffs, <br><br> v. <br><br> JANICE SCHNEIDER, Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE, <br> Defendants. | Case No.  1:16-CV-83-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it the plaintiffs' motion for preliminary injunction to enjoin the Federal Defendants from implementing the 2019 BLM Sage-Grouse Plan Amendments.  The Court heard oral argument on the injunction motion and took it under advisement.  For the reasons explained below, the Court will grant the motion.

## LITIGATION BACKGROUND

The original complaint in this case was brought by four different environmental groups challenging fifteen Environmental Impact Statements (EISs) issued in 2015 that govern land covering ten western states. The gist of plaintiffs'

lawsuit was that the BLM and Forest Service artificially minimized the harms to sage grouse by segmenting their analysis into 15 sub-regions without conducting any range-wide evaluation – the agencies looked at the trees without looking at the forest, so to speak. The plaintiffs brought their claims under the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), and the National Forest Management Act (NFMA).

Early in the case, the BLM filed a motion to sever and transfer arguing that, for example, the challenge to the Utah Plan should be transferred to Utah and the challenge to the Nevada Plan should be transferred to Nevada.  The Court denied the motion, reasoning that "plaintiffs made overarching claims that applied to each EIS and RMP and required a range-wide evaluation that extended beyond the boundaries of any particular court."  *See Memorandum Decision (Dkt. No. 86).*

As this litigation was underway, the Trump Administration came into office and began a process to review and revise the 2015 Sage-Grouse Plans.  This litigation was put on hold pending that review.  In 2017 that review was completed, and as a result, WWP alleges, Interior Secretary Ryan Zinke directed agencies to relax restrictions on oil and gas development in sage grouse habitat. The BLM responded by issuing amendments to the Sage Grouse Plans (referred to as the 2019 Plan Amendments).  Plaintiffs supplemented their complaint to challenge the BLM's 2019 Amendments, alleging that the agency – acting at the

direction of the Trump Administration – again made common errors across numerous Plans, including (1) failing to take a range-wide analysis, (2) failing to evaluate climate change impacts, and (3) generally removing protections for the sage grouse that were unjustified by science or conditions on the ground.

The Utah and Wyoming intervenors responded by filing a motion to transfer, arguing that the circumstances have changed since the Court denied the BLM's motion discussed above.[1]  The intervenors argued that the interests of justice and the interests of local concerns justified transferring, for example, the Utah Plan challenges to Utah and the Wyoming Plan challenges to Wyoming.  The intervenors argued that the challenges in this case are Plan-specific and will be unique to each State.

The Court disagreed and denied their motions.  *See Memorandum Decision (Dkt. No. 181).*  The Court reasoned that their motions ignored the allegations of plaintiffs' complaint.  Plaintiffs allege that the challenged Plans suffer from common failings that did not result entirely from errors of local Field Offices but rather were heavily influenced by directions from the Trump Administration and the Interior Secretary.  Transferring these cases to various States would require plaintiffs to make duplicative arguments and courts to render duplicative – and

---

[1] The Idaho intervenors joined in the motions, arguing that the Court can more effectively focus on issues unique to Idaho if the other matters are severed and transferred to their respective States.

**Memorandum Decision & Order – page 3**

perhaps conflicting – decisions.  The Court did not agree with intervenors that circumstances have changed since the Court denied the Government's earlier motion to sever and transfer.

The Government filed a motion to dismiss or transfer, arguing that this Court was not the proper venue for resolving plaintiffs' challenges to the 2019 Plan Amendments.  The Court disagreed, finding that venue was proper under 28 U.S.C. § 1391(e)(1)(C).

The plaintiffs now seek to enjoin the BLM from implementing the 2019 Plan Amendments.  The Court will resolve this challenge after reviewing the facts set forth in the record.

## FACTS

### Sage Grouse Decline

This Court has written extensively on the decline of sage grouse populations and habitat.  Despite these declines the Fish and Wildlife Service (FWS) in 2005 determined that a listing under the Endangered Species Act (ESA) was "not warranted."  The Court reversed that decision, finding that it ignored declines in population and habitat, and was not based on the best science as required.  *See WWP* v. *FWS,* 535 F. Supp.2d 1173 (D. Idaho 2007).  The Court remanded the case to the FWS for further consideration.

On remand, the FWS issued a new finding in 2010 that the ESA listing was "warranted-but-precluded." *See* 75 Fed. Reg. 13910 (March 5, 2010). That finding stressed the inadequacy of federal land use plans to protect sage-grouse, particularly from energy development impacts. *Id.* at 13,942. The FWS's determination prompted the BLM and Forest Service, along with several States, to consider protections for the sage grouse to avoid a future ESA listing.

**National Greater Sage Grouse Planning Strategy**

The BLM and Forest Service launched their National Greater Sage-Grouse Planning Strategy in 2011 to amend federal land use plans with sage-grouse conservation measures to avoid ESA listing. To guide that Strategy, a National Technical Team of sage-grouse experts was convened and released their "Report on National Greater Sage-grouse Conservation Measures" (NTT Report) in December 2011. This Court found – after an evidentiary hearing and testimony from sage grouse expert Dr. Clait Braun – that the NTT Report "contains the best available science concerning the sage-grouse." *See WWP v. Salazar,* 2012 WL 5880658, at *2 (D. Id. Nov. 20, 2012).

The NTT Report emphasized the protection of priority sage grouse habitats and the need for buffers around sage grouse leks. The NTT report stated that the "overall objective is to protect priority sage-grouse habitats from anthropogenic disturbances that will reduce distribution or abundance of sage grouse." *See* NTT

Report, at 7.  It identified priority sage-grouse habitats as "breeding, late brood-rearing, winter concentration areas, and where known, migration or connectivity corridors." *Id.*  The NTT Report recommended closing these priority sage-grouse habitat areas to oil and gas or other mineral leasing, concluding that "[t]here is strong evidence . . . that surface-disturbing energy or mineral development within priority sage-grouse habitats is not consistent with the goal to maintain or increase populations or distribution." *Id.* at 19.

With regard to lek buffers, the NTT Report found that BLM's existing 0.25 mile "No Surface Occupancy" (NSO) buffers around sage-grouse leks and 0.6 mile seasonal timing buffers were inadequate to protect sage-grouse, stating that "protecting even 75 to >80% of nesting hens would require a 4-mile radius buffer" and even that "would not be large enough to offset all the impacts" of energy development.  *Id.* at 21.

In March 2013, FWS released its own report entitled the "Conservation Objectives Team Report" (COT Report) that identified "Priority Areas for Conservation" (PACs) as "key habitats necessary for sage-grouse conservation." *See* COT Report (WO AR 1492), at 13.  The COT Report emphasized that "[m]aintenance of the integrity of PACs . . . is the essential foundation for sage-grouse conservation," but recognized that "habitats outside of PACs may also be essential," including to provide connectivity between PACs.  *Id*. at 13, 36.  In

October 2014, FWS identified a sub-category of the PACs as sage-grouse "stronghold" areas, which were the basis for the "Sagebrush Focal Areas" (SFAs) designated in the 2015 Plans for highest protection from energy development and other surface disturbance.  *See* WO AR 1490.

## 2015 Plans

In 2015, the BLM and Forest Service adopted Sage-Grouse Plans that covered ten States, revised 98 federal land use plans, and incorporated many of the NTT and COT Reports' recommendations, such as restrictions to prevent or minimize surface disturbances in priority habitats, and requirements of compensatory mitigation for unavoidable adverse impacts to sage-grouse habitats. *See, e.g.*, BLM Great Basin ROD, at S-1 to S-2 and 1-1 to 1-41.2  As called for in the NTT and COT Reports, the 2015 Plans established new sage-grouse priority habitat designations with heightened management protections across some 67 million acres of federal land, including "Priority Habitat Management Areas" (PHMAs) – of which SFAs are a subset – and "General Habitat Management Areas" (GHMAs), along with other priority habitats in certain states (including "Important Habitat Management Areas," or IHMAs, in Idaho).  *Id.*  PHMAs are "lands identified as having the highest value to maintaining sustainable GRSG populations," and "largely coincide with areas identified as PACs in the COT Report."  *See* Great Basin ROD at 1-15.  GHMAs are "GRSG habitat that is

occupied seasonally or year-round . . . where special management would apply to
sustain GRSG populations." Id.

**2015 FWS Finding**

The protections for sage grouse contained in the 2015 Plans of the BLM and
Forest Service convinced the FWS to revise its 2010 finding that an ESA listing
was "warranted but precluded" to a finding that listing was "not warranted."  The
FWS explained this change as follows:

> Since 2010, there have been several major changes in the regulatory
> mechanisms that minimize impacts to sage-grouse and their habitats.
> Foremost among these are the adoption of new Federal Plans
> specifically tailored to conserving sage-grouse over more than half of
> its occupied range. These Federal Plans now include substantial
> provisions for addressing activities that occur in sage-grouse habitats
> and affect the species, including those threats identified in 2010 as
> having inadequate regulatory measures. Aside from addressing
> specific activities, the Federal Plans include provisions for
> monitoring, adaptive management, mitigation, and limitations on
> anthropogenic disturbance to reduce impacts authorized in sage-
> grouse habitats. The Federal Plans are the foundation of land-use
> management on BLM and USFS managed lands. We are confident
> that these Federal Plans will be implemented and that the new
> changes, which are based on the scientific literature, will effectively
> reduce and minimize impacts to the species and its habitat.

See 80 Fed. Reg. at 59,887.  The FWS was particularly impressed that the 2015
Plans followed the "COT Report and NTT guidance [by] restricting impacts in the
most important habitat [thereby] . . . ensur[ing] that high-quality sage grouse lands
with substantial populations are minimally disturbed and sage grouse within this
habitat remain protected."  Id. at 80 Fed. Reg. 59,882.

The FWS also relied on provisions in the 2015 Plans ensuring that unavoidable adverse impacts from energy development and other BLM-approved actions would be offset by off-site mitigation to provide a net gain to the species: "Requiring mitigation for residual impacts provides additional certainty that, while impacts will continue at reduced levels on Federal lands, those impacts will be offset to a net conservation gain standard".  *See* 80 Fed. Reg. at 59,881.

## 2019 Plan Amendments

In 2017, then-Interior Secretary Zinke directed that a "Sage-Grouse Review Team" be assembled to review the 2015 Sage-Grouse Plans and recommend modifications to "enhance State involvement" and align the BLM's actions with State plans concerning the sage grouse.  Following the report of that Team recommending numerous modifications to the 2015 Plans, the BLM released six Draft Environmental Impact Statements (Draft EISs) and draft proposed plan amendments to revise the 2015 Plans in Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, and allowed a 90-day public comment period.  *See* 83 Fed. Reg. 19,800-11 (May 4, 2018).

The BLM received comments from, among others, the Environmental Protection Agency (EPA).  *See Anderson Declaration Exhibit B (Dkt. No. 124-2).* The EPA commented that the Draft EIS for the 2019 Plan Amendments for Idaho reduced lek buffers, representing a "major change."  *Id.* at p. 2.  Finding no

scientific support for this change in the Draft EIS, the agency recommended that the "Final EIS summarize the scientific information used to develop the [provisions] to reduce lek buffers . . . ." *Id.* at p. 31.

In commenting on the 2019 Plan Amendments for Utah, the EPA noted the importance of habitat connectivity given the multi-state range of the sage grouse and the need for the protection of priority habitat.   The EPA was concerned that the Draft EIS eliminated SFAs and GHMAs, "in addition to diminishing the protections that were established for PHMAs." *Id.* at p. 42.  The SFAs, GHMAs and PHMAs "straddle the borders of Nevada, Idaho, Wyoming and Colorado" but "the Draft EIS does not assess how these proposed amendments in Utah may impact populations in nearby States." *Id.*  The EPA recommended that "[g]iven sage-grouse populations cross state boundaries and because there are seven BLM state offices revising their plans, we recommend the Final EIS include a cumulative, cross-boundary effects analysis to assess the combined effects to greater sage-grouse populations and habitats associated with the revisions." *Id.* The EPA expressed the same concerns with the 2019 Plan Amendments for Wyoming. *Id.* at pp. 36-37.

The BLM did not address the EPA's comments, and instead issued Final EISs in December of 2018, and then Records of Decisions (RODs) in March of 2019, to amend its 2015 Sage-Grouse Plans in Idaho and the six other states.  The

BLM announced that the 2019 BLM RODs were "effectively immediately." *See* 84 Fed. Reg. 10,322–10,330 (Mar. 20, 2019).

## Changes in 2019 Plan Amendments

The stated purpose of the 2019 Plan Amendments was to enhance cooperation between the BLM and the States by modifying the BLM's protections for sage grouse to better align with plans developed by the States.  While this is a purpose well-within the agency's discretion, the effect on the ground was to substantially reduce protections for sage grouse without any explanation that the reductions were justified by, say, changes in habitat, improvement in population numbers, or revisions to the best science contained in the NTT and CTO Reports.

One example of these reductions is that the 2019 BLM Plan Amendments eliminated SFAs in all states but Oregon, downgrading SFAs to the less protective PHMA designation.  In Idaho, 3,961,824 acres of SFAs were eliminated by the 2019 Plan Amendments.  The Final EISs stated that removing the SFA designations "would have no measurable effect on the conservation of Greater Sage-Grouse," but failed to identify any changes on the ground – or in the science – since the COT Report that had explained the need for the SFAs and designated those areas for the highest protection from energy development and other surface disturbance.

The 2019 BLM Plan Amendments eliminated both the "compensatory mitigation" requirement and related "net conservation gain" standard. As discussed above, these features were crucial to the FWS finding in 2015 that an ESA listing for the sage grouse was not warranted. *See* 80 Fed. Reg. at 59,882 ("Requiring mitigation for residual impacts provides additional certainty that, while impacts will continue at reduced levels on Federal lands, those impacts will be offset to a net conservation gain standard").

The 2019 Amendments included significant changes to mandatory buffers around sage-grouse leks in designated habitat areas. *See* App. A at 2. In Idaho and Nevada/California, the BLM reduced existing lek buffers by several miles. *Id.* Colorado removed the prohibition on oil and gas leasing within 1 mile of active sage-grouse leks, opening up approximately 224,000 acres of previously-protected habitat. *Id.* The application of buffers around lek sites was changed from mandatory to discretionary in Colorado, Utah, and Nevada/California, and the plans in Idaho and Wyoming now allow BLM officers to exempt projects from buffers in more circumstances. *Id.*

The 2019 Amendments included a series of measures undermining the 2015 Plans' mechanisms of "hard and soft triggers" requiring BLM to take corrective action when monitoring data shows that sage-grouse populations or habitats fall

below specified thresholds. *See* App. A at 4.  In Nevada/NE California, for example, BLM replaced "hard" triggers requiring management changes with "warnings" and will now apply triggers only at the lek cluster scale, which could allow individual leks to blink out without corrective management action. *Id.* The Utah ROD similarly undermined the certainty that concrete steps will be taken once adaptive management "triggers" are met, by lengthening time-frames for management response and introducing qualifications on when corrective strategies must be implemented. *Id.* The Final EISs claimed that these changes will be "beneficial" for sage-grouse or failed to evaluate them at all.  *Id.*

**LEGAL STANDARDS**

<u>**Injunctive Relief**</u>

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. NRDC*, 555 U.S. 7, 22 (2008).  Plaintiffs must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

<u>**NEPA**</u>

The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005).

## Administrative Procedures Act

NEPA does not provide a separate standard of review. Thus, NEPA claims are reviewed under the standards of the Administrative Procedures Act (APA). *See San Luis v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Jewell*, 747 F.3d at 601 (*quoting* 5 U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.*

Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reasoned-decision making requirement, the Supreme Court has often observed, includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why.").

## ANALYSIS

### Plaintiffs' Declarations

The plaintiffs ask the Court to consider the Declaration of Dr. Clait Braun (Dkt. No. 124-3) although it is not part of the administrative record. The Court may properly consider material outside the administrative record like Dr. Braun's Declaration to determine whether BLM failed to consider important factors in its NEPA analysis. *See Ctr. for Biol. Diversity v. BLM*, 698 F.3d 1101,

1123 n. 14 (9th Cir. 2012).  Considering extra-record evidence is warranted "where the plaintiff alleges 'that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug.'"  *Nat'l Audubon Soc. v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir. 1993); *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not").  The burden is on plaintiffs to satisfy this standard.  *Id.*

The Court finds that plaintiffs have satisfied that burden here.  There is a serious issue in this case whether the BLM neglected to evaluate a serious environmental consequence or failed to consider an important factor – that is, whether the BLM based its reductions on protections for the sage grouse on something other than merely a desire to adopt State plans.

For example, did the BLM fail to consider the science on sage grouse?  Dr. Braun's Declaration directly addresses that issue.  As discussed, the Court has previously found Dr. Braun to be a leading expert on sage grouse after hearing his testimony during an evidentiary hearing.  In his Declaration filed in this case, Dr. Braun states that "subsequent scientific research and studies" confirm his earlier

opinion that the NTT Report was the "gold standard" for management recommendations to protect sage grouse populations and habitat.  *Id.* at ¶ 3.  While he found the 2015 Plans largely follow the NTT Report recommendations, he finds that the "2019 Plan Amendments eliminate or substantially weaken important aspects of the 2015 Plans in contradiction of the best available science, and would allow BLM to approve extensive new oil and gas and other energy and industrial developments, as well as unscientific and damaging livestock grazing and vegetation management projects . . . ."  *Id.* at ¶ 5.  He also finds that in the years since the 2015 Plans, sage grouse habitats have "suffered extensive losses and fragmentation" due to wildfire and oil and gas development.  *Id.* at ¶ 31.  After reviewing the Final EISs for the 2019 Plan Amendments, he concludes that the "BLM seems to have wholly avoided addressing these recent trends, and completely failed to evaluate what they reveal for the future of sage-grouse . . . ."  *Id.* at ¶ 32.  He concludes further that "BLM essentially ignored analyzing either current habitat conditions and fragmentation, or how plan changes may impact sage-grouse habitats. The failure of BLM to undertake such analysis in the 2019 Plan Amendments is wholly inconsistent with standard practices and the best available science."  *Id.* at ¶ 45.

Here, Dr. Braun's Declaration shows that the BLM wholly failed to consider a serious environmental consequence.  The same analysis applies to the

Declarations of Dr. Amy Haak (who compiled data relied upon by Dr. Braun in reaching his conclusion that habitat has suffered extensive losses and fragmentation due to wildfire and oil and gas development) and Dr. John Connelly (a sage grouse expert who reviewed the 2019 Plan Amendments for Idaho and Wyoming). Both Dr. Haak and Dr. Connelly reach the same conclusion as Dr. Braun that the BLM failed to consider serious environmental consequences in the adoption of the 2019 Plan Amendments.

The Government objects that plaintiffs failed to file a motion to supplement the administrative record and simply filed these Declarations with their motion for summary judgment. This tactic, defendants argue, "effectively shift[s] the burden to Federal Defendant to explain why the materials should not be considered." *See Government Brief (Dkt. No. 43)* at p. 3. But the Court is not shifting that burden – the burden remains on plaintiffs to show that the admission of the Declarations "is necessary to determine whether the agency has considered all relevant factors." *Powell,* 395 F.3d at 1030. The Court finds that plaintiffs have carried that burden with respect to the Declarations of Drs. Braun, Haak, and Connelly.[2]

---

[2] Plaintiffs have moved to file a supplemental Declaration of Dr. Braun updating his discussion of sage grouse conditions while Intervenors have move to file a Declaration of Joshua Uriarte, discussing why the data in Dr. Braun's supplemental Declaration might be misleading. The Court will allow both Declarations to be filed and finds both helpful but neither determinative.

In addition, the Declarations are appropriate to establish that irreparable harm will result if the 2019 Plan Amendments are not enjoined.  *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833–34 (9th Cir. 2002) (reviewing extra-record declaration when considering injunction); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 422 F.3d 782, 797 (9th Cir. 2005) (affirming preliminary injunction based upon extra-record expert declarations).  The Court will therefore consider those three Declarations.

The Court will now turn to a discussion of each element required for injunctive relief.

## Likelihood of Success – Failure to Consider Reasonable Alternatives

In addition to evaluating the proposed agency action, every EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action.  *See* 40 C.F.R. § 1502.14(a).  The analysis of alternatives to the proposed action is "the heart of the environmental impact statement." *Ctr. for Biological Diversity v. U.S.*, 623 F.3d 633, 642 (9th Cir. 2010).

In this case, the Final EISs identified the purpose and need of the 2019 BLM Plan Amendments as follows: (1) to enhance cooperation and coordination with the states, (2) to align with Dept. of Interior and BLM policy directives issued since 2015, and (3) to incorporate measures to better align with state conservation plans.  *See, e.g*., ID Final EIS at ES-2.  To achieve these purposes, each Draft EIS

identified two alternatives: (1) the "No Action" alternative (i.e., keeping the 2015 Plans intact), and (2) BLM's preferred "Management Alignment Alternative," (i.e., proposed modifications for each state). *See, e.g.,* Idaho DEIS at ES-5. The Final EISs modified the "Management Alignment Alternative" slightly, to arrive at the Proposed Plan Amendments approved in the RODs.

However, the "No Action" alternative was not in fact an alternative but was included only for comparison purposes because the BLM had decided that it would not meet the three purposes and needs listed above. *See, e.g.*, ID ROD at 1-9. The Final EISs thus only considered BLM's preferred outcome.

In order to be adequate, an environmental impact statement must consider "not every possible alternative, but every reasonable alternative." *Protect Our Communities Foundation v. LaCounte,* 2019 WL 4582841 (9th Cir. Sept. 23, 2019). The stated goals of a project necessarily dictate the range of "reasonable" alternatives. *Id.* An agency need not consider alternatives that are "unlikely to be implemented or those inconsistent with its basic policy objectives." *Id.*

Here, the BLM's stated goals – set forth above – generally seek to align its actions with the State's plans but do not mention sage grouse protections. Nevertheless, the BLM defends the EISs as continuing to protect the sage grouse, and so the Court will assume that is a key goal. But given that goal, the weakening

of protections without justification does not make "reasonable" the single

"alternative" considered.

In *Protect our Communities (POC),* decided just last month, the Ninth

Circuit reaffirmed its holding in *Muckleshoot Indian Tribe v. U.S.,* 177 F.3d 800,

813 (9th Cir. 1999) (per curiam).  In *Muckleshoot,* the Circuit held that an

alternatives analysis was deficient because it "considered only a no action

alternative along with two virtually identical alternatives."  *Id.* at 813.  The Circuit

distinguished *Muckleshoot* in *POC* because the EIS in *POC* combined an analysis

of two projects – labeled Phase I and Phase II – and an alternative to the preferred

alternative was considered for the project as a whole even though no alternatives

were considered for Phase II itself.  The *POC* decision states that "if Phase II

constituted the entire project, . . . *Muckleshoot* would require us to conclude that

the alternatives analysis was deficient."  *Id.* at *6.

This case is closer to *Muckleshoot* than *POC.*  Each EIS is a separate NEPA

document and none of the EISs considered any alternative other than the

Management Alignment Alternative.  Common sense and this record demonstrate

that mid-range alternatives were available that would contain more protections for

sage grouse than this single proposal.  The Court therefore finds that plaintiffs are

likely to succeed on their claim that the BLM failed to consider reasonable

alternatives in violation of NEPA.

**Memorandum Decision & Order – page 21**

## Likelihood of Success – Failure to Take a "Hard Look"

In *WWP v. Kraayenbrink,* 632 F.3d 472 (9th Cir. 2011), the Ninth Circuit held that the BLM failed to take a hard look at the environmental consequences of regulatory changes when it ignored comments of the FWS and EPA, among others, expressing concerns about those changes. The Circuit found that the BLM gave "short shrift" to the concerns of the FWS and EPA and "neither responded to their considered comments objectively and in good faith nor made responsive changes to the proposed regulations." *Id.* at 493. The Circuit went on to hold that "[w]hen an agency, such as the BLM, . . . offers no meaningful response to serious and considered comments by experts, that agency renders the procedural requirement meaningless and the EIS an exercise in form over substance." *Id.* at 492-93.

In the present case, as explained above, the EPA expressed several concerns about the proposed 2019 Plan Amendments. Those Amendments weakened many of the protections that the FWS relied upon in finding that an ESA listing was not warranted. The weakening of protections is contrary to the science contained in the NTT and COT Reports.

Certainly, the BLM is entitled to align its actions with the State plans, but when the BLM substantially reduces protections for sage grouse contrary to the best science and the concerns of other agencies, there must be some analysis and justification – a hard look – in the NEPA documents. It is likely that plaintiffs will

prevail on their claim that this hard look was not done with respect to all six EISs challenged here, just as it was missing in *Kraayenbrink.*

### Likelihood of Success – Failure to Consider Cumulative Impacts

The EPA expressed concerns about the lack of a substantive cumulative impact analysis, as discussed above.  Part of that concern was due to the manner in which the BLM divided up the analysis among six separate EISs each focusing on a single State.

Under NEPA, courts must give deference "to an agency's determination of the scope of its cumulative effects review."  *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 959 (9th Cir. 2003).  The geographical scope is not necessarily limited to the project's geographical boundaries or to state borders.  *Id.* "Agencies are not obligated to explain why they exclude every possible area that might be included in the cumulative effects area. Instead, they must justify on the record the chosen level of analysis."  *Id.*

Here, the six EISs at issue are State specific despite clear evidence in the record that the sage grouse range covers multiple states and that a key factor – connectivity of habitat – requires a large-scale analysis that transcends the boundaries of any single State.  The BLM is in a unique position, as compared to each individual State, to conduct an analysis that evaluates the cumulative impacts of each State plan – and the BLM's own actions – over the entire range of the sage

grouse. While courts must give deference to an agency's scope decision, the BLM's focus on individual States required a robust cumulative impacts analysis given the range of the sage grouse. Because that is lacking, the plaintiffs are likely to succeed in their claim that the BLM's EISs do not contain a sufficient cumulative impacts analysis under NEPA and, most importantly, do not contain any justification for that failure.

## Likelihood of Success – Elimination of Compensatory Mitigation Requirements

As discussed above, the FWS relied on the mandatory compensatory mitigation provisions of the 2015 Plans to make its finding that an ESA listing was not warranted. The Draft EISs for the 2019 Plans assumed that the mandatory compensatory mitigation provisions of the 2015 Plans would remain in effect, *see e.g., Idaho Draft EIS* at 4-15, but stated that the BLM was still evaluating whether to maintain those provisions. *Id.* at 2-4.

The Final EISs were the first time the BLM announced it was removing the mandatory compensatory mitigation, and the public was never given notice or an opportunity to comment on those actions before they were taken. BLM's elimination of mandatory compensatory mitigation through the Final EISs appears to constitute both a "substantial changes" to its proposed action and "significant new circumstances" under 40 C.F.R. § 1502.9(c), requiring that BLM have issued a supplemental draft EIS for public review and comment before finalizing these

changes.  Failing to do so "insulate[d] [the agency's] decision-making process

from public scrutiny. Such a result renders NEPA's procedures meaningless."

*California v. Block,* 690 F.2d 753, 771 (9th Cir. 1982).

For these reasons, the plaintiffs are likely to succeed on this claim.

**Conclusion on Likelihood of Success on the Merits**

The BLM had a duty to explain any "departure from prior norms." *Atchison,*

*Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808 (1973); *see*

*also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n

administrative agency is not allowed to change direction without some explanation

of what it is doing and why.").  To summarize the discussion above, the plaintiffs

will likely succeed in showing that (1) the 2019 Plan Amendments contained

substantial reductions in protections for the sage grouse (compared to the 2015

Plans) without justification; (2) The EISs failed to comply with NEPA's

requirement that reasonable alternatives be considered; (3) The EISs failed to

contain a sufficient cumulative impacts analysis as required by NEPA; (4)  The

EISs failed to take the required "hard look" at the environmental consequences of

the 2019 Plan Amendments; and (5) Supplemental Draft EISs should have been

issued as required by NEPA when the BLM decided to eliminate mandatory

compensatory mitigation.

**Irreparable Harm**

As discussed above, the BLM has ordered that the 2019 Plan Amendments be effective immediately.  That means that all BLM approvals of discretionary actions affecting sage-grouse habitats must now follow the 2019 Plan Amendments.  *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).  Under these weakened protections, the BLM will be approving oil and gas leases; drilling permits; rights-of-way for roads, pipelines, and powerlines; coal and phosphate mining approvals; and livestock grazing permit renewals.  *See Saul Declaration (Dkt. No. 124-16)* . ¶¶ 22–31; *Anderson Declaration* (Dkt. No. 124-2). ¶¶ 26–59. It is likely that these actions will cause further declines of the sage grouse under the weakened protections of the 2019 Plan Amendments.

Defendants argue that such actions are not imminent, but the Court disagrees.  The record shows that the 2019 Plan Amendments were designed to open up more land to oil, gas, and mineral extraction as soon as possible.  That was the expressed intent of the Trump Administration and then-Secretary Ryan Zinke. There is no indication that current Secretary David Bernhardt is proceeding at any slower pace.

Numerous site-specific applications of the 2019 Plan Amendments that are upcoming (or have already occurred) include oil and gas well drilling and associated road and pipeline construction in Wyoming; coal mining projects in Utah; gold and other surface mining projects in Nevada; and large phosphate

mining projects in Idaho. *See Saul Declaration, supra,* at ¶¶ 22–31; *Anderson Declaration, supra,* at ¶¶ 53–58.

Given these circumstances, the Court finds that plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief.

## Balance of Hardships & Public Interest

Plaintiffs do not seek injunctive relief preventing BLM from approving any new oil and gas well or lease, grazing permit, or other discretionary authorization for use of public lands.  Plaintiffs only ask the Court to enjoin BLM from approving such uses based on the 2019 Plan Amendments.  Under the requested injunction, BLM may continue applying the 2015 Plans to upcoming permits, licenses and other approvals; and plaintiffs reserve the right to challenge such actions as may be appropriate.  But this Court is not asked to enjoin them now.

These circumstances tip the balance of hardships toward plaintiffs – the sage grouse will suffer more hardships from the 2019 Plan Amendments than the defendants will suffer from reverting to the provisions of the 2015 Plans.

With regard to the public interest, the Ninth Circuit has recognized "the well-established public interest in preserving nature and avoiding irreparable environmental injury."  *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled on other grounds by Winter v. NRDC,* 555 U.S. 7 (2008)).  And "[s]uspending a project until [environmental analysis] has occurred . . . comports

with the public interest," because "the public interest requires careful consideration of environmental impacts before major federal projects may go forward."  *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

<u>Conclusion</u>

The plaintiffs have satisfied all the elements for injunctive relief, and the Court will therefore grant their motion for a preliminary injunction.  The BLM is enjoined from implementing the 2019 BLM Sage-Grouse Plan Amendments for Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, until such time as the Court can adjudicate the claims on the merits.  The 2015 Plans remain in effect during this time.

Because plaintiffs are non-profit environmental groups seeking to advance the public interest in this litigation the Court will waive the injunction bond requirement under Rule 65(c).  *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)

**ORDER**

In accordance with the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for preliminary injunction (docket no. 124) is GRANTED.  The BLM is enjoined from implementing the 2019 BLM Sage-Grouse Plan Amendments for Idaho, Wyoming,

Colorado, Utah, Nevada/Northeastern California, and Oregon, until such time as the Court can adjudicate the claims on the merits. The 2015 Plans remain in effect during this time.

IT IS FURTHER ORDERED, that the plaintiffs' motion to supplement with the declaration of Dr. Braun (docket no. 182) and intervenor's motion to supplement with the declaration of Uriarte (docket no. 183) are GRANTED.

DATED: October 16, 2019

B. Lynn Winmill
U.S. District Court Judge