UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Western Watersheds Project; et al., | Case No. 1:16-cv-00083-BLW |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| v. | |
| DAVID BERNHARDT, Secretary of Interior; et al., | |
| Defendants. | |

## INTRODUCTION

Before the Court is Plaintiffs' Motion for Partial Summary Judgment (Dkt. 235) and Defendants' Cross Motion for Partial Summary Judgement (Dkt. 239). At issue on the cross motions is the Bureau of Land Management's decision to cancel the proposed mineral withdrawal of 10 million acres of federal lands located in Idaho, Montana, Nevada, Oregon, Utah, and Wyoming, which had previously been identified as Sagebrush Focal Area (SFA) essential for the long-term health of sage grouse. Plaintiffs seek partial summary judgment reversing the Bureau of Land Management's cancellation decision. Defendants seek partial summary judgment on, and the dismissal of, Plaintiff's claim challenging the cancellation decision.

The Court heard oral argument on October 6, 2020. For the reasons set forth below, the Court will grant in part and deny in part Plaintiffs' motion for partial summary judgment and deny Defendants' motion for partial summary judgment.

## LITIGATION BACKGROUND

The original complaint in this case was brought by four different environmental groups challenging fifteen Environmental Impact Statements (EISs) issued in 2015 that govern land covering ten western states. The gist of Plaintiffs' lawsuit was that the BLM and Forest Service artificially minimized the harms to sage grouse by segmenting their analysis into 15 sub-regions without conducting any range-wide evaluation—the agencies looked at the trees without looking at the forest, so to speak. Plaintiffs brought their claims under the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), and the National Forest Management Act (NFMA).

As this litigation was underway, the Trump Administration came into office and began a process to review and revise the 2015 Sage Grouse Plans. This litigation was put on hold pending that review. In 2017 that review was completed. WWP alleges that, as part of that review, former Interior Secretary Ryan Zinke directed agencies to relax restrictions on oil and gas development in sage grouse habitat. The BLM responded by issuing amendments to the Sage Grouse Plans (referred to as the 2019 Plan Amendments).

In May 2019, Plaintiffs supplemented their complaint to challenge the

BLM's 2019 Plan Amendments. Plaintiffs allege that the agency—acting at the

direction of the Trump Administration—again made common errors across

numerous Plans, including (1) failing to conduct a range-wide analysis, (2) failing

to evaluate climate change impacts, and (3) generally removing protections for the

sage grouse that were not justified by science or conditions on the ground.

Plaintiffs also brought numerous supplemental claims for relief. At issue in the

cross-motions for summary judgment currently before the Court is Plaintiffs' fifth

supplemental claim, challenging the BLM's October 2017 SFA Mineral

Withdrawal Cancellation Notice, 82 Fed. Reg. 47,248 (Oct. 11, 2017), as violating

NEPA, NEPA regulations, and the APA.

## FACTUAL BACKGROUND

### A.   Sage Grouse Decline

This Court has written extensively about the decline of sage grouse

populations and habitat. *See WWP v. FWS*, 535 F. Supp. 2d 1173 (D. Idaho 2007);

*WWP v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019). Despite these declines,

the Fish and Wildlife Service (FWS) in 2005 determined that a listing under the

Endangered Species Act (ESA) was "not warranted." The Court reversed that

decision, finding that it ignored declines in population and habitat, and was not

based on the best available science as required by the Endangered Species Act

(ESA). *See* 535 F. Supp.2d 1173. The Court remanded the case to the U.S. Fish and Wildlife Service (FWS) for further consideration.

On remand, the FWS issued a new finding in 2010 that ESA listing of the sage grouse was "warranted-but-precluded." *See* 75 Fed. Reg. 13910 (March 5, 2010). That finding stressed the inadequacy of federal land use plans to protect sage grouse, particularly from energy development impacts. *Id*. at 13,942. The FWS's determination prompted the Bureau of Land Management (BLM) and the U.S. Forest Service, along with several states, to consider protections for the sage grouse to avoid a future ESA listing.

**B.     National Greater Sage-Grouse Planning Strategy**

The BLM and Forest Service launched their National Greater Sage-Grouse Planning Strategy in 2011 to amend federal land use plans with sage grouse conservation measures necessary to avoid ESA listing. To guide that strategy, a National Technical Team (NTT) of sage-grouse experts was convened. The NTT released their "Report on National Greater Sage-Grouse Conservation Measures" (NTT Report) in December 2011. This Court found—after an evidentiary hearing and testimony from sage grouse expert Dr. Clait Braun—that the NTT Report "contains the best available science concerning the sage-grouse." *See WWP v. Salazar*, 2012 WL 5880658, at *2 (D. Id. Nov. 20, 2012).

The NTT Report emphasized the protection of priority sage grouse habitats

and the need for buffers around sage grouse leks. (SFA_18380-83; SFA_18393-94.) The NTT report stated that the "overall objective is to protect priority sage-grouse habitats from anthropogenic disturbances that will reduce distribution or abundance of sage grouse." (SFA_18380.) It identified priority sage-grouse habitats as "breeding, late brood-rearing, winter concentration areas, and where known, migration or connectivity corridors." (*Id*.) The NTT Report recommended closing these priority sage-grouse habitat areas to oil and gas or other mineral leasing, concluding that "[t]here is strong evidence from the literature to support that surface-disturbing energy or mineral development within priority sage-grouse habitats is not consistent with the goal to maintain or increase populations or distribution." (SFA_18392.)

With regard to lek buffers, the NTT Report found that the BLM's existing 0.25 mile "No Surface Occupancy" buffers around sage-grouse leks and 0.6 mile seasonal timing buffers were inadequate to protect sage-grouse, stating that "protecting even 75 to >80% of nesting hens would require a 4-mile radius buffer" and that even a 4-mile buffer "would not be large enough to offset all the impacts" of energy and mineral development. (SFA_18393-94.)

In March 2013, the FWS released its own report entitled the "Conservation Objectives Team Report" (COT Report) that identified "Priority Areas for

Conservation" (PACs) as "key habitats necessary for sage-grouse conservation." (SFA_18467.) The COT Report emphasized that "[m]aintenance of the integrity of PACs . . . . is the essential foundation for sage-grouse conservation," but recognized that "habitats outside of PACs may also be essential," including to provide connectivity between PACs. (SFA_18467; SFA_18490.) The COT Report recommended avoiding "new mining activities and/or any associated facilities within occupied habitats, including seasonal habitats" and stressed the need to ensure "no net loss of sage-grouse habitats in areas affected by mining." (SFA_18503.) The COT Report also stated: "There is an urgent need to 'stop the bleeding' of continued population declines and habitat losses by acting immediately to eliminate or reduce the impacts contributing to population declines and range erosion," and that "[t]here are no populations within the range of sage-grouse that are immune to the threat of habitat loss and fragmentation." (SAF_18485-46.) "Achieving this objective requires eliminating activities known to negatively impact sage-grouse and their habitats, or redesigning these activities to achieve the same goal." (SFA_18486.) The report found that management "must continue to effectively conserve all current PACs," which are "essential for sage-grouse conservation." (SFA_18448; SFA_18486.)

In an October 2014 memorandum to the BLM and Forest Service, the FWS

identified a sub-category of the PACs as sage-grouse "stronghold" areas that have the "highest densities of greater sage-grouse and other criteria important for the persistence." (SFA_14530.) These strongholds were the basis for the "Sagebrush Focal Areas" (SFAs) in the 2015 Plans (which are discussed next) and were designated as "a subset of priority habitat most vital to the species persistence within which [the FWS] recommend[s] the strongest levels of protection." (*Id.*)

C. **The 2015 Plans and Proposed SFA Mineral Withdrawal**

In 2015, the BLM and Forest Service adopted Sage-Grouse Plans (the 2015 Plans) that covered ten states, revised 98 federal land use plans, and incorporated many of the NTT and COT Reports' recommendations, such as restrictions to prevent or minimize surface disturbances in priority habitats, and requirements of compensatory mitigation for unavoidable adverse impacts to sage-grouse habitats. As called for in the NTT and COT Reports, the 2015 Plans established new sage-grouse priority habitat designations with heightened management protections across some 67 million acres of federal land, including "Priority Habitat Management Areas" (PHMAs)—of which SFAs are a subset—and "General Habitat Management Areas" (GHMAs), along with other priority habitats in certain states (including "Important Habitat Management Areas," or IHMAs, in Idaho). 80 Fed. Reg. 59875, 59905.

PHMAs "are the location of the highest quality habitat with the greatest

number of breeding sage-grouse," and largely coincide with PACs identified in the COT Report. 80 Fed. Reg. 59875. These "[p]riority sage-grouse habitats are areas that have the highest conservation value to maintaining or increasing sage-grouse populations." (*Id.*) GHMAs are sage grouse habitat that contain "fewer leks and sage-grouse than PHMAs" and "provide sage-grouse conservation by protecting habitat and connectivity between populations and potential refugia in the event of catastrophic events such as wildfire." 80 Fed. Reg. 59878.

To address threats from mining, the BLM submitted an application requesting the Secretary of Interior withdraw approximately 10 million acres of SFA from mineral location and entry under the Mining Law, subject to valid existing rights. *See* 80 Fed. Reg. 57635-37. The FWS supported this proposed withdrawal. *See* 80 FR 59878; *see also* 80 FR 59916 ("Within the areas of greatest conservation importance (SFAs), DOI will recommend withdrawal from locatable mineral entry. We support the recommendations for mineral withdrawal in SFAs that would remove potential impacts on approximately 4 million ha (10 million ac) of sage-grouse habitat.").

The Secretary of Interior approved the withdrawal application and took the first step in the withdrawal process by proposing the withdrawal on September 16, 2015, and publishing notice of the proposed withdrawal on September 24, 2015. 80

Fed. Reg. 57635; *see* 80 Fed. Reg. 59878. *see also* 43 C.F.R. § 2310.3-1 (setting

out publication and public meeting requirements for a proposed withdrawal of

lands).

> **D.     2015 FWS "Not Warranted" Finding.**

The protections for sage grouse contained in the BLM and Forest Service's

2015 Plans convinced the FWS to revise its 2010 finding that an ESA listing was

"warranted but precluded," to a finding that listing of the sage grouse was "not

warranted." The FWS explained this change as follows:

> Since 2010, there have been several major changes in the regulatory
> mechanisms that minimize impacts to sage-grouse and their habitats.
> Foremost among these are the adoption of new Federal Plans
> specifically tailored to conserving sage-grouse over more than half of
> its occupied range. These Federal Plans now include substantial
> provisions for addressing activities that occur in sage-grouse habitats
> and affect the species, including those threats identified in 2010 as
> having inadequate regulatory measures. Aside from addressing
> specific activities, the Federal Plans include provisions for
> monitoring, adaptive management, mitigation, and limitations on
> anthropogenic disturbance to reduce impacts authorized in sage-
> grouse habitats. The Federal Plans are the foundation of land-use
> management on BLM and USFS managed lands. We are confident
> that these Federal Plans will be implemented and that the new
> changes, which are based on the scientific literature, will effectively
> reduce and minimize impacts to the species and its habitat.

80 Fed. Reg. 59,887. The FWS further stated that "the Federal Plans provide

adequate mechanisms to reduce and minimize new disturbance in the most

important areas for the species. By following COT Report and NTT guidance and

restricting impacts in the most important habitat, the Federal Plans ensure that

high-quality sage-grouse lands with substantial populations are minimally

disturbed and sage-grouse within this habitat remain protected." 80 Fed. Reg.

59882.

Regarding federal conservation plans, the FWS stated:

Within the areas of greatest conservation importance (SFAs), DOI
will recommend withdrawal from locatable mineral entry. We support
the recommendations for mineral withdrawal in SFAs that would
remove potential impacts on approximately 4 million ha (10 million
ac) of sage-grouse habitat. . . . These measures minimize mining
impacts in priority habitats for the life of the management plans,
estimated to be the next 20 to 30 years. Based on what we know
today, no mining activities are likely to result in loss of these
important areas for conservation, but we recognize that economic
changes or technological advances may increase the risk of
development in the future. Therefore, the long-term protection of the
sage-grouse habitat in the SFAs from locatable mineral development
will ensure that these important populations are conserved into the
future.

80 Fed. Reg. 59916.

The FWS explicitly relied on the BLM and Forest Service's conservation

efforts, including the proposed withdrawal, in finding that the listing of the sage

grouse as a threatened or endangered species "is not warranted at this time." 80

Fed. Reg. 59936.

### E.    Draft Environmental Impact Statement

In December 2016, the BLM circulated a Draft Environmental Impact

Statement (DEIS) analyzing the proposed SFA mineral withdrawal. (SFA_14480.)
The DEIS described the purpose of the withdrawal as avoiding "loss of greater
sage-grouse habitat important for the persistence of the species," and "because
certain mining operations are viewed by USFWS as a threat to the persistence of
greater sage-grouse and the agencies have less discretion with respect to when and
where mineral exploration and mining under the Mining Law is conducted, as
compared to other agency authorizations." (SFA_14485-86.)

The DEIS analyzed five alternatives, including a "No Action" alternative,
and the "Proposed Action" alternative—the proposed withdrawal of 10 million
acres of SFA. (SFA_14488.) The BLM also commissioned a USGS survey, which
produced a "Mineral Potential Report," to analyze the impacts of each alternative.
(SFA_14530.) The Mineral Potential Report described the locatable mineral
potential within the withdrawal area and provided the basis for the DEIS's
Reasonable Foreseeable Development (RFD) scenario, which provided an
"estimate of the amount and type of future locatable mineral exploration and
development that could occur in the proposed withdrawal area over the 20-year
duration of the withdrawal."[1] (SFA_14531.)

---

[1] The DEIS states that the RFD "provides a consistent set of assumptions regarding the
(Continued)

Under the no action alternative, i.e., no withdrawal, the DEIS projected that 114 future exploration projects and 26 future mines would occur in the SFA over the next 20 years. (SFA_14488; SFA_14609.) Under the proposed alternative, i.e., the 10-million acre withdrawal, the DEIS projected that only 38 future exploration projects and 3 future mines would occur in the SFA over the next 20 years. (*Ibid.*)

The BLM estimated the average disturbances for each type of activity using its database of past mining projects. (SFA_ 14560-61.) Small exploration projects were those estimated to involve 5 acres of disturbance area; large projects were estimated to involve a disturbance greater than 5 acres (SFA_14561.) Small mining projects were estimated to generate a disturbance area of less than 100 acres, and large mining projects were estimated to involve a disturbance area of 100 or more acres. (SFA_14560.) To assess the impacts on sage grouse, the DEIS estimated the number of leks, male birds, and habitat that would be impacted under each alternative, calculating habitat disturbance using the estimated footprint of exploration and mining projects for each alternative. (SFA_14877.)

The DEIS then classified the mining-related impacts as minor, moderate, or

---

anticipated future mineral development projects that could occur in the absence of the withdrawal and serves as the basis for assessing the environmental impacts of the" proposed withdrawal. (SFA_14531.)

major using the following definitions: minor impacts "would affect less than 1 percent of the leks, habitat, or population members within the SFA withdrawal area, within a specified SFA, or within a state"; moderate impacts "would affect more than 1 percent but less than 3 percent of the leks, habitat, or population numbers within the SFA withdrawal area, within a specified SFA, or within a state"; and major impacts "would affect more than 3 percent of the leks, habitat, or population numbers within the SFA withdrawal area, within a specified SFA, or within a state." (SFA_14876.)

The DEIS projected that future mining under the proposed action alternative, which would close the SFA withdrawal area to all new claims, would result in 291 leks impacts and 5,749 male sage grouse impacts. (SFA_14883.) Under the no action alternative, future mining was projected to result in 494 leks and 9,292 male sage grouse impacts. (*Id.*) This meant that the withdrawal was projected to result in 203 (14%) fewer leks impacted and 3,543 (12%) fewer males impacted than the no action alternative. (*See* Pl SOF, ¶ 40; SFA_14882, 14883.) Under the BLM's definitions, these percentage differences exceeded the threshold for a "major" impact.

The DEIS was adopted on December 30, 2016. (SFA_14482.) It was open for public comment from December 30, 2016 to March 30, 2017. (SFA_16966.)

The BLM received 4,210 responses, including letters and emails, to the DEIS. (*Id.*)

## F.   FWS Comments

The FWS submitted its comments to the DEIS in March 2017. These comments stressed the continued importance of SFAs for sage grouse conservation and recommended, at a minimum, that areas with moderate and high mineral potential be withdrawn. (SFA_16936-53.) The FWS reiterated that the "planned withdrawal was included and relied upon in the [FWS's] 2015 not warranted finding to show the reduction in risk of habitat loss and fragmentation due to locatable mineral development in GRGS habitat." (SFA_16936.)

The FWS also noted that, at the time of its 2015 not warranted finding, "there was little comprehensive information available about potential mineral development in important GRSG habitats and mineral potential appeared widespread," but that, since then (in 2016), the USGS released a survey (the Mineral Potential Report) that evaluated the potential for locatable minerals in the SFA proposed for withdrawal. (*Id.*)

The FWS comments went on to note that "the SFAs identified by the BLM remain important areas for GRSG. Prioritization of habitat availability and connectivity in these areas remain important." (SFA_16937.) The FWS explained: "Many of the SFAs provide connectivity between GRSG populations. Loss of connectivity in these areas would likely result in population isolation with

associated loss of genetic diversity and long-term population persistence. The [FWS] supports protecting SFAs from fragmentation and limiting development in SFAs to keep an intact sagebrush landscape." (*Id.*)

The FWS also stated that, "to meet the need of the EIS to protect the GRSG and its habitat from adverse effects of locatable mineral exploration and mining, the [FWS] believes that areas within the SFAs identified as having high and moderate mineral potential are the most important to include in the mineral withdrawal" and recommended that the BLM "craft an alternative that focuses the withdrawals on the areas identified as high or moderate potential for locatable minerals." (*Id.*)

Finally, the FWS provided a detailed assessment of the current status of potentially impacted populations, and their contributions to population connectivity and noted flaws and omissions in DEIS analysis, including BLM's failure to analyze potentially "major" localized impacts and lost population connectivity. (SFA_16943-53.) The FWS also provided a detail state-by-state assessment of the percentage of SFA classified as high or moderate mineral potential, the current status of potentially-impacted populations, and their contributions to population connectivity. (SFA_16940-42.)

### G.    2017 Administrative Final EIS

In 2017, after the Trump Administration came into office and while this litigation was pending, then-Interior Secretary Zinke directed that a "Sage-Grouse Review Team" be assembled to review the 2015 Sage-Grouse Plans and recommend modifications to "enhance State involvement" and align the BLM's actions with State plans concerning the sage grouse. (Dkt. 94, 94-1, 94-2.) This new team recommended numerous modifications to the 2015 Plans and, in September 2017, the BLM released an "Administrative Final EIS (AFEIS) (SFA_16960-17694.) The AFEIS was not circulated for external review.

The AFEIS made adjustments to the number of birds and leks impacted by withdrawal alternatives, finding that under the no action alternative, 470 leks and 3,219 males would be impacted, and under the withdrawal alternative, 90 leks and 649 males would be impacted (SFA_17382.) Based on the adjusted numbers, the AFEIS projected that the withdrawal would benefit 12% of leks and 9% of males in the SFA withdrawal area. (*Id*; Pl. SOF ¶ 40.) However, the AFEIS further divided the percentage impact by 20 (representing the 20 years that the withdrawal of SFA would be in effect) to obtain what the AFEIS characterized as the "maximum percent of total" leks or males "impacted per year." (SFA_17382.)

The AFEIS also revised the definitions of what would be considered a "minor," "moderate," or "major" impact. Under these revised definitions, a

"minor" impact includes "impacts that would affect less than at least 1 percent of the leks or population," but also includes[2] impacts that result in an annual population drop of less than 40 percent, or that result in an annual population drop of less than 10 percent for 3 consecutive years. (SFA_17374.) A "moderate" impact was redefined to include an annual population drop of 40 percent or greater in a single year, or an annual population drop of 10 percent or greater for 3 consecutive years." (*Id.*) A "major" impact was redefined to include an annual population drop of 60 percent or greater, or an annual population drop of 20 percent or greater for 3 consecutive years. (*Id.*)

Based on these new definitions, the AFEIS determined that mining would cause only minor negative impacts to sage grouse populations, leks, and habitat. (SFA_16975.) Again, in reaching that conclusion, the AFEIS divided the percent of males and leks expected to be impacted by 20 to obtain what the AFEIS characterized as the number that would be impacted per year. The AFEIS thus concluded that the total number of leks that could be directly impacted by the proposed withdrawal was approximately 0.18 percent of all leks in the SFAs per

---

[2] Because the revised definition of "moderate" has as floor of 40%, the effective definition of a "minor" impact is an impact that results in an annual population drop of less than 40 percent, or that results in an annual population drop of less than 10 percent for 3 consecutive years. (*See* SFA_17374.)

year, and that the number of males impacted would be approximately 0.12 percent of all males per year. However, as Plaintiffs point out, absent successful restoration, which is difficult to achieve and may not occur,[3] the impacts will be cumulative and the projected total number of birds impacted by year 20 will be 3,219, and the total leks impacted will be 470 based on the numbers provided in the AFEIS.[4]

## H.      Cancellation of Proposal

On October 5, 2017, then-Acting BLM Director, Michael D. Nedd, submitted a memorandum to then-Deputy Interior Secretary David Bernhardt, with the subject line: "Proposal to Cancel Withdrawal Application and the Proposed

---

[3] As Plaintiffs point out, and Defendants do not dispute, mining and associated infrastructure in sagebrush habitats result in direct habitat loss, and restoration of sagebrush, even where required, "is difficult to achieve and disturbed sites may never return to suitability for sage grouse." (Pl. SOF at 2, Dkt. 235-2; Def. SOF at 1, Dkt. 239-3; SFA_9936-7; SFA_17378.) Further, resulting habitat fragmentation can magnify the decline of sage grouse populations by restricting the connectivity between populations, limiting genetic flow, and placing isolated populations at risk of extirpation. (*Ibid.*; *see* SFA_18463-64 (COT Report discussing "loss and fragmentation of sagebrush habitats as a primary cause of decline of sage-grouse populations"; that "restoration of disturbed areas is very difficult," that not all areas can be restored; that "processes to restore healthy native sagebrush communities are relatively unknown"; and noting the various sources of habitat loss).)

[4] The AFEIS also changed the total number of estimated mines and exploration projects for the withdrawal area. For the mines, the no action estimate was increased from 26 in the DEIS to 31 in the AFEIS, and the withdrawal estimate was increased from 3 in the DEIS to 4 in the AFEIS. (SFA_14803; SFA_107296.) For the number of exploration projects, the no action estimate was decreased from 114 in the DEIS to 100 in the AFEIS, and the withdrawal estimate was decreased from 38 in the DEIS to 29 in the AFEIS. (*Ibid.*)

Withdrawal for the Sagebrush Focal Areas and Terminate Environmental Impact Statement" (Nedd Memo). (Rangewide_4-26.) The Memo states that the withdrawal recommendation "was unreasonable in light of the data available at the time of the decision," and that through the NEPA process, the USGS Survey and the states have provided data on mining activity and its impacts, "which confirmed that the proposed withdrawal was unnecessary." (Rangewide_4-5.) Citing the finding of the AFEIS, and federal regulations that allow cancellation of a withdrawal application, 43 C.F.R. § 2310.1-4(a), the Nedd Memo concluded that the withdrawal was "no longer needed" for sage grouse conservation because the benefits to sage grouse "would be minimal." (Rangewide_12-13, 14.) The Nedd Memo relied on the findings of the AFEIS regarding the impacts that were now deemed "minor." The Nedd Memo concluded by proposing that the BLM cancel the withdrawal application and terminate the EIS process. (Rangewide_15.)

The Nedd Memo was signed by then-Secretary of Interior David Bernhardt on October 5, 2017, showing his concurrence with the recommendation. (*Id.*). That same day, BLM issued a press release announcing it had cancelled the withdrawal, quoting Nedd as stating: "The proposal to withdraw 10 million acres to prevent 10,000 from potential mineral development was a complete overreach." (SFA_10117.)

On October 10, 2017, the BLM published a Federal Register notice that it had cancelled the withdrawal proposal and terminated the EIS process. *See* Fed. Reg. 47248. BLM did not issue a final EIS.

## STATUTORY FRAMEWORK

### A.    Mining and Withdrawals of Public Lands from Mining

Under the 1872 Mining Law, all federal public lands are open to locatable mining unless they have been withdrawn. Citizens can locate mining claims on federal public lands by making a discovery of a deposit of gold, silver, cinnabar, lead, tin, copper, "or other valuable deposits." 30 U.S.C. §§ 22, 23. A citizen that has a valid mining claim also has the right of "possession and enjoyment of" the surface of federal lands for purposes of mining. *See* 30 U.S.C. § 26.

"Only a withdrawal from location and entry under the Mining Law can prevent the establishment of new mining claims and provide certainty that lands not encumbered by mining claims will not be developed." (SFA_14485.) Thus, federal agencies "have less discretion with respect to when and where mineral exploration and mining under the Mining Law is conducted, as compared to other agency authorizations." (SFA_14486.)

The process of withdrawing federal public lands from location and entry under the Mining Law is initiated through submission of an application for withdrawal to the Secretary of the Interior, or upon the Secretary's own proposal

for a withdrawal. 43 U.S.C. § 1714. Once an application has been accepted, or a proposal made, the Secretary must publish a notice in the Federal Register stating that the application has been submitted or the proposal has been made and setting forth the extent to which land is to be segregated while the application is being considered by the Secretary. *Id*.

The publication of notice in the Federal Register triggers a temporary segregation of the proposed withdrawal land pending the Secretary's final decision, for a period of up to 2 years. *Id.*; 43 C.F.R. § 2310.2. This temporary segregation terminates upon (1) rejection of the withdrawal application by the Secretary, (2) the withdrawal of lands by the Secretary, or (3) the expiration of the 2-year temporary segregation period. 43 U.S.C. § 1714(b); 43 C.F.R. 2310.2. The termination of temporary segregation upon expiration of the 2-year period does not, however, affect the processing of the withdrawal application. 43 C.F.R. § 2310.2-1(d). Finally, withdrawals such as the present one, which is aggregating 5,000 or more acres, may be made for a period of not more than 20 years, subject to renewal, and must receive Congressional approval. 43 U.S.C. § 1714(c).

A withdrawal application or proposal can be cancelled if the applicant or proposer determines that withdrawal of the lands is "no longer needed" in connection with a requested or proposed action. The filing of a cancellation notice

in such a case terminates the temporary segregation of the lands and eliminates the

land from the withdrawal application or proposal. *See* 43 C.F.R. § 2310.1-4; 43

C.F.R. § 2310.2-1 ("The cancellation, in whole or in part, of a withdrawal

application or a withdrawal proposal shall result in the termination of the

segregative effect of the application or proposal, as to those lands deleted from the

application or proposal.").

### B.    NEPA

The purpose of NEPA is twofold: "(1) to ensure that agencies carefully

consider information about significant environmental impacts and (2) to guarantee

relevant information is available to the public." *N. Plains Res. Council, Inc. v.

Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish

this, NEPA imposes procedural requirements designed to force agencies to take a

'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d

1019, 1027 (9th Cir. 2005).

NEPA does not provide a separate standard of review. Thus, NEPA claims

are reviewed under the standards of the Administrative Procedures Act. *See* 5

U.S.C. § 706(2); *San Luis v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *NW

Resource Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995).

### C.    Administrative Procedures Act

Under the Administrative Procedures Act (APA), "an agency action must be

upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jewell*, 747 F.3d at 601 (quoting 5 U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id*.

Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

The reasoned-decision making requirement includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973). Thus, an agency violates the APA when it changes its policy or "chang[es] its course" without providing a reasoned

explanation or analysis for that change. *See State Farm*, 463 U.S. at 34, 57; *Organized Vill. of Kake v. U.S. Dep't of Agric*., 795 F.3d 956, 967, 969 (9th Cir. 2015) (agency violated the APA where it failed to provide a reasoned explanation for the agency's change in policy); *Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why.")

## JURISDICTIONAL CHALLENGES

Defendants contend that the Court lacks jurisdiction over Plaintiff's challenge to the BLM's cancellation of the withdrawal application. Defendants raise three arguments in support of this contention: (1) that the BLM's cancellation is not a final agency action; (2) that Plaintiffs have failed to demonstrate that they have standing; and (3) that Plaintiffs' free-standing APA claims are not cognizable.

### A. Final Agency Action

To invoke the Court's jurisdiction under the APA, a plaintiff must challenge "agency action" that is "final." 5 U.S.C. § 704; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990). " '[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). Such a list is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc*., 531 U.S. 457, 478 (2001).

Agency action is "final" when two conditions are met: (1) "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted); *see Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) ("courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled").

Here, the first prong of *Bennett* is met because the act of cancelling the withdrawal proposal and terminating the EIS process marks the consummation of the BLM's decision-making process in relation to that withdrawal.

The second prong of *Bennett* is also met here because legal consequences flowed from the BLM's cancellation of the withdrawal application. Specifically, a withdrawal of lands requires either an application for withdrawal from the agency, or a proposal for withdrawal on the Secretary's own motion. *See* 43 U.S.C. § 1714 (describing withdrawal of lands as requiring application for withdrawal or a proposal for withdrawal on the Secretary's own motion). The BLM's cancellation of the pending application for withdrawal terminated the withdrawal process and

terminated the Secretary's ability to consider the proposed withdrawal under the

application. *See* 43 C.F.R. § 2310.1-4(a) (providing for cancellation of withdrawal

applications where applicant determines lands are "no longer needed"). Thus, legal

consequences flowed from the BLM's cancellation of the withdrawal application,

and the BLM's cancellation decision is a final action subject to judicial review. *See*

*Bennett,* 520 U.S. at 177-78; *Sound Action v. U.S. Army Corps of Engineers*, 2019

WL 446614, *8 (W.D. Wash. 2019) (finding final agency action where memo

directed agency to stop evaluation of, and prevented agency from further

considering, potential alterations to the high tide line).

    Defendants do not dispute that the first prong of *Bennett* is met.[5] They

contend, however, that *Bennett*'s second prong is not met, and put forward several

_____

    [5] Intervenors argue that the first prong of *Bennett* is not met because the cancellation of the withdrawal was a discretionary decision and was not the BLM's final word on the issue of mineral withdrawal because the BLM is free to propose withdrawal of all or some portion of SFA again at any time. (Dkt. 251.) This argument is entirely without merit. The BLM's cancellation decision was not tentative or interlocutory and the fact that the BLM may in the future consider applying to withdraw some or all of the SFA does not impact the fact that the cancellation was a consummation of the BLM's decision making process as to the proposed withdrawal at issue here. *See Nat'l Env. Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change in the future.' ") (citation omitted); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("But all laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."); *Sound Action*, 2019 WL 446614 (rejecting argument that agency's memo did not mark the consummation of its decision-making process where memo halted any future consideration of the specific proposal at issue).

arguments in support of their contention.

For example, Defendants argue that because the 2-year temporary segregation period expired prior to the BLM's cancellation of the withdrawal application, the cancellation did not determine any rights or obligations or have legal consequences. The Court disagrees. Although expiration of the 2-year temporary segregation period meant that the lands proposed for withdrawal were no longer segregated, this expiration had no impact on the pending application for withdrawal—that application remained pending before the Secretary. *See* 43 C.F.R. § 2310.2-1 (providing that the expiration of the 2-year temporary segregation period "shall not affect the processing of the withdrawal application"). It was, instead, the BLM's cancellation that terminated the withdrawal application and terminated the Secretary's ability to consider the proposed withdrawal. *See* 43 U.S.C. § 1714 (describing withdrawal of lands as requiring an application for withdrawal or a proposal for withdrawal on the Secretary's own motion).

Further, although the BLM's cancellation decision did not change the ability of third parties to locate and develop new mining claims, and thus did not change the status quo as to those interests, this does not render the BLM's decision unreviewable. Case law makes clear that an agency's decision to not act, and thus not change the status quo, is a final agency action subject to judicial review where,

as here, the agency has entered into an evaluative process and there is a sufficient record to enable judicial review. *See, e.g., City of Chicago v. United States*, 396 U.S. 162, 166-67 (1969) (agency decision to discontinue investigation is a final agency action); *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1037-38 (D.C. Cir.), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (agency decision not to repeal rules is a final agency action); *Envt'l Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) (agency inaction on request for suspension of registration of pesticide can be final agency action); *Capital Network Sys., Inc. v. F.C.C.*, 3 F.3d 1526, 1530 (D.C. Cir. 1993) (refusal to institute rule-making proceedings was final agency action); *Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1046 (D.C. Cir. 1979) ("in light of the strong presumption of reviewability, discretionary decisions not to adopt rules are reviewable where, as here, the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted"); *see also Rochester Telephone Corp. v. United States*, 307 U.S. 125, 142-143 (1939) (explaining that agency decision to "dismiss a complaint on the merits and maintain[] the status quo is an exercise of administrative function, no more and no less, than an order directing some change in status"); *Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 830-31 (9th Cir. 2006), *opinion vacated on*

*reh'g en banc*, 490 F.3d 725 (9th Cir. 2007)[6] (agency decision to not adopt draft

policy regarding treatment of primates was reviewable "final agency action" where

decision had practical consequence of allowing continuing harm to primates); *cf.*

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473

U.S. 172, 193, (1985) ("the finality requirement is concerned with whether the

initial decisionmaker has arrived at a definitive position on the issue that inflicts an

actual, concrete injury"), *overruled on other grounds by Knick v. Twp. of Scott,*

*Pennsylvania*, 139 S. Ct. 2162 (2019).

Defendants also point out that the Secretary could have made a proposal on

his own motion for the withdrawal of the lands, and thus could have restarted the

withdrawal process, and contend that this means the BLM's decision did not have

legal consequences. The Court disagrees. The possibility that the Secretary could

have initiated the withdrawal process in the future on his own motion does not

negate the legal consequences that flowed from the BLM's decision—the

termination of the withdrawal application and resulting termination of the

---

[6] The *Veneman* opinion was vacated for rehearing *en banc*, but the parties settled and the case was dismissed prior to that rehearing. Thus, the opinion does not have precedential effect. However, the opinion's analysis regarding final agency action provides persuasive authority. *See United States v. Joelson*, 7 F.3d 174, 178 n.1 (9th Cir. 1993).

Secretary's ability to consider the proposed withdrawal pursuant to that application. *See Cty. of Rockland v. U.S. Nuclear Regulatory Comm'n*, 709 F.2d 766, 775 (2d Cir. 1983) ("The fact that the Commission may reexamine its decision at a later date does not detract from the final nature of the December decision."); *cf. Abramowitz v. United States Envtl. Protection Agency*, 832 F.2d 1071, 1075 (9th Cir. 1987) (EPA notice stating that it was "holding open" and "was not taking final action" on a ruling did not destroy finality).

Defendants point out that then-Deputy Secretary Bernhardt concurred in the Nedd Memo, and that the BLM thus made a decision in concert with the Secretary when it cancelled the application and terminated the withdrawal process. However, that the Secretary may have informally concurred in the BLM's cancellation decision does not change the fact that the cancellation took consideration of the application away from the Secretary, and that the Secretary thus no longer had the ability to either reject or approve the application.

Finally, Defendants set forth a policy argument. They argue that the judicial review sought by Plaintiffs is likely to interfere with the proper functioning of the agency and impose a burden on the court, citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980). Defendants' reliance on *Standard Oil* is misplaced. In that case, the Supreme Court found that an agency's issuance of a complaint was not a final

agency action but was, instead, "a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." *Id*. at 239, 241. Here, in contrast to *Standard Oil*, the BLM's cancellation decision was not a threshold determination. It was a final decision in the withdrawal process and, as discussed above, legal consequences flowed from that decision.

Additional cases cited by Defendants are similarly inapposite because direct legal consequences did not flow from the agency action at issue in those cases; instead, for legal consequences to flow, additional agency action was required. *See, e.g., Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593-94 (9th Cir. 2008) (agency's determination that property contained wetlands subject to Clean Water Act was not a final agency action but was merely a "bare statement of the agency's opinion"); *Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017) (agency's issuance of a pilot program report was not final agency action; although issuance of the report cleared the way for issuing permits, the agency could still have lawfully declined to issue the permits); *Cal. by and through Brown v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019) (agency's revised determination that emission standards were not appropriate because they "may be too stringent" was not a final agency action because the determination merely set in motion a rulemaking process that may

result in a change in standards in the future); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (agency's promulgation of voluntary survey protocols that provide a methodology for the detection of an endangered species was not a final agency action as it did not change or determine the legal obligations of the landowners). In contrast, in the present case a direct legal consequence flowed from the agency's decision—the BLM's cancellation decision terminated the withdrawal application and thus terminated the Secretary's ability to consider the application and the proposed withdrawal. Accordingly, the BLM's decision is a final agency action subject to judicial review.

### B. Standing

Standing requires that plaintiffs show an injury in fact, fairly traceable to the defendant, and likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. To demonstrate injury in fact for a procedural claim—such as the claims at issue here—a plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his [or hers] that is the ultimate basis of his [or her] standing," and " 'the reasonable probability of the challenged action's threat to [his or her] concrete interest.' " *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) (citations omitted).

Here, Plaintiffs contend that the BLM's cancellation decision presents two substantial risks of future harm to Plaintiffs' members: (1) risks to the recreational

and aesthetic use and enjoyment of members, and (2) risks to members'
opportunities to observe and photograph sage grouse. Plaintiffs have submitted
declarations of three members in support of standing.

The member declarations establish that the members have had extensive
contacts with SFA lands that were proposed for withdrawal, including living,
traveling, working, and recreating across significant portions of those lands, and
that these members have specific plans to continue doing so in the future. (*See
Ruprecht Decl.,* Dkt. 235-3; *Cole Decl.*, Dkt. 253-4; *Klitz Decl.*, Dkt. 253-5.) These
declarations also establish that mining disturbances would lessen the members' use
and enjoyment of these lands on future visits as well as their ability to observe and
photograph sage grouse. (*See ibid.*)

The record further establishes that there is a substantial risk that these
members will encounter mining disturbances that a withdrawal would have
prevented. Mining and associated infrastructure in sagebrush habitats cause
environmental damage, including surface disturbance and direct habitat loss and
fragmentation. Further, the impacts of mining operations extend well beyond the
direct surface disturbance and negative visual impacts that mining operations
create, and include ancillary impacts such as blasting noise, mine traffic, fugitive
dust, light pollution, air pollution, soil erosion, water contamination, surface water

drawdowns, and networks of roads and powerlines. (*See Ruprecht Decl.,* Dkt. 235-3; *Cole Decl.*, Dkt. 253-4.)

Defendants do not dispute these impacts but argue that Plaintiffs have failed to demonstrate the injury in fact necessary to establish that they have standing. Defendants point out that the proposed withdrawal covered nearly 10 million acres, and that BLM's analysis showed that mining was reasonably foreseeable on less than 0.1% of this area, or 10,000 acres, over the next 20 years. Defendants take the position that, to establish an injury in fact, Plaintiffs must identify a specific proposed mining project in a specific area that Plaintiffs' members plan to visit and that only then will Plaintiffs have standing to challenge the cancellation of the withdrawal. The Court disagrees.

Under the FLPMA, a withdrawal of public lands is "subject to valid existing rights." Pub. L. 94-579, § 701(h), 90 Stat. 2743, 2786 (1976)). Thus, the withdrawal would have prevented the location only of new mining claims. As Plaintiffs correctly point out, no prior notice is required for the location of new claims. Further, although notice of a new claim must be filed within 90 days of location,[7] by the time this notice is filed, the claim is already in existence. Thus, it

_____

[7] *See* 43 U.S.C. § 1744 (imposing filing requirements for new claims); 43 C.F.R. § (Continued)

is impossible for Plaintiffs to know of new claims until after the claims are already in existence. And, once in existence, the claims would not be precluded by a withdrawal. This makes it impossible for Plaintiffs to identify a specific project that would be precluded by a withdrawal. Indeed, Defendants argue repeatedly throughout their briefs of the inability to know the location of future mining and exploration projects.

Defendants also note that more than 90 days have passed since the cancellation and that Plaintiffs have not cited to any new claims that have been filed. However, assuming that no new claim has been filed in the interim since the BLM's cancellation of the withdrawal application, this would not negate the risk of injury claimed by Plaintiffs. The BLM's own AFEIS anticipated that there would be 98 additional projects without a withdrawal. This information, combined with the declaration of Plaintiffs' members and the other information in the record regarding the impact of mining and exploration projects, are sufficient to demonstrate Plaintiffs' injury in fact.

Further, the negative visible impacts of the surface disturbance and ancillary impacts of mining can be seen from significant distances. For example, a small

---

3833.1 (a claim that is not recorded within 90 days of location is abandoned and void by operation of law).

exploration project in Nevada that disturbs 1 acre of land was found by the BLM to be visible by a casual observer from a distance of approximately 3 miles. *See Mackay Optimization Project: Final Environmental Impact Statement*, at page 3-7, retrieved from https://eplanning.blm.gov/public_projects/nepa/54844/20003689/25004345/201900903_volume_I_mackay_feis_508 (last visited Jan. 26, 2021). As plaintiff points out, this 1-acre project would thus impact the viewshed of over 18,000 surrounding acres.[8] Extrapolating this impact to the anticipated 98 additional mining and exploration projects that the withdrawal would have prevented results in an estimated 1,764,000 acres for which the viewshed would be impaired. The Court finds that this information is more than sufficient to demonstrate that the cancellation of the withdrawal creates a substantial risk to Plaintiffs' members even though the 98 anticipated projects are expected to be located on less than 10,000 acres of the withdrawal lands.

The cases relied on by Defendants are not to the contrary. In *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009), the Supreme Court found that the plaintiff failed to establish standing where a member's affidavit was not tied to application of the challenged regulations, did not identify a particular site, and

---

[8] Calculated using the formula for the area of a circle, $A = \pi r^2$.

related "to past injury rather than imminent future injury sought to be enjoined." *Id.* at 495. Similarly, in *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256-57 (9th Cir. 2010), the Ninth Circuit found that the plaintiff failed to establish standing where a member's declaration did not demonstrate a link between a particular project and injury to the member's future recreational or aesthetic interests.

In contrast to *Summers* and *Rey*, in the present case, as discussed above, the information provided by Plaintiffs' members' declarations, and the BLM's own information, establish that the members have concrete plans to visit specific portions of the withdrawal area, and that the cancellation of the withdrawal creates a substantial risk of future harm to Plaintiffs' members' interests due to the impacts of the anticipated 98 additional mining and exploration projects that the withdrawal would have prevented. This is sufficient to establish the injury in fact necessary for standing. *See Jayne v. Sherman*, 706 F.3d 994, 999-1000 (9th Cir. 2013) (finding that plaintiffs had standing to challenge roadless rule because plaintiffs' members used the roadless area that received less protection under the rule and rejecting argument that plaintiffs lacked standing because they did not allege a specific project that would cause them harm, noting that "this is the only opportunity for plaintiffs to challenge the programmatic rule and that challenge can not become riper").

Plaintiffs have also established the other requirements for standing. The risk of harm claimed by Plaintiffs' members are traceable to the BLM's cancellation decision, which stopped consideration of the proposed withdrawal, and a favorable outcome could alter the BLM's decision to proceed with the withdrawal. The additional requirements for associational standing are also met here. Sage grouse and environmental conservation are germane to Plaintiffs' organizational missions, and there is no indication that the participation of individual members would be helpful or necessary.

## C. Reviewability under the APA

Defendants and Intervenors argue that the BLM's decision is not reviewable under the APA because (1) the decision is committed to agency discretion by law under 5 U.S.C. § 702(a)(2); (2) there is no meaningful standard under which to review the agency's decision; and (3) Plaintiffs do not allege an underlying statutory violation. The Court disagrees with their arguments and finds the BLM's decision reviewable under the APA.

The APA "creates a basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citations and internal quotation marks omitted). " '[L]egal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption

favoring judicial review of administrative action.' " *Id.* (quoting *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652-1653 (2015)). This presumption may be rebutted only if (1) the relevant statute precludes review, or (2) the action is committed to agency discretion by law. *Id.* (citing 5 U.S.C. § 701(a)(1), (2)). At issue here is the second exception—whether the action is committed to agency discretion by law under § 701(a)(2).

The Supreme Court, in addressing reviewability of agency decisions, "has noted the 'tension' between the prohibition of judicial review for actions 'committed to agency discretion' and the command in § 706(2)(A) that courts set aside any agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Weyerhaeuser*, 139 S. Ct. at 370 (quoting *Heckler v. Chaney*, 470 U.S. 821, 829 (1985)). "A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Id.* Thus, "[t]o give effect to § 706(2)(A) and to honor the presumption of review," the exception in § 701(a)(2) is to be read "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' " *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

Here, Plaintiffs' challenge to the BLM's cancellation decision is grounded in

the BLM's determination that the withdrawal was "no longer needed in connection with a requested or proposed action" under 43 C.F.R. § 2310.1-4.[9] This regulation provides a meaningful standard by which to judge the BLM's exercise of its discretion. Specifically, the "in connection with" language of the regulation indicates that the determination of whether the withdrawal "is no longer needed" is to be viewed in connection with the purpose for which the lands were proposed to be withdrawn, which, in the present case, was sage grouse conservation. *See id*; 80 Fed. Reg. 57, 635 (stating that the purpose of the withdrawal was to "to protect the Greater Sage-Grouse and its habitat from adverse effects of locatable mineral exploration and mining").

The FLPMA provides additional reference points and policies to guide judicial review of the BLM's decision. *See* 43 U.S.C. § 1702(j) ("The term 'withdrawal' means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the

---

[9] Defendants argue that Plaintiffs raised this basis for APA review for the first time in their reply brief and that the Court should therefore decline to consider it. Defendants' argument lacks merit. Plaintiffs raised this argument in their combined response/reply brief, and thus in their *response* to Defendants' motion for partial summary judgment, and Defendants have thus had an opportunity to reply to the argument.

area or reserving the area for a particular public purpose or program . . .");

43 U.S.C. § 1701(a)(8) (setting out policy that "the public lands be managed in a

manner that will protect the quality of scientific, scenic, historical, ecological,

environmental, air and atmospheric, water resource, and archeological values; that,

where appropriate, will preserve and protect certain public lands in their natural

condition; that will provide food and habitat for fish and wildlife and domestic

animals; and that will provide for outdoor recreation and human occupancy and

use").

 The regulations and statement of purpose for the withdrawal provide a

sufficiently meaningful standard against which to judge whether the BLM's

decision that the withdrawal was "no longer needed" to conserve sage grouse was

arbitrary and capricious.

 Moreover, courts have been willing to review a Secretary's decision to adopt

a withdrawal application. *See Nat'l Mining Ass's v. Zinke,* 877 F.3d 845 (9th Cir.

2017); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007).

And the Secretary's decision to adopt a withdrawal proposal involves even greater

discretion than the BLM's decision to cancel a withdrawal application, *see* 43

U.S.C. § 1714; 43 C.F.R. § 2310.3-3 (placing essentially no constraints on the

Secretary's discretion to approve or reject a withdrawal proposal that is properly

presented). If a Secretary's decision to adopt a withdrawal application is reviewable, then so too is a decision to cancel a withdrawal application based on an agency's determination that the withdrawal is "no longer needed in connection with a requested or proposed action."

The Court rejects Defendants' additional argument that the BLM's decision is not reviewable on the independent basis that Plaintiffs have failed to cite to an underlying statutory violation. First, as noted above, Plaintiffs' challenge to the BLM's cancellation decision is grounded in BLM's determination that the withdrawal was "no longer needed in connection with a requested or proposed action" under 43 C.F.R. § 2310.1-4. This regulation provides a meaningful standard by which to judge BLM's exercise of its discretion.

Second, both the Supreme Court and the Ninth Circuit have reviewed agency decisions that did not involve an underlying statutory violation. For example, in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020), the Government made a similar argument to Defendants' argument here, which the Supreme Court rejected. The Court held that the Department of Homeland Security's decision to rescind DACA, which was an agency-created policy, was reviewable under the APA. *See id.* at 1905-07. The Court went on to hold that the agency's recission of DACA "was arbitrary and

capricious in violation of the APA." *Id.* at 1915.

Other Supreme Court and Ninth Circuit decisions have also reviewed agency decisions that did not involve an underlying statutory violation. *See State Farm*, 463 U.S. at 34, 57 (1983) (reviewing an agency's change of policy under the APA and finding that the agency violated the APA where it "failed to present an adequate basis and explanation for" its change in policy, explaining that an "agency changing its course must supply a reasoned analysis" for that change (citation and internal quotation marks omitted)); *Kake*, 795 F.3d at 967, 969 (reviewing an agency's change of policy under the APA and finding the agency violated the APA where it failed to provide a reasoned explanation for that change); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (reviewing claim that agency violated the APA during rulemaking).

Finally, Defendants' reliance on *Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792 (9th Cir. 1996), is misplaced. In *Thomas*, the Ninth Circuit held that an agency's decision to sell timber was committed to agency discretion under § 701(a)(2) and thus not subject to judicial review. *Id.* at 796, 798. The Ninth Circuit rejected the plaintiffs' argument that review of the sale could be conducted under the "arbitrary and capricious" standard of §706(2)(A), independent of

another statute, noting that "*where there is no law to apply for purposes of section 701(a)(2)* it is legally irrelevant whether an agency has made a finding that is contrary to the evidence before it or that's so implausible that it couldn't be ascribed to a difference in view or the product of agency expertise." *Id.* at 798 (emphasis added). Thus, the Court was focused on § 701(a)(2) and the lack of any standard to apply in judging the agency's decision. In the present case, as discussed above, a standard for reviewing the BLM's decision is found in 43 C.F.R. § 2310.1-4.

## THE BLM'S CANCELLATION DECISION

The Court now turns to the merits of Plaintiffs' challenge to the BLM's decision to cancel the withdrawal application. Plaintiffs and Defendants both seek summary judgment regarding this challenge. Plaintiffs argue that the cancellation decision must be reversed because (1) the BLM's cancellation decision was arbitrary and capricious under the APA; and (2) the BLM's cancellation decision violated NEPA because the BLM issued the decision before completing the EIS process. Defendants argue that their cancellation decision must be upheld because (1) the BLM adequately explained that its cancellation of the withdrawal application was based on new data and information; and (2) the BLM was not required to finish the NEPA process because it had cancelled the withdrawal proposal and there was thus no proposal before the agency.

### A.      Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an administrative record review case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id.*

Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43; *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id*.

An agency must set forth clearly the grounds on which it acted. *See Atchison*

*T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations for its action. *State Farm*, 463 U.S. at 50  (citation omitted). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (citations omitted).

Finally, because NEPA contains no separate provision for judicial review, an agency's compliance with NEPA is reviewed under the APA. *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1066 (9th Cir. 1995).

### B.    The BLM's cancellation decision was arbitrary and capricious in violation of the APA.

Plaintiffs argue that the BLM's decision to cancel the withdrawal application violates that APA because the BLM (1) failed to offer a reasoned explanation for reversing its prior position that a mineral withdrawal was necessary; and (2) entirely failed to consider significant benefits of the withdrawal.

#### 1.    The BLM failed to provide a reasoned explanation for reversing its prior position that the SFA mineral withdrawal was needed.

When an agency changes its policy position, "the APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015). Failure to do so renders its new policy arbitrary and capricious. *Id.*; *see F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy); *Kake*, 795 F.3d at 966 (" 'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.' ") (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 987, 981 (2005))).

Defendants and intervenors argue that *Kake* and *Perez* are inapplicable here because the BLM's change in position regarding the need for withdrawal was not a change in policy within the meaning of these cases. They argue that the BLM and the FWS are legally prohibited from making a withdrawal decision under the FLPMA, that the withdrawal decision is vested in the Secretary, and that, therefore, the BLM's cancellation decision was not a change in policy. The Court disagrees.

The agency at issue here is the BLM, not the Department of Interior, and the policy at issue is whether the withdrawal was needed for sage grouse conservation. In 2015, the BLM took the position that the withdrawal was needed for sage grouse conservation and therefore submitted the application for withdrawal. In 2017, the

BLM took the position that withdrawal was "no longer needed" for sage grouse conservation and cancelled its application. The BLM's change in position regarding whether the withdrawal was needed for sage grouse conservation requires a reasoned explanation. *See Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (the change in policy test applies when agencies fail "to provide reasoned explanations for changes in their position on matters of policy or factual findings"); *see also Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126 (2016) (noting an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (internal quotation marks, citation, and modifications omitted).

Plaintiffs contend that the BLM failed to provide a reasoned explanation for its change in position regarding whether the withdrawal was needed. Plaintiff argues first that Defendants failed explain why the BLM, in changing its position regarding the need for the withdrawal, disregarded prior expert and agency findings about the need for the withdrawal to protect against even incremental losses of SFA and that even incremental habitat losses could appreciably diminish prospects for sage grouse recovery. They contend that the record shows overwhelmingly that, to adequately protect the sage grouse, the priority habitats must be closed to new mining, and that the BLM failed to explain why these

considerations no longer rendered the withdrawal necessary. The Court agrees.

The Nedd Memo sets forth the reasons for the BLM's cancellation decision. The Memo states that the withdrawal is not needed because only 0.1%, or 10,000 acres of disturbance from locatable mining and exploration is expected over the next 20 years in the proposed withdrawal area of 10 million acres, and "there is no way to predict with any specificity where such development would occur." (SFA_4-5.) However, as Plaintiffs point out, the minimal footprint of mining disturbance was already known to the BLM when it proposed the withdrawal, and the USGS survey about locatable mining was available at the time the DEIS was published. Thus, the minimal footprint of the expected locatable mining in the withdrawal area and the inability to know with specificity where that mining will occur do not provide a reasoned explanation justifying the BLM's change in position.

Nonetheless, Defendants argue that the 0.1% referred to in the Nedd Memo is based on new data and provides a reasoned explanation for the change in position regarding the need for the withdrawal. Specifically, Defendants argue that the 0.1% figure that was known at the time of the withdrawal application was a *rangewide* figure and accounted for the impacts of *all* mining. Defendants argue that, in contrast, new data revealed that 0.1% of *SFAs* were expected to be

impacted by *locatable mining*. (Dkt. 239-1 at 2 ("In 2010, FWS thought *all* mining—not just locatable mineral mining—could disturb 0.1% *of all sage-grouse habitat rangewide.* SFA 10064. What BLM discovered after collecting more data is that *locatable mineral mining* was likely to disturb 0.1% *of SFAs*, the only lands proposed for withdrawal.").) Defendants also note that sage grouse occupy approximately 164 million acres, compared to the 10 million acres of SFA proposed for withdrawal. (Dkt. 249 (citing SFA_18460).)

The Court does not find this "new data" explanation to be a reasoned justification for  the BLM's change in position regarding the need for the withdrawal. Specifically, the previous data Defendants say the BLM relied on showing that 0.1% of 164 million acres would likely be impacted meant that less than 0.1% of the 10 million acre SFA area could be impacted. Further, that this 0.1% impact was from *all forms* of mining meant that the impact from only locatable mining would be less than 0.1%. In contrast, the new data that Defendants say the BLM relied upon showing that 0.1% of *SFA area* would likely be impacted and that all of that expected impact was attributable to *locatable mining* means that the impact in the SFA area could be even greater than the previous data showed.  Simply put, the new data showed that the impacts from locatable mining was more significant than the previous data showed. The new

data does not, therefore, provide a reasoned explanation for the BLM's change in position regarding the withdrawal. If anything, this new data indicated a greater need for the withdrawal from locatable mining than the previous data.

The Nedd Memo also states that, based on the BLM's updated analysis, it determined that the potential effects on the sage grouse "habitat, leks, and population from locatable mineral exploration and development under any alternative (including No Action) would be minimal." (Randwide_9-10.) The Memo goes on to explain that, under the no action alternative, "only 0.58 percent of male GRSG and 0.95 percent of leks potentially affected annually" and that, when comparing these impacts with the "relevant thresholds and associated adaptive management triggers in the 2015 ROD's and LUP [land use plan] amendments, the potential effects remain significantly less than 'minor.' " (Rangwide_9-10.) There are numerous problems with this explanation for the change in position regarding the need for the withdrawal.

First, the BLM has not provided a reasoned explanation for its change in the definition of "minor" impacts in the AFEIS. Defendants argue that they retained the same definition for "minor" in the DEIS and the AFEIS. However, a comparison of the definitions of both "minor impacts" and "moderate impacts" in the DEIS and the AFEIS demonstrates that Defendants' argument is fatally flawed.

Those definitions (plus the definition of major impacts) are as follows:

| Impact | DEIS definitions | AFEIS definitions |
|---|---|---|
| Minor | Impacts that would affect *less than 1 percent of the leks, habitat, or population numbers* within the SFA withdrawal area, within a specific SFA, or within a state would be considered minor. | Impacts that would affect *less than 1 percent of the leks, habitat, or population numbers* within the analysis area (which includes the SFA withdrawal area plus the additional area outside of the SFAs proposed for withdrawal by the Governor of Nevada), within a specific SFA, or within a state would be considered minor. |
| Moderate | Impacts that would affect *more than 1 percent but less than 3 percent of the leks, habitat, or population numbers* within the SFA withdrawal area, within a specific SFA, or within a state would be considered moderate. | *Annual population drops by 40 percent or greater in a single year, or annual population drops by 10 percent or greater for three consecutive years*, within the analysis area, within a specific SFA, or within a state would be considered moderate. |
| Major | Impacts that would affect *more than 3 percent of the leks, habitat, or population numbers* within the SFA withdrawal area, within a specific SFA, or within a state would be considered major. | *Annual population drops by 60 percent or greater in two consecutive years, or annual population drops by 20 percent or greater for three consecutive years*, within the analysis area, within a specific SFA, or within a state would be considered major. |

(SFA_14876 (DEIS); SFA_17374 (AFEIS).)

Although the definition of minor impacts in the DEIS and AFEIS appears, at first glance, to be essentially the same, the AFEIS's change in the definition for moderate impacts reveals that the effective definition of minor impacts in the

AFEIS is significantly different than in the DEIS. Specifically, the AFEIS defines
moderate impacts as those impacts where the population drops by 40% or greater
in a single year, or by 10% or greater each year for 3 consecutive years. This
means that anything below that level, i.e., population drops of up to but less than
40% in a single year, and up to but less than 10% each year for 3 consecutive
years, would necessarily fall into the category of a "minor" impact under the
AFEIS.[10] In contrast, under the DEIS, a minor impact was defined as anything that
reduces population by less than 1%, and a moderate impact as anything that
reduces population by 1% or more and less than 3%.

Defendants explain that the changes in the definition of "minor,"
"moderate," and "major" impacts in the AFEIS were based on hard and soft
triggers in the 2015 Plan Amendments (citing AFEIS, SFA_17373-74). However,
the BLM has failed to provide a reasoned explanation for why these changes in
definition were needed or appropriate.

Defendants also argue that the changes in the definitions of minor, moderate,
and major impacts are "inapposite" because the Nedd Memo relies only on updated

---

[10] Defendants acknowledge the "gap" between the AFEIS's definition of minor and
moderate, but contend that this gap merely illustrates that the AFEIS was not final and was
subject to further review. Defendants provide no further explanation for the broad expansion of
the effective definition of minor impacts in the AFEIS.

lek, population, and acreage numbers from the AFEIS to find that impacts are minimal and does not adopt the "minor," "moderate," and "major" definitions or thresholds from either the DEIS or AFEIS. That the Nedd Memo used the term "minimal" does not, however, provide a reasoned explanation as to why impacts that would have been deemed to be major impacts under the DEIS and to thus justify the withdrawal were now deemed to be "minimal" and to thus not justify the proposed withdrawal.

Moreover, the Nedd Memo also specifically states that "the potential effects remain significantly less than 'minor.'" (Rangewide_10.) The use of the word "minor" in quotation marks in the Nedd Memo indicates reliance on the definition of "minor" in the AFEIS. Further, although the Nedd Memo refers to the triggers in the 2015 RODs and LUP amendments in connection with the use of the term minor, this merely appears to reiterate the AFEIS basis for changing the definition of minor. Moreover, whether the triggers were used in the Nedd Memo with or without reference to the AFEIS definition of minor does not change the fact that the Nedd Memo used a changed definition of what is deemed to be a minor impact and did not provide a reasoned explanation for this change, rendering the cancellation decision arbitrary and capricious.

Defendants argue that the Nedd Memo "merely concludes based on the raw

data that the proposed withdrawal of 10 million acres is not necessary or justified based on its minimal benefits of preventing at most 7,121 acres of surface disturbance benefitting less than 0.5% of leks and male sage-grouse per year." As discussed above, the minimal footprint of mining disturbance was already known to the BLM when it proposed the withdrawal and this minimal footprint does not, therefore, provide a reasoned explanation for the BLM's change in position regarding whether the withdrawal was needed for sage grouse conservation.

As to the reliance on a per-year percentage of leks and males impacted, the Nedd Memo again fails to provide a reasoned explanation. There is no explanation as to why the BLM was disregarding all of the prior expert findings and the DEIS regarding the need for the withdrawal based on the expected *cumulative* impacts over 20 years of mining activity and the urgent need to avoid even an incremental loss of population or habitat—the urgent need to "stop the bleeding of continued population declines and habitat losses." (SAF_18485-46.) Instead, without any reasoned explanation as to why the BLM was changing its approach, the Nedd Memo (and AFEIS) divides the cumulative expected impacts by 20 years and uses the resulting per-year figure to deem the impacts "minor." (Rangewide_10.) The Nedd Memo's failure to provide a reasoned explanation for this change to an annualized metric rather than a cumulative metric renders its cancellation decision

arbitrary and capricious.[11]

The Nedd Memo also states that cancellation is supported by the fact that locatable mineral exploration and mining is not a primary threat to sage grouse or sage grouse habitat, and that mining (locatable, leasable, and salable minerals mining) is merely one threat among several other threats, including wildland fire and grazing. (Rangewide_13.) In support, the Nedd Memo cites to the October 2, 2015, not warranted finding of the FWS. (*Id.* (citing 80 fed. Reg. 59858, 59916).) This information regarding other threats was thus known to the BLM at the time the withdrawal was deemed to be needed for sage grouse application. The information does not, therefore, provide a reasoned explanation for the BLM's 2017 change in position regarding the need for the withdrawal. Further, as Plaintiffs point out, wildfires and mining are not an either/or proposition—the sage grouse will be impacted by both. The record also demonstrates that a withdrawal

---

[11] As noted above, the DEIS projected that without the withdrawal, 33% of leks and 32% of males in the SFA withdrawal area would be impacted by locatable mining and exploration projects, and the AFEIS projected that 15% of all leks and 12% of all males would be impacted. (SFA_14482, 14483, 17382.) In contrast, with the withdrawal, the DEIS projected that only 20% of leks and 19% of males would be impacted; and the AFEIS projected that only 3% of leks and 2% of males would be impacted. (*ibid.*) Thus, under the DEIS, the proposed withdrawal was expected to avoid impacts to 14% of all leks and 12% of all males in the withdrawal area; and under the AFEIS, the proposed withdrawal was expected to avoid impacts to 12% of all leks and 9% of all males in the withdrawal area. (*See ibid.*; Pl. SOF § 40.) Under the DEIS definition, the withdrawal would have a major positive impact on sage grouse conservation.

could potentially decrease wildfires. (SFA_14863 (DEIS stating that the indirect effects of mining related activities include the introduction and spread of invasive species, which have the potential to increase the risk of wildfire).)

Moreover, it is well established that the principal threat to sage grouse is habitat loss and fragmentation. *See* 80 Fed. Reg. 59,934. Both mining and wildfire contribute cumulatively to this threat. That habitat loss and fragmentation in the SFA withdrawal area has already occurred due to wildfire does not lessen the need for the withdrawal. To the contrary, it would reasonably be viewed as increasing the need to stop additional cumulative habitat loss and fragmentation, and thus increasing the need for the withdrawal. The impacts of wildfire, and other threats to sage grouse and their habitat, does not, therefore, provide a reasoned explanation for the BLM's change in position regarding the need for the withdrawal.

Finally, Defendants contend that the BLM based its cancellation decision on "substantial additional mining specific data and analysis including the USGS Report, the RFD, the DEIS, and the AFEIS." (Dkt. 239-1 at 15.) However, the USGS Report and the RFD were both available at the time that the DEIS was published, and the DEIS supported the withdrawal as needed for sage grouse conservation. These documents do not, therefore, support the BLM's change of position regarding the need for the withdrawal. And, to the extent the Nedd Memo

was relying on analysis of data in those previous documents to come to a different conclusion regarding the need for the withdrawal, the Memo does not provide a reasoned explanation of that analysis.[12]

The Court has considered in depth the reasons given by the Nedd Memo for cancelling the withdrawal application.[13] The Court finds that the reasons given do not provide the reasoned explanation needed to support the BLM's change in position regarding the need for the withdrawal, rendering the cancellation decision arbitrary and capricious.

### 2. The BLM failed to account for serious reliance interests in cancelling its withdrawal application.

Plaintiffs contend that in making its decision to cancel the withdrawal, the BLM failed to account for the FWS's serious reliance interests in the proposed withdrawal. In response, Defendants argue that the FWS did not and could not have relied on the proposed withdrawal because the FWS knew that any

---

[12] Further, as discussed above, the BLM has failed to provide reasoned explanations for the changes in the AFEIS regarding the definitions of minor, moderate, and major impacts to sage grouse populations, and to the change to an annualized metric as opposed to a cumulative metric for impacts. Thus, this information from the AFEIS does not provide a reasoned explanation.

[13] The Court has also considered the arguments of the Intervenors in support of their position that cancellation of the withdrawal application was appropriate. These arguments fail to demonstrate that the BLM, and specifically the Nedd Memo, provided a reasoned explanation for the BLM's change of position regarding the need for the withdrawal.

withdrawal was contingent on further analysis and a decision by the Secretary.

The Defendants are wrong.  The record is clear that the FWS **did** rely on the proposed withdrawal in making its 2015 finding that the listing of the sage grouse as a threatened or endangered species "is not warranted at this time." 80 Fed. Reg. 59936. In making its not warranted finding, the FWS stated:

> Within the areas of greatest conservation importance (SFAs), DOI will recommend withdrawal from locatable mineral entry. We support the recommendations for mineral withdrawal in SFAs that would remove potential impacts on approximately 4 million ha (10 million ac) of sage-grouse habitat. . . . These measures minimize mining impacts in priority habitats for the life of the management plans, estimated to be the next 20 to 30 years. Based on what we know today, no mining activities are likely to result in loss of these important areas for conservation, but we recognize that economic changes or technological advances may increase the risk of development in the future. Therefore, the long-term protection of the sage-grouse habitat in the SFAs from locatable mineral development will ensure that these important populations are conserved into the future.

80 Fed. Reg. 59916.

In DEIS comments submitted in March 2017, the FWS reiterated its reliance.  Specifically, it stated that the "planned withdrawal was included and relied upon in the [FWS's] 2015 not warranted finding to show the reduction in risk of habitat loss and fragmentation due to locatable mineral development in GRGS habitat." (SFA_16936.) The FWS comments went on to note that "the SFAs identified by the BLM remain important areas for GRSG. Prioritization of habitat

availability and connectivity in these areas remain important." (SFA_16937.) The FWS also explained that many of the "SFAs provide connectivity between GRSG populations. Loss of connectivity in these areas would likely result in population isolation with associated loss of genetic diversity and long-term population persistence. The [FWS] supports protecting SFAs from fragmentation and limiting development in SFAs to keep an intact sagebrush landscape." (*Id.*)

Thus, the FWS relied on the proposed withdrawal in making its not warranted finding. And there is no argument or evidence that the FWS's reliance on the proposed withdrawal was considered by the BLM in its decision to cancel the withdrawal.

Defendants also argue that Plaintiffs' reliance argument is an improper attempt to "commandeer the alleged interests of another agency for their own purposes," and that "the FWS is perfectly capable of vindicating its own reliance interests if they exist." The Court disagrees.  Indeed, it is difficult to envision a legal process by which one agency could challenge, on reliance grounds, decisions made by another agency within the same administration.  The court concludes that Plaintiffs can raise the serious reliance interests of public agencies, such as the FWS, in arguing that the BLM failed to adequately consider serious reliance interests when it changed its position. *See United Farm Workers v. Perdue*, 2020

WL 6318432, at *10-*11 (E.D. Cal. Oct. 28, 2020) (relying on serious reliance interests of public agencies and private parties in the defendant agency's previous practice and finding that the defendant agency's "conclusory statements" regarding that reliance were insufficient to explain its decision to change its previous practice).[14]

Defendants further argue that even if FWS relied on the proposed withdrawal, the remedy for that reliance is the FWS's reconsideration of its not warranted determination, not the vindication of the FWS's reliance interests in this lawsuit, to which the FWS is not a party. The Court, again, disagrees. While the FWS may want to reconsider its not warranted determination in light of the BLM's cancellation decision (and other changes in sage grouse conservation efforts made by the BLM), this potential reconsideration does not negate the BLM's obligation to take the FWS's reliance into account in changing its position regarding the need for the withdrawal and making the decision to cancel the withdrawal.[15]

───────────────────

[14] Although not argued by Plaintiffs, the Court notes that Plaintiffs and/or other private parties may have also relied on the proposed withdrawal in making decisions on whether and how to challenge the FWS's not warranted decision.

[15] Defendants also point out that the FWS explained in its not warranted determination that the FWS would "work with our Federal and State partners to conduct a sage-grouse status review in 5 years." (Dkt. 239-1 at 23 n.8 (citing SFA_10090).) In their opening brief, Defendants represented that the referenced five-year review "will occur this year, 2020." (*Id.*) However, as
(Continued)

In sum, there were serious reliance interests in the BLM's proposed SFA mineral withdrawal. The BLM failed take those interests into account in making its cancellation decision. The BLM's change of position regarding the need for the withdrawal and resulting cancellation decision was therefore arbitrary and capricious.

### C.       The BLM failed to consider significant benefits of the withdrawal.

The arbitrary and capricious standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *State Farm*, 463 U.S. at 43. To meet this requirement, the agency must consider the "important aspect[s]" of the problem before it. *Id.* The failure to do so renders the agency's decision arbitrary and capricious. *Id.* (agency decision is arbitrary and capricious where agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise).

---

Plaintiffs point out, and Defendants concede in their reply brief, the FWS canceled that five-year status review in early December 2018, almost 18 months before Defendants initially represented that the review was going to occur in 2020. (Dkt. 245 at 35; Dkt. 249 at 27 n.9.)

Plaintiffs contend that the BLM's cancellation decision entirely failed to consider the following important environmental considerations: (1) functional habitat loss, (2) loss of population connectivity, and (3) the concentrated nature of mining impacts and potentially severe localized impacts.

### 1.  Functional habitat loss.

Plaintiffs argue that the BLM failed to account for functional habitat loss and thus greatly discounted the true extent of SFA habitat that would be lost to mining absent a withdrawal.

The record establishes that mining causes both direct habitat loss by physically removing vegetation within the footprint of the mining operation and associated infrastructure, and functional habitat loss beyond the mine's physical footprint. This functional habitat loss falls into two categories: habitat fragmentation and behavioral avoidance. (SFA_9915; 75 Fed. Reg. 13927.)

Habitat fragmentation is an important consideration for sage grouse conservation. As the DEIS and AFEIS recognized:

> Habitat fragmentation of greater sage-grouse and other wildlife habitat is an important consideration. Habitat fragmentation can affect seasonal habitat use (i.e., nesting/brooding and winter) and disrupt the connectedness of populations (i.e., leks and migration patterns) or use areas. Because greater sage-grouse are highly sensitive to habitat fragmentation, development, or changes in habitat conditions and because greater sage-grouse require large, intact habitat to complete their annual life history, alternatives proposing to protect (in this case, through withdrawal) greater sage-grouse habitat from disturbance are

considered of greatest beneficial impact.

(SFA_14877 (DEIS); SFA_17375 (AFEIS); *see* SFA_9915.)

Behavioral avoidance occurs when disturbances or activities cause sage grouse to avoid otherwise suitable habitat. (SFA_9915.) Such activities and disturbances include noise, such as from blasting or from roads, visual disturbances, pollutants, and areas with increased predators/predation risks due to human-made structures, such as powerlines and fences. (SFA_9916, 9917, 9918 (FWS 2010 finding); SFA_14877-78 (DEIS); SFA_17376 (AFEIS).)

Defendants do not dispute that functional habitat loss is an important consideration but instead argue that the BLM understood that habitat loss is not limited to the footprint of a mine, and that the "no action" (no withdrawal) alternative would result in additional habitat alteration and fragmentation than the other alternatives. Defendants also point out that the DEIS and AFEIS calculated the potential habitat fragmentation under the various alternatives.  And, in determining the number of leks and birds impacted by the potential mining and exploration activities, the BLM included those leks and birds within a 3.1 mile buffer of the disturbed area to account for indirect impacts, such as noise and visual intrusion, that could result in avoidance or behavioral changes. Defendants further contend that because the locations and size of future mining operations is

unknown, the BLM estimated the functional habitat loss and other indirect impacts based on available data—lek and population numbers—instead of speculating about future mining in a 10 million-acre area. Finally, Defendants contend that Plaintiff's argument comes down to an attack on the BLM's methodology. In support of their contentions, Defendants cite to the AFEIS and the Nedd Memo.

As to the AFEIS, Defendants cite to various points in the AFEIS where habitat fragmentation is mentioned and discussed, but none of these citations show that the BLM considered the functional habitat loss that could occur from locatable mining and exploration projects. (*See* Dkt. 239-1 at 24-25 (citing SFA_16975, 17262, 17269, 17291, 17374-76, 17378, 17382); Dkt. 249 at 28-29 (citing SFA_17375-76, 17380-82).) Defendants also point out that the BLM used a 3.1 mile buffer around leks and birds to estimate functional habitat loss. (*See* SFA_17376 ("[W]e defined the potential indirect impacts to sage grouse as the number of leks within 3.1 miles of the potential area for disturbance.").)

These citations to the AFEIS do not, however, demonstrate that the BLM actually considered functional habitat loss that could occur from locatable mining in making its cancellation decision. The Nedd Memo, which sets forth the basis for the cancellation decision, does not mention or indicate that functional habitat loss was considered. To the contrary, the Memo discussed only direct disturbance from

locatable mining and exploration and noted this direct disturbance repeatedly. (*See* Rangewide_5 (noting the small footprint of the mining disturbances); Rangewide_5 (the BLM "can only foresee less than 10,000 acres of disturbance"); Rangewide_10 ("the effects on GRSG habitat of locatable mineral exploration and mining over the proposed 20-year withdrawal period are estimated to be less than 0.1 percent of the 10 million acres, with only 0.58 percent of male SRSG and 0.95 percent of leks potentially affected annually"); Rangewide_13 ("the possible adverse effects from locatable mineral exploration and mining has now been quantified, and found to be limited to approximately 9000 acres of surface disturbance over 20 years, with approximately 0.58 percent of GRSG male birds affected per year"); Rangewide_14 ("That is, even the approximately 9000 acres of disturbance anticipated under the No Action Alternative is likely on the high side."); Rangewide_15 ("[T]he withdrawal of less than 10 million acres in order to prevent approximately 9000 acres of disturbance is not the best use of this tool.").) Although the Nedd Memo also cited to the annual loss of leks and birds that would result from locatable mining (Rangewide_10, 13), which is taken from the AFEIS, there is no indication that the Memo linked this to functional habitat loss or that the amount of functional habitat loss was otherwise considered in the cancellation decision.

Moreover, as discussed previously, the use of annual loss of leks and birds, as opposed to cumulative losses over the 20 year period, is itself arbitrary and capricious, and does not demonstrate that the BLM actually considered functional habitat loss in making its decision to cancel the withdrawal.

Finally, although the quantification of functional habitat loss under the various alternatives may have been difficult given the lack of information about the exact location and size of future mining and exploration projects, this difficulty does not allow the BLM to disregard and fail to consider these impacts. *See Public Citizen v. Federal Motor Carrier Safety Admin. Pub. Citizen*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) ("The mere fact that the magnitude of time-on-task effects is uncertain is no justification for disregarding the effect entirely.").

In sum, the BLM failed to consider functional habitat loss in making its determination that the withdrawal was no longer needed and deciding to cancel the withdrawal application. The failure to do so renders the BLM's cancellation decision arbitrary and capricious.

### 2.  Loss of population connectivity.

Plaintiffs argue that the BLM entirely failed to consider the impacts of mining on genetic connectivity between sage grouse populations and resulting harm to species persistence.

Connectivity refers to the ability of sage grouse to intermingle with

neighboring populations. Loss of connectivity can increase population isolation and result in the loss of genetic diversity and extirpation from stochastic events, such as drought or wildfire. (SFA_9911.) Human development, such as a mine pits, powerlines, and roads, results in habitat fragmentation and decreased connectivity. (SFA_9945.) "Small decreases in lek connectivity [can result] in large increases in the probability of lek abandonment." (SFA_9911.) "Therefore, maintaining habitat connectivity and sage-grouse population numbers are essential for sage-grouse persistence." (*Id.*)

The FWS commented, in relation to the DEIS, that the BLM needed to consider the "increased risk of fragmentation and loss of connectivity that could occur due to the direct loss of habitat" (SFA_16948); the importance of prioritizing and preserving habitat availability and connectivity in SFAs and that many SFAs provide connectivity between sage grouse populations (SFA_16937); and that the loss of connectivity in SFAs "would likely result in population isolation with associated loss of genetic diversity and long-term population persistence" (*id.*).

Plaintiffs contend that, despite these FWS comments, the BLM entirely failed to consider connectivity in making its cancellation decision and instead totally disregarded this issue.

Defendants respond that connectivity is another facet of habitat

fragmentation because habitat fragmentation reduces population connectivity. They further argue that the BLM discussed habitat fragmentation and the associated lack of connectivity in both the DEIS and the AFEIS. In support, Defendants provide various citations to the DEIS and AFEIS. Although the cited sections of the AFEIS discuss connectivity generally, missing is any consideration of the loss of genetic connectivity among sage grouse populations and the resulting harms to species persistence that may result without a withdrawal.[16]

Defendants again rely on the uncertainty in knowing where future mineral exploration and mining activity may occur as a reason for not considering with

---

[16] For example, Defendants cite a portion of the AFEIS, which in turn cites the FWS 2015 not warranted finding in which the FWS identified areas of high and moderate mineral potential as important for withdrawal because, among other things, the areas "have high breeding bird densities and provide important connectivity between greater sage-grouse populations." (SFA_17261-62.) The BLM cites to another portion of the FWS not warranted finding that states PHMA areas provide connectivity corridors for populations to interact and interbreed. (Id.) Yet another citation is to a portion of the AFEIS that states population declines due to fragmentation of sagebrush habitat. (SFA_17269.) Another citation is to a portion of the AFEIS stating that the proposed withdrawal could have beneficial impacts to wildlife, including sage grouse, and associated habitat as indicated by "connected populations." (SFA_17291.) Another citation is to a portion stating, "Habitat fragmentation can affect seasonal habitat use (i.e., nesting/brooding and winter) and disrupt the connectedness of populations (i.e., leks and migration patterns) or use areas," and "Habitat fragmentation or greater sage-grouse habitat—this could include fragmentation of seasonal habitats (i.e., nesting/brooding and winter) and connected populations (i.e., leks)"—was used as an indicator of potential impacts to wildlife. (SFA_17375-76.) Finally, Defendants cite to a response in the AFEIS to a comment that the BLM should address the importance of withdrawn areas in providing connectivity to habitat and migratory corridors for grizzly bear, big game, and other wildlife. That response is: "The importance of sagebrush habitat for connectivity (reduction in fragmentation) and migratory wildlife is discussed in the EIS in Section 3.7.3 and extensively in Section 4.5." (SFA_17587-88.)

more specificity the impacts on connectivity. However, the FWS comments make clear that consideration of such impacts was possible despite the uncertainty of the location and size of future mining and exploration projects. That the FWS stated in its comments that the effect of mining and exploration on connectivity could be "minor to major" "depending on where exactly the disturbance impacts occur" (SFA_16948) does not excuse the BLM from considering impacts on genetic connectivity among sage grouse populations and resulting harm to species persistence.

Finally, as noted previously, the FWS made comments regarding the importance of connectivity, the impacts of loss of connectivity in SFAs, including in particular areas identified in the comments, and the need for BLM to discuss the increased risk of fragmentation and the loss of connectivity that could occur due to direct habitat loss (*see, e.g.,* SFA_16937, 16940, 16948). The AFEIS failed to address these comments or otherwise consider the impacts on connectivity of mining and exploration activity.

Moreover, and more importantly, the Nedd Memo, which sets forth the BLM's reasons for the cancellation decision, fails to indicate any consideration of the impact of mining and exploration on genetic connectivity.

In sum, there is no indication that the BLM considered the impacts of

locatable mining and exploration activity on genetic connectivity despite the
importance of connectivity to species persistence, and despite comments from the
FWS that the BLM needed to consider the increased risk of fragmentation and loss
of connectivity, and stressing the importance of connectivity, the impacts that loss
of connectivity could have on genetic diversity and long-term population
persistence, and the potentially major impacts of mining on connectivity. The
failure to address the FWS's connectivity concerns in the AFEIS, and failure to
consider genetic connectivity concerns in making the cancellation decision renders
that decision arbitrary and capricious. *See State Farm*, 463 U.S. at 43; *Ocean
Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 866 (9th Cir. 2005)
(agency finding arbitrary and capricious where agency failed to address concerns
expressed by FWS); *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1156-57 (D.C.
Cir. 2011), *as amended* (Jan. 30, 2012) (agency decision was arbitrary and
capricious where agency failed to address habitat fragmentation risks raised in
FWS comments).

### 3.  Possibly severe localized impacts.

Finally, as Plaintiffs point out, the BLM entirely failed to consider the
possibility of severe localized impacts of mining activities. As noted previously,
the Nedd Memo focused only on an overall figure for impacts based on the
percentage of the total withdrawal area that was expected to be impacted by

surface disturbance. This rangewide approach diluted the localized impacts of mining activities and failed to discuss or acknowledge the greater percent of habitat that will be lost in a localized or regional area of high mineral potential.

There is no discussion or acknowledgement in the Nedd Memo that the 0.1% figure does not represent the destruction of habitat that will occur in particular areas, that a particular mining or exploration project, or group of projects, may have major impacts on SFA areas with high mineral potential, and the compounding effects of these projects in areas that have already been ravaged by wildfire or have already tripped hard triggers.

Defendants once again rely on the inability to predict the location and scope of future exploration and mining activities, and argue that any analysis by the BLM of localized impacts would be pure speculation. However, the issue is not that the BLM failed to quantify or pinpoint where the localized impacts from future mining and exploration projects could occur. The problem is that BLM failed to consider altogether the localized impact that such projects could have in a more general way based on the information it did have. Its failure to do so renders its cancellation decision arbitrary and capricious.

Because the BLM's cancellation decision was arbitrary and capricious, the Court will vacate the BLM's cancellation of the withdrawal application and

remand to the BLM for further proceedings, including re-initiation of the NEPA process.

### D. The BLM did not violate NEPA by making the cancellation decision before completing the EIS process.

NEPA requires that federal agencies include an environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1502. The Department of Interior also has an implementing regulation requiring preparation of "an environmental impact statement for each proposed major Federal action significantly affecting the quality of the human environment before making a decision on whether to proceed with the proposed action." 43 C.F.R. § 46.400.

Plaintiffs argue that the BLM violated NEPA by making the decision to cancel the withdrawal application before it completed the EIS process. Before addressing this issue on the merits, the Court must first determine whether the issue is moot.

As noted above, the Court is vacating the BLM's cancellation and remanding to the BLM for further proceedings, including the re-initiation of the NEPA process. This decision would moot Plaintiffs' claim that the BLM violated NEPA by failing to complete the NEPA process prior to cancelling the withdrawal,

unless the claim falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. *See Kingdomware Techs., Inc. v. United States,* 136 S. Ct. 1969, 1976 (2016) (setting out exception to mootness doctrine for controversies that are "capable of repetition, yet evading review"). To fall within this exception, the NEPA violation claim must meet two requirements: "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002)). The Court finds that these requirements are met and that Plaintiffs' NEPA violation claim is accordingly subject to review.

First, the time between when the BLM decides that a withdrawal is no longer needed and when the BLM cancels the withdrawal application is too short to allow full litigation. *See Badgley*, 309 F.3d at 1173. This is because an agency is required to "promptly" cancel a withdrawal application upon determining that the lands proposed for withdrawal are "no longer needed in connection with a requested or proposed action." 43 C.F.R. § 2310.1-4. Second, there is a reasonable expectation that the issue will arise again in the future because the BLM may again decide to cancel the withdrawal without completing the NEPA process. *See Badgley*, 309 F.3d at 1173. Accordingly, the Court has jurisdiction over and will

proceed to address Plaintiffs' NEPA violation claim.

Plaintiffs argue that the BLM was required to complete the EIS process before cancelling the withdrawal application. However, Plaintiffs have cited to no case law that supports this argument, and the case law is clear that "[d]iscretionary agency action that does not alter the status quo does not require an EIS." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1344 (9th Cir. 1995); *see Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002) ("NEPA procedures do not apply to federal actions that maintain the environmental status quo."), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv*., 630 F.3d 1173 (9th Cir. 2011). The reason for this is made clear by the language of NEPA—maintaining the status quo does not "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Confederated Tribes and Bands v. F.E.R.C*., 746 F.2d 466, 476 (9th Cir.1984) (an EIS is generally only required where there is an irreversible and irretrievable commitment of a public resource, rather than a mere continuation of the status quo).

Further, the mere fact that the BLM had started the EIS process does not mean that it was required to complete the process before deciding to cancel the application. *See Louie v. Dickson*, 964 F.3d 50, 56 (D.C. Cir. 2020) ("[T]he FAA notified the Airport Authority that it had closed its file on the EA due to

insufficient progress and deemed the Authority's application for an Airport

Operating Certificate withdrawn. Accordingly, the FAA no longer needs or intends

to prepare a commercial service EA, as no application for an Operating Certificate

remains pending."); *cf. West v. Horner*, 810 F. Supp. 2d 228, 234 (D.D.C. 2011)

(NEPA challenges to a proposed highway project were moot where project

applicant withdrew proposal). Indeed, as Defendants point out, federal agencies

routinely cancel the NEPA process for proposed projects that they choose not to

pursue. *See, e.g.,* 84 Fed. Reg. 13,712 (Apr. 5, 2019) (terminating NEPA process

after agency cancelled planning process); 83 Fed. Reg. 23,664 (May 22, 2018)

(terminating NEPA process after the agency decided not to pursue project); 82 Fed.

Reg. 61,324 (Dec. 27, 2017 (terminating EIS after agency cancelled planning

process); 79 Fed. Reg. 64,586 (Oct. 30, 2014) (terminating NEPA process after

preparation of DEIS because agency decided not to pursue project at this time).

 Plaintiffs rely on the language of the regulation implementing NEPA's EIS

requirement, and specifically point to the use of the term "whether" in that

regulation. *See* 43 C.F.R. § 46.400 (requiring an EIS is required "for each proposed

major Federal action significantly affecting the quality of the human environment

before making a decision on *whether* to proceed with the proposed action"

(emphasis added)). Plaintiffs argue that the term "whether" means that the BLM

was required to complete the EIS process prior to making a decision on *whether or not* to cancel the application. Plaintiffs have not, however, cited any case supporting this interpretation and the Court finds Plaintiffs' interpretation to be strained and unpersuasive.

Plaintiffs also point to the analytical deficiencies in the BLM's decision making process, many of which have been discussed above, and note that these deficiencies may have been identified and corrected if the BLM had published a final EIS for public review and comment. While that may be true, as discussed above, there is nothing that requires the BLM to complete a final EIS before cancelling its application because cancellation would merely continue the status quo. Once the application was cancelled, there was no proposed Federal action that would significantly affect the quality of the human environment and thus, no EIS was required.

In sum, the Court finds that the BLM did not violate NEPA by cancelling its withdrawal application prior to completing the NEPA process.

## ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 235) is **GRANTED** in part and **DENIED** in part.

   a. The motion is GRANTED on Plaintiffs' APA violation claims.

b.      The BLM's cancellation of the application and proposal for the SFA

Mineral Withdrawal is VACATED and remanded to the BLM for further

proceedings and consideration of whether the withdrawal is needed for sage

grouse conservation. Such proceedings shall include re-initiation of the

NEPA process.

c.      The motion is DENIED on Plaintiffs' NEPA violation claim.

2.      Defendant's Motion for Partial Summary Judgment (Dkt. 239) is

**DENIED**.

DATED: February 11, 2021

B. Lynn Winmill
U.S. District Court Judge