Alison Hunter (ISB # 8997)
Laura Granier (*Pro hac vice*)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, ID 83701-2527
(208) 342-5000
achunter@hollandhart.com
lkgranier@hollandhart.com

*Counsel for Proposed Intervenor-Defendants
Elko, Eureka, and Humboldt Counties*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, and PRAIRIE HILLS AUDUBON SOCIETY, | ) ) ) ) ) | Case No. 1:16-cv-83-BLW |
| Plaintiffs, | ) ) | **MEMORANDUM IN SUPPORT** |
| vs. | ) ) | **OF MOTION TO INTERVENE** |
| DAVID BERNHARDT, Secretary of Interior; JOSEPH R. BALASH, Assistant Secretary of Interior; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE, et al. | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**Table of Contents**

Table of Authorities ................................................................................................................. ii

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND...............................................2

       A.     2015 Sage-Grouse Plans ..............................................................................2

       B.     Nevada State Plan ........................................................................................4

       C.     2019 Sage-Grouse Plans ..............................................................................6

       D.     Humboldt County.........................................................................................7

       E.     Eureka County ............................................................................................12

       F.     Elko County ................................................................................................19

III.   ARGUMENT.........................................................................................................22

       A.     Intervention of Right..................................................................................22

              1.     The Counties' Motion to Intervene is Timely.............................23

              2.     The Counties Have Significant Protectable Interests in This Action. .......24

              3.     The Counties' Interests in BLM's Decisions Since 2015 Will Be Impaired of the Court Rules in Favor of the Plaintiffs. ............................26

              4.     The Counties' Interests Cannot be Adequately Represented by Existing Parties.................................................................................27

       B.     In the Alternative, the Counties Request Permissive Intervention be Granted......29

IV.    CONCLUSION......................................................................................................30

# Table of Authorities

**Page(s)**

## Cases

*Alliance for the Wild Rockies v. U.S. Forest Serv.*,
 No. 1:15-CV-00193-EJL, 2016 WL 7626528 (D. Idaho June 9, 2016) ..................................26, 27

*Amanatullah v. U.S. Life Ins. Co.*,
 No. 4:15-cv-00056-EJL, 2017 WL 2906045 (D. Idaho June 29, 2017) .........................................29

*Cty. of Fresno v. Andrus*,
 622 F.2d 436 (9th Cir. 1980) ........................................................................................................24

*Greene v. United States*,
 996 F.2d 973 (9th Cir. 1993) ........................................................................................................24

*Nw. Forest Res. Council v. Glickman*,
 82 F.3d 825, 837 (9th Cir. 1996) ..................................................................................................24

*Perez v. Idaho Falls Sch. Dist. No. 91*,
 No. 4:15-cv-00019-BLW, 2016 WL 1032790 (D. Idaho Mar. 15, 2016) .....................................26

*Sagebrush Rebellion, Inc. v. Watt*,
 713 F.2d 525 (9th Cir. 1983) ........................................................................................................24

*Sec. and Exch. Comm'n v. Muroff*,
 No. 1:17-cv-00180-EJL, 2018 WL 7108114 (D. Idaho Dec. 4, 2018) .............................23, 27, 30

*Sw. Ctr. for Biological Diversity v. Berg*,
 268 F.3d 810 (9th Cir. 2001) ..................................................................................................22, 27

*United States v. Howell*,
 No. 3:16-cv-00164-BLW, 2018 WL 4500134 (D. Idaho Sept. 19, 2018)..............................23, 27

*WEX, et al. v. Jewell, et al.*,
 No. 3:15-cv-00491-MMD (D. Nev., 2015).......................................................................... *passim*

*WEX v. U.S. Dep't of the Interior*,
 250 F. Supp. 3d 718 (D. Nev. 2017 .................................................................................................4

## Statutes

28 U.S.C. § 1331..............................................................................................................................29

28 U.S.C. § 1367..............................................................................................................................29

## Other Authorities

75 Fed. Reg. 13910 (Mar. 23, 2010)................................................................2

80 Fed. Reg. 57633 (Sept. 24, 2015) ...............................................................3

82 Fed. Reg. 47248 (Oct. 11, 2017)..................................................................6

84 Fed. Reg. 10323 (March 20, 2019) ..............................................................6

7C Charles Allen Wright et al., FED. PRAC. AND PROC. § 1909 (3d ed. 2017) ............................27

Fed. R. Civ. P. 24(a) ..........................................................................22, 30

Fed. R. Civ. P. 24(b) ..........................................................................29, 30

Elko, Eureka, and Humboldt Counties (collectively, "the Counties") submit this memorandum supporting their motion to intervene as defendants in Phase Two of this case.

## I.     INTRODUCTION

Elko, Eureka and Humboldt Counties are political subdivisions of the State of Nevada. The Counties have dedicated countless hours and significant financial resources to the conservation of the Greater Sage-grouse and management of its habitat including significant participation in both the 2015 and 2019 land use plan amendment processes.   Plaintiffs seek to undo the BLM's 2019 Sage-Grouse Plans, including the 2019 Nevada Sage-Grouse Plans, and related management decisions and revert to the BLM's 2015 Sage-Grouse Plans that the Counties challenged in federal court. *WEX, et al. v. Jewell, et al.*, No. 3:15-cv-00491-MMD (D. Nev., 2015) (the "Nevada Lawsuit"); *see* Amended Complaint (ECF No. 20).   No other parties currently participating in Phase Two of this case are governed by the Nevada Sage-Grouse Plans.

As explained in the Nevada Lawsuit, the mapping relied upon in the 2015 Sage-Grouse Plans includes significant errors, many of which have been addressed in the updated mapping and data considered in the 2019 Nevada Sage-Grouse Plans.  These errors, as well as inconsistencies in the Nevada portion of the 2015 Sage-Grouse Plans with the State and local land use plans, interfere with local police powers to protect the public health and safety including emergency response communications, necessary expansion of the landfill in Humboldt County (which is approximately 37 acres of cheat grass but has been identified as habitat), and maintaining road access in rural Nevada.  The 2015 Sage-Grouse Plans' restrictions reduce even managed grazing and interfere with important provisions in Elko, Eureka and Humboldt Counties' plans to use managed grazing to reduce rangeland fuel loads and decrease the risk of wildfire.  The 2019 Nevada Sage-Grouse Plans also provide important updated science and approaches such as ground-truthing and use of site-specific information that is critical to

conservation efforts.  For example, the restrictions under the 2015 Sage-Grouse Plans interfere with the Counties' ability to use the limited and critical eighteen-month period after a fire to restore native vegetation, interfering with important Greater Sage-grouse habitat restoration efforts and exacerbating wildfire hazards.  The restrictions and closures in the 2015 Sage-Grouse Plans also close substantial acreage in Nevada to renewable energy projects and interfere with exploration and development of critical minerals that President Biden has identified as necessary to support America's Supply Chain, renewable energy objectives, and national safety.  In addition to interfering with national objectives, this also is inconsistent with the Counties' Master Plans and harms the Counties by eliminating jobs and revenue that result from these projects. The Counties also are harmed by the 2015 Sage-Grouse Plans' interference with travel restrictions that interfere with access to ranching operations and lands where many of Nevada's most important mineral deposits, including critical minerals, and gold trends are located (in violation of the Mining Law).

Because the Counties meet the requirements for intervention as of right under Fed. R. Civ. P. 24(a) or, alternatively, the broad standard for permissive intervention under Rule 24(b), the Counties respectfully request that the Court grant them leave to intervene as defendants in Phase Two of this case.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      2015 Sage-Grouse Plans

The U.S. Fish and Wildlife Service ("USFWS") issued a finding in March 2010 that the Greater Sage-grouse warranted inclusion in the Endangered Species Act's ("ESA") threatened or endangered species list but that it was precluded from being listed by higher-priority listing proposals. 75 Fed. Reg. 13910-14014 (Mar. 23, 2010).  A subsequent settlement between a number of organizational plaintiffs and the USFWS led to listing decision deadlines for a number

of species by 2015, including the Greater Sage-grouse which, in turn, led the BLM and the

United States Forest Service ("USFS") to initiate their land use planning processes to amend

existing land use plans focused on Greater Sage-grouse habitat conservation in eleven western

states, including Nevada.  In the course of this process, the then Secretary of the Interior, in

December of 2011, invited western governors to develop state-specific management plans, citing

the success of the BLM's adoption of a Wyoming plan as an example.

The Counties were cooperating agencies for the Nevada and Northeastern California

Environmental Impact Statement ("EIS"/LUPA").  Decl. of Julian J. Goicoechea in Supp. of

Mot. to Intervene ("Goicoechea Decl."), ¶ 3; Decl. of Curtis Moore in Supp. of Mot. to Intervene

("Moore Decl."), ¶ 4.  Their County Commissioners and staff devoted countless hours and

resources to reviewing the November 2013 Draft EIS, the May 2015 Administrative Draft of the

Nevada and Northeastern California Final Environmental Impact Statement ("FEIS"), and the

June 2015 FEIS/Proposed LUPA.  *See* Goicoechea Decl. ¶¶ 3, 18; Moore Decl. ¶ 4; Decl. of

James French in Supp. of Mot. to Intervene ("French Decl."), ¶ 4.   In September of 2015, BLM

issued a Record of Decision amending numerous land use plans in Nevada.  80 Fed. Reg. 57633-

35 (Sept. 24, 2015) ("2015 Sage-Grouse Plans").

The 2015 Sage-Grouse Plans limited or eliminated numerous activities in sage-grouse

habitat on BLM surface lands and above federal minerals in Nevada.  *Id.*  The 2015 Sage-Grouse

Plans created inconsistencies with the Nevada State Plan and the Counties' individual

conservation plans and imposed restrictions that interfered with the Counties' protection of the

public health and safety leading to injury to the Counties.  *See* Goicoechea Decl. ¶¶ 11, 20, 23;

Moore Decl. ¶¶ 5, 14; French Decl. ¶¶ 5, 8.   The 2015 Sage-Grouse Plans also imposed

restrictions that interfere with effective habitat conservation, for example, given that the

erroneous maps relied on in the 2015 Sage-Grouse Plans missed approximately 200,000 acres of

the "best of the best" greater sage-grouse habitat in Nevada, as identified by the Nevada

Department of Wildlife ("NDOW").  Goicoechea Decl. ¶¶ 21-22.  This was corrected in the 2019

Nevada Sage-Grouse Plans.  *Id.* ¶ 22.  These injuries caused the Counties to sue the BLM and

Forest Service in 2016 in federal district court in Nevada to enjoin implementation of and

remand the 2015 Sage-Grouse Plans.  *WEX, et al. v. Jewell, et al.*, No. 3:15-cv-00491-MMD (D.

Nev., 2015); *see* Amended Complaint (ECF No. 20).  In March 2017, the Nevada District Court

remanded the 2015 Sage-Grouse Plans finding NEPA violations and acknowledging the

substantial mapping errors.  *WEX v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 718, 751 (D.

Nev. 2017) (granting summary judgment in part to the Counties on their claim that the agencies

failed to comply with NEPA and remanding "the Records of Decision to the Agencies to prepare

a supplemental environmental impact statement consistent with this Order").

B.     **Nevada State Plan**

The Nevada State Sagebrush Ecosystem Council ("SEC"), NDOW, the Nevada Division

of Minerals, the BLM and the USFS, multiple counties, and other state and federal agencies have

worked together in Nevada to identify effective tools and conservation requirements for Greater

Sage-Grouse habitat.  Goicoechea Decl. ¶ 5.  The State of Nevada, through the SEC, has been

working for years on its state sage grouse conservation plan (the "State Plan") that is based on

best-available science and has had thousands of hours of work, input and data from experts, state

agencies, local stakeholders, and the BLM, USFS and USFWS.  *Id.*

The SEC is made up of diverse interests and includes as *ex officio* members basically

every federal and state land and resource agency that has an interest or jurisdiction over matters

related to Greater Sage-grouse conservation including NDOW, BLM, USFS, USFWS, Nevada

Department of Conservation and Natural Resources, and Nevada Department of Agriculture.  *Id.*

¶ 6.  While originally established through an Executive Order by Governor Brian Sandoval, the

SEC has since been explicitly authorized and empowered through State law in NRS Chapter 321. *Id.* The Nevada legislature was the first in the 11-state western region to formalize the State's commitment to Greater Sage-Grouse and sagebrush ecosystem conservation within statute. *Id.* The Nevada Legislature has consistently provided the capacity and funding to ensure this commitment is sustained. *Id.* Further, the Nevada Legislature reiterated its support of the State Plan when, on May 23, 2019, Assembly Joint Resolution 3 ("AJR 3") was passed with only one dissenting vote in the Assembly and no dissenting votes in the Senate. *Id.* AJR 3 "expressed support for the Nevada Greater Sage-Grouse Conservation Plan and the Nevada Conservation Credit System and urging the United States Bureau of Land Management to require compensatory mitigation to offset anthropogenic disturbances in accordance with the Nevada Conservation Credit System." *Id.* This shows that Nevada, as a sovereign state, through both the Governor, the Legislature, and the SEC are fully behind the Management Alignment Alternative in the 2019 Nevada Sage-Grouse Plans intended to align with the State Plan. *Id.* Of note, at least one of the many environmental groups that supported AJR 3 and lobbied for its passage is a plaintiff in this lawsuit. *Id.*

The Nevada SEC has adopted a State Habitat Map based on Dr. Pete Coates' updated habitat map developed in 2016 with further refinements based on local scientific expertise of NDOW, the Sagebrush Ecosystem Technical Team ("SETT"), and the SEC *ex officio* state and federal land and resource management agencies. *Id.* ¶ 12. As Dr. Coates recognized in his maps prepared and relied upon by the BLM, it is important to recognize that field data and other sources of information should be used in conjunction with the inferences from his model. *Id*. The 2019 Nevada Sage-Grouse Plans are aligned with this approach of ground-truthing and critical to habitat conservation and also provide for critical private-public partnerships, essential to conservation given that some of the best habitat is on private lands. *Id.* The 2015 Sage-

Grouse Plans are not aligned with this approach and interfere with this public-private

collaboration to the detriment of conservation efforts. *Id.*

C. **2019 Sage-Grouse Plans**

In 2017, BLM issued a Notice of Intent to amend the 2015 Sage-Grouse Plans to bring

them into alignment with the State Conservation Plan and related strategies. 82 Fed. Reg.

47248-49 (Oct. 11, 2017). BLM California and Nevada State Directors signed the 2019 BLM

Nevada and Northeastern California Greater Sage-Grouse Draft Record of Decision and

Approved Resource Management Plan Amendment ("2019 Nevada Sage-Grouse Plans") on

March 15, 2019. 84 Fed. Reg. 10323 (March 20, 2019). In addition to adopting the most

updated (and substantially more accurate) habitat mapping, the 2019 Nevada Sage-Grouse Plans

amended the 2015 Sage-Grouse Plans by implementing key management decisions including:

> • Removing designated Sagebrush Focal Areas ("SFAs") and associated
> management restrictions and re-designating this acreage as priority habitat.

> • Adding exceptions to management restrictions if a project is in a non-habitat and
> would not have indirect impacts to adjacent seasonal habitat.

> • Allowing exceedances to disturbance caps in situations where doing so would
> improve the habitat.

> • Applying the best available local science to sage-grouse habitat objectives.

> • Allowing exceptions to travel management actions.

On May 3, 2019, Plaintiffs filed their First Supplemental Complaint challenging the

BLM's 2019 Sage-Grouse Plans and accompanying Final Environmental Impact Statement and

BLM's decision to not withdraw public lands from location and entry under the federal mining

laws. Plaintiffs seeks an order vacating the BLM's 2019 Nevada Sage-Grouse Plans and

maintaining the 2015 Sage-Grouse Plans—the Plans that the Counties have challenged in federal

district court in Nevada. *See* First Suppl. Compl. at 49-50 (ECF No. 118). After this Court

issued its injunction on October 16, 2019, the BLM conducted further NEPA analysis and

prepared a supplemental environmental impact statement. The Counties all have participated throughout the entirety of the land use planning exercise, including this latest SEIS. French Decl. ¶ 4; Goicoechea Decl., ¶¶ 3, 18; Moore Decl. ¶ 4. On January 11, 2021, the BLM issued its notice concluding that based on the information and analysis in the 2020 SEIS, no changes were required to the 2019 Sage-Grouse Plans. Notice of the Issuance of New Decisions (ECF No. 254).

### D. Humboldt County

Eighty percent of Humboldt County's 6.2 million acres of lands is under public ownership. French Decl. ¶ 3. Less than one percent of the land is urban or developed. *Id.* Close to 17,000 people live in Humboldt County and are mainly employed in the natural resources, agriculture, or ranching sectors. *Id.* Humboldt County has several mines that produce gold, silver, limestone, and opals. *Id.* ¶ 16. Gold mining accounts for over 40 percent of the tax base in the county. *Id.* In addition, livestock production is the primary agricultural commodity in Humboldt County. *Id.* ¶¶ 3, 12. Humboldt County also has numerous prospective projects for the critical mineral lithium which is important to renewable and green energy projects and America's supply chains and national security. *Id.*

Humboldt County participated as a commenter on the 2015 Sage-Grouse Plans and also on the 2019 Nevada Sage-Grouse Plans. *Id.* ¶ 4. Humboldt County has been highly engaged in this multi-year planning process and has a significant interest in any decision on the 2019 Nevada Sage-Grouse Plans and/or the 2015 Sage-Grouse Plans (which also are the no-action alternative in the 2019 plans). *Id.*

Vacating the 2019 Nevada Sage-Grouse Plans in favor of the 2015 Sage-Grouse Plans will have a significant negative effect on two of Humboldt County's most important industries:

mining and ranching, as well as many other businesses that directly or indirectly support mining and livestock production. *Id.* ¶¶ 3, 12, 16, 17.

The habitat maps relied upon in the 2015 Sage-Grouse Plans include significant errors that misidentify lands as habitat that are not and also fail to identify for protection some 200,000 acres of what NDOW has identified as the best of the best greater sage-grouse habitat. *Id.* ¶ 5. For example, the 2015 plan maps identify Humboldt County's Regional Landfill, approximately 37 acres of cheat grass, and the City of Winnemucca as being situated in the middle of Greater Sage-Grouse habitat. *Id.* These mapping errors in the 2015 plans, if left uncorrected, will have cascading negative impacts on NDOW's ability to complete necessary activities for protection of endangered species, Humboldt County's emergency services, maintenance of existing county infrastructure (i.e. roads), renewable energy development, transportation and travel management, county administrative access, ranching, recreation, mineral exploration and development and important utility rights-of-way. *Id.* The 2019 Nevada Sage-Grouse Plans are based on best available science and are significantly more consistent with the extensive work done to prepare the Nevada State Plan for Sage Grouse habitat conservation and make use of updated, more accurate habitat maps. *Id.*

The Nevada portion of the 2015 Sage-Grouse Plans establish over 633,000 acres SFA in Humboldt County closing this land to renewable energy projects, new mining claims and restricting activities on existing claims. *Id.* ¶ 6. The SFAs greatly impede county wildfire management efforts. *Id.* If the SFA prohibits or severely restricts managed grazing practices, a large effective management tool for fuel load during periods of high fire risk will be lost. *Id.* The 2019 Nevada Sage-Grouse Plans provide for the highest level of protections for Priority Habitat Management Area ("PHMA") but eliminates the erroneous and ineffective one-size-fits all outright prohibitions within the SFAs to renewable energy projects such as wind and solar.

*Id.* The removal of the SFAs also helps mitigate the fatal omission in the 2015 Sage-Grouse Plans of socioeconomic impacts from the outright prohibitions in the SFAs. *Id.* Humboldt County will be harmed due to the loss of net proceeds of mines taxes and the loss of mining and mineral exploration jobs if the 2019 Sage-Grouse Plans are vacated in favor of the 2015 Sage-Grouse Plans. *Id.*

In addition, the continued implementation of the 2015 Sage-Grouse Plans and restrictions including those based on erroneous mapping and the SFAs interferes with important species conservation work required under Federal law. *Id.* ¶ 7. NDOW employees are required to complete Lahontan Cutthroat Trout activities for compliance with requirements under the Endangered Species Act. *Id.* These activities are impossible under restrictions and road closures in place under the 2015 plans because the time of year closure of roads is the exact time that crews need to access streams to complete their work. *Id.*

Continued implementation of the 2015 Sage-Grouse Plans rather than the 2019 Nevada Sage-Grouse Plans Nevada Plan also interferes with the County emergency services including responses to fires, EMS, and availability of emergency communication sites. *Id.* ¶ 8. For example, Humboldt County has been working for five years to update emergency communication equipment for first responders such as the Sheriff and for the BLM's use for fire suppression and responses during fire events. It has been a multi-million-dollar project to replace the antiquated existing equipment on a less than one-acre site. *Id.* Yet, Humboldt County is at a standstill under the 2015 plans which creates a public safety hazard for Humboldt County's residents. *Id.* Humboldt County has evaluated the potential to move the equipment to private land and it is not viable given the location and the reception for communications needed for emergency responses in rural areas. *Id.*

The SFAs and erroneous mapping in the 2015 Sage-Grouse Plans also interfere with Humboldt County's ability to effectively rehabilitate burned areas. *Id.* ¶ 9. Approximately one million acres of land in Humboldt County have burned in the last decade. *Id.* Humboldt County needs to access these areas for restoration, which must begin within eighteen months in order to establish native vegetation before it is overcome with invasive species. *Id.* Under the closures imposed by the 2015 plans and SFAs (based on erroneous mapping), Humboldt County does not have the necessary access to carry out its Burned Area Recovery Plan. *Id.* This interferes with restoration of potential habitat and also exacerbates the fire hazard if the County is unable to re-establish native vegetation before it is too late – endangering the public and also some of the best Greater Sage-grouse. *Id.*

Travel restrictions included in the 2015 Sage-Grouse Plans based on incomplete and erroneous habitat mapping will interfere with the County's responsibilities to protect the public health and safety, including road maintenance, landfill plans, pipelines and necessary local and street travel. *Id.* ¶ 11. Key public land disposals important to Humboldt County's master plan may be limited or disallowed entirely and restrict the necessary future expansion of the landfill. Humboldt County's current landfill footprint requires expansion to meet growth projections within approximately the next ten years. *Id.* The landfill is surrounded by thirty-seven acres of federal lands covered in cheat grass which have been erroneously identified in the 2015 plans as PHMA. *Id.* The superior data, science and ground-truthing approach in the 2019 Nevada Sage-Grouse Plans are critical to Humboldt County fulfilling its public obligations to protect the health and safety of its residents and to cure substantial inconsistencies between the 2015 plans and the County's Master Plan. *Id.*

The 2015 Sage-Grouse Plans' seasonal road closures and restrictions on pasture rotations will negatively impact ranchers, one of the largest industries in Humboldt County. *Id.* ¶ 12.

Germane to Humboldt County's Master Plan and land use management, the 2015 Sage-Grouse Plans will interfere with good managed grazing practices, agricultural management, zoning ordinances, wildfire and wildlife management activities, road construction and maintenance, pipelines, and our ability to attract industrial development. *Id.* The 2015 Sage-Grouse Plans also will reduce geothermal exploration and development in Humboldt County and may hinder development of critical minerals such as lithium. *Id.* The importance of the domestic production of critical minerals to the Nation's supply chain and national security has received growing attention recently and, once again, last week, by President Biden's Executive Order 14017, America's Supply Chains. *Id.* The 2019 Nevada Plans include not only significantly improved mapping and conservation strategies but also a more balanced approach that avoids interference with development of critical minerals and the County's emergency services. *Id.*

Many of the travel restrictions in the 2015 Sage-Grouse Plans interfere with key Humboldt County responsibilities, including road maintenance, landfill plans, pipelines, and local and interstate travel. *Id.* ¶ 15. Aside from impeding Humboldt County's responsibilities with regard to rural transportation, many of the "limited" closed roads will inhibit access to private lands imbedded in the focal areas. *Id*. The 2015 Sage-Grouse Plans' seasonal access restrictions will change the County's road maintenance schedules, limiting the effectiveness of maintenance during times of ideal soil moisture and weather. *Id*. For example, maintenance may be restricted to times when conditions are not suitable for maintenance activities. *Id*. Or prohibitive times of the year when weather is most suitable for access to major county roads. *Id*. Road maintenance and construction work often require use of the public lands and resources. *Id*. While the 2019 Sage-Grouse Plans do not eliminate theses travel restrictions and seasonal access restrictions, they do provide for exceptions to the restrictions that will likely allow the County to

perform more of its responsibilities than would be allowed under the 2015 Sage-Grouse Plans. *Id*.

The 2015 Sage-Grouse Plans have adversely impacted mining growth and chilled potential investments that would otherwise benefit Humboldt County. *Id.* ¶ 16. The mining economy represents the single greatest concentration of capital investment, human resources and skills, technology, equipment, and land in Humboldt County. *Id.* Mining contributes major revenues to the area and constitutes at least 20% of the labor force in Humboldt County. *Id.* Vacating the 2019 Sage Grouse Plans in favor of the 2015 Sage-Grouse Plans will restrict exploration activities for mining companies altogether, or at a minimum to other times of the year which could render some projects infeasible. *Id.* ¶ 17. As a result, Humboldt County will lose important economic development dollars that are invested by mineral exploration and create work for numerous small businesses as well as the eventual net proceeds of mines tax or consolidated taxes. *Id.* This will significantly impact a smaller rural county like Humboldt County. *Id.*

E. **Eureka County**

Eureka County is made up of eighty-one percent federally administered land, primarily managed by BLM and USFS. Goicoechea Decl. ¶ 3. The County's economy is driven by mining, farming and ranching, all of which will be harmed if Plaintiffs are successful and the 2019 Sage-Grouse Plans are vacated in favor of the 2015 Sage-Grouse Plans. *Id.* Approximately 2,000 people live in Eureka County and are mainly employed in the natural resources or ranching sectors. *Id.* at ¶ 4. The community's welfare and viability depend on business and recreational activities conducted on or in connection with use of and access to federal lands. *Id.*

Eureka County was a cooperating agency for the EIS/LUPA and submitted comments on each of the BLM/USFS documents developed. *Id.* ¶ 3. The County's March 2012 scoping comments emphasized the need for the LUPA to be consistent with the Eureka Master Plan and Eureka County Code Title 9. *Id.* at ¶ 8. Throughout the EIS process, Eureka County commented on the many ways the agencies' proposed land use restrictions are inconsistent with Eureka County's policies and code. *Id.* For example, Eureka County submitted comments on the draft EIS that detailed the many inconsistencies with Eureka County's Master Plan and Eureka County Code. *Id.* ¶ 9.

The land use restrictions in the 2015 Sage-Grouse Plans threaten many Eureka County jobs because the restrictions substantially reduce uses of federally administered lands and adversely affect the bulk of our economic base. *Id.* ¶ 4. Many of those restrictions, as discussed below, are based on erroneous mapping and outdated science and have been corrected in the 2019 Nevada Sage-Grouse Plans. *Id.* Eureka County is already at an economic threshold and additional losses in employment and economic outputs that will result from the continued implementation of unnecessary restrictions in the 2015 Sage-Grouse Plans will be devastating. Because of Eureka County's small population, a handful of lost jobs in Eureka County is equivalent to the loss of many jobs in larger metropolitan areas. *Id.*

Additionally, the 2015 Sage-Grouse Plans are not based on quality data or sound science and are currently out-of-date given that Dr. Coates of USGS prepared a revised habitat map in 2016 (which has been further refined and adopted by the State of Nevada). *Id.* ¶ 10. The 2014 habitat maps used in the 2015 Sage-Grouse Plans are not founded upon on-the-ground realities. For example, there is a large area in southern Eureka County designated as PHMA that incorrectly includes the Town of Eureka, US Highway 50, State Route 278, the Eureka County landfill, the Falcon-to- Gondor major distribution power line, multiple ancillary power lines,

multiple subdivisions with homes, paved roads and gravel roads, farms with alfalfa fields and irrigation systems, and hay barns, among other infrastructure. *Id*. The 2015 Sage-Grouse Plans includes many rigid land use restrictions for PHMA such as disturbance caps that are nonsensical for the Town of Eureka and the surrounding developed area. *Id.* The 2015 Sage-Grouse Plans do not provide a mechanism for ground-truthing of habitat which is particularly important given the numerous and significant mapping errors in the 2015 plans. *Id*.

The arbitrary, incorrect, and rigid 2015 Sage-Grouse Plans habitat delineations have serious implications for Eureka County because BLM substantially revised its map to remove lands that were previously determined through a public resource management planning process as suitable for disposal on the basis of the faulty habitat map based on the 2015 plans. *Id.* ¶ 11. Lands that Eureka County needs for community expansion, economic development, and infrastructure that were formerly designated as suitable for disposal are no longer considered suitable for disposal because of the erroneous classification of these lands as Greater Sage-grouse habitat. *Id.* This is another example of how the 2015 Sage-Grouse Plans seriously interfere with Eureka County's land use planning and community development planning efforts. This interference is especially problematic for Diamond Valley, where two-thirds of Eureka County's population resides, and where the County is in an advanced stage of critically important water planning that is compromised by the inaccurate 2015 Sage-Grouse Plans habitat maps. *Id.*

The Nevada portion of the 2015 Sage-Grouse Plans is inconsistent with Eureka County's planning efforts, and interferes with Eureka County's police powers, public health and safety responsibilities, road access and maintenance obligations, our master plan, and economic development. *Id.* ¶ 14. The agencies' Records of Decision ("RODs") for the 2015 Sage-Grouse Plans are based on a EIS/LUPA, which failed to adequately analyze economic impacts to Eureka

County even though the County provided the BLM locally sourced data and reports for their use. *Id*. Based on that same information Eureka County estimates the adverse economic impact to its economy due to the impacts to the ranching industry alone will range from $7 million to $15 million per year. *Id*. Eureka County expects the economic impact will be millions of dollars more when taking into account mining impairment and lack of future options for other private land agricultural producers. *Id*.

The importance of the domestic production of critical minerals to the Nation's supply chain and national security has received increasing attention recently and, once again, last week, by President Biden's Executive Order 14017, America's Supply Chains. *Id.* ¶ 15. The 2019 Nevada Plan includes not only significantly improved mapping and conservation approaches and strategies but also a more balanced approach that avoids interference with development of critical minerals. *Id*. The list of Critical Minerals identified by the Department of the Interior as required by Executive Order 13817 (which is the definition adopted in President Biden's Executive Order 14017) includes barite, fluorspar, vanadium and uranium all of which are known to occur in and are currently being actively explored for to define their extent, with associated projects in various stages of permitting within Eureka County. *Id*. Mining is one of the industries that contributes substantially to our local and state economy. *Id*. The 2019 Nevada Sage-Grouse Plans provide for more accurate habitat mapping and more effective conservation tools for evaluation of mineral exploration and proposed mine development from the erroneous maps and rigid mandates of the 2015 plans. *Id*.

Eureka County has a long history of developing land stewardship policies dealing with wildlife and other natural resources. *Id.* ¶ 16. In 2006, the County updated our Land Use Element of the Eureka County Master Plan with substantive provisions for wildlife and wildlife habitat, which include sage grouse. *Id*. This plan was again updated in 2010 to become the

Natural Resources and Federal or State Land Use Element of the Master Plan ("Eureka Master Plan"). *Id*. The Eureka Master Plan was adopted pursuant to and in compliance with Nevada Revised Statutes Chapter. *Id*. The Nevada portion of the 2015 Sage-Grouse Plans is inconsistent with the Eureka County Master Plan. *Id*.

Title 9 of the Eureka County Code provides for conservation of natural resources and wildlife. *Id*. ¶ 17. The Nevada portion of the 2015 Sage-Grouse Plans is inconsistent with key elements of Title 9, including: Chapter 30, the framework for land-use planning on federal lands; Chapter 40, procedures to ensure that there is full disclosure and cooperation regarding decisions affecting federal lands located within the County; and Chapter 50, which declares that the County holds title in trust for the public to all public roads and public travel corridors in the County except for State and federal highways. *Id*.

Under the 2015 Sage-Grouse Plans, the agencies failed to demonstrate that the Eureka County Master Plan and Title 9 of the Eureka County Code would not benefit and conserve Greater Sage-grouse habitat. *Id*. ¶ 19. Moreover, the 2015 Sage-Grouse Plans failed to address the key threats to Greater Sage-grouse, (e.g., wildfire and the spread of non-native annual grass species that are highly flammable) and will thus result in inferior Greater Sage-grouse conservation compared to Eureka County's policies, and the 2019 Nevada Sage-Grouse Plans, which focus on abating these threats. The serious shortcomings of the Nevada portion of the 2015 Sage-Grouse Plans and its interference with the County's policies will ultimately harm both the environment and Humboldt County's economy if it continues to be implemented. *Id*.

The 2015 Sage-Grouse Plans fail to recognize that managed livestock grazing represents an important and cost-effective tool to achieve desired Greater Sage-grouse habitat conditions and to reduce wildfires. *Id*. ¶ 20. The livestock grazing restrictions in the 2015 Sage-Grouse Plans cause environmental harm because they increase the volume of highly flammable non-

native invasive annual grasses and inevitably lead to more wildfires. *Id.* The increased fuels that result from the economically burdensome and technically ill-advised livestock grazing restrictions in the 2015 Sage-Grouse Plans place a burden upon our fire district and result in destruction of critical Greater Sage-grouse habitat. *Id.* The 2015 Sage-Grouse Plans also decrease the level of active management currently provided by ranchers that benefit Greater Sage-grouse. *Id.* When permitted to have livestock on the range, ranchers provide a constant presence to maintain water developments used by wildlife, provide first response to fires, keep a watchful eye, and provide a timely response to situations that may be detrimental to Greater Sage-grouse habitat. *Id.*

Importantly, the 2019 Nevada Sage-Grouse Plans clarify that Habitat Objectives are desired conditions that are broad goals based on habitat selection that may not be achievable in all areas. *Id.* ¶ 21. The 2015 Sage-Grouse Plans only identified umbrella habitat and restrictions based on lek buffers. *Id.* There are management actions in the 2015 Sage-Grouse Plans based on sub-habitats like presence of winter habitat or brood rearing habitat. *Id.* These delineations were not in the 2015 Sage-Grouse Plans but Eureka County has seen restrictions based on them (e.g., gravel pit renewals). *Id.* Eureka County has also experienced circumstances where other types of mapped designations appear to be flexible for BLM while the 2015 Sage-Grouse Plans mapped habitat is set in stone without a future Plan amendment. *Id.* For example, wild horse Herd Management Areas ("HMAs") are those areas where wild horses are managed under a resource management plan and have very clear boundaries on a map. *Id.* Yet, not every acre in an HMA is used by horses. *Id.* Eureka County has examples where BLM has adjusted management actions or completed NEPA and made statements that there would be no impact on wild horses due to ground-truthing. *Id.* This recognition of the importance of actions and analysis of impacts based on on-the-ground circumstances for wild horses even though an

activity was occurring in "mapped" HMAs should also be considered relative to what is preliminarily identified as PHMA or General Habitat Management Area ("GHMA") based on modeling and, in the 2015 plans, erroneous mapping. *Id.* The 2019 Nevada Sage-Grouse Plans and the Nevada State Plan both recognize the importance of local conditions which results in better conservation (for example, on the approximately 200,000 acres of high quality greater sage-grouse habitat that was missed completely in the maps relied upon in the 2015 Sage-Grouse Plans. *Id.*

Seasonal timing restrictions under the 2015 Sage-Grouse Plans have been rigidly imposed in a manner that interferes with Eureka County's provision of services to protect the public health and safety of our residents. *Id.* ¶ 23. Eureka County has had to renew many gravel pit leases with BLM under the 2015 Sage-Grouse Plans. *Id.* The seasonal restrictions imposed on accessing these gravel pits precludes the County from access to material for the bulk of every year. *Id.* The County requested at least some kind of emergency variances in case of road wash outs and road safety issues but the local BLM office said that they have no ability to waiver from the 2015 Sage-Grouse Plans "sets in stone" seasonal timing requirements. Eureka County has and continues to fund and implement habitat projects to benefit sage grouse. *Id.* Eureka County would have contemplated mitigation options to offset any minimal impacts that could be argued to occur based on gravel pit renewals for gravel pits that have existed for many decades. *Id.* Yet, this option is not available to us in the 2015 Sage-Grouse Plans because of the hard-and-fast timing restrictions. *Id.*

In sum, the 2019 Nevada Sage-Grouse Plans provide a greater level of and more effective Greater Sage-grouse habitat conservation by including more accurate mapping, updated science and providing for site-specific ground truthing while, at the same time, avoiding some of the

devastatingly harmful impacts to Eureka County and its residents that result from the 2015 Sage-Grouse Plans. *Id.* ¶ 3.

### F. Elko County

Elko County covers 10,995,840 acres and has a population of 52,760 people. Moore Decl. ¶ 3. The County's economic drivers are ranching, mining, recreation, and tourism. *Id.* Over 72 percent of the County is federal land managed by BLM and USFS. *Id.* In 2018 alone, mining in the region produced over 615 million dollars, and agriculture produced 35 million dollars. *Id.* The ranching and mining industries in particular will be seriously harmed by the land use restrictions and prohibitions in the 2015 Sage-Grouse Plans. *Id.*

Elko County has been a cooperating agency and commenter on the 2015 Sage-Grouse Plans and the 2019 Nevada Sage-Grouse Plans. *Id.* ¶ 4. Elko County has been highly engaged in this multi-year planning process and has a significant interest in any decision on the 2019 Nevada Sage-Grouse Plans and/or the 2015 Sage-Grouse Plans (which also are the no-action alternative in the 2019 plans). *Id.*

Elko County has devoted a great deal of time and effort to developing Greater Sage-grouse conservation plans and policies. *Id.* ¶ 7. In September 2012, the Elko County Division of Natural Resource Management published the Elko County, Nevada Greater Sage-Grouse Management and Conservation Strategy Plan ("Elko County Plan"). *Id.* The purpose of the Elko County Plan is ... "ensuring that to the greatest extent feasible, Greater Sage-grouse populations and their habitat are maintained, enhanced, or restored on public lands, and that such activities are promoted on private lands ... " (Elko County Plan, Page 13). *Id.*

Wildland fire has destroyed thousands of acres of Greater Sage-Grouse habitat in Elko County and is a primary threat along with invasive species which, left uncontrolled, exacerbate the fire hazard. *Id.* ¶ 5. During the 2018 fire season, approximately 660,240 acres burned in 138

fires in Elko County costing the BLM $24 million to contain. *Id.* Managed, moderate long-term grazing has proven to be one of the most effective tools to manage fine fuels and decrease the probability of severe, catastrophic wildfires. *Id.* Total fine fuel accumulations were twofold higher in no-grazed areas compared to areas that have managed, moderate grazing. *Id.* The 2019 Nevada Sage-Grouse plans include a critical change from the 2015 plans, reflecting an approach that incorporates the best-available science (which has changed since 2015), to establish management practices with specific management objectives responsive to changing, on the ground conditions, such as increased fuel loads that must be managed. This is fundamental to any habitat conservation efforts. *Id.* Being forced to continue implementing the 2015 plans that are based on incomplete and now outdated science will cause significant harm to sage-grouse habitat conservation efforts. *Id.*

Over 40 percent of the PHMA and GHMA in Nevada is located in Elko County, making Elko County "ground zero" for the adverse impacts resulting from the Nevada portion of the 2015 Sage-Grouse Plans. *Id.* ¶ 6. The land use restrictions and prohibitions in the 2015 Sage-Grouse Plans, will seriously harm Elko County's economy. *Id.* The livelihoods of numerous Elko County residents will be adversely affected by the land use restrictions in the 2015 Sage-Grouse Plans because they conduct business on public lands and adjacent private lands in Elko County with Greater Sage-grouse habitat. *Id.* In addition, the 2015 Sage-Grouse Plans will interfere with the County's land use planning and management. *Id.* The 2019 Nevada Sage-Grouse plans provide better and more effective habitat conservation tools than the 2015 plans. *Id.*

The areas previously identified as SFA cover over 2 million acres in northern Elko County, which is roughly 72 percent of the 2.8 million acres of SFA in Nevada. *Id.* ¶ 11. Unfortunately, the management directives in the 2015 Sage-Grouse Plans for the SFA threaten to

eliminate or reduce the authorized use of the adjacent private lands for livestock grazing by imposing unworkable and prescriptive one-size-fits-all habitat management objectives. *Id.* The current use of private land parcels that are either adjacent to or engulfed by the SFA, for agriculture and ranching will be adversely affected by restrictions on grazing on adjacent public lands. *Id.* Thus, the continued implementation of the 2015 Sage-Grouse Plans will diminish or even eliminate future economic agriculture and ranching uses on private property causing substantial economic harm to individual landowners and Elko County in general and potentially subject the federal government to regulatory takings claims. *Id.* The SFA includes stranded inholdings of private land parcels surrounded by public land managed for the sole purpose of Greater Sage-grouse conservation. *Id.*

Cultivated fields, meadows, and pastures provide critically important broodrearing habitat for the Greater Sage-grouse. *Id.* ¶ 13. So, in addition to harming landowners within and adjacent to the SFA the potential diminished agricultural and ranching uses of the private land parcels due to the 2015 Sage-Grouse Plans' restrictions on adjacent public lands could have a significantly adverse impact on Greater Sage-grouse habitat. *Id.* Any reduction in the size or distribution of these crucial but limited seasonal Greater Sage-grouse habitats will harm the species. *Id.*

Many of the travel restrictions in the 2015 Sage-Grouse Plans are inconsistent with the Elko County Conservation Plans. *Id.* ¶ 14. The Elko County Conservation Plans rely on maintaining access throughout Elko County in order to achieve the county's conservation goals, for access to ranches throughout the county, as routes to adjacent counties, and to provide emergency services for ambulances and fire-fighting equipment. *Id.* Other users of Elko County public lands including ranchers, hunters, recreationists, and exploration geologists routinely rely on both road access and cross-country travel. *Id.* The 2015 Sage-Grouse Plans prohibit cross-

country travel in the SFA, PHMA, and GHMA, which is another source of inconsistency between the 2015 Sage-Grouse Plans and the Elko County Conservation Plans. *Id.* Additionally, the 2015 Sage-Grouse Plans impose restrictions on road use and maintenance of existing roads including prohibiting the use of certain roads during specific seasons and times of day and limiting noise. *Id.* While the 2019 Sage-Grouse Plans do not eliminate theses travel restrictions and seasonal access restrictions, they do provide for exceptions to the restrictions that will likely allow Elko County to perform more of its responsibilities than would be allowed under the 2015 Sage-Grouse Plans but in a manner that still provides for careful and appropriate regulation for habitat conservation. *Id.*

Vacating the 2019 Nevada Sage-Grouse Plans in favor of the 2015 Sage-Grouse Plans will result in substantial harm to Elko County's economy from severely restricted mineral exploration and development, oil and gas exploration and development, wind energy, and other natural resource development. *Id.* at ¶¶ 3, 11-13.

## III.    ARGUMENT

Federal Rule of Civil Procedure 24 provides for intervention in an action as a matter of right under subsection (a), and permissive intervention under subsection (b).  The Counties satisfy both standards under the circumstances of this case.

### A.    Intervention of Right.

Under Fed. R. Civ. P. 24(a)(2), on timely motion, the court must permit intervention for anyone who claims "an interest related to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Generally, the rule must be construed liberally in favor of intervention. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) ("*Berg*").  Additionally, the

Court's evaluation is "guided primarily by practical considerations," not technical distinctions. *Id.*

As the applicant, the Counties bear the burden of showing it meets each of the four elements:

> (1) the application for intervention must be timely;
>
> (2) the applicant must have a 'significantly protectable' interest related to the property or transaction that is the subject of the action;
>
> (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and
>
> (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.

*United States v. Howell*, No. 3:16-cv-00164-BLW, 2018 WL 4500134 at *1 (D. Idaho Sept. 19, 2018) (citation omitted).

Here, the Counties are entitled to intervene of right because its motion is timely, it has significant, protectable interests that could be impaired by the disposition of this action, and the Federal Defendants and existing Intervenors cannot adequately represent the Counties' interests.

### 1. The Counties' Motion to Intervene is Timely.

The Counties' motion to intervene is timely under the three factors that must be satisfied: (1) stage of the proceeding; (2) prejudice to other parties; and (3) reason for, and length of delay. *Sec. and Exch. Comm'n v. Muroff*, No. 1:17-cv-00180-EJL, 2018 WL 7108114 at *5 (D. Idaho Dec. 4, 2018) (citation omitted).

While Phase One of the litigation has concluded, the Counties do not seek participation in Phase One and, this Court has not yet set a briefing schedule for Phase Two. By seeking intervention now, shortly after the BLM completed its supplemental environmental impact statement on the 2019 Sage-Grouse Plans and before substantive briefing on the merits in Phase

Two, the Counties are avoiding prejudicing the other parties or disrupting the Court's management of the case. If granted intervention, the Counties would abide by any briefing schedule page limitations the Court orders.

### 2. The Counties Have Significant Protectable Interests in This Action.

To demonstrate a sufficient interest related to the subject of the current action, the applicant must establish a significantly protectable interest that has some relationship with the claims at issue. *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996). The Ninth Circuit liberally construes Rule 24(a), *see Greene v. United States*, 996 F.2d 973 (9th Cir. 1993), and has "rejected the notion that Rule 24(a)(2) requires a specific legal or equitable interest." *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). Rather, the interest test is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* at 438 (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)).

Here, the Counties have significant protectable interests in this action. Large portions of each of the Counties consist of federal land containing sage-grouse habitat, including 633,000 acres of SFAs in Humboldt County and over two million acres of SFAs in Elko County. Moore Decl. ¶ 11; French Decl. ¶ 6. Vacating the 2019 Sage-Grouse Plans in favor of the 2015 Sage-Grouse Plans will have significant negative effects on the Counties, including to the Counties' mining and agriculture industries, renewable energy development, ability to manage wildfires, and ability to maintain existing county infrastructure. *See* French Decl. ¶¶ 6-9; Moore Decl. ¶¶ 5, 11, 13, 14; Goicoechea Decl. ¶¶ 4, 11, 14, 21-23. To the extent that the 2019 Sage-Grouse Plans more closely aligns with the Nevada State Conservation Plan and individual county plans, the Counties seek to maintain that alignment and resist Plaintiffs' efforts to undo that alignment by enjoining the 2019 Sage-Grouse Plans. Moreover, as explained in detail above, the

restrictions in the 2015 Sage-Grouse Plans are interfering with the Counties' abilities to carry out activities necessary for their protection of the public health and safety (such as emergency service communications and the landfill in Humboldt County and, emergency road repairs in Eureka) and for habitat conservation and wildfire mitigation. Goicoechea Decl. ¶¶ 11, 20, 23; Moore Decl. ¶¶ 5, 14; French Decl. ¶¶ 5, 8.

The Counties are not new to these proceedings involving the Greater Sage-grouse land use plans and sued the BLM and USFS challenging the 2015 Sage-Grouse Plans. First Amended Compl., *WEX, et al. v. Jewell, et al.*, No. 3:15-cv-00491-MMD (D. Nev., Oct. 22, 2015), ECF No. 20. This complaint for declaratory and injunctive relief filed in the U.S. District Court for the District of Nevada sets forth the myriad federal statutes that protect the Counties' interests in the BLM and USFS land use plan amendments governing Greater Sage-grouse at issue in this case. *See* First Amended Complaint, *WEX, et al. v. Jewell, et al.*, No. 3:15-cv-00491-MMD (D. Nev., Oct. 22, 2015), ECF No. 20.

The Counties' legally protected interests are strongly related to the Plaintiffs' claims. If the relief requested in the Plaintiffs' supplemental complaint is granted, it would negatively impact the Counties' local economy as well as their habitat conservation efforts and core functions to protect the public health and safety. *See* French Decl. ¶¶ 6-9; Moore Decl. ¶¶ 5, 11, 13, 14; Goicoechea Decl. ¶¶ 4, 11, 14, 21-23. Grazing restrictions will result in an estimated annual loss of $7 million to $15 million to the Eureka County economy alone. Goicoechea Decl. ¶ 14. The Counties also will be harmed by the 2015 Sage-Grouse Plans' travel restrictions that threaten to impede access to ranching operations and lands where many of Nevada's most promising mineral exploration (important to America's Supply Chain and critical minerals development), important mineral deposits and gold trends are located (in violation of the Mining Law). Goicoechea Decl. ¶¶ 10, 23; Moore Decl. ¶¶ 8,11; French Decl. ¶ 15. Negative economic

impacts are sufficient to meet the "significantly protectable" factor. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, No. 1:15-CV-00193-EJL, 2016 WL 7626528 at *2 (D. Idaho June 9, 2016). The restrictions and erroneous mapping in the 2015 plans also interfere with the Counties ability to mitigate invasive species and potential wildfire hazards and to work with the BLM to restore burned habitat in the critical and limited eighteen month window they have to try to re-establish native vegetation before invasive species takeover. *See, e.g.*, Goicoechea Decl. ¶¶ 20-21, 23; Moore Decl. ¶ 5; French Decl. ¶¶ 5, 8-9.

The applicant has a protectable interest when "the resolution of the plaintiff's claims actually will affect the applicant." *Perez v. Idaho Falls Sch. Dist. No. 91*, No. 4:15-cv- 00019-BLW, 2016 WL 1032790 at *3 (D. Idaho Mar. 15, 2016) (citation omitted). Thus, the Counties have significant, direct, and legally protectable interests in the 2019 Plan Amendments that are at issue in the Plaintiffs' supplemental complaint.

### 3. The Counties' Interests in BLM's Decisions Since 2015 Will Be Impaired of the Court Rules in Favor of the Plaintiffs.

The third intervention factor—practical impairment of interests—is met through a showing that the Counties' interests are directly contrary to the Plaintiffs' interests, as evidenced by the Plaintiffs' supplemental complaint. *Alliance for the Wild Rockies*, 2016 WL 7626528 at *2.

The Counties are simultaneously prosecuting their interests in the litigation in the Federal District Court in Nevada (now pending before the Ninth Circuit) in which the Counties and other Nevada parties challenged the validity of the 2015 Sage-Grouse Plans affecting Nevada as well as the proposed mineral withdrawal. The Plaintiffs' supplemental complaint could impair or impede the Counties' ability to proceed with its District of Nevada case. If the Counties are not permitted to intervene here, then they "would not have an opportunity to educate the Court regarding their relative interests in the on-going and related litigation [in Nevada] and how those

interests might be impacted" by the Court's rulings in this case. *Sec. and Exch. Comm'n*, 2018 WL 7108114 at *5 (intervention permitted in Idaho action where intervenors sought limited intervention due to potential impacts on litigation filed in Idaho and Washington State). In the instant case, the Counties seek to intervene in Phase Two of this case to oppose the Plaintiffs' attempt to enjoin implementation of the 2019 Plan Amendments.

The Counties' interests are directly contrary to those of the Plaintiffs, leaving the Counties unable to protect their interests that are at issue in the case if intervention is denied. *Alliance for the Wild Rockies*, 2016 WL 7626528 at *2. Thus, the Counties demonstrate significant protectable interests that could be impaired by the outcome of this case.

### 4. The Counties' Interests Cannot be Adequately Represented by Existing Parties.

In determining the final intervention factor—adequacy of existing representation—a court considers (1) whether the present parties will undoubtedly make all of the intervenor's arguments, (2) whether the present parties are capable and willing to make those arguments, and (3) whether the intervenor would offer any necessary elements to the proceedings that the other parties would neglect. *Berg*, 268 F.3d at 822.

The Counties satisfy this minimal burden in showing inadequacy of representation if they demonstrate that representation of its interests by existing defendants "*may be* inadequate." *Howell*, 2018 WL 4500134 at *3–*4 (citation omitted) (emphasis added by the citing court). Intervention should be granted unless the Court is persuaded that the Counties interests are demonstrably represented by existing parties. This high bar causes courts to resolve doubts in favor of intervention. 7C Charles Allen Wright et al., FED. PRAC. AND PROC. § 1909 (3d ed. 2017). Where the Counties and the other defendants share the same ultimate objective, a presumption of adequacy applies that is rebuttable by a compelling showing to the contrary. *Howell*, 2018 WL 4500134 at *3.

There currently are no defendant parties present in this case for Phase Two that represent interests in the 2019 Nevada Sage-Grouse Plans or can speak to the impacts on Nevadans or the Counties. Goicoechea Decl. ¶ 24; Moore Decl. ¶ 16; French Decl. ¶ 18. While the Counties have worked cooperatively with the federal government on sage-grouse management issues, it cannot be expected that the localized interests of the Counties are so aligned with the national interests of the federal government so as to make the Counties' participation unnecessary. First, the Counties' interest in sage-grouse conservation extends to county and private lands within the Counties. In addition, the Counties have been involved with the development of the Nevada State Plan and the updated habitat mapping important in Nevada given the errors in the mapping relied upon in the 2015 Sage-Grouse Plans. Goicoechea Decl. ¶¶ 5-10; Moore Decl. ¶¶ 4, 7-8; French Decl. ¶¶ 4-6, 8. Second, there is also an unavoidable risk that the federal government may settle the lawsuit on terms they consider favorable for the United States, but which would not be favorable to the Counties. In short, while the Counties and the Federal Defendants have a shared interest in defending some aspects of the federal actions at issue in this litigation, their ultimate objectives are not fully aligned. At the very least, Counties' perspective may vary considerably from the federal government due to the vastly different burdens and responsibilities each government bears with regard to wildlife management. *See Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (an important factor in "assessing the adequacy of the Interior Secretary's representation" was whether "the intervenor offers a perspective which differs materially from that of the present parties to this litigation"). In fact, Humboldt County has identified as one of its concerns the impediments the 2015 Sage-Grouse Plans pose to important ESA compliance activities. French Decl. ¶ 7.

The existing Intervenors represent the State of Wyoming, State of Utah, ranching and oil and gas industries, and electric utilities, respectively, none of which can represent the Nevada

Counties' interests particularly given that the 2019 Nevada Sage-Grouse Plans differ substantively and in significant ways from the other plans. Thus, none of the existing parties will make all of the Counties arguments, particularly given the Counties' participation in the Nevada Lawsuit as well as the related land use planning processes.

For the reasons stated above, the Nevada Counties respectfully requests that this Court allow the Counties to intervene of right because the motion is timely, the Counties has significant protectable interests unique to Nevada and the Nevada Plans which would be impaired if the Federal Defendants lose the case. Neither Plaintiffs, nor the Federal Defendants, nor existing Intervenors can adequately represent the Nevada Counties' interests.

### B.     In the Alternative, the Counties Request Permissive Intervention be Granted.

If this Court does not grant intervention of right, the Counties should be granted permissive intervention in this matter pursuant to Fed. R. Civ. P. 24(b)(1)(B), which provides that on timely motion, "the court may permit anyone to intervene who. . . has a claim or defense that shares with the main action a common question of law or fact." Permissive intervention may be granted where "(1) there is an independent ground for jurisdiction; (2) the motion is timely; and (3) the movant's claim or defense and the main action must have a common question of the law or fact in common." *Amanatullah v. U.S. Life Ins. Co.*, No. 4:15-cv-00056-EJL, 2017 WL 2906045 at *1 (D. Idaho June 29, 2017) (citation omitted). Additionally, the court will consider whether intervention will unduly delay or prejudice the original parties and whether the movant's interests are adequately represented by existing parties. *Id.*

The Counties satisfy each of these requirements. An independent ground for jurisdiction exists through the federal question doctrine, 28 U.S.C. § 1331, augmented through supplemental jurisdiction under 28 U.S.C. § 1367. As explained above in the argument for intervention of right, the motion is timely and will not delay proceedings or otherwise prejudice existing parties.

The Counties will comply with any briefing schedule set by the Court and will also abide by the conditions imposed by the Court on existing Intervenors. The Counties described above why the existing parties cannot adequately represent its interests. The common questions for the Court will be the factual and legal bases supporting the Federal Defendants' and the Counties' answers or other dispositive motion that may be filed. Information and argument provided by the Counties will squarely address these factual and legal questions. Moreover, where a party seeks to intervene for a limited purpose, "the showing of commonality is reduced and it is not necessary to demonstrate an independent basis for jurisdiction." *Sec. Exch. Comm'n*, 2018 WL 7108114 at *6 (citation omitted).

Accordingly, (1) an independent ground for jurisdiction exists, assuming such ground is needed in a limited intervention, (2) the Counties meet the reduced showing of commonality of law and facts, and (3) the Counties' motion to intervene is timely. The Counties meet the criteria for permissive intervention. The Counties' intervention will not cause undue delay or prejudice as the Counties are able and willing to abide by the Court's restrictions on existing intervenors.

Alternatively, the Counties request the Court allow it to intervene under Fed. R. Civ. P. 24(b)(2).

## IV.    CONCLUSION

For the foregoing reasons, the Counties respectfully requests that the Court grant the Counties motion and allow their intervention in Phase Two this action (1) as a matter of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure or, in the alternative, (2) permissively pursuant to Rule 24(b).

Respectfully submitted this 1st day of March 2021.

                                    HOLLAND & HART LLP

                                    By: /s/ Alison C. Hunter

                                    *Counsel for Proposed Intervenor-Defendants Elko, Eureka, and Humboldt Counties*

**Certificate of Service**

I HEREBY CERTIFY that on the 1st day of March, 2021, I filed the foregoing electronically through the CM/ECF system, which sent a Notice of Electronic filing to the parties of record.

/s/ Alison C. Hunter
for HOLLAND & HART LLP